**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

       Plaintiff,

   v.

MCC INTERNATIONAL CORP. (DBA
"MINING CAPITAL COIN CORP."),
CPTLCOIN CORP., BITCHAIN
EXCHANGES, LUIZ CARLOS CAPUCI,
JR. (AKA "JUNIOR CAPUTTI"), and
EMERSON SOUSA PIRES,

       Defendants.

_____/



# COMPLAINT

Plaintiff United States Securities and Exchange Commission alleges:

1.    Defendant MCC International Corp. or "MCC" and its founders, defendants Luiz Carlos Capuci, Jr. and Emerson Sousa Pires, offered investors an irresistible opportunity. MCC crowed about its thousands of machines, here and abroad, that actively mined for cryptocurrency, like Bitcoin. It boasted about its team of traders and phalanx of trading robots, who relentlessly found and exploited arbitrage opportunities in the stock, foreign exchange, and crypto markets. It touted how, by planning to mine for gold in Africa and to drill for oil in Canada, it would be diversifying its portfolio while hedging its bets.

2.      All of which made MCC a most impressive company. But what made it an *irresistible* investment opportunity was its *guaranteed* returns: An eye-popping 1% daily "profit sharing" return, paid weekly. So just one week after an investor made her $10,000 investment, MCC would pay her $700. A week later, another $700. And so on. So that by the time her membership expired a year later, her initial $10,000 investment would have ballooned to $36,400 – a guaranteed annual return of 364%.

3.      Better still, MCC allowed an investor to easily tap into her returns. Each week she could make a request to liquidate her $700 weekly returns. So after 15 weeks, she could recoup her $10,000 initial investment (and then some). And then she *still* could look forward to 37 *more* guaranteed installments of $700 coming her way, which she could easily liquidate to use as she saw fit. All thanks to MCC's profitable mining and trading operations.

4.      But wait – there was more. Rather than take her profit-sharing returns in Bitcoin, MCC offered her a once-in-a-lifetime opportunity to get in on the ground floor of its very own newly minted Capital Coin tokens ("CPTL"). If Bitcoin was any guide – and really, why wouldn't it be? – if she invested her $36,400 in the still nascent CPTL, there was no limit to the wealth she could amass once the currency caught on.

5.      Tens of thousands of investors in the United States and abroad lined up to invest in MCC. Defendants took in at the very least $8 million in investor proceeds, although their true haul was likely much, much more.

6.      As it turned out, an investor could check out of MCC anytime she liked, but her money could never leave. Once she entrusted her hard-earned savings to MCC, defendants put up roadblock after roadblock to prevent her from cashing out. Worse, they shook her down for ***still more money*** – in the form of new transaction fees and renewals – if she ever hoped to see her money again.

7.      MCC was a Potemkin village for the digital age. There was no mining for cryptocurrency. No trading robots. No trading. MCC might have created its own crypto asset, but it had no real value. MCC had one, and only one, source of revenues: Its unsuspecting investors.

8.      The United States Securities and Exchange Commission ("SEC") brings this lawsuit to put an immediate stop to the defendants' ongoing misconduct; to marshal and safeguard assets; to prevent further harm to investors; and to hold defendants accountable for their deception and lies.

### JURISDICTION AND VENUE

9.      The SEC brings this action pursuant to Section 20(b) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §77t(b)] and Sections 21(d) and 21(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C.

§§78u(d) and 78u(e)].

10.     This Court has jurisdiction over this action pursuant to Section 22

of the Securities Act [15 U.S.C. § 77v], Section 27 of the Exchange Act [15

U.S.C. § 78aa], and 28 U.S.C. § 1331.

11.     Venue is proper in this Court pursuant to Section 27 of the

Exchange Act [15 U.S.C. § 78aa]. Acts, practices and courses of business

constituting violations alleged herein have occurred within the jurisdiction of

the United States District Court for the Southern District of Florida and

elsewhere.

12.     Defendants directly and indirectly made use of the means and

instrumentalities of interstate commerce and of the mails in connection with the

acts, practices, and courses of business alleged herein, and will continue to do

so unless enjoined.

## DEFENDANTS

13.     **Defendant MCC International Corp**. (dba "Mining Capital Coin

Corp.") ("MCC"), established in 2018, is a Massachusetts corporation

organized to conduct "general virtual services." In 2018 and 2019, MCC

maintained an office in Port St. Lucie, Florida. It continues to operate through

its President, defendant Luiz Carlos Capuci, Jr. MCC is not registered with the

Commission in any capacity, nor has it ever registered or tried to register any

offering of securities under the Securities Act or any class of securities under the

4

Exchange Act.

14.     **Defendant CPTLCoin Corp.** ("CPTLCoin"), established in 2020, is a Massachusetts corporation organized to conduct "training and consulting on CPTL, management, business administrations." Its principal place of business is in Worcester, Massachusetts. CPTLCoin is not registered with the Commission in any capacity. CPTLCoin has never registered or tried to register any offering of securities under the Securities Act or any class of securities under the Exchange Act.

15.     **Defendant Bitchain Exchanges** ("Bitchain"), an unincorporated organization or association, operated the website bitchainexchanges.com. It once listed an office address in Palo Alto, California. Bitchain purports to be a crypto asset trading platform that trades CPTL, a crypto asset created by MCC, and defendant Luiz Carlos Capuci, Jr. Capuci registered Bitchain's website. About a month later, the website's registrant was changed to "Shawn Lee," purportedly Bitchain's Chief Technology Officer. Bitchain is not registered and has never tried to register with the Commission in any capacity. Bitchain has never registered or tried to register any offering of securities under the Securities Act or any class of securities under the Exchange Act.

16.     **Defendant Luiz Carlos Capuci, Jr.** (aka "Junior Caputti") ("Capuci"), age 45, on information and belief recently relocated to Brazil. Capuci was living in Port St. Lucie, Florida when the SEC first served him with

investigatory subpoenas. He is a citizen of Brazil and the United States. Capuci
is MCC's founder, president, director, and registered agent. He is also
CPTLCoin's CEO, president, vice-president, director, treasurer, secretary, and
registered agent. Capuci is not registered with the Commission or associated
with a registrant in any capacity.

17.     **Defendant Emerson Sousa Pires** ("Pires"), age 32, formerly of
Fort Myers, Florida, is MCC's co-founder, former vice-president, secretary,
treasurer, and director. Upon information and belief, he left MCC around
November 2020 and now resides in Brazil, where he is a citizen. Pires is not
registered with the Commission or associated with a registrant in any capacity.

**FACTS**

**MCC AND ITS MINING PACKAGES**

18.     In 2017, Capuci and Pires founded MCC. Capuci and Pires told
potential investors that MCC made money through "cryptocurrency mining";
trading stocks and foreign exchange ("forex"); and "trading cryptocurrency" on
digital asset trading platforms. They claimed MCC worked with the "world's
leading exchanges" to trade cryptocurrencies through "arbitrage trading
generating 1% to 1.5% per day." Capuci and Pires told potential investors that
MCC had traders who conducted "forex trading generat[ing] 0.6% to 1% per
day," and that MCC operated in the forex market with "semi-automatic robotic
trading."

19.     Capuci and Pires described for potential investors MCC's robust mining operations in Miami, Vermont, and Iceland. MCC's investor marketing materials touted its 45,198 active machines that mined Bitcoin.

20.     In publicly available Facebook videos, Capuci, and Pires purported to showcase MCC's mining machines. One such video shows equipment, which Capuci describes as "almost 400 machines" in MCC's Florida offices that are "mining" and "making money for you guys!" He explains that MCC has seven such offices filled with "mining [machines] like this." These machines, Capuci insists in the video, prove that MCC is a "real company" with "real machines," not some "Ponzi scheme."

21.     In another Facebook video, a camera pans rows of "mining machines" as Pires tells investors: "You can see here, we're mining right now, all the time for you, MCC working with the investments, working with the money, working with your money, making your money work for you."

22.     Capuci and Pires told investors and potential investors that MCC used investor funds not only to buy and maintain those mining operations, but also to mine for gold in Africa and to drill for oil in Canada.

23.     One MCC slideshow illustrated to prospective investors and investors how MCC made money for its investors through its mining operations:



24.     Another MCC slideshow illustrated to prospective investors and

investors how MCC made money through arbitrage trading:



25.     And in another detailed slide, MCC calculated for prospective

investors and investors how MCC made money for its investors through forex

trading:



26.     Defendants explained to investors that they could tap into these profits by buying MCC's "mining packages." While prices varied over time, the packages typically ranged from about $125 (for the "bronze package") to $1.2 million (for the "MVP Royal package"). In return, MCC guaranteed 52 weekly payouts to its members ranging from $10 a week (for "bronze") to $84,000 a week (for "MVP Royal"). In its marketing materials, MCC characterized such payouts as "Sharing Profit."

27.     MCC, Capuci, and Pires relied on a multilevel marketing structure to solicit new investors. MCC encouraged existing investors to serve as "sponsors" who recruited new investors. These sponsors were not MCC employees. Rather, MCC would pay such sponsors commissions amounting to 10% of sales of mining packages made by the sponsor or her downline team.

28.     As another sweetener, MCC promised extravagant gifts –

including iPads, Apple Watches, a Mercedes C-180, a Range Rover Evoque, a

Porsche Cayenne, and a Lamborghini Aventador – to those sponsors who

proved adept at recruiting new investors.

29.     Capuci and Pires supplemented this multilevel marketing

compensation structure with an aggressive marketing campaign. This campaign

included in-person solicitations in Las Vegas, Florida and elsewhere in the

United States and around the world; live web-based presentations; web-based

prerecorded videos, like those described above; publicly available YouTube

videos, marketing on social media platforms; and slide shows and other written

marketing materials.

30.     To invest in MCC, investors would pay a $50 "initiation fee" and

select from a menu of "mining packages":

  

31.     In its early days, MCC assured its members that they could easily

liquidate their MCC investment by following a straightforward roadmap:

(a) open an account with a third-party crypto asset trading platform; (b) submit

a withdrawal request on the MCC "back office," which is the website where

MCC investors can manage their investment accounts; (c) transfer Bitcoin from their wallets on the MCC back office to their wallets on the third-party crypto asset trading platform; and (d) sell the Bitcoin for cash, or hold it as an investment.

## THE CPTL TOKEN, BITCHAIN EXCHANGES, AND CPTLCOIN

32.     Later, MCC made the redemption process more complicated by requiring investors to withdraw their investment in "CPTL" – the newly-minted, MCC-created crypto asset. This required the MCC investor to create an account on the "Bitchain" website, which in turn required a fee. Capuci explained that Bitchain was an independent crypto asset trading platform – unaffiliated with MCC – that "listed" and therefore accepted CPTL.

33.     To imbue Bitchain with legitimacy, Capuci created a website, "CPTLCoin." The website stated that CPTL is listed with Bitchain. It published CPTL's market value as $2.43 – the same value listed on Bitchain's website.

34.     CPTLCoin also issued a "CPTL whitepaper," which informed investors and prospective investors that "[o]ver time, CPTL expects its native token to increase in price and market capitalization. This will reward early token holders and platform adopters, as well as encourage more users to join."

35.     MCC, Capuci, and Pires directed investors seeking to liquidate their investment to transfer assets from their MCC back office wallets to their Bitchain wallets. From there, the investment proceeds would be converted to CPTL. MCC saddled investors seeking to redeem their investment with *another* transaction fee – this time $100 – which it characterized as a "know-your-customer" fee.

36.     MCC never provided its investors with any notice before imposing these added restrictions and fees.

37.     Defendants made many representations to MCC investors about the new CPTL:

- There would be a limited supply;

- MCC had applied to list CPTL on an established crypto asset exchange platform;

- That exchange would list CPTL on its platform no later than July 1, 2021;

- MCC had completed construction of a e-commerce mall that would accept CPTL in exchange for goods;

- MCC had made arrangements with major hotels and casinos to accept CPTL for payment; and

- The MCC Pay application – which, investors were told, was like "Apple Pay," only with CPTL – was already up-and-running in Asia, and was pending authorization in the United States.

38.     Pires made similar representations to MCC investors about CPTL. In an audio recording shared with MCC investors, Pires explained that

CPTL would "eventually become decentralized because it will become a payment platform, just like the fiat currency we have today." Pires told MCC investors that CPTL was now "in the market," and that "we're having casinos that are going to be using the coin, we have [a] mall that's going to be using CPTL," and "we have MCC Pay that's going to be using CPTL."

## MCC'S INVESTORS ARE UNABLE TO LIQUIDATE THEIR MCC INVESTMENTS

39.     When MCC members tried to sell CPTL on Bitchain before their one-year membership expired, they immediately encountered a litany of errors that stymied their efforts to liquidate their MCC investments. MCC investors thus faced an unfortunate choice: *Either* double-down on their initial MCC investment by buying another mining package *or* walk away from their MCC investment, along with any hope of recovery.

40.     Capuci blamed Bitchain for these problems. Such blame can charitably be described as disingenuous, since as it turns out, Capuci *was* Bitchain. Domain registration records reflect that Capuci paid to register Bitchain's website and then paid Domains by Proxy LLC to make his domain registration of Bitchain private.

41.     Capuci also managed Bitchain's information technology personnel. In a handwritten organizational chart that Capuci created but never shared with MCC's investors, Capuci (who refers to himself as "Junior" and

13

"JR") identifies himself as Bitchain's CEO.

42.     But MCC investors were not informed of defendants' ownership of Bitchain. On the contrary, Capuci insisted to investors that he was working *with* Bitchain to resolve *its* problems. He also tried to "help" the investors in webinars by explaining how they could transfer funds from an MCC wallet to a Bitchain wallet. And in WhatsApp chats and videos he offered updates on his supposedly ongoing dialogue with Bitchain.

43.     Capuci made short self-filmed videos that he circulated to investors via WhatsApp. In one such video, he assures viewers that MCC and Bitchain are not the same company and do not have the same owners: "MCC is a group which together has MCC, [a mall], and own about 30%-40% CPTL. Bitchain is a separate company, founded by a Brazilian guy," and later sold to a Chinese group. He further states: "I don't own Bitchain. When I give some announcements about Bitchain, or videos or audios, it's because I get information and I want to send information to you guys. I want to clarify for you guys – Bitchain for last 20 days was a little bit slow with transfer and withdrawals; the reason was they were creating [application programming interfaces]."

44.     When defendants weren't making excuses for Bitchain or blaming it, they were blaming the pandemic for the delays. Bitchain joined in, publishing a "Bitchain COVID 19 Notice" on its website that attributed delays

to the virus.

45.     Meanwhile, defendants encouraged MCC's investors to view the glass as half-full: True, they couldn't negotiate, exchange, or do anything else with the CPTL they were stuck with. But at least they would be the beneficiaries of the inevitably precipitous spike in the value of the crypto asset, which was all but assured. Capuci predicted to investors that CPTL's market value would increase ten-fold in a single year. Both Capuci and Pires also counseled patience, reminding investors that it took several years before Bitcoin's value soared.

46.     To advance this charade, defendants disguised Bitchain as a legitimate crypto asset trading platform. The Bitchain website prominently showcased a banner with real-time prices of crypto assets such as Bitcoin, Ethereum, Litecoin, Tether, Augur, Tron, Cardano, EOS, TenX, and of course, CPTL. In 2021, both Bitchain and the CPTLCoin website listed the value of CPTL as $2.43 – seemingly in line with defendants' assurances of the currency's inevitable ascendance and the exact quote found on Capuci's website for CPTLCoin.

47.     Bitchain's and CPTLCoin's representation about CPTL's market value of $2.43 was good news to MCC investors who believed they had gotten in on the ground floor – at the low "promotional" price of $0.10.

## THE TRUTH

48.     *The Truth About Capuci's Background.* MCC, Capuci, and Pires plied MCC investors and prospective investors with lies about defendants' backgrounds. During one live appearance, Capuci told prospective investors that he had worked for the FBI for almost eight years. That was a lie. He never worked for the FBI.

49.     *The Truth About MCC's "Partnerships."* Capuci told prospective investors that MCC was a "partner" of the Clinton Foundation. Along the same lines, MCC boasted that it had partnered with "The World Bank to secure an investment in ECO friendly power generators." There were no such partnerships.

50.     *The Truth About MCC's Mining.* When questioned about MCC's use of mining machines during testimonies taken by the SEC in 2021 and 2022, Capuci and Pires both invoked their Fifth Amendment privilege against self-incrimination. In earlier SEC testimony in 2020, they had testified that MCC had some mining machines in the United States but "never used them" because one mining machine alone "uses more electricity than the whole building." On information and belief, MCC has no assets or presence in either Vermont or in Iceland.

51.     *The Truth About MCC's Trading.* MCC has admitted to the SEC that it never had trading robots and never engaged in any trading. When the

SEC questioned Capuci and Pires about MCC's trading platform, they invoked their Fifth Amendment rights against self-incrimination.

52.     ***The Truth About Investor "Profits" & The Value of CPTL.*** The portal or "back office" MCC established to interface with investors reflected the accrual of the supposed 1% daily profits in each investor account. This provided comfort to investors that MCC was consistently earning them reliable, significant profits.

53.     Bitchain assured investors that the CPTL accumulating in their accounts ranged in value from thousands of dollars to hundreds of thousands of dollars. The ugly truth was that any one of these account statements grossly exceeded the ***cumulative value of all CPTL***. On a day when the CPTLCoin website listed the value of CPTL as $2.43, its actual closing value was $.000605. On a day when Bitchain listed CPTL's value as $2.43, its actual closing value was $.00032. The profits posted on MCC's "back office" and the value of CPTL were figments of defendants' active imaginations.

54.     So too were defendants' statements about CPTL. Defendants had never applied for CPTL to trade on a legitimate crypto asset trading platform. There was no casino, hotel, or mall with stores that accepted CPTL. There was no Apple Pay-like app that used CPTL. In short, no investor – or anyone, for that matter – has ever successfully withdrawn, sold, traded or otherwise used their CPTL.

## DEFENDANTS HAVE PROFITED HANDSOMLY
## FROM THEIR SCHEME AT THE INVESTORS' EXPENSE

55.     While MCC members have been unable to withdraw their investment proceeds, defendants' scheme has proven wildly successful – but only for defendants. Their scheme attracted tens of thousands of investors, over a thousand of whom live in the United States, including within the Southern District of Florida. MCC and Capuci maintained an investor list showing 65,535 investor accounts. Conservatively, defendants netted at least $8.1 million from the sale of mining packages and $3.2 million in initiation fees. More likely, they made far more than that.

56.     Defendants have misappropriated much of these proceeds. Capuci and Pires have paid themselves generous salaries, ranging from $5,000 to $20,000 a month in Bitcoin each. Further, at a time when MCC was Capuci's only source of income, he spent millions to fund a lavish lifestyle. He bought two Ferraris, a Lamborghini, a Mercedes, a yacht, and real estate, among other extravagant purchases.

57.     Pires, for his part, has spent about $10.9 million during the relevant period, some of which he used to buy real estate, a Mercedes, a Harley Davidson, a Land Rover, and a Lamborghini.

## COUNT I

### Violations of Sections 5(a) and (c) of the Securities Act
### (Against Defendants MCC, Capuci, and Pires)

58.     Paragraphs 1 through 57 are realleged and incorporated by

reference.

59.     At all times alleged in this Complaint, no registration statement

was filed or in effect with the Commission pursuant to the Securities Act with

respect to the securities and transactions issued by MCC described in this

Complaint, and no exemption from registration existed with respect to these

securities and transactions.

60.     Since at least 2018, defendants MCC, Capuci, and Pires, directly

and indirectly:

(a)     made use of any means or instruments of transportation or
        communication in interstate commerce or of the mails to
        sell securities, through the use or medium of a prospectus
        or otherwise;

(b)     carried or caused to be carried securities through the mails
        or in interstate commerce, by any means or instruments of
        transportation, for the purpose of sale or delivery after sale;
        or

(c)     made use of any means or instruments of transportation or
        communication in interstate commerce or of the mails to
        offer to sell or offer to buy through the use or medium of
        any prospectus or otherwise any security,

without a registration statement having been filed or being in effect with the

Commission as to such securities.

61.    By reason of the foregoing, defendants MCC, Capuci, and Pires

violated and, unless enjoined, are reasonably likely to continue to violate

Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

## COUNT II

### Violations of Section 17(a) of the Securities Act
### (Against All Defendants)

62.    Paragraphs 1 through 57 are realleged and incorporated by

reference as though fully set forth herein.

63.    By engaging in the conduct described above, defendants, in the

offer and sale of securities, by the use of the means and instruments of

transportation or communication in interstate commerce or by use of the mails,

directly or indirectly, have (a) employed devices, schemes and artifices to

defraud; (b) obtained money and property by means of untrue statements of

material fact and by omitting to state material facts necessary to make the

statements made, in light of the circumstances under which they were made,

not misleading; and (c) engaged in transactions, practices, and courses of

business which operated or would operate as a fraud or deceit upon the

purchasers of such securities.

64.    Specifically, all defendants violated Sections 17(a)(1) and 17(a)(3)

of the Securities Act. Defendants MCC, Capuci, and Pires further violated

Section 17(a)(2) of the Securities Act.

65.     Defendants acted knowingly, or with extreme recklessness, in engaging in the fraudulent conduct described above.

66.     Defendants also acted negligently in engaging in the conduct described above.

67.     By engaging in the conduct described above, defendants violated Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), 77q(a)(2), and 77q(a)(3)] in the manner set forth above.

## COUNT III

### Violations of Section 10(b) of the Exchange Act, and Exchange Act Rule 10b-5 (Against All Defendants)

68.     Paragraphs 1 through 57 are realleged and incorporated by reference.

69.     As more fully described in paragraphs 1 through 57 above, defendants, in connection with the purchase and sale of securities, by the use of the means and instrumentalities of interstate commerce and by the use of the mails, directly and indirectly: used and employed devices, schemes and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in acts, practices and courses of business which operated or would have operated

as a fraud and deceit upon purchasers and sellers and prospective purchasers and sellers of securities.

70.     Specifically, all defendants violated Rule 10b-5(a) and (c) of the Exchange Act. Defendants MCC, Capuci, and Pires further violated Rule 10b-5(b) of the Exchange Act.

71.     Defendants knew, or were reckless in not knowing, of the facts and circumstances described in paragraphs 1 through 70 above.

72.     By reason of the foregoing, defendants violated Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5] in the manner set forth above.

## COUNT IV

### Control Person Liability
### (Against Defendants Capuci and Pires)

73.     Paragraphs 1 through 57 are realleged and incorporated by reference.

74.     At all relevant times, Capuci and Pires have been, directly or indirectly, control persons of MCC for purposes of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

75.     MCC violated Section 10(b) and Rule 10b-5 of the Exchange Act. As control persons of MCC, Capuci and Pires are jointly and severally liable with and to the same extent as MCC for violations of Section 10(b) and Rule

10b-5 of the Exchange Act.

## RELIEF REQUESTED

**WHEREFORE,** the Commission respectfully requests that this Court:

### I.

Issue permanent injunctions restraining and enjoining defendants from violating Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), (c), and 77q(a)]; and Section 10(b) of the Exchange Act [15 U.S.C. § 78j] and Rule 10b-5 [17 CFR § 240.10b-5] thereunder, and from soliciting any new investors; accepting additional funds from existing investors; or issuing, purchasing, offering, or selling any security.

### II.

Order defendants to disgorge the ill-gotten gains received because of the violations alleged herein, including prejudgment interest, pursuant to Section 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(5), and 78u(d)(7)].

### III.

Order defendants to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

**IV.**

Permanently bar defendants Capuci and Pires from serving as an officer or director of any company that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)], pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.S. § 78u(d)(2)].

**V.**

Grant such other relief as this Court deems appropriate.

**JURY DEMAND**

The Commission hereby requests a trial by jury.

**UNITED STATES SECURITIES
AND EXCHANGE COMMISSION**

By: Jonathan S. Polish
One of Its Attorneys

Jonathan S. Polish
Senior Trial Counsel
S.D. Fla. No. A5502869
Direct Dial: (312) 353-6884
Email: PolishJ@SEC.gov

Christine B. Jeon
S.D. Fla. No. A5502884
Senior Counsel
Direct Dial: (312) 353-7419
Email: JeonC@SEC.gov

Devlin Su
Senior Counsel
S.D. Fla. No. A5502883
Direct Dial: (312) 596-6012
Email: SuDe@SEC.gov

Attorneys for Plaintiff
**UNITED STATES SECURITIES
  AND EXCHANGE COMMISSION**
175 W. Jackson Blvd., Suite 1450
Chicago, Illinois 60604
Tel: (312) 353-7390

Date: April 7, 2022