UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. ZZCV14129KMM/RMM

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

        Plaintiff,

    v.

MCC INTERNATIONAL CORP. (DBA
"MINING CAPITAL COIN CORP.,"),
CPTLCOIN CORP., BITCHAIN
EXCHANGES, LUIZ CARLOS CAPUCI,
JR. (AKA "JUNIOR CAPUTTI"), and
EMERSON SOUSA PIRES,

        Defendants.

_____/



FILED BY _____ D.C.

APR 07 2022

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. – W.P.B.

CASE FILED UNDER SEAL

**DECLARATION OF LARRY BRANNON IN SUPPORT OF PLAINTIFF'S
*EX PARTE* EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER
AND EMERGENCY ANCILLARY RELIEF**

I, Larry Brannon, declare under penalty of perjury, in accordance with 28 U.S.C. § 1746, as

follows:

1. This declaration is submitted in support of Plaintiff United States Securities and Exchange

   Commission's ("SEC" or "Commission") *Ex Parte* Emergency Motion for a Temporary

   Restraining Order and Emergency Ancillary Relief.

2. I am employed as an Accountant in the Division of Enforcement by the SEC's Chicago

   Regional Office, located at 175 West Jackson Boulevard, Suite 1450, Chicago, Illinois

   60604. I have been employed by the Commission since August 2021. Prior to my

   employment with the SEC, I was employed as an auditor, accountant and business consultant

in the private sector for more than 21 years and as a forensic auditor with another federal government agency for 2 years.

3.  I received a Bachelor of Arts in Communication Arts and Science from DePauw University and a Master of Science in Accountancy from DePaul University. I am a licensed Certified Public Accountant in good standing in the state of Illinois.

4.  My duties with the Commission include participating in fact-finding inquiries and investigations to determine whether the federal securities laws have been, are presently, or are about to be violated, and assisting in the Commission's litigation of securities laws violations. As part of my job, I routinely obtain and analyze bank records, brokerage records, and other financial records typically maintained at financial institutions. I also review documents gathered in the course of an investigation, including but not limited to internal company financial records, communications, agreements, marketing materials, tax records, and documents regarding the structure of a company.

## Materials Reviewed

5.  I have participated in the Commission's investigation captioned *In the Matter of Mining Capital Coin*, C-08791 (the "Investigation"), including participating in interviews, testimonies, and reviewing documents. In connection with the Investigation, I have reviewed:

   a.  Bank records of Luiz C. Capuci, Jr. ("**Capuci**"), his spouse (Stephanie Cassia Capuci, fka "Stephanie Cassia Lira") (hereinafter "Stephanie Lira"), Emerson Sousa Pires ("**Pires**"), and bank records of certain related entities described in paragraph 13 below, which records included but were not limited to: account opening documents, bank signatory forms, canceled checks, monthly statements, deposits, debit and credit memoranda, and wire transfers;

   b.  Corporate filings, including Articles of Incorporation, Certificates of Organization, and Annual Reports, all of which are available on the websites of the Florida and Massachusetts Secretaries of State, of the following entities: MCC International Corp. (dba "Mining Capital Coin Corp.") ("**MCC**"); CPTLCoin Corp. ("**CPTL**"); and other corporations affiliated with **Capuci** and **Pires**, including the related entities described in paragraph 13 below;

c. Documents produced to the Commission by **MCC**, **Capuci**, **Pires**, **CPTLCoin**, witnesses, investors, financial institutions, internet domain providers, real estate title agencies, and car companies, including but not limited to, MCC marketing materials, videos and audio recordings of **Capuci** and **Pires**, **Pires's** tax records and schedules, WhatsApp communications, leases, investor information, and financial records;

d. Other documents obtained by the SEC staff in the course of the Investigation including the websites of **MCC**, **CPTLCoin**, and Bitchain Exchanges ("**Bitchain**"), social media postings and videos, and YouTube videos; and

e. Testimony transcripts and exhibits.

**Defendants and Roles**

6. Based upon my participation in this Investigation, I am familiar with **MCC, CPTLCoin, Bitchain, Capuci,** and **Pires**. I have reviewed Massachusetts Secretary of State records (attached as **Group Exhibit 1),** reflecting that:

   a. **MCC** was organized in Massachusetts on or about 10/4/2018, principal office location is 346 Turnpike Rd., Westborough, MA 01581.

   b. **Capuci** is the Registered Agent, President, and Director of **MCC**, and listed address is 346 Turnpike Rd., Westborough, MA 01581.

   c. **Pires** is the Vice-President, Secretary, Treasurer, and Marketing Director of **MCC**, and listed address is 346 Turnpike Rd., Westborough, MA 01581.

   d. **CPTLCoin**, date of organization in Massachusetts is 3/10/2020, principal office location is 100 Main Street, Worcester, MA 01608.

   e. **Capuci** is the Registered Agent, CEO, President, Vice-President, Director, Treasurer, and Secretary of CPTLCoin, and listed address is 100 Main Street, Worcester, MA 01608.

7. I have also reviewed the websites of **MCC** (myminingcapitalcoin.com), **CPTLCoin** (cptlcoin.com**)**, and **Bitchain** (bitchainexchanges.com), and records produced by "Domains by Proxy LLC" ("Domains By Proxy") in response to SEC subpoenas issued in this Investigation. A copy of the Domains By Proxy records are attached as **Exhibit 2**, including:

   a. Bates Nos. DBP 000006-000007, reflecting that **Capuci** created the CPTLCoin.com website on January 15, 2019, and that **Capuci's** registered address was 11285 SW Vanderbilt Circle, Port Saint Lucie, Florida;

    b. Bates Nos. DBP 000016-000017, reflecting that **Capuci** created the Bitchainexchanges.com website on April 4, 2019, and that **Capuci's** registered address was 11285 SW Vanderbilt Circle, Port Saint Lucie, Florida; and

    c. Bates No. DBP00018, reflecting that "Shawn Lee" became the contact for Bitchainexchanges.com on May 4, 2019 and that his email address was mccasia2019@gmail.com, which I believe indicates that "Shawn Lee" was affiliated with **MCC**.

    d. Based upon my review of a web preservation of Bitchain Exchanges website captured on March 31, 2021, "Shawn Lee" is listed as the Chief Technology Officer of **Bitchain**. (See **Exhibit 2(a)**, p. 4.)

8. I have also reviewed a December 3, 2021 email and its attachment sent from the attorney of **Capuci, MCC,** and Enoque Pires,[1] Chris Wellman ("Mr. Wellman"), which is attached as **Exhibit 3**. In the email, Mr. Wellman wrote: "This is the organizational chart that Enoque produced to me. This was prepared by Junior." Based on my participation in this Investigation and videos I have watched of **Capuci**, it is my understanding that **Capuci** goes by the nickname of "Junior." The attached organizational chart reflects that "JR" is the "CEO" of "**MCC**" and "**Bitchain**." Furthermore, based upon my participation in this Investigation, it is my understanding that **Capuci** managed the information technology personnel of **Bitchain**.

9. I have reviewed evidence gathered in this Investigation reflecting content from the **MCC** "back office," which is available online to investors who have a login and password, as well as account balances available to MCC investors on the **Bitchain** website. Furthermore, I have reviewed a March 2021 web preservation of **Bitchain's** website, attached as **Exhibit 4**, providing contact information of 3503 El Camino Real, Palo Alto, California. (*See* Ex. 4, p.

---

[1] Based on investigative testimony given by Enoque Pires on or about October 26, 2021, it is my understanding that Enoque Pires is **Emerson Pires's** brother and the former IT manager of **MCC**.

5.) However, based on my research, Bitchain is not registered with the California Secretary of State to do business.

10. From my participation in this Investigation, it is my understanding that **MCC**, **CPTL**, and **Bitchain** are not registered with the Commission in any capacity, nor have they ever registered or tried to register any offering of securities with the Commission under the Securities Act or any class of securities under the Exchange Act. Furthermore, it is my understanding that **Capuci** and **Pires** are not registered with the Commission or associated with a registrant in any capacity.

11. As part of my participation in this Investigation, I have reviewed certain background questionnaires that **Capuci** (age 45) and **Pires** (age 32) provided to the Commission in or about February 2020. (**Group Exhibit 5**.) **Capuci's** questionnaire stated that he is a dual citizen of the United States and Brazil. **Pires's** questionnaire stated that he is a lawful permanent resident of the United States. It is my understanding that **Capuci** left his residence in Florida and moved to Brazil in July 2021, after the SEC issued subpoenas in the Investigation on June 29, 2021. It is also my understanding that **Pires** left his residence in Florida after the SEC issued the June 29, 2021 subpoenas, and is also now in Brazil. Furthermore, it is my understanding that **Pires** left **MCC** around November 2020.[2]

12. I have reviewed an undated audio recording produced by a witness that is Bates-numbered SEC-CROSSM-E-000385. I observed the testimony of the witness who produced this audio recording and who testified that the person speaking in this audio recording is **Capuci**. In it, **Capuci** states, "If they want to help to go to SEC I can help them, I can block their account and then they go to SEC without the proof they have against MCC and myself. Especially the

---

[2] All dates and values in this Declaration are approximate.

proof they . . . go to MCC and sign up without any restriction." Based on this, I believe that

**Capuci** was informing this witness that he was willing to block MCC investors' access to the

**MCC** back office in order to prevent the investor from providing evidence to the SEC in

furtherance of this Investigation.

**Related Entities**

13. In the course of this Investigation, in addition to **MCC**, **CPTLCoin**, and **Bitchain**, I have

reviewed records reflecting the roles of **Capuci**, **Capuci**'s spouse (Stephanie Lira), and **Pires**

with the following companies. (A copy of the supporting Secretary of State filings are

attached as **Group Exhibit 6**.)

| # | Company Name | Role & Address Associated With Role | State of Incorporation | Corporate Status & Corporate Registered Address |
|---|---|---|---|---|
| 1 | Hi Tech Commerce and Logistics Corp. ("Hi-Tech") | **Capuci** is the President and Vice-President (Address: 128 SE Via San Marino Port St. Lucie, FL 34984) | Florida Effective: 12/05/2017 | Active<br><br>128 SE Via San Marino Port St. Lucie, FL 34984 |
| 2 | Hi-Tech Commerce and Logistics LLC | **Capuci** is the Manager and Resident Agent (Address: 400 Central Park #413 Holden, MA 01520) | Massachusetts Date of Organization: 12/02/2014 | Involuntary dissolution by Court Order or by the SOC: 06/30/2017<br><br>400 Central Park #413 Holden, MA 01520 |
| 3 | Bittech Global Corp. ("Bittech Global") | Per the Articles of Organization, as of 5/31/2017,[3] **Capuci** is the CEO, President, Treasurer, Secretary, Director and Registered Agent (Address: 346 Turnpike Rd., Unit 1205, Westborough, MA 01581) | Massachusetts Date of Organization: 5/31/2017 | Active<br><br>702 SW Port Saint Lucie Blvd. Port Saint Lucie, FL 34953 |

---

[3] The current Bittech Registered Agent, President, Treasurer, Secretary, Vice President, and Director is Deli Pereira Da Silva, whose listed address is 17 Sewall St., Peabody, FL 01960.

| # | Company Name | Role & Address Associated With Role | State of Incorporation | Corporate Status & Corporate Registered Address |
|---|---|---|---|---|
| 4 | Conde Jackson USA Corp. ("Conde Jackson") | **Capuci** is the President and Vice-President (Address: 128 SE Via San Marino, Port Saint Lucie, FL 34984) | Florida Effective: 8/8/2017 | Inactive 9/24/2021<br><br>128 SE Via San Marino Port Saint Lucie, FL 34983 |
| 5 | SL Trustee Corp. ("SL Trustee")[4] | Stephanie Lira is the President, Treasurer, Secretary, CEO, Vice President, Director, and Registered Agent (Address: 2662 SW Fair Isle Rd., Port Saint Lucie, FL 34987) | Massachusetts Date of Organization: 10/18/2019 | Active<br><br>600 Main Street 345, Worcester, MA 01608 |
| 6 | JSK Virtual Corp. ("JSK") | **Capuci** is the President, Treasurer, Director, and Registered Agent.  (Address: 128 SE Via San Marino, Oport [sic] Saint Lucie, FL 34983)<br><br>Stephanie Lira is the Vice-President, Secretary and Assistant Secretary (Address: 128 SE Via San Marino, Oport [sic] Saint Lucie, FL 34983) | Massachusetts Date of Organization: 3/4/2021 | Active<br><br>346 Turnpike Rd., Unit 1205 Westborough, MA 01581 |
| 7 | JS Homes Corp. ("JS Homes") | **Capuci** is the President, Treasurer, Director, and Registered Agent (Address: 128 SE Via San Marino, Port Saint Lucie, FL 34984)<br><br>Stephanie Lira is the CEO, Vice-President, Director, Secretary, and Registered Agent (Address: 128 SE Via San Marino, Port Saint Lucie, FL 34984) | Massachusetts Date of Organization: 10/22/2020 | Active<br><br>600 Main Street Worcester, MA 01608 |

---

[4] SL Trustee Corp. is also registered in Florida effective 8/21/2020, principal address 1841 NW 42nd Dr., Boca Raton, FL 33431, and the registered agent is "Adria Guido."

| # | Company Name | Role & Address Associated With Role | State of Incorporation | Corporate Status & Corporate Registered Address |
|---|---|---|---|---|
| 8 | JP Home Development LLC ("JP Home") | **Capuci** is the Manager and "SOC Signatory" (Address: 128 SE Via San Marino, Port Saint Lucie, FL 34984)[5] | Massachusetts Date of Organization: 4/22/2021 | Active<br><br>346 Turnpike Rd. Westborough, MA 01581 |
| 9 | United General Construction LLC ("United General Construction") | **Capuci** is the Manager and Registered Agent (Address: 413 Central Park, #413, Holden, MA 01520) | Massachusetts Date of Organization: 5/13/2014 | Inactive<br>Date of involuntary dissolution by court or by the SOC: 6/30/2018<br><br>413 Central Park Holden, MA 01520 |
| 10 | LEJ Global Trade and Exchange LLC ("LEJ Global") | Per the Articles of Incorporation, as of 5/18/2020, **Capuci** was the President and Vice-President (Address: 11285 SW Vanderbilt Circle, Port Saint Lucie, FL 34987)[6] | Florida Effective: 5/15/2020 | Active<br><br>1331 NW 197th St Miami, FL 33169 |
| 11 | JK Gas Station Services Corp. ("JK Gas Station") | **Pires** is the Director, Treasurer, and Secretary (Address: 11285 SW Vanderbilt Cir., Port Saint Lucie, FL 34987)[7] | Massachusetts Date of Organization: 6/1/2018 | Involuntary dissolution by Court Order or by the SOC: 12/31/2021<br><br>345 Turnpike Rd., Unit 1205 Westborough, MA 01581 |
| 12 | Trade Topside Business Limited ("Trade Topside") | **Capuci** is the Director, Secretary, and sole Shareholder | England Company number 13321922<br><br>7/29/2021 | 7 Charles Street London, England W1J 5DQ |

[5] Paulo Da Silva is listed as JP Home's Registered Agent and Manager with an address of 158 NE Jettie Terrace, Port Saint Lucie, FL 34983.

[6] LEJ Global's current Registered Agent is Alexander Socia, and its CEO is Nikelson L. Felix, whose listed address is 1331 NW 197th St., Miami, FL 33169.

[7] Marcue Tulio de Pinho is listed as JK Gas Station's Registered Agent and President with an address of 11285 SW Vanderbilt Circle, Port Saint Lucie, FL 34987.

| # | Company Name | Role & Address Associated With Role | State of Incorporation | Corporate Status & Corporate Registered Address |
|---|---|---|---|---|
| 13 | E&J Granite Install LLC | **Pires** is the Registered Agent and Manager (Two different addresses: (1) 2821 Java Plum Ave. Sarasota, FL 34232 (Registered Agent address); (2) 832 Champion Ave., Lehigh Acres, FL, 33971) | Florida Effective: 2/19/2012 | Inactive Administrative Dissolution for Annual Report 9/25/2020 <br><br> 2821 Java Plum Ave. Sarasota, FL 34232 |
| 14 | EmpiresX Corp. ("EmpiresX") | **Pires** is the Registered Agent and President (Address: 9700 Casa Linda Court, Fort Meyers, FL 33919) | Florida Effective: 1/30/2020 | Inactive Voluntary Dissolution 9/19/2020 <br><br> Principal Address: 9700 Casa Linda Court, Fort Meyers, FL 33919 <br><br> Mailing address: 200 Carolina Ave., P.O. Box 6129, Fort Meyers Beach, FL 33931 |
| 15 | EmpX Management LLC ("EmpX Management") | **Pires** is the Registered Agent and President (Address: 1855 SE Port Saint Lucie Blvd., Port Saint Lucie, FL 34592) | Florida Filed: 6/9/2021 | Active <br><br> 1855 SE Port Saint Lucie Blvd., Port Saint Lucie, FL 34592 |
| 16 | Empires Consulting Corp. ("Empires Consulting Corp.") | **Pires** is the Registered Agent and President (Address: 9700 Casa Linda Court, Fort Meyers, FL 33919) | Florida Filed: 10/14/2020 | Active <br><br> 9700 Casa Linda Court, Fort Meyers, FL 33919 |
| 17 | EmpireX Management Equity Group LLC | Empires Consulting Corp. is the Registered Agent (Address: 4801 S Sandhill Rd. Las Vegas, NV 89121) | Nevada Formation Date: 8/24/2021 | Active <br><br> 4801 S Sandhill Rd. Las Vegas, NV 89121 |

14. I have reviewed SEC subpoenas dated June 29, 2021 issued to **Capuci** and **Pires**, in which

the SEC requested: "All U.S. tax returns and related schedules filed for the last 5 years (tax

years 2015-2020), filed on behalf of you and any companies you control or are otherwise a

partner or managing member." I have also reviewed SEC subpoenas dated June 29, 2021

issued to **MCC, CPTLCoin,** and Bittech Global, in which the SEC requested: "All U.S. tax

returns and related schedules filed for the last 5 years (tax years 2015-2020), filed on behalf of [these companies]."  No tax records or schedules were produced to the SEC by **MCC, CPTLCoin**, Bittech Global, **Capuci**, or any of the related entities identified above. **Pires** produced two sets of tax records with different figures and sources of income, which I describe in paragraphs 68 to 72 below.

15. Based upon this lack of information, it is difficult to determine whether **MCC, CPTLCoin**, Bittech Global, and any of the related entities identified above have any legitimate business operations and expenses. However, as described in paragraphs 88 to 92 below, **Capuci** and **Pires** created financial accounts in the names of certain of the related entities, including bank accounts that received MCC investor funds.

16. I have reviewed a document Bates-numbered MCC CAPUCI 000638, attached as **Exhibit 7**, which appears to be a filing that appoints **Capuci** as a director of "Trade Topside Business Limited," ("Trade Topside") whose service address is in London, England.  I have also reviewed MCC CAPUCI 000633, also attached as **Exhibit 7**, which states that the principal activity of Trade Topside is "Activities of investment trusts."  To my knowledge, no further information about Trade Topside was provided by **Capuci**. Furthermore, as described in paragraph 54 below, **Capuci** and **Pires** have asserted their Fifth Amendment rights against self-incrimination, and invoked the act-of-production doctrine, in response to the SEC's requests for the identification of financial accounts, including foreign bank accounts and digital wallet addresses. Therefore, it is possible that **Capuci** and **Pires** have foreign accounts or access to financial accounts while outside of the United States.

## MCC Florida Office and Marketing Materials

17. I have reviewed a 22-page brochure entitled "Mining Capital Coin: Bussines [sic] Portfolio 2019" (hereinafter "Portfolio"), a copy of which is attached as **Exhibit 8**. Page 3 of the Portfolio states: "MCC was started in November 2017 in the state of Florida."

18. I have also reviewed documents reflecting that "JK Gas Station Services Corp." ("JK Gas Station") leased commercial space located at 1776 SE Port St. Lucie Blvd., Port St. Lucie, FL 34952, from the Morningside Shoppes, LLC. Based upon the information in paragraph 13 above, #11, I observed that **Pires** is the Director, Treasurer, and Secretary of JK Gas Station. The lease term was May 1, 2018 for a period of two years, and annual rent was $12,000 for the first 12 months, and $12,600 for months 13-24 of the lease term. The lease reflects that **Pires** signed the lease as a witness. I reviewed payment records reflecting the last lease payment was made on March 19, 2019. I have also reviewed court records reflecting that the Morningside Shoppes, LLC filed a lawsuit to evict JK Gas Station on or about May 1, 2019, and obtained a judgment against JK Gas Station and **Capuci** in the amount of $25,127.33 plus interest on December 3, 2019. (A copy of the lease, payment records, and summary judgment order are attached as **Group Exhibit 9**.)

19. In addition, I reviewed a City of Port St. Lucie Utility Systems Department receipt reflecting that "Luiz **Capuci**" is the tenant at 1776 SE Port St. Lucie Blvd., Port St. Lucie, FL 34987. **Capuci** paid $175 via credit card for water and sewer services for his account number ending 072324, on May 2, 2018. (A copy of the City of Port St. Lucie Utility Systems Department receipt is attached as **Exhibit 10**.)

20. I have also reviewed a video posted on Facebook in which **Capuci** shows what appears to be the **MCC** Port Saint Lucie office. In the video, **Capuci** shows equipment, which he describes

11

as "almost 400 machines" in the office that are "mining" and "making money for you guys!" He explains that **MCC** has seven such offices filled with "mining [machines] like this." These machines, **Capuci** insists in the video, prove that **MCC** is a "real company" with "real machines," not some "Ponzi scheme." At the end of the video, **Capuci** walks out of the office and points to the **MCC** logo and name visible on the office window from the street view. **Capuci** states, "This is the biggest, huge, street in Port Saint Lucie."

21. In a different Facebook video, **Pires** states, "Hello Mining Capital Coin family. This is Emerson **Pires** and I am your Vice-President. And, today, I am here in Florida . . . . I am here, here, at our office in Florida." In this video, **Pires** enters an office with the **MCC** logo visible from the outside. The logo appears to be the same logo shown in the **Capuci** video referenced above. I observed that in the video, **Pires** shows what he identifies as "mining machines," and states, "You can see here, we're mining right now, all the time for you, MCC working with the investments, working with the money, working with your money, making your money work for you."

22. In addition, I have reviewed the testimony transcripts of at least two investors, who stated that they visited **MCC's** office in Port Saint Lucie, Florida.

**MCC Business and Marketing Materials**

23. Based upon my participation in this Investigation, it is my understanding that **MCC** is a multi-level marketing company that sells investments called "mining packages." It is my understanding that **MCC** encouraged existing investors to serve as "sponsors" who recruited new investors. These sponsors were not **MCC** employees. Rather, **MCC** would pay such sponsors commissions amounting to 10% of sales of mining packages made by the sponsor or her downline team. And, based on **MCC** marketing materials I reviewed, it is my

understanding that **MCC** sponsors were awarded gifts based upon a point system determined by value of investments sold to new investors, including iPads, Apple Watches, a Mercedes C-180, a Range Rover Evoque, a Porsche Cayenne, and a Lamborghini Aventador. (Ex. 11, pp. 27-36; Ex. 12, pp. 21-31.) It is also my understanding based upon my participation in this Investigation that **Capuci** and **Pires** marketed **MCC**'s compensation structure, investments, and business plans through in-person meetings in Las Vegas, Florida and elsewhere in the United States and around the world; live web-based presentations; web-based prerecorded videos, like those described above; publicly available YouTube videos, marketing on social media platforms; and slide shows and other written marketing materials.

24. In addition to the Portfolio (**Exhibit 8**), I have reviewed a 38-page **MCC** brochure, provided by a witness in this Investigation, which is attached as **Exhibit 11.** I have also reviewed a 34-page **MCC** brochure produced by **Pires**, which is Bates-numbered MCC-EMERSON 000013, and is attached as **Exhibit 12**.

25. Page 9 of **Exhibit 11** states: "What We Do?" and is followed by several pages with the following titles: "Cryptocurrency Mining," "Forex Market," and "Exchange of Cryptocurrencies."

      a. Page 10 states: "With the latest generation machines, the company has its crypto mining park located in Iceland."

      b. Page 11 states: "With much more security and without the possible pitfalls of the forex, invest intelligently not only in stocks but also in the future market, of assets and leverage that are a potential tool for gains."

26. I have reviewed a screenshot taken from a YouTube video entitled, "Recorrido en la oficinas de mining capital coin," which represented that **MCC** has mining operations in Florida and Vermont and is at **Exhibit 13.** I have also listened to an audio recording file entitled "VID-20190225-WA0007," that was provided by a **MCC** investor, in which **Pires** states that **MCC**

has mining operations in Miami, Florida.  In the same audio recording, I heard **Pires** state

that **MCC** mines Bitcoin.

27. On pages 16-18 of **Exhibit 8**, the Portfolio states: "How Mining Capital Coin makes a

profit?" and is followed by eight bullet points:

   a. MCC mines at a cost of 2 cents per kwh.  MCC has partnered with The World
      Bank to secure an investment in ECO friendly power generators.  After
      securing a partnership with a Wroclaw, Polish group MCC was able to use
      Turbines to power up the mining facility.

   b. With 45,198 active mining machines . . . .

   c. 112,618 offline machines to be activated online by the end of April . . . .

   d. Arbitrage trading generating 1% to 1.5% per day.  MCC works with the
      world's leading exchanges to trade cryptocurrency daily.

   e. Forex trading generates 0.6% to 1% per day.  MCC operates in the Forex
      market with Semi-Automatic robotic trading.

   f. Trading of CapitalCoin, (MCC's Own Coin).  CapitalCoin is MCC's own coin
      and will be added to exchanges around the world for trade.

   g. Gold Mining in DRC Africa (starting to generate income in July 2019).

   h. Oil Mining in Saskatchewan, Canada (starting December 2019).

28. Pages 19-21 of **Exhibit 8** illustrate calculations regarding how **MCC** makes a profit. For the

"Mining Profit Example," the Portfolio states: "If MCC receives 100,000 investors of $2000

packages, this will generate $392,100,000 profit with mining itself per year."  For the

"Arbitrage Trade Profit Example," the Portfolio states: "If MCC receives 100,000 investors

of $2000 packages, this will generate $120,000,000 profit."  For the "Forex Profit Example,"

the Portfolio states: "If MCC receives 100,000 investors of $2000 packages, this will

generate $72,000,000 profit with Forex trading itself per year."

29. **Exhibits 11** and **12** describe the costs and returns of **MCC** mining packages:

   a. Pages 14-16 of **Exhibit 11** lists the costs of various mining packages and
      shows that there is a $50 start fee. The cost of mining packages are: $125

(bronze), $250 (silver), $500 (gold), $1,000 (premium), $2,000 (platinum), $5,000 (VIP base), $10,000 (VIP classic), $20,000 (VIP premiere), $40,000 (VIP deluxe), $80,000 (VIP supreme), $160,000 (MVP director), $320,000 (MVP executive), $1,200,000 (MVP Royal).

b. Pages 18-20 of **Exhibit 11** are entitled "Sharing Profit," and list the weekly returns for each of the above mining packages and states that there are "daily earnings from 0.6% up to 1% for a period of 52 weeks." The weekly payments listed are as follows: $10 (bronze), $20 (silver), $35 (gold), $70 (premium), $140 (platinum), $350 (VIP base), $700 (VIP classic), $1,400 (VIP premiere), $2,800 (VIP deluxe), $5,600 (VIP supreme), $11,200 (MVP director), $22,400 (MVP executive), $84,000 (MVP Royal). Monthly payments are also listed.

c. Pages 13-14 of **Exhibit 12** contain the same prices of mining packages described above, however, the most expensive mining package listed is $10,000 (VIP classic).

d. Pages 16-17 of **Exhibit 12** are entitled "Sharing Profit," and state that there are "daily earnings from 0.3% up to 1% for a period of 52 weeks." The weekly and monthly payments are the same as the figures in Pages 18-20 of Exhibit H, however, the highest return listed was for the VIP classic package ($700/week and $2,800/month).

30. Based upon my participation in this Investigation, it is my understanding that investors were told that they received 1% daily (or 7% weekly) profits on the cost of their purchased mining package, which was paid once a week. Investors could see their alleged account balances on the **MCC** back office, which they could log onto with a login and password. When the 7% was deposited into investors' account, its description was "Profit Sharing."

31. Page 37 of **Exhibit 11**, and page 32 of **Exhibit 12**, state that "Withdrawals Paid up to 7 Business Days."

32. Based upon my participation in this Investigation, it is my understanding that MCC investors who purchased mining packages in 2018 were told that they would receive their investment proceeds in Bitcoin ("BTC"). It is also my understanding that in order to redeem investment proceeds, MCC investors were told that they only needed to complete the following steps: (i) open an account with a third-party crypto asset trading platform; (ii) submit a withdrawal

15

request on the **MCC** "back office," which is the website where MCC investors can manage their investment accounts; (iii) transfer Bitcoin from their wallets on the **MCC** back office to their wallets on the third-party crypto asset trading platform; and (iv) sell the Bitcoin for cash, or hold it as an investment.

**Bitchain**

33. Based upon my participation in this Investigation, it is my understanding that in late 2019, **MCC** changed its redemption rules such that MCC investors had to receive their investment proceeds in Capital Coin tokens ("CPTL"). Furthermore, based upon my review of a **MCC** tutorial video produced by Enoque Pires (Bates numbered MCC ENOQUE 95), it appears that **MCC** charged investors what it characterized as a $100 know-your-customer ("KYC") fee between March 27 and April 19, 2020, which **MCC** required before investors could receive their proceeds in CPTL. (*See* **Exhibit 14**, pp. 2-3, screenshot from MCC ENOQUE 95.)  Based upon my participation in this Investigation, MCC investors were not aware of the KYC fee before they purchased mining packages, and therefore, did not receive prior notice of the fee.

34. According to **Exhibit 8** (page 18), and as described in paragraph 27(f) above, CPTL was **MCC's** own coin. I reviewed a contract that is Bates No. MCC CAPUCI 000643 (attached as **Exhibit 15**), reflecting that **Capuci** contracted with others to create CPTL on March 26, 2020. In addition, based upon my participation in this Investigation, I am aware that CPTL purported to be traded on **Bitchain**, and that **Capuci** represented that **Bitchain** was independent of **MCC**. In particular, I reviewed a video of **Capuci,** provided by an investor, in which **Capuci** claims that he did not own **Bitchain**, that **MCC** and **Bitchain** are not the same companies, and that **MCC** and **Bitchain** do not have the same owners. In the video

**Capuci** states: "MCC is a group which together has MCC, [a mall], and own about 30%-40% CPTL. Bitchain is a separate company, founded by a Brazilian guy," and later sold to a Chinese group. He further states: "I don't own Bitchain. When I give some announcements about Bitchain, or videos or audios, it's because I get information and I want to send information to you guys. I want to clarify for you guys – Bitchain for last 20 days was a little bit slow with transfer and withdrawals; the reason was they were creating API." In the same video, **Capuci** acknowledges that **Bitchain** was slow and that MCC investors were experiencing delays in getting their withdrawals. Additionally, based upon my observation of witness interviews and testimonies in this Investigation, it is my understanding that **Capuci** explained to MCC investors that they could redeem their investment proceeds in CPTL on **Bitchain** because CPTL was listed on **Bitchain**.

35. Based upon my participation in this Investigation, it is my understanding that in order for MCC investors to redeem their investments in CPTL, they had to create a wallet or an account with **Bitchain**, which required a fee. Then, the MCC investors had to transfer funds from their **MCC** back office wallets to wallets they had to create on **Bitchain**, which **MCC** purported to be a third-party digital asset trading platform. Once the funds were transferred to **Bitchain**, MCC investors could see the value of their accounts in CPTL and its value in U.S. dollars. However, there was no mechanism for MCC investors to sell or trade their CPTL on **Bitchain.** Therefore, MCC investors could not redeem their purported investment proceeds. As time passed, MCC investors' one-year memberships expired. In order to continue having access to their investment proceeds, they had to pay the same price of the mining package they purchased as a renewal fee. Based upon my participation in this Investigation, I am not

aware of any MCC investor who has successfully withdrawn, sold, traded, or used their CPTL.

**CPTLCoin**

36. I have reviewed **CPTLCoin**'s website as it existed on March 29, 2021, a copy of which is attached as **Exhibit 16**. The website depicted a photo of a man, with the name "Luiz Capuci Jr." next to it, and the title "Founder and CEO of CPTL Coin." *See* **Exhibit 16**, p. 2. Above the photo was information stating that the "CPTL Market Value" was $2.43. Based upon my participation in this Investigation, it is my understanding that on March 29, 2021, the actual closing value of CPTL was $0.000605 according to https://www.coincarp.com/currencies/cptlcoin/history/, (attached as **Exhibit 17**, p. 22). "CoinCarp" is a public website that describes itself as providing "real-time, accurate and highly-quality market data services to institutional and retail investors by aggregating and analyzing market data, blockchain data, social information and other data from hundreds of cryptocurrency exchanges around the world." *See* www.coincarp.com/aboutus.html.

37. In addition, the **CPTLCoin** website listed "Some exchanges that already work with CPTL Coin," including **Bitchain**, "Bittech Wallet," and "USAExchange". (**Exhibit 16**, p. 5.) According to my review of Domains By Proxy records, **Capuci** registered Bittechwallet.com on January 15, 2019 (**Exhibit 2**, DBP 000001-2). He also registered USAExchanges.com on February 28, 2019 (**Exhibit 2**, DBP 000011-12.)

38. On August 24, 2021, I reviewed the **Bitchain** website, which also showed that the price of **CPTL** was $2.43. However, based upon information in **Exhibit 17** (page 32), it appears that the actual closing value of **CPTL** on August 25, 2021 was $0.00032.

39. I have also reviewed the CPTLCoin white paper that is Bates numbered MCC CAPUCI 002497-002525, attached as **Exhibit 18**. The white paper states: "Over time, CPTL expects its native token to increase in price and market capitalization. This will reward early token holders and platform adopters, as well as encourage more users to join." (**Exhibit 18**, p. 22.) The CPTLCoin white paper also states: "CPTL Coin has 5,000,000,000 tokens in maximum supply." (*Id.*)

40. I have listened to two audio recordings of **Capuci**, which were publicly available on YouTube at https://www.youtube.com/watch?v=fBvYuSczhW0, entitled "MCC – Mining Capital Coin Meeting Part 1 – YouTube," posted December 7, 2020, and https://www.youtube.com/watch?v=6rTga1D1wGE, entitled "MCC - Mining Capital Coin Meeting Part 2 – YouTube" posted December 8, 2020. (Screenshots and collection reports of these videos are attached as **Exhibit 19**.)  In these videos, **Capuci** represents that there is an application to list CPTL on "Coinbase." In addition, I have watched a self-filmed video of **Capuci** provided by an investor, in which **Capuci** states that CPTL will be listed on "Coinbase" by July 1. I understand this to mean July 1, 2021 based upon my participation in this Investigation. (A screenshot of this self-filmed **Capuci** video is attached as **Exhibit 20**.) In the same self-filmed video, **Capuci** states that the "MGM mall" is complete.  It is my understanding that the "MGM mall" refers to **MCC's** purported e-commerce platform that **Capuci** and **Pires** claimed would accept **CPTL** in exchange for goods.

41. I also reviewed WhatsApp messages produced by investors, including **Exhibit 21**, which provides highlights of a February 13, 2020 webinar with **Capuci**, including:

    a. "MCC Pay App / Payment System - coming soon by the end of February/early March. Similar to Zelle/Cash. App available in the USA. It's currently available in Asia and already connected to approximately 2 million people in Asia. The MCC Pay App is being designed to be usable all over the world.

Currently waiting for authorization for other countries including the USA." (**Exhibit 21**, p. 2.)

    b.  "Arrangements have been made with major Casinos and hotels in Asia to accept CPTL coin." (*Id.*)

42. I have listened to an audio recording, with a file name of "AUD-20200424-WA0011.ogg," which was provided to the SEC by a MCC investor, who had received the recording through WhatsApp. In the audio recording, **Pires** explained that CPTL would "eventually become decentralized because it will become a payment platform, just like the fiat currency we have today," that CPTL was now "in the market," and that "we're having casinos that are going to be using the coin, we have [a] mall that's going to be using CPTL."

**Problems with Bitchain**

43. Based upon my participation in this Investigation, it is my understanding that MCC investors were not informed of **Capuci's** ownership or control over **Bitchain**. Instead, MCC investors received WhatsApp messages purporting to describe efforts by **MCC** and **Capuci** to work with **Bitchain** in order to resolve problems that prevented investors from receiving their **MCC** investment proceeds. Based upon WhatsApp messages provided by investors and investor testimonies, it is my understanding that **Capuci** offered updates on his conversation with **Bitchain**, and that webinars were offered to investors concerning how to transfer funds from **MCC** wallets to **Bitchain** wallets.

44. I also watched a video that was provided by a MCC investor, which is Bates numbered SEC-CROSSM-E-470, a screenshot of which is attached as **Exhibit 22**. In the video, **Capuci** discusses how the Covid-19 pandemic has affected **MCC**. **Capuci** also states that it is projected that CPTL's value will increase ten times by next year and that this was "guaranteed."

45. I also observed a "COVID-19 NOTICE" on the **Bitchain** website, which states: "**Bitchain** Exchanges would like to announce to everyone that we have received an update for Capital Coin listing. As we prepare to implement the exchange between cryptocurrencies in our platform, we have been facing some delays. . . . Unfortunately we have all been impacted by Covid-19 and our requests for certain approvals have been slower than usual."

46. I have reviewed audio and video recordings gathered in this Investigation, in which **Capuci** encouraged investors to be patient, because CPTL will be listed on Coinbase by July 2021.

47. Based on the web captures of **Bitchain** that I have reviewed, the **Bitchain** website displayed a running banner that purported to display real-time prices of crypto assets such as Bitcoin, Ethereum, Litecoin, Tether, Augur, Tron, Cardano, EOS, TenX, and CPTL.

48. I reviewed a document, which appears to be a screenshot from the **MCC** back office and is Bates numbered MCC CAPUCI 002557, attached as **Exhibit 23**, and states: "The promotional event of the CPTL at $0.10 is finished, stay tuned for more upcoming promotions," and prominently displays "Promotion ended" at the bottom of this news post.

**Misrepresentations**

49. I have watched a publicly available YouTube video entitled "Mining Capital Coin Africa Launch," which was previously available at https://www.youtube.com/watch?v=CSjdXfr7QnA as of September 30, 2019, in which **Capuci** states, "I worked for the government, for the FBI in the United States for almost 8 years for the federal government." The FBI has confirmed to the SEC that **Capuci** was never employed by the FBI in any capacity.

50. I have also reviewed a video entitled, "Facebook Mining Capital Coin," in which **Capuci** states, "That MCC has a partnership with Clinton Foundation, United States." I have seen no evidence of any such partnership.

51. Furthermore, the **MCC** Portfolio states, "MCC has partnered with The World Bank to secure an investment in ECO friendly power generators." (**Exhibit 8**, p. 16.) I have seen no evidence of any such partnership.

52. In addition, despite representations that there was an application to list CPTL on "Coinbase" and that CPTL would be listed on "Coinbase" by July 2021, *see infra* ¶ 40, I have reviewed a letter from Coinbase, Inc. ("Coinbase") dated October 25, 2021 (**Exhibit 24**), responding to the SEC's October 7, 2021 subpoena seeking "All Documents and Communications Concerning the listing or possible listing of CPTL Coin Tokens or Capital Coin Tokens ('CPTL Coin Tokens') on Coinbase, including, but not limited to, any applications for CPTL Coin Tokens and any Communications reflecting requirements for CPTL Coin Tokens to be listed on Coinbase." In its October 25, 2021 letter, Coinbase's response to this request was as follows: "It does not appear that CPTL Coin Tokens have been considered for listing, and Coinbase has been unable to identify materials responsive to this request." *See* Ex. 24.

**MCC Investors**

53. According to an investor list produced by **Capuci**, which is Bates-numbered MCC CAPUCI 100, there are 65,535 MCC investor accounts, including about 1,200 investor accounts whose contact information includes U.S. cities.

54. Based on my participation in this Investigation, I am aware that although **Capuci** and **Pires** produced some documents to the Commission, they subsequently invoked their Fifth Amendment privilege against self-incrimination and the act-of-production doctrine in

response to SEC subpoenas. I reviewed the transcript of the February 3, 2022 voluntary interview of **Capuci**, wherein he asserted his Fifth Amendment right against self-incrimination, and the transcript of the January 11, 2022 testimony of **Pires**, where **Pires** did the same. The transcripts are attached as **Exhibits 28** and **29**, respectively.

55. Furthermore, **Capuci** and **Pires** have refused to respond to subpoena requests seeking the addresses of digital wallets that were used to receive and transfer MCC investor funds. **Capuci** has provided some information concerning U.S. bank accounts but has objected to providing the Commission with any foreign bank account information or identifying any U.S. bank accounts he opened after he received the first subpoena in this matter issued on June 29, 2021.

56. In addition, **MCC** has not provided the Commission with any financial statements, balance sheets, cash flow statements, tax returns or any other books and records to reflect sources of revenue for any legitimate business operations. Nor has **MCC** provided the Commission with complete investor information and financial account information that would enable Commission Staff to conduct a full tracing of investor funds.

57. Accordingly, the Commission lacks sufficient data to determine the total amount of investor funds and fees received by **MCC, Capuci,** and **Pires** and whether any fees paid to **Bitchain** were provided to **MCC, Capuci,** and **Pires**.

58. Assuming there are 65,535 investor accounts, and using the least expensive mining package, which **MCC** sold for $125, it is my understanding that **MCC** raised at least $8.1 million from the sale of mining packages. Further, if each of the 65,535 investors paid a $50 initiation fee, then **MCC** likely received an additional $3.2 million, in initiation fees. And if each of the

65,535 investors paid the $100 KYC fee charged by **MCC** in order to give investors CPTL, then **MCC** received an additional $6.5 million in KYC fees.

**Capuci and Pires Testimony from First Investigation**

59. This Investigation is the second investigation of **MCC**, **Capuci**, and **Pires**. The first investigation, *In the Matter of Mining Capital Coin International Corp.* (C-08623) ("First Investigation"), took place before I joined the Commission. I have reviewed the testimony transcripts of **Capuci** and **Pires** in the First Investigation, both of whom provided separate sworn testimony on February 18, 2020. (A copy of the **Capuci** and **Pires** testimony transcripts from the First Investigation are attached as **Exhibits 25** and **26**, respectively.)

60. In addition to testifying that **MCC** had no U.S. investors or U.S. operations, **Capuci** and **Pires** testified that their **MCC** salaries were deposited into their personal digital wallets. (Ex. 25, page 36-37; Ex. 26, page 51.) They both testified that their salary ranged from $5,000 to $20,000 in BTC per month, and that they sold the BTC through digital asset trading platforms, such as Coinbase. (Ex. 25, page 37-38; Ex. 26, page 51.) **Capuci** further testified that **MCC** was his only source of income at that time. (Ex. 25, page 74.)

61. Based upon my review of the February 18, 2020 testimony transcripts of **Capuci** and **Pires**, I read that they explained that "MCC International Corp." never operated in the United States after they obtained legal advice and concluded that their plans to sell software that traded forex currencies and digital assets, and to mine and sell digital assets, would not work in the United States. (Ex. 25, page 27-28.) **Pires** testified that "MCC International Corp." "never operated," and **Capuci** testified that the attorney whom they consulted to "legalize" **MCC** "shut us down." (Ex. 25, page 27-28; Ex. 26, page 16.) **Pires** and **Capuci** further explained that **MCC** operated outside of the United States, namely, in Brazil, Africa, and Asia. (Ex. 25,

page 20, 33; Ex. 26, page 24.) They also produced a member list reflecting only 2,501 active members in the First Investigation without any U.S. addresses. Regarding mining machines, **Pires** testified, "We had personal mining machines here in the U.S. but we never really used them. We never used them." (Ex. 26, page 60.)  **Capuci** testified that they purchased 80-100 mining machines that were shipped to the United States, but did not pursue mining after discovering that one mining machine "uses more electricity than the whole building." (Ex. 25, page 29.) He also testified that he put the mining machines in storage and "never move[d]" them. (Ex. 25, page 29.)

62. Attached as **Exhibit 27a** is the December 29, 2021 subpoena to **MCC** requesting information concerning **MCC's** trading platform and trading robots. Attached as **Exhibit 27** is **MCC's** response to the December 29, 2021 subpoena in which **MCC** stated that it "has no documents to produce because it has never been involved with 'trading robots'."  (**Exhibit 27**, Response to Required Document Nos. 3-7, pp. 2-4.)  Similarly, **MCC** also stated that it "has no documents to produce because it has never been involved with 'trading platforms'."  (*Id.*)

63. I have reviewed the transcripts of the January 11, 2022 testimony of **Pires** and the February 3, 2022 voluntary interview of **Capuci**. Based upon my review of these transcripts, it appears that **Capuci** and **Pires** invoked their Fifth Amendment rights against self-incrimination in response to questions about whether **MCC** had trading robots and trading platforms. (Ex. 28, pp. 75, 109-110; Ex. 29, page 24)

64. Based upon my participation in this Investigation, it is my understanding that the **MCC** "back office" showed investor account balances and 1% daily profits (7% weekly profits) that were deposited once a week into investor accounts. It is also my understanding that when MCC investors transferred their balances or requested withdrawal amounts to their **Bitchain**

wallets, investors could see on the **Bitchain** website the value of their wallets. Based upon

the screenshots of **Bitchain** wallet balances that investors have provided, I observed that the

balances ranged in value from thousands of dollars to hundreds of thousands of dollars.

## How MCC Investors Paid For Mining Packages

65. The evidence I have reviewed reflects that there were various methods in which MCC

investors paid for mining packages, including:

      a.  New investors obtained cashier's checks that were deposited directly into bank accounts controlled by **Capuci** and **Pires**, namely the "Hi Tech Commerce and Logistics Corp." and "MCC International Corp." bank accounts, described in paragraphs 88 to 92 below.

      b.  New investors provided their sponsors investor funds via Zelle, Chase Quickpay, or cash, who would then purchase digital assets to give to **MCC** on the investor's behalf.

      c.  New investors who had access to digital assets created their own **MCC** accounts on the **MCC** back office, using the link provided by their sponsors. When submitting payment of their digital assets, the **MCC** payment page created uniquely-generated wallet addresses, to which investor funds were purportedly transferred.

66. Based upon my review of financial records in this Investigation, it also appears that **Capuci**

and **Pires** received investor funds directly via wire transfer, Zelle, and Quickpay as described

in paragraphs 73 to 78 below. In addition, as outlined in paragraphs 77 to 78 below, between

January 2018 and January 2022, **Capuci** and **Pires** received approximately $1.2 million and

$2.1 million in cash, respectively, in deposits to bank accounts they controlled and whose

sources cannot be determined.

## Coinbase Records

67. As mentioned above, in the First Investigation, **Capuci** and **Pires** testified that they received

their **MCC** salaries in BTC, which they deposited into their Coinbase accounts. My

colleague, SEC Accountant Steven Tremaglio, has conducted an analysis of **Capuci** and

**Pires's** Coinbase accounts, and his Declaration is attached as Exhibit B in support of the SEC's *Ex Parte* Emergency Motion for a Temporary Restraining Order and Emergency Ancillary Relief.

**Tax Filings**

68. **Pires** produced two unique sets of federal individual tax forms for different tax years with his name and tax identification number. The first forms produced, dated for the tax years ended December 21, 2018 (**Exhibit 30**) and 2019 (**Exhibit 31**), were purportedly prepared by someone named Leah McLaughlin. No occupation was noted for the tax filer on Form 1040 and the forms were not signed by **Pires** or anyone else. The 2018 file included Schedule C income of $50,000 and adjusted gross income of $33,881. The 2019 file included Schedule C income of $50,000 and adjusted gross income of $33,683. The principal business or profession noted on Schedule C for both 2018 and 2019 was noted as "contractor."

69. **Pires** produced a second Form 1040, U.S. Individual Income Tax Return, for the tax year ended December 31, 2018 (**Exhibit 32**). The 2018 tax file included Schedule C, Profit or Loss From Business, with the principal business or profession reported as "Computing, Software Developer." Gross sales from this business for 2018 were reported on Schedule C as $367,824. The net profit from the business was $240,627, which was reported as the only source of income on the 2018 tax return. There was no notation of a tax preparer name, and the form was not signed by **Pires** or anyone else.

70. **Pires** also produced a second Form 1040, U.S. Individual Income Tax Return, for the tax year ended December 31, 2019 (**Exhibit 33**). The 2019 tax file included Schedule C, Profit or Loss From Business, with the principal business or profession reported as "Computing, Software Developer." Gross sales from this business for 2019 were reported on Schedule C

as $312,035. The net profit from the business was $188,239, which was reported as the only source of income on the 2019 tax return. There was no notation of a tax preparer name, and the form was not signed by **Pires** or anyone else.  Therefore, it remains unknown whether this second set of tax forms were filed.

71. Based on my review of the tax documents produced by **Pires** for tax years 2018 and 2019, gross sales for the 2 years from his "Computing, Software Developer" business was approximately $679,859.

72. Based on my review of the tax documents filed by **Pires**, no salaries or wages were reported as being paid to him for compensation of work completed at **MCC**, or any other business entities he organized and/or operated during those years.

**Bank Records and Financial Analysis**

73. As part of my participation in this Investigation, I analyzed records, for the time period January 2018 through January 2022, for approximately 22 bank and credit card accounts that **Capuci** and **Pires** controlled as authorized signors.

74. I analyzed deposits (credits) to bank accounts based on the following sources of funds received: Coinbase, PayPal, Zelle, wire transfers, cash, other sources and refunds. The total amounts noted as being deposited to the bank accounts from each source were traced back to the source to ensure all appropriate deposits were included in the bank records.

75. Between approximately January 2018 and January 2022, **Capuci** received approximately $13 million into 13 different bank accounts that he controlled. **Capuci** spent approximately $4.8 million on expenditures for vehicles leases and purchases, residential property, yachts and child support. He made payments totaling $2.7 million to friends, individuals who appear to be family members, and other unknown individuals. **Capuci** incurred other expenditures of

$5.6 million that included legal fees, video production fees, and other expenses for miscellaneous or unknown goods and services.

76. Between approximately January 2018 and January 2022, **Pires** received approximately $10.9 million into nine (9) different bank accounts that he controlled. **Pires** spent approximately $800,000 on expenditures for apparel, jewelry, vehicles and travel. He made payments of nearly $7.6 million to individuals who appear to be family members or friends and other unknown individuals. **Pires** incurred other expenses of $2.5 million for computer services, equipment, legal fees, video production fees, and other miscellaneous or unknown goods and services.

77. The following chart is a summary of the deposits into the approximately 22 bank accounts controlled by **Capuci** and **Pires** that were made between approximately January 2018 and January 2022:

| DEPOSITS | | | | |
|---|---|---|---|---|
| | **Luiz Capuci Accounts** | | **Emerson Pires Accounts** | |
| Source[8] | Amount | Percentage | Amount | Percentage |
| Coinbase | $ 4,847,884 | 37.3% | $ 245,134 | 2.2% |
| PayPal | 2,863,515 | 22.0% | 323,312 | 3.0% |
| Zelle | 131,527 | 1.0% | 150,776 | 1.4% |
| Wire transfers | 1,925,828 | 14.8% | 7,502,766 | 68.8% |
| Cash | 1,255,561 | 9.7% | 2,128,937 | 19.5% |
| Other | 1,839,949 | 14.2% | 526,603 | 4.8% |
| Refunds/Returns | 132,276 | 1.0% | 21,622 | 0.2% |

[8] Key:
    a) Coinbase refers to the amount of U.S. dollars withdrawn from Coinbase wallets directly to bank accounts.
    b) PayPal refers to the funds withdrawn from PayPal accounts to bank accounts
    c) Zelle refers to bank-to-bank transfers of funds from individuals account owners to bank accounts.  This is net of any intercompany (same business owner) transfers.
    d) Wire refers to funds transferred from bank to bank via a bank wire transaction
    e) Cash refers to cash funds deposited via ATM or bank teller with no source references
    f) Other - transfers from other bank accounts (no identifiers), interest income, insurance claims paid, vendor receipts and unknown sources

| DEPOSITS | | | | |
|---|---|---|---|---|
| | **Luiz Capuci Accounts** | | **Emerson Pires Accounts** | |
| **Source[8]** | **Amount** | **Percentage** | **Amount** | **Percentage** |
| **Total Deposits** | **$ 12,996,540** | **100.0%** | **$ 10,899,150** | **100.0%** |

78. As illustrated by the chart above, more than half ($7,711,399 or 59%) of the funds deposited

into **Capuci's** bank accounts were from Coinbase and PayPal. The majority ($9,782,479 or

90%) of funds deposited into **Pires's** bank accounts were from primary sources, including

Zelle, wire transfers and cash. The Zelle and wire transfer deposits can be traced to original

sources based on names, originating banks or other identifiers, but limited or no detailed

information regarding the business purpose of the deposits was produced during the

investigation.

79. The below charts illustrate examples of what appear to be wire transfers by MCC investors

related to the purchase of **MCC** mining packages:

   a. Wire Transfers Into J.P. Morgan Chase Bank account ending 2093 in the
      name of "Hi Tech Commerce and Logistics Corp." ("Hi Tech Bank
      Account"), of which **Capuci** was the only authorized signer:

| **Wire Transfer Date** | **Payee** | **Amount** | **Description** |
|---|---|---|---|
| 8/7/2019 | Investor A | $2,142.50 | "For MCC Platinum Package" |
| 8/21/2019 | Investor A | $22,480 | "For MCC VIP Base Package" |
| 10/10/19 | Investor B | $41,965 | "PAYING FOR MATERIAS (MACHINERY FOR MINING)" |
| TOTAL | | $66,587.50 | |

   b. Wire Transfers Into J.P. Morgan Chase Bank account ending 9950 in the
      name of "MCC International Corp." ("MCC Bank Account") of which **Pires**
      was the only authorized signer:

| Wire Transfer Date | Payee | Amount | Description |
|---|---|---|---|
| 12/3/2018 | Investor C | $2,390 | "[E.J.] FOR 1 PLATINUM AND 2 BRONZE PACKAGES INVESTMENT" |
| 12/5/2018 | Investor D | $40,990 | "FURTHER CREDIT TO TRADING ACCOUNT" |
| TOTAL | | $43,380 | |

## MCC Investor Deposits

80. **Capuci's** Hi Tech Bank Account received payments from individuals whose names are on the investor list produced by **Capuci** referenced in paragraph 53 above, and they include:

| Posted Date | Amount | Transaction Type | Payor |
|---|---|---|---|
| 2018-11-16 | $    5,090 | Wire Transfer | Investor #1 |
| 2019-01-15 | 509 | Zelle | Investor #2 |
| 2019-01-16 | 5,042 | Wire Transfer | Investor #3 |
| 2019-01-28 | 10 | Zelle | Investor #2 |
| 2019-02-19 | 100 | Zelle | Investor #2 |
| 2019-02-25 | 22,150 | Wire Transfer | Investor #5 |
| 2019-05-09 | 3,255 | Wire Transfer | Investor #6 |
| 2019-05-09 | 5,050 | Wire Transfer | Investor #7 |
| 2019-05-13 | 7,350 | Wire Transfer | Investor $8 |
| 2019-05-23 | 1,000 | Zelle | Investor #2 |
| 2019-06-12 | 4,000 | Wire Transfer | Investor #9 |
| 2019-06-14 | 980 | Wire Transfer | Investor #10 |
| 2019-06-28 | 7,100 | Wire Transfer | Investor #11 |
| 2019-07-16 | 1,000 | Wire Transfer | Investor #6 |
| 2019-07-19 | 1,490 | Wire Transfer | Investor #12 |
| 2019-07-26 | 490 | Wire Transfer | Investor #13 |
| 2019-07-26 | 2,040 | Wire Transfer | Investor #14 |
| 2019-07-29 | 1,000 | Zelle | Investor #15 |
| 2019-08-02 | 1,740 | Wire Transfer | Investor #16 |
| 2019-08-05 | 500 | Zelle | Investor #17 |
| 2019-08-07 | 500 | Zelle | Investor #17 |
| 2019-08-08 | 2,040 | Wire Transfer | Investor #14 |
| 2019-08-09 | 500 | Zelle | Investor #17 |
| 2019-08-09 | 1,490 | Wire Transfer | Investor #16 |
| 2019-08-16 | 50 | Zelle | Investor #17 |
| 2019-08-26 | 3,480 | Wire Transfer | Investor #18 |

| 2019-09-10 | 2,500 | Wire Transfer | Investor #9 |
|---|---|---|---|
| 2019-09-17 | 1,600 | Wire Transfer | Investor #19 |
| 2019-09-19 | 340 | Wire Transfer | Investor #16 |
| 2019-09-20 | 1,015 | Wire Transfer | Investor #20 |
| 2019-10-07 | 1,190 | Wire Transfer | Investor #16 |
| 2020-03-23 | 190 | Zelle | Investor #21 |
| 2020-03-27 | 200 | Zelle | Investor #22 |
| 2020-03-27 | 2,200 | Zelle | Investor #22 |
| 2020-03-27 | 400 | Zelle | Investor #21 |
| 2020-03-30 | 294 | Zelle | Investor #21 |
| 2020-03-31 | 1,600 | Zelle | Investor #22 |
| 2020-04-01 | 100 | Zelle | Investor #22 |
| 2020-04-01 | 1,400 | Zelle | Investor #21 |
| 2020-04-07 | 1,000 | Zelle | Investor #21 |
| | $ 91,985 | **Total Named Deposits** | |

*See* **Exhibits 38 and 43**.

81. Based upon my participation in this Investigation, I am aware that there was a team of MCC investors who identified themselves as the "Dream Team." I am also aware that a person whose initials are M.B. led the Dream Team and was the only authorized signer of a Bank of America account in the name of "Dream Big Global LLC." I observed that Dream Big Global made the following payments to **Capuci**'s Hi Tech Bank Account:

| Posted Date | Amount | Transaction Type | Payor |
|---|---|---|---|
| 2020-03-20 | $ 5,000 | Deposit | Dream Big Global |
| 2020-03-20 | 1,679 | Deposit | Dream Big Global |
| 2020-03-23 | 5,000 | Deposit | Dream Big Global |
| 2020-04-02 | 5,000 | Deposit | Dream Big Global |
| 2020-04-02 | 3,632 | Deposit | Dream Big Global |
| | $ 20,311 | **Total Dream Big Deposits** | |

82. Based on the foregoing (totals from paragraphs 79, 80, and 81 above), I calculated that **Capuci**'s Hi Tech Bank Account received approximately $178,883.50 from MCC investors.

83. **Pires's** MCC Bank Account received payments from individuals whose names are on the investor list produced by **Capuci** referenced in paragraph 53 above, and they include:

| Posted Date | Amount | Transaction Type | Payee/Payor |
|---|---|---|---|
| 2018-12-05 | $ 40,990 | Wire transfer | Investor #1 |
| 2018-11-21 | 2,550 | Deposit: Cashier check | Investor #2 |
| 2018-11-23 | 4,000 | Deposit: Cashier check | Investor #2 |
| 2018-11-19 | 8,190 | Wire transfer | Investor #3 |
| | $55,730 | Total Named Deposits | |

*See* **Exhibit 44**.

84. Based on the foregoing (totals from paragraphs 79 and 83 above), I calculated that **Pires's** MCC Bank Account received approximately $99,110 from MCC investors.

**Summary of Sources and Uses in Capuci and Pires Bank Accounts**

85. The following tables illustrate summaries of transactions recorded in the bank accounts controlled by **Capuci** and **Pires** during the time period from January 2018 to January 2022.

| Capuci  - 13 accounts | |
|---|---|
| Beginning Balance | $      108,429 |
| Sources/Deposits (Exhibit 49) | 13,034,938 |
| less: Uses/Expenditures (Exhibit 49) | |
| Payments | (2,660,519) |
| Personal expenditures | (4,817,381) |
| Other expenditures | (5,648,813) |
| Total Uses | (13,126,713) |
| **Ending Balance** | **$      16,653** |

| Pires  - 9 accounts | |
|---|---|
| Beginning Balance | $      2,401 |
| Sources/Deposits (Exhibit 50) | 10,979,845 |
| less: Uses/Expenditures (Exhibit 50) | |
| Payments | (7,592,231) |
| Personal expenditures | (838,581) |
| Other expenditures | (2,549,662) |

| Pires = 9 accounts | |
|---|---|
| Total Uses | (10,980,473) |
| **Ending Balance** | **$  1,773** |

### Misappropriation

86. As part of my participation in this Investigation, I have reviewed account records and statements for the Hi Tech Bank Account for the entire period that the account was open, which was from approximately June 2018 to April 2020 (**Exhibit 50**). Based upon my review of those records, it appears that during that period **Capuci** spent nearly approximately $2 million, an amount that includes investor funds, including the following:

- $9,700 on apparel, which includes luxury stores like Louis Vuitton, Salvatore Ferragamo, and Gucci;

- $23,400 on marina fees and other boating expenditures;

- $26,700 on one year of child support to an individual that I believe, based upon my participation in this Investigation, to be **Capuci's** first ex-wife;

- $33,110 in additional payments, via various electronic payment apps, to **Capuci's** first ex-wife;

- $5,200 for pool construction and maintenance;

- $21,900 on entertainment, including golf club memberships, streaming services, and Apple products;

- $30,650 on meals;

- $141,745 on domestic and international travel;

- $221,000 on payments related to motorcycles, luxury automobiles, and other car rentals;

- $36,000 in Zelle payments to **Capuci's** current spouse; and

- $36,500 in Zelle payments to E&J Granite Install LLC, which is controlled by **Pires** as discussed above in paragraph 3.

87. As part of my participation in this Investigation, I have obtained account records and statements for the MCC Bank Account for the entire period that the account was open, which was from approximately October 2018 to January 2019 (**Exhibit 51**). Based upon my review of those records, it appears that during that time period **Pires** spent over approximately $97,000, an amount that includes investor funds, on the following:

- $1,737 at Half Price Mattress;
- $2,742 at Ashley Home Stores;
- $260 for Disney World tickets;
- $15,600 on airline tickets;
- $3,800 on hotels;
- $10,500 on purchases from stores that appear to be located in foreign countries, including in China, Korea, Poland, Turkey, United Kingdom, Germany, and Spain;
- $7,000 at Diamond Vault.

The MCC Bank Account was closed on or about January 14, 2019, when approximately $49,000 was withdrawn.

### Financial Accounts Used By Capuci

88. Based upon my participation in this Investigation and materials reviewed, **Capuci** created bank accounts for certain related entities referenced in paragraph 13 above, including: Hi Tech Commerce, United General Construction, Bittech Global, Conde Jackson, and SL Trustee. **Capuci** was the authorized signor for these bank accounts. I reviewed the opening documents for the following bank accounts used by the businesses controlled by **Capuci**.

| Banking Institution | Account Holder Name | Account Ending Number | Account Type | Open Date | Close Date |
|---|---|---|---|---|---|
| TD Bank | United General Construction | 2754 | Checking | 10/10/2017 | 6/5/2018 |

| Banking Institution | Account Holder Name | Account Ending Number | Account Type | Open Date | Close Date |
|---|---|---|---|---|---|
| TD Bank | United General Construction | 2762 | Checking | 10/10/2017 | 6/5/2018 |
| TD Bank | United General Construction | 7912 | Checking | 5/19/2017 | 6/5/2018 |
| TD Bank | United General Construction | 7920 | Checking | 5/19/2017 | 7/3/2018 |
| TD Bank | Hi Tech Commerce and Logistic Corp | 5612 | Checking | 12/13/2017 | 6/7/2018 |
| Citibank | Hi Tech Commerce and Logistic Corp | 8352 | Checking | 8/18/2020 | 2/14/2022 |
| JPMCB | Hi Tech Commerce and Logistic Corp | 2093 | Checking | 6/19/2018 | 4/10/2020 |
| Wells Fargo | SL Trustee Corp | 7671 | Checking | 2/12/2021 | 7/28/2021 |
| Wells Fargo | Bittech Global Corp | 7663 | Checking | 2/21/2021 | 7/28/2021 |
| Wells Fargo | Conde Jackson USA Corp | 7622 | Checking | 1/27/2021 | 7/28/2021 |

89. Personal bank accounts and credit cards used by **Capuci** include the following:

| Banking Institution | Account Holder Name | Account Type | Open Date | Close Date |
|---|---|---|---|---|
| Wells Fargo | Stephanie Lira and Luiz C Capuci Jr | Checking | 4/25/2018 | 8/24/2021 |
| Varo Bank | Luiz Capuci | Checking | 2/13/2021 | OPEN |
| Varo Bank | Luiz Capuci | Credit Card | 8/15/2020 | OPEN |

90. A checking account was opened at Wells Fargo Bank for SL Trustee Corp, and maintained

from approximately February 2021 to July 2021 (**Exhibit 52**). Deposits of more than

$112,000 were made to this account, including transfers from Wells Fargo Bank account

ending in x2942, a joint bank account maintained by Stephanie Lira and **Capuci** and closed

in August 24, 2021 (the "Wells Fargo Bank Account"); an insurance claim of $60,000 paid

by Geico Marine Insurance Co. on February 12, 2021; and PayPal deposits of $30,634 paid

from various unknown accounts between approximately April 2021 and June 2021. During

the same time period, this account spent approximately $4,000 on legal fees, $795 on child

support payments, $65,995 on transfers to other accounts,[9] and $22,130 on Zelle payments to various associates.[10]

**Financial Accounts Used By Pires**

91. During the relevant time period, **Pires** opened and/or maintained several bank accounts in the names of businesses. Some of the activity in these accounts do not appear to have any business purpose. The companies for which he had bank accounts were the following:

| Banking Institution | Account Ending Number | Account Holder Name | Account Type | Open Date | Close Date |
|---|---|---|---|---|---|
| Bank of America | 2267 | Empires Consulting Corp. | Checking | 12/31/2021 | 2/14/2022 |
| JPMorgan Chase | 1665 | E&J Granite Install LLC | Checking | 10/28/2016 | 4/16/2020 |
| JPMorgan Chase | 9950 | MCC International Corp | Checking | 10/9/2018 | 1/12/2019 |

92. Personal bank accounts and credit cards used by **Pires** include the following:

| Banking Institution | Account Ending Number | Account Holder Name | Account Type | Open Date | Close Date |
|---|---|---|---|---|---|
| JPMorgan Chase | 2962 | Emerson Pires | Checking | 10/9/2018 | 3/23/2020 |
| JPMorgan Chase | 4149 | Amy N Parker and Emerson Pires | Credit Card | Prior to 1/1/2018 | OPEN |
| PNC Bank | 1434 | Emerson Pires | Checking | 8/14/2020 | OPEN |
| Suncoast Credit Union | 1941-00 | Emerson Pires | Savings | 6/24/2020 | OPEN |
| Suncoast Credit Union | 1941-50 | Emerson Pires | Checking | 6/24/2020 | OPEN |
| Suncoast Credit Union | 9895 | Emerson Pires | Credit Card | 9/14/2007 | 6/16/2020 |

---

[9] The recipient accounts were the Wells Fargo Bank Account; Wells Fargo checking account x9045 (held by Luiza Capuci/Stephanie Lira); and Wells Fargo savings account x3757 (held by Stephanie Lira).  Transfers to these accounts took place between approximately February 24, 2021 and June 21, 2021.

[10] Payments made between approximately February 25, 2021 and June 25, 2021.

### Capuci's Disposition of Assets and Closing of Bank Accounts

#### Closing of Bank Accounts After SEC Subpoenas Issued

93. Based on my participation in this Investigation and review of Wells Fargo records, I am aware that the SL Trustee Corp., Bittech Global, and Conde Jackson checking accounts were all closed on or about July 28, 2021. I am also aware that the SEC issued subpoenas to **Capuci**, **MCC**, and Bittech Global on or about June 29, 2021.

#### September and October 2021 Car Sales

94. I have also reviewed records for Citibank account x8352, held in the name of "Hi Tech Commerce and Logistic Corp" (the "Hi Tech Citibank Account"). According to account opening documents produced by Citibank, N.A., **Capuci** is the sole authorized signor on the Hi Tech Citibank Account.

95. Records for the Hi Tech Citibank Account (**Exhibit 53 and 43**) indicate that after the SEC issued the June 29, 2021 subpoenas in this Investigation, the Hi Tech Citibank Account received approximately $388,600 in wire transfers from "RL Car King" as follows:

| Date | Amount |
|---|---|
| 9/17/21 | $98,000 |
| 10/12/21 | $120,000 |
| 10/14/21 | $65,000 |
| 10/18/21 | $60,000 |
| 10/19/21 | $45,500 |

Based on open-source Internet research, I believe that "RL Car King" may be a used auto dealership located in Pompano Beach, FL. Accordingly, it is possible these wire transfers may represent proceeds of auto sales by **Capuci** after the SEC issued the June 29, 2021 subpoenas in this Investigation.

### November 2021 Yacht Sale

96. I have also reviewed records concerning a purchase of a forty-two-foot yacht by **Capuci**, through one of his companies, in or about March 2021. After the SEC issued subpoenas in this Investigation, **Capuci** sold the yacht. In approximately November 2021, he deposited the sale proceeds in a bank account held in the name of his wife's company.

97. According to records produced by The New Yachts Company d/b/a YachtCreators, on or about February 15, 2021 (**Exhibit 55**), **Capuci** electronically signed a purchase agreement for a 2017 Azimut Flybridge forty-two-foot yacht, bearing hull ID no. XXXXXXXXL617 and named "LU-KI" (the "Capuci Yacht"). The total purchase price was $470,000. **Capuci** entered into the purchase agreement under his own name, and presented a copy of his Florida driver's license.

98. Pursuant to the purchase agreement, on or about February 16, 2021, **Capuci** wired a deposit of $47,000 from the Hi Tech Citibank Account to an escrow account held by The New Yachts Company.

99. On or about March 8, 2021, **Capuci** electronically signed a closing statement for the **Capuci** Yacht reflecting a final balance due of $441,529.01. This time, **Capuci** signed the agreement on behalf of buyer "JSK Virtual Corp." As discussed above in paragraph 13, corporate documents indicate that JSK Virtual Corp. is controlled by **Capuci**.

100. On or about March 8, 2021, **Capuci** wired the final balance due of $441,529.01 from the Hi Tech Citibank Account to an account held by The New Yachts Company.

101. On or about October 19, 2021, **Capuci** entered into a purchase and sale agreement for the **Capuci** Yacht (now named "JrStephy"). The sale price was $580,000, and **Capuci** again electronically signed the agreement on behalf of JSK Virtual Corp.

102.    On or about November 5, 2021, **Capuci** signed a closing statement directing that the net

sales proceeds of $500,000 be wired to Citibank account x4766. This different Citibank

account was held in the name of "SL Trustee Corp." As discussed above in paragraph 13,

corporate documents indicate that SL Trustee Corp. is controlled by **Capuci's** spouse.

103.    On or about November 16, 2021, an individual from YachtCreators emailed **Capuci**,

"We are close to releasing the funds on the 'JrStephy' 42' Azimut closing. However, as you

are not currently an officer of SL Trustee Corp., please quickly confirm in writing that you

fully authorize YachtCreators to wire the closing funds to the bank account held by SL

Trustee Corp." **Capuci** responded, "Yes I authorize you guys deposit on the account under

the name of SL Trustee Corp."

104.    Wire transfer records produced by The New Yacht Company indicate that two wire

transfers totaling $500,000 were sent to the SL Trustee Citibank account on or about

November 17, 2021.

**Transfers to Third Parties from the Hi Tech Citibank Account**

105.    I have also reviewed account statements and wire transfer records for the Hi Tech

Citibank Account. Those documents reflect that between approximately July and November

2021 **Capuci** transferred over $1.9 million from the Hi Tech Citibank Account to various

individuals and entities. The purpose of many of these transactions is currently unknown.

Certain of those transactions are summarized below:

| Date | Amount | Recipient Name |
|---|---|---|
| 7/6/21 | $14,309 | Eric Gozlan |
| 8/11/21 | $13,500 | 4Brazil Video & Phone |
| 8/13/21 | $51,000 | 4Brazil Video & Phone |
| 8/17/21 | $20,0000 | Villa Franca Design and Development |
| 8/24/21 | $10,000 | Deli Pereira Da Silva |
| 9/13/21 | $21,000 | 4Brazil Video & Phone |
| 9/16/21 | $21,000 | 4Brazil Video & Phone |

| Date | Amount | Recipient Name |
|---|---|---|
| 9/17/21 | $20,000 | 4Brazil Video & Phone |
| 9/27/21 | $32,000 | 4Brazil Video & Phone |
| 10/13/21 | $54,000 | 4Brazil Video & Phone |
| 10/14/21 | $150,000 | K1 Import Export |
| 10/15/21 | $54,000 | 4Brazil Video & Phone |
| 10/20/21 | $250,000 | K1 Import Export |
| 10/21/21 | $21,200 | 4Brazil Video & Phone |
| 10/21/21 | $75,000 | Bless Constructions Corp. |
| 10/21/21 | $50,000 | Hi Tech Electronics |
| 10/21/21 | $75,000 | Easy for You Import Export |
| 10/26/21 | $34,592 | 4Brazil Video & Phone |
| 10/27/21 | $500,000 | MBC Trade International Inc. |
| 11/8/21 | $85,000 | Bless Constructions Corp. |
| 11/8/21 | $75,000 | Bless Constructions Corp. |
| 11/8/21 | $75,000 | Eletrons Red Inc. |
| 11/8/21 | $80,000 | Easy for You Import Export |

**Current Assets of Capuci and Pires**

106.    Based on my participation in this Investigation and review of documents, the following are assets that I have identified as currently controlled by **Capuci.** The table below includes known bank accounts with balances as of September 2021. I have also included **Exhibit 56**, which is a list I prepared of all payments made from **Capuci**-controlled bank accounts.

**Capuci – Current Asset List**

| Asset Type | Description | Location/Address | Purchase Price / Last Known Balance | Purchase Date |
|---|---|---|---|---|
| Vehicle | **Jeep Cherokee** (2020) | 128 SE Via San Marino, Port Saint Lucie, Florida | $ 27,595 | 4/28/2021 |
| Vehicle | **Pillard Hardtop 4DR** (2017) | 128 SE Via San Marino, Port Saint Lucie, Florida | Unknown | 2/8/2021 |
| Vehicle | **Mercedes-Benz G 63 AMG** (2015) | 128 SE Via San Marino, Port Saint Lucie, Florida | $137,150 | 11/17/2020 |

| Asset Type | Description | Location/Address | Purchase Price / Last Known Balance | Purchase Date |
|---|---|---|---|---|
| Vehicle | **Harley Davidson VRSCDX Night Rod Special Edition** (2014) | 128 SE Via San Marino, Port Saint Lucie, Florida | $ 16,349 | 2/4/2020 |
| Bank Account | **Varo Bank** | Checking account (x2747) | $ 46 | N/A |

107. **2020 Jeep Cherokee**. Searches of a database of public records maintained by Lexis-Nexis indicate that a 2020 Jeep Cherokee Latitude Plus 4 Dr Wagon Sport Utility was registered to and owned by **Capuci** as of at least approximately April 28, 2021. The database search results reflects a base price for this vehicle of $27,595.

108. **2017 Pillard Hardtop**. Searches of a database of public records maintained by Lexis-Nexis indicate that a 2017 Pillard Hardtop 4 Dr was registered to and owned by **Capuci** as of at least approximately April 15, 2021.

109. **2015 Mercedes Benz AMG**. Searches of a database of public records maintained by Lexis-Nexis indicate that a 2015 Mercedes Benz AMG, 4 Dr Wagon Sport Utility was registered to and owned by **Capuci** as of at least approximately April 15, 2021. The database search results reflects a base price for this vehicle of $137,150.

110. **2014 Harley Davidson VRSCDX Night Rod Special Edition**. Searches of a database of public records maintained by Lexis-Nexis indicate that a 2014 Harley-Davidson VRSCDX Night Rod Special was registered to **Capuci** and SL Trustee Corp. as of at least approximately February 4, 2020. Records produced by Wells Fargo indicate that the Wells Fargo Bank Account paid approximately $19,000 with a check payable to "American V Twin" on or about August 19, 2020. The accompanying memo line for this check references

"Bike," which I believe is a reference to this motorcycle. The database search results reflects a base price for this vehicle of $16,349.

111.  **Varo Bank Account.** This personal checking account was opened on or about February 13, 2021, with **Capuci** as the only name in the account opening application. The account reflects a balance of $47 as of September 2021.

**Capuci's Ownership of Assets In Different Corporate Names**

**SL Trustee Corp.**

112.  **SL Trustee Corp.**, of which **Capuci**'s spouse is a director as explained in paragraph 13 above, currently owns or leases the following assets:

| Asset Type | Description | Location/Address | Purchase Price | Purchase Date |
|---|---|---|---|---|
| Residence | **Tesoro Condo**, Single family residence | 128 SE Via San Marino, Port Saint Lucie, Florida | $ 675,000 | 10/24/2019 |
| Real Estate | Vacant Lot | 126 SE Via San Marino, Port Saint Lucie, Florida | $225,000 (sale price) | 12/15/2021 |
| Vehicle | **Cadillac Escalade ESV Premium Luxury** (2021) | 1841 NW 42nd Drive, Boca Raton, Florida | $ 85,995 | 5/26/2021 |
| Vehicle | **Ferrari 488 PISTA** (2019) | 128 SE Via San Marino, Port Saint Lucie, Florida | $ 345,300 | 4/15/2021 |
| Vehicle | **Land Rover Autobiography SUV** (2020) | 1841 NW 42nd Drive, Boca Raton, Florida | $ 150,300 | 10/27/2020 |
| Vehicle | **Lamborghini Urus** (2019) | 1841 NW 42nd Drive, Boca Raton, Florida | $ 200,000 | 9/3/2020 |
| Vehicle | **Ferrari F8 Tributo** (2020) | 1841 NW 42nd Drive, Boca Raton, Florida | $ 335,000 | 8/28/2020 |

| Asset Type | Description | Location/Address | Purchase Price | Purchase Date |
|---|---|---|---|---|
| Vehicle | **Hummer** (2008) | 128 SE Via San Marino, Port Saint Lucie, Florida | $ 64,950 | 8/11/2020 |
| Vehicle | **Harley Davidson VRSCDX Night Rod Special Edition** (2014) | 128 SE Via San Marino, Port Saint Lucie, Florida | $16,349 | 2/4/2020 |
| Boat | **Sea Ray Boats** (2000) | 600 Main Street, Apt 345, Worcester, MA | $ 50,000 | 2/4/2020 |

113.   **Tesoro Condo and Neighboring Vacant Lot:** Records produced by JP Morgan Chase,

Citibank, and Wells Fargo indicate that the Hi Tech Bank Account, the Hi Tech Citibank

Account, and the Wells Fargo Bank Account made a total of 12 payments, each $3,160 plus

transaction fees totaling $60 fee, to "Albert Russo." The memo lines accompanying each

such payment from the Hi Tech Citibank Account state, "Mortgage 128 SE Via San Marino,"

which is the address of the Tesoro Condo. Searches of a database of public records

maintained by Lexis-Nexis for property owned by SL Trustee Corp. and for this specific

property address both indicate that Albert Russo was the "lender" and **Capuci** the "owner" of

the Tesoro Condo, with the sale price listed as $675,000. A search of various online real

estate websites, including Zillow.com, Redfin and Trulia.com, indicate that the Tesoro

Condo was listed for sale on or about November 6, 2021—after subpoenas in this

Investigation were issued—with a list price of $1.1 million. As of March 29, 2022, this

property is listed on Zillow.com as "Under contract." Documents produced by Domain

Realty LLC include an "'As Is' Residential Contract For Sale and Purchase" between SL

Trustee Corp and a buyer to sell the Tesoro Condo for a purchase price of $825,000. This

sales agreement further includes a "Vacant Land Contract" for the neighboring property

located at 126 SE Via San Marino for a purchase price of $225,000. This agreement is dated
December 15, 2021. Based upon my review of the sales contract, it appears that closing on
this property is scheduled between March 1, 2022 and August 1, 2022.

114.    **2021 Cadillac Escalade ESV**. Searches of a database of public records maintained by
Lexis-Nexis for property owned by SL Trustee Corp. indicate that this corporation owns a
2021 Cadillac ESV Premium Luxury 4 Dr Wagon Sport Utility. The database search results
reflect a base price for this vehicle of $85,995.

115.    **2019 Ferrari 488 Pista:** Records produced by Wells Fargo and Citibank indicate that the
Wells Fargo Bank Account and the Hi Tech Citibank Account paid approximately $47,434
and $60,740, respectively, to "DSTD Company" and "Luca Sales Services" from
approximately June 2020 to October 2021. The accompanying memo lines for these checks
and wire transfers reference VIN ending in 5197, which is a 2019 Ferrari 488 Pista per
www.NHTSA.gov. Documents produced by DSTD Company included photographs of
checks payable to DSTD Company from "Stephanie C Capuci" with the memo line
referencing monthly lease payments for that same VIN. Searches of a database of public
records maintained by Lexis-Nexis for property owned by SL Trustee Corp. indicate that a
2019 Ferrari 488 Pista with the same VIN was registered to SL Trustee Corp. and **Capuci** on
or about March 23, 2020. The database search results reflects a base price for this vehicle of
$345,300.

116.    **2020 Land Rover Autobiography SUV**:   Records produced by Citibank indicate that
the Hi Tech Citibank Account made a wire transfer payment of approximately $59,741.74 to
"Exotic Car Leasing LLC" on or about August 31, 2020. The accompanying memo line
stated, "Down payment for 2020 Landrover." Searches of a database of public records

maintained by Lexis-Nexis for property owned by SL Trustee Corp. indicate that the corporation owns a 2020 Land Rover Autobiography 4 Dr Wagon Sport Utility. The database search results reflects a base price for this vehicle of $150,300.

117.   **2019 Lamborghini Urus**: Records produced by Wells Fargo Bank indicate that the Wells Fargo Bank Account issued a check for $8,000 to "Sam's Automotive" on or about April 10, 2020. The check's memo line stated, "Lamborghini Monthly," which I believe references a monthly lease for this Lamborghini vehicle. Searches of a database of public records maintained by Lexis-Nexis for property owned by SL Trustee Corp. indicate that the corporation owns a 2019 Lamborghini Urus Base, 4 Dr Wagon Sport Utility. The database search results reflects a base price for this vehicle of $200,000.

118.   **2020 Ferrari F8 Tributo**:  Searches of a database of public records maintained by Lexis-Nexis for property owned by SL Trustee Corp. indicate that the corporation owns a 2020 Ferrari F8 Tributo.

119.   **2008 Hummer.** Records produced by Wells Fargo Bank indicate that the Wells Fargo Bank Account made two wire transfers totaling approximately $67,350 to "A&L Imports Inc" in approximately August 2020. According to A&L Imports, Inc., they sold a vehicle to SL Trustee Corp. on or about August 11, 2020. Documents produced by A&L Imports included the purchase agreement for this 2008 Hummer, a receipt for a $5,000 down payment received by wire transfer, and a receipt for the balance of $59,950 received by wire transfer.

120.   **2014 Harley Davidson VRSCDX Night Rod Special Edition**. See paragraph 110 above.

121.   **2000 Sea Ray Boat**. Searches of a database of public records maintained by Lexis-Nexis for property owned by SL Trustee Corp. and Stephanie Lira indicate that the corporation

owns a 2000 Sea Ray Boat as of approximately February 4, 2020. An internet search on "Boattrader.com" for similar Sea Ray vessels reflects an average base price for this boat of type of boat of $50,000.

**JS Homes Corp.**

122.   **JS Homes Corp.**, of which **Capuci** is the President, Treasurer, Director, and Registered Agent, as explained in paragraph 13 above, currently owns or leases the following assets:

| Asset Type | Description | Location/Address | Purchase Price | Purchase Date |
|---|---|---|---|---|
| Residence | Single family residence | 381 Southfield St, Kissimmee, Florida | $ 481,400 | 2/23/2021 |
| Residence | Land | 1651 SW Rutland St, Port Saint Lucie, Florida | $ 59,000 | 2/13/2021 |
| Residence | Land | 1638 SW Paddock, Port Saint Lucie, Florida | $59,900 | 11/6/2020 |

123.   **381 Southfield St:** Records produced by Citibank indicate that the Hi Tech Citibank made a wire transfer of approximately $181,000 to "Reunion West Development" on or about January 29, 2021. The note accompanying the transfer stated, "Down payment of house located Encore Kissimmee Florida." Additionally, records produced by Wells Fargo Bank indicate that checking account ending in 7622 (held in the name of Conde Jackson USA Corp., with **Capuci** as the sole authorized signor) made a wire transfer of approximately $313,389.63 to "Reunion West Development" on or about February 5, 2021. The accompanying wire transfer details notes: "Purpose of Funds: 382 S Field St Kissimmee FL 34747." Records produced by Reunion West Development Corporation further include emails between Luiz **Capuci** and Reunion West representatives regarding closing cost requirements, prior payments made by **Capuci**, wire transfer instructions and property closing dates for the 381 Southfield Street residence in Kissimmee. Moreover, searches of a

database of public records maintained by Lexis-Nexis indicate that this residence was purchased by JS Homes Corp in or about February 2021 for $481,400. Finally, a search with various online real estate websites, including Zillow.com, Redfin and Trulia.com, indicate that this property was listed for sale in approximately mid-February 2022—again, after the subpoenas in this Investigation were issued— with a list price of $750,000. I have reviewed the sales contract reflecting that the sales price was $780,000. Closing is scheduled for April 12, 2022.

124.    **Rutland and Paddock properties**. Searches of a database of public records maintained by Lexis-Nexis for properties owned by JS Homes Corp. indicate that these two properties were purchased by JS Homes Corp. The search results provided the dates the properties were purchased by JS Homes Corp and the purchase prices included in the table above.

**Current Assets of Pires**

125.    Based on my participation in this Investigation and review of documents, the following are assets that I have identified as currently controlled by **Pires.** The below table includes known bank and investment accounts with current balances as of approximately October 2021 (Suncoast), November 2021 (Suncoast), December 2021 (TD Ameritrade), and January 2022 (PNC Bank). I have also included **Exhibit 57**, which is list of all payments made from **Pires**-controlled bank accounts that I have drafted based on my participation in this Investigation.

**Pires – Current Asset List**

| Asset Type | Description | Location/Address | Purchase Price / Last Known Balance | Purchase Date |
|---|---|---|---|---|
| Residence | Single Family Residence - Townhouse | 14120 Reflection Lakes Drive, Fort Myers, Florida | $ 536,200 | 10/9/2020 |

| Asset Type | Description | Location/Address | Purchase Price / Last Known Balance | Purchase Date |
|---|---|---|---|---|
| Vehicle | **Lamborghini Urus** (2019) | 14120 Reflection Lakes Drive, Fort Myers, Florida | $ 200,000 | 6/3/2021 |
| Vehicle | **Land Rover Range Rover Autobiography** (2020) | 14120 Reflection Lakes Drive, Fort Myers, Florida | $150,300 | 11/9/2020 |
| Vehicle | **Harley Davidson Road King Tilt Tandem** (2007) | 9700 Casa Linda Ct, Fort Myers, Florida | $17,345 | 8/26/2020 |
| Vehicle | **Mercedes-Benz S 63 AMG** (2015) | 9700 Casa Linda Ct, Fort Myers, Florida | $ 160,900 | 1/31/2020 |
| Bank Account | Suncoast Credit Union | Checking account (x1941) | $  505.13 | N/A |
| Bank Account | Suncoast Credit Union | Savings account (x1941) | $468.04 | N/A |
| Bank Account | PNC Bank | Checking account | $  799.79 | N/A |
| Brokerage account | TD Ameritrade | Taxable brokerage account | $  2,000.13 | N/A |

126.   **14120 Reflection Lakes Drive:** Records produced by Bank of America indicate that

checking account ending in 2267, held in the name of Empires Consulting Corp. with **Pires**

as the sole authorized signatory (the "Empires Bank of America Account") made three wire

transfers to Nelayda Fonte in or about December 2020, January 2021 and February 2021.

Each transfer was approximately $1,865.80. The accompanying wire transfer notes for two of

the transfers indicate that one transfer was for "Mortgage Statement Number 2" and the other

for "Mortgage Statement Number 4." In addition, eight Zelle payments totaling

approximately $14,926.43 were made using Zelle from the Empires Bank of America

Account between May 2021 and December 2021. The Zelle payments were sent to "Loo."

Searches of a database of public records maintained by Lexis-Nexis indicate that Nelayda Fonte and Loo T Yap own the deed to this property, and that the sales price was $536,200. I therefore believe that **Pires** has made monthly mortgage payments to Nelayda Fonte and Loo T Yap for this property.

127.   **2019 Lamborghini Urus**. Records produced by Bank of America indicate that the Empires Bank of America Account made a wire transfer of approximately $70,000 to Exotic Car Leasing LLC on or about May 19, 2021. The accompanying memo information states, "Lamborghini Urus, 2019, VIN: xxxxxxxxxxxxx1316." Searches of a database of public records maintained by Lexis-Nexis indicate that a 2019 Lamborghini Urus BASE, 4 Dr Wagon Sport Utility with this same VIN and a base price of $200,000 was registered to **Pires** as "Lessee" as of June 3, 2021.

128.   **2020 Land Rover Range Rover Autobiography**. Searches of a database of public records maintained by Lexis-Nexis indicate that a 2020 Land Rover Range Rover Autobiography, 4 Dr Wagon Sport Utility with a base price of $150,300 was registered to **Pires** as "Lessee" as of at least approximately April 8, 2021.

129.   **2007 Harley Davidson Road King Tilt Tandem**. Searches of a database of public records maintained by Lexis-Nexis indicate that a 2007 Road King Tilt Tandem motorcycle was registered to **Pires** as of at least approximately August 26, 2020.

130.   **2015 Mercedes-Benz S 63 AMG**. Searches of a database of public records maintained by Lexis-Nexis indicate that a 2015 Mercedes-Benz S63 AMG passenger car was registered **Pires** as of at least approximately April 5, 2021.

131.  **Suncoast Credit Union Checking and Savings Accounts**. Records produced by Suncoast Credit Union indicate that **Pires** was the only person who signed the account opening applications for these accounts, and that these accounts are held in his name.

132.  **PNC Bank Checking Account**. Records produced by PNC Bank indicate that **Pires** was the only person who signed the account opening application for this account, and that these accounts are held in his name.

133.  **TD Ameritrade Brokerage Account**. Records produced by TD Ameritrade indicate that **Pires** was the only person who signed the account opening application for this account, and that this brokerage account is held in his name.

**_Capuci Divorce_**

134.  Based upon my participation in this Investigation and review of court documents, I am aware that **Capuci** was a respondent in a second, now-settled divorce case: _Laurykassia Danielle Silva Vasconcelos Capuci v. Luiz Carlos J. Capuci_, Case No. 2019DR002718 (Circuit Court in Port Saint Lucie County, Florida). Although I do not have access to the settlement documents, it is possible that the settlement agreement requires **Capuci** to pay child support and/or alimony.

**_Capuci Flight_**

135.  Based upon my participation in this Investigation, I am aware that **Capuci** was in Florida with his wife and minor son for a brief period of time in March 2022. However, he and his family flew back to Brazil on a late evening flight on Friday, March 25, 2022.

**Vanderbilt Residence**

136.  **11285 SW Vanderbilt Circle**. This residence in Port St. Lucie, Florida was initially identified as being associated with **Capuci** as the business address listed on the Hi Tech Commerce bank account maintained at JPMorgan Chase bank, checking account ending in

2093, and controlled by **Capuc**i.  The opening documents and monthly bank statements produced by JPMorgan Chase bank listed **Capuci** as the "President" of Hi Tech Commerce. A search of the online real estate website Zillow.com provided historical reports that this property was sold on the open market for $510,000 in approximately October 31, 2017. Searches of a database of public records maintained by Lexis-Nexis indicated this as **Capuci's** address from approximately October 2017 to November 2020.  The Lexis-Nexis report also shows a sale date for this property of approximately December 31, 2020 for a sale price of $469.000.  An additional Lexis-Nexis report notes that this property was sold by Townpark Master Assn. Inc. to "Laurykassia Capucci", the former wife of Luiz **Capuci**, on approximately February 1, 2021.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 5, 2022

/s/ *Larry Brannon*
LARRY BRANNON
