# EXHIBIT 8





# MINING CAPITAL COIN
# INTRODUCTION

We have created this Portfolio for better understanding of our company.

Through this information we are aiming to share MCC's vision, goal and our expectation for years to come. The content found here is dedicated to our leaders, affiliates and future members.



## ABOUT MINING
## CAPITAL COIN?

MCC was started in November 2017 in the state of Florida.

While in the planning period, the founders of the company researched the most efficient ways to Mine in a world of big competition. The most important steps of building MCC structure is to combine low cost energy and low cost but effective machinery. While traveling around the world and building serious business
relationships, MCC was able to secure and improve the formula to maintain profitability.

The first step was finding a energy source to power the mining machines and this was accomplished by using Wind, Solar, Hydro and other sources of power to lower the energy cost to support the different mining equipment.

In a period of 3 to 5 years we have projected our mining machine growth to be in between 500,000 to 1,000,000 machines.
Another aspect of our company is arbitrage trading, on a market that has generated transaction volumes of billions per day.

With a very capable trading staff MCC uses all the volume that is earned from mining and invested in the MCC platform to make positive return.

MCC uses the top rated crypto trading platforms known around the world to generate 1% to 1.5% daily.

Mining Capital Coin is also operating in the field of the Forex market.
The Forex Trading department is under constant supervision by some of the worlds top Forex advisors located in South America.

The Forex trading is made by semi-automatic computer programming called Robot trading and it generates profits in between 0.6% to 1% daily. MCC uses 3 mainstream source of income and shares its profit with all the affiliates.





## FOUNDER OF MCC

*Junior Caputti*

An American business executive that has conquered life
through hard work and leadership, having to overcome
many challenges in life and never falling short from
reaching his goals and dreams.
After going through a period in his life as a
homeless person in freezing weather, Junior
set a hard to believe target of reaching
$10 million dollars in a period of 12 years.
After being asked how he managed to
accomplish this dream he simply answered.

*"In life the most important aspect is BELIEVING in yourself and the second most important is FOCUS. We must become magnets and what I mean by this is everywhere we walk we must attract others by our testimony"*

*Junior Caputti*

While majoring on computer science in Havard University, Junior was told about Bitcoin by his teacher in 2010.

At that time cryptocurrency was a new wave of technology and worth cents on the dollar.
Even though he was highly interested in the idea of a decentralized monetary system, he did not acquire any coins until 2013 where he purchased 4,500 bitcoin units ranging between $100 dollars each. He was patient and kept the coins stored for around 4 years while he managed his own construction business, building residential properties. In the year of 2017 Bitcoin reached almost $20,000 each unit and Junior sold most of his coins and made millions.

During this time he realized the potential behind cryptocurrency and developed a interest in Blockchain technology and the creation of the cryptocurrency which we all know today as Mining.

Junior has been involved in various different business areas such as owning his own Subway restaurant, Gas Station Line and even before owning his own businesses he was a US Federal Officer, but nothing impacted his financial life the way cryptocurrency has.

In 2018 Junior launched Mining Capital Coin and his main purpose is to become a powerhouse in the mining industry.



## CO-FOUNDER

*Emerson Pires*

Is a entrepreneur in inbound marketing and sales platform that helps companies attract visitors, convert leads, and close customers. Previously, Emerson operated his own construction design company and specialized in final touches to high class residence. He graduated from Havard University with a dual degree in Business Administration and Computer Science. Emerson is a close friend of Junior Caputti and considered him his mentor in life.

He also attended University along with Caputti and was fortunate to have the same opportunities in the cryptocurrency world. When approached by Junior with a Bitcoin investment opportunity he was encouraged to buy 900 Bitcoin units which he also waited patiently for a few years before selling each coin for around $20,000.

During his waiting period of Bitcoin growth he was very focused on growing his business that he started from zero. Emerson is very passionate about renovations and upgrading the old with the new and he also developed a passion for the cryptocurrency. After being approached with MCC business plan, he was intrigued and started a period of research and was able to implement ideas to make MCC's goals reachable in the matter of a few years.

We also asked Emerson to give us an input about his thoughts and he replied the following.

*"When approached with the MCC idea I was flattered and found a dream that I could embrace and with a person I have great respect for. Together we are strong and in this business we will join force with millions of people that share the same interest and passion. I will give my best and strive for greatness. Let's build a family and become the greatest"*

*Emerson Pires*







**NORTH CAROLINA**

**Virtual Currency Dealer License**

License No: 127130

Efective Date: 05/15/2017

Expiration Date: 05/16/2022

The North Carolina Commissioner of Banks hereby issued to

MINING CAPITAL COIN CORP
177 HUNTINGTON AVE 22ND
BOSTON, MA 02115

this license to buy, sell, minying, brokering and dealering any type of Virtual Currency in special BitCoins business pursuant to the provisions of Chapter 53. Article 18A of the United States.

Witness my hand, this 15 day of May, 2017

Ray Grace
Commissioner of Banks

North Carolina Commissioner of Banks, 316 W Edenton St, Raleigh, NC 27603 US
919-733-3016 - www.nccob.org



# HOW MINING CAPITAL COIN
# MAKES A PROFIT?

► **MCC MINES AT A COST OF 2 CENTS PER KWH**
MCC has partnered up with The World Bank to secure an investment in ECO friendly power generators. After securing a partnership with a Wroclaw, Polish group MCC was able to use Wind Turbines to power up the mining facility.

► **WITH 45,198 ACTIVE MINING MACHINES**
An estimated 12 million mining machines are out of service in China due to elevated electricity cost. Based on this situation MCC has acquired mining machines at a lower cost from dealing directly with miners and avoiding manufacturers.

▶ **112,618 OFFLINE MACHINES TO BE ACTIVATED ONLINE BY THE END OF APRIL**
MCC is making the preparations for electricity to activate all offline machines. By growing the power grid the volume of equipment will also increase the mining power. The total target of Mining machines will be between 500,000 to 1,000,000

▶ **ARBITRAGE TRADING GENERATING 1% TO 1.5% PER DAY**
MCC works with the worlds leading exchanges to trade cryptocurrencies daily.

▶ **FOREX TRADING GENERATES 0.6% TO 1% PER DAY**
MCC operates in the Forex market with Semi-Auto robotic trading.

▶ **TRADING OF CAPITALCOIN, (MCC'S OWN COIN)**
CapitalCoin is MCC's own coin and will be added to exchanges around the world for trade.

▶ **GOLD MINING IN DRC AFRICA**
(starting to generate income in July 2019)

▶ **OIL MINING IN SASKATCHEWAN, CANADA**
(starting December 2019)



## MINING PROFIT
# EXAMPLE:

- MCC purchases each machine S9J for $150

- Each machine generates $59 profit per month

- With a $2000 package it is promised a return of 300% = $6000 in 1 year. With the same package MCC can acquire 14 machines

- 14 machines X $59 = $826 per month X 12 months = $9,912 per year

- After the 300% is paid back to the investor, MCC will earn $3,912 in profit per $2000 package invested.

  If MCC receives 100,000 investors of $2000 packages, this will generate $392,100,000 profit with mining itself per year.

  All these calculations are based on estimated percentages.



**ARBITRAGE TRADE PROFIT**
EXAMPLE:

▶ With arbitrage trade every $2000 package generates around 30% profit per month for MCC.

▶ 30% of $2000 = $600 x 12 = $7,200 – $6000 (for investment returned) = $1,200

If MCC receives 100,000 investors of $2000 packages, this will generate $120,000,000 profit with mining itself per year.

All these calculations are based on estimated percentages.



**FOREX PROFIT**
EXAMPLE:

▶ With Forex trade, every $2000 package generates 28% profit per month for MCC.

▶ 28% of $2000 = $560 x 12 = $6720 – $6000 (for investment returned) = $720

If MCC receives 100,000 investors of $2000 packages, this will generate $72,000,000 profit with Forex trading itself per year.

All these calculations are based on estimated percentages.



# EXHIBIT 9

MORNINGSIDE SHOPPES, LLC

"Landlord"

JK GAS STATION SERVICES CORP

"Tenant"

----------------
LEASE
----------------

Premises In: MORNINGSIDE SHOPPES SHOPPING CENTER, Port St. Lucie, Florida

**SHOPPING CENTER LEASE**
**INDEX**

SECTION 1.0 DEFINITIONS ...........................................................................................

SECTION 1.1 LEASE AND EXHIBITS .............................................................................

SECTION 1.2 PREMISES...............................................................................................

SECTION 2.0 TERM ......................................................................................................

SECTION 3.0 RENTAL ..................................................................................................

SECTION 3.1 GUARANTEED MINIMUM RENTAL ...........................................................

SECTION 3.2 PERCENTAGE RENTAL ...........................................................................

SECTION 4.0 SALES REPORTS ....................................................................................

SECTION 5.0 GROSS SALES ........................................................................................

SECTION 6.0 BOOKKEEPING RECORDS INSPECTION ..................................................

SECTION 7.0 LATE CHARGE/NON-SUFFICIENT FUNDS PENALTY ................................

SECTION 8.0 SALES AND RENTAL TAX .......................................................................

SECTION 9.0 USE ........................................................................................................

SECTION 10.0 CARE OF PREMISES .............................................................................

SECTION 11.0 REPAIRS ...............................................................................................

SECTION 12.0 ADVERTISING MEDIA ............................................................................

SECTION 13.0 ALTERATIONS .......................................................................................

SECTION 14.0 INDEMNITY-LIABILITY INSURANCE ......................................................

SECTION 15.0 FIRE INSURANCE..................................................................................

SECTION 16.0 ASSIGNMENT AND SUBLETTING ..........................................................

SECTION 17.0 ACCESS TO PREMISES .........................................................................

SECTION 18.0 UTILITIES ..............................................................................................

SECTION 19.0 EMINENT DOMAIN ................................................................................

SECTION 20.0 DESTRUCTION-FIRE .............................................................................

SECTION 21.0 DEFAULT OF TENANT ...........................................................................

SECTION 22.0 LANDLORD'S FEES ...............................................................................

SECTION 23.0 NOTICE TO LANDLORD..........................................................................

SECTION 24.0 SERVICE OF NOTICE .............................................................................

SECTION 25.0 OBSERVANCE OF LAWS AND ORDINANCES .........................................

SECTION 26.0 STRIKES, ETC .......................................................................................

SECTION 27.0 RIGHT TO CURE DEFAULTS...................................................................

SECTION 28.0 NONLIABILITY FOR INJURY, LOSS, OR DAMAGE ..................................

SECTION 29.0 REAL ESTATE TAXES ...........................................................................

SECTION 30.0 OPERATING EXPENSES ........................................................................

SECTION 31.0 MERCHANTS ASSOCIATION/PROMOTION FUND ...................................

SECTION 32.0 SURRENDER AT END OF TERM .............................................................

SECTION 33.0 DEFINITION OF LANDLORD ...................................................................

SECTION 34.0 TENANT DEFINED, USE OF PRONOUN ..................................................

SECTION 35.0 SECURITY DEPOSIT ..............................................................................

SECTION 36.0 TRANSFER OF DEPOSIT .......................................................................

SECTION 37.0 PERSONAL PROPERTY..........................................................................

SECTION 38.0 CONTROL OF COMMON AREAS BY LANDLORD .....................................

SECTION 39.0 RULES AND REGULATIONS ...................................................................

SECTION 40.0 OFFSET STATEMENT ............................................................................

SECTION 41.0 ATTORNMENT .......................................................................................

SECTION 42.0 TAXES ON LEASEHOLD ........................................................................

SECTION 43.0 LANDLORD'S COVENANT ......................................................................

SECTION 44.0 ACCORD AND SATISFACTION ...............................................................

SECTION 45.0 ENTIRE AGREEMENT ...................................................................................

SECTION 46.0 NO PARTNERSHIP ......................................................................................

SECTION 47.0 CAPTIONS AND SECTION NUMBERS ..................................................................

SECTION 48.0 BROKER'S COMMISSION ..............................................................................

SECTION 49.0 PARTIAL INVALIDITY ....................................................................................

SECTION 50.0 SUBORDINATION ........................................................................................

SECTION 51.0 SIGNS ...................................................................................................

SECTION 52.0 EMPLOYEE PARKING ..................................................................................

SECTION 53.0 WAIVER ..................................................................................................

SECTION 54.0 FAILURE OF TENANT TO OPEN; FAILURE TO OPERATE .......................................

SECTION 55.0 NON-LIABILITY OF LANDLORD ........................................................................

SECTION 56.0 CORPORATE STATUS ..................................................................................

SECTION 57.0 CONSTRUCTION INSURANCE AND INDEMNITY ...................................................

SECTION 58.0 MECHANIC'S LIENS AND ADDITIONAL CONSTRUCTION ........................................

SECTION 59.0 TRADE FIXTURES ......................................................................................

SECTION 60.0 HAZARDOUS MATERIALS .............................................................................

SECTION 61.0 NO OPTION .............................................................................................

SECTION 62.0 SECURITY FORCE ......................................................................................

SECTION 63.0 RIGHT TO RELOCATE ..................................................................................

SECTION 64.0 LANDLORD'S RIGHT TO PERFORM BUILDING RENOVATIONS ................................

SECTION 65.0 LEASE ...................................................................................................

SECTION 66.0 RADON GAS .............................................................................................

SECTION 67.0 CONFIDENTIALITY ......................................................................................

SECTION 68.0 AGENCY DISCLOSURE ................................................................................

SECTION 69.0 AGREEMENT TO COOPERATE.......................................................................

SECTION 70.0 WAIVER ..................................................................................................

SECTION 71.0 CHOICE OF LAW & FORUM & WAIVER OF JURY TRIAL .........................................

SECTION 72.0 PLAZA REMODELING ...................................................................................

Exhibit A - Site Plan

Exhibit B - Landlord's and Tenant's Work

Exhibit C - Legal Description

Exhibit D - Rules and Regulations

Exhibit E - Sign Criteria

Exhibit F - Guarantee of Lease

Exhibit G - Environmental Addendum

Exhibit H - Asbestos Containing Material (ACM)

Corporate Certificate

### SHOPPING CENTER LEASE

THIS LEASE made and entered into as of the 1st day of **May, 2018**, by and between Landlord and Tenant as specified in Items 1 and 2 of the Definitions appearing in Section 1.0 hereof.

Landlord hereby demises and rents unto Tenant, and Tenant hereby leases from Landlord, certain premises now existing in Landlord's shopping center as described in Item 3 of the Definitions appearing in Section 1.0 hereof, and upon the terms, covenants and conditions contained herein.

#### WITNESSETH:

**SECTION 1.0 DEFINITIONS:** The following Items shall be defined or be referred to as indicated below for the purposes of this Lease and the Exhibits attached hereto:

| | |
|---|---|
| **Item 1** - Landlord: | MORNINGSIDE SHOPPES, LLC |
| **Item 2** - Tenant: | JK GAS STATION SERVICES CORP |
| **Item 3** - Shopping Center (Section 1.2): | MORNINGSIDE SHOPPES, LLC |
| Address: | 1776 SE Port St. Lucie Blvd.<br>Port St. Lucie, Florida 34952 |
| County: | St. Lucie |
| Premises: | Store/Bay #1776 |
| Size: | Approximately 1,000 square feet |
| **Item 4** - Term (Section 2.0): | Two (2) Years from Rent Commencement Date. |
| **Item 5** - Lease Commencement Date (Section 2.0): | May 1, 2018 |
| Turnover Date: | May 1, 2018 |
| Rent Commencement Date (Section 2.0): | May 1, 2018 |
| Lease Expiration Date (Section 2.0): | Two (2) years after Rent Commencement Date. |
| | Landlord and Tenant agree to execute, acknowledge and deliver a Confirmation of Lease Term Agreement to each other, certifying the Lease Commencement Date, Rent Commencement Date and Lease Expiration Date upon determination. Landlord shall send said Agreement to Tenant; however, in the event Tenant does not execute said Agreement and return to Landlord within one (1) week of Tenant's receipt, then the terms as submitted by Landlord will be considered as confirmed by Tenant. |
| **Item 6** - Guaranteed Minimum Rental (Section 3.1): | Payable as follows, plus all applicable taxes: |
| | Payment in the amount of **$9,944.40** is due and payable upon execution of this Lease Agreement by Tenant. This amount includes estimated **Security Deposit, Base Rent, Operating Expenses, Real Estate Taxes, and all applicable sales taxes**, and shall be applied toward the **First, Second, Third, and Fourth Months' Rent**, due at the Rent Commencement Date. If the Rent Commencement Date commences on any day other than the first day of the month, then Tenant shall pay pro-rated Rent and charges for that partial month, and the advance Rent shall be applied to the first full month's payment. |

| Period | Annual Base Rent | Monthly Base Rent |
|---|---|---|
| Months 1-12 | $12,000.00 | $1,000.00 |
| Months 13-24 | $12,600.00 | $1,050.00 |

~~**Item 7** - Percentage Rent (Section 3.2):~~ ~~Percentage Rent Rate:~~ ~~(%)~~

~~**Item 7a** - Sales Reports (Section 4.0):~~ ~~Sales reports are due ten (10) days after each month and thirty (30) days after the expiration of each Lease Year.~~

| | |
|---|---|
| Item 8 - Use of Premises (Section 9.0): | The premises may be used only for **Bitcoin Mining.** No exclusivity to this use at this shopping center is awarded to the Tenant. |
| Item 9 - Notices to Landlord (Section 23.0): | MORNINGSIDE SHOPPES, LLC<br>c/o **Cohen Commercial Management, I.I.C.**<br>712 U.S. Highway One, Suite 205<br>North Palm Beach, Florida 33408<br>Mailing Address: P.O. Box 14127<br>North Palm Beach, Florida 33408<br>561.471.0212 Office<br>561.471.5905 Fax |
| Item 10 - Notice to Tenant (Section 24.0): | At Premises |
| Item 11 - Estimated Real Estate Tax Cost for 2016 (Section 29.0): | Included in Item #12 below. |
| Item 12 - Estimated Operating Expenses for 2016 (Section 30.0): | Monthly $559.17 |
| Item 13 - Estimated Security Force Cost For 2016 (Section 62.0): | None. |
| | Should a Security Force become active, Tenant shall be responsible for its pro-rata share of said expenses. |
| Item 14 - Estimated Merchant's Association Cost/ Promotion Fund for 2013 (Section 31.0): | None. |
| | Should a Merchant's Association or Promotional Fund become active, Tenant must comply with the Association's or Promotional Fund's rules and regulations and shall be responsible for its pro-rata share of said expenses. |
| Item 15 - Security Deposit (Section 35.0): | $3,314.80 |
| Item 16 - Broker's Commission (Section 48.0): | Current Capital Management represents the Landlord in this transaction and shall be paid per separate agreement. |
| Item 17 - Option To Renew (Special Provision #1): | NONE |

Item 18 - Special Provisions:

1.    Tenant shall have the right to place its business sign upon the front exterior of the Premises, provided such sign is in compliance with applicable law and Landlord's standard sign criteria. Tenant's sign shall be subject to Landlord's approval.

2.    Tenant is responsible for the cost of all their utilities, including but not limited to, electricity, water and sewer, natural gas, telephone, cable, telecommunications, security, pest control, rubbish removal, and janitorial.

3.    Tenant shall pay **First Full Months' Rentals** in the sum of **$1,657.40** (this sum includes estimated CAM charges and applicable Florida Sales Tax), **Second Full Months' Rentals** in the sum of **$1,657.40** (this sum includes estimated CAM charges and applicable Florida Sales Tax), **Third Full Months' Rentals** in the sum of **$1,657.40** (this sum includes estimated CAM charges and applicable Florida Sales Tax), **Fourth Full Months' Rentals** in the sum of **$1,657.40** (this sum includes estimated CAM charges and applicable Florida Sales Tax), and **Security Deposit** in the amount of **$3,314.80** at the complete execution of this agreement and before given access to the Premises. Tenant will provide to Landlord evidence of all required insurance to be in place by Tenant to cover the Premises prior to being given access to the Premises.

4. All rental and CAM charges shall be abated for the first sixty (60) days after Lease Commencement Date.

5. Tenant Accepts the Premises "AS-IS" except for those specific items identified as the Landlord's obligations itemized in Exhibit B of this Lease.

6. HVAC, plumbing, and electrical shall be in good working order upon possession.

7. Termination Clause: Tenant shall have the right to terminate lease with a minimum of one hundred twenty (120) days written notice to Landlord. Tenant shall forfeit any security deposit and prepaid rents and agrees to pay back all real estate commissions upon early termination.

**SECTION 1.1 LEASE AND EXHIBITS:** The pages and exhibits listed hereunder and attached to this Lease are incorporated and made a part hereof:

Exhibit A - Site Plan
Exhibit B - Landlord's and Tenant's Work
Exhibit C - Legal Description (Intentionally Deleted)
Exhibit D - Rules and Regulations
Exhibit E - Sign Criteria (To be provided to Tenant by Management)
Exhibit F - Guarantee of Lease
Exhibit G - Environmental Addendum
Exhibit H - Asbestos Containing Material (ACM)
Corporate Certificate

**SECTION 1.2 PREMISES:** In consideration of the rent hereinafter agreed upon to be paid by the Tenant to the Landlord, and in consideration of the covenants of the respective parties hereto, each to the other to be performed by them at the time and in the manner hereinafter provided, the Landlord does hereby lease and let unto the Tenant, and the Tenant does hereby hire from the Landlord, those certain premises (hereinafter called "Premises" or "the Demised Premises"), as described in Item #3 of the Definitions, outlined on Exhibit A. (if no Exhibit "A" is attached then the bay or address on the lease under Item #3 titled premises)

The Landlord reserves the right to change building perimeters, add buildings, driveways, malls, kiosks, or other structures, and to make any other changes it desires in and about the Shopping Center, including the Common Areas, provided only that reasonable access to the Demised Premises is provided and maintained. The Landlord makes no representation as to the identity of other Tenants in the Shopping Center and said Tenants may be changed from time to time.

**SECTION 2.0 TERM:** TO HAVE AND TO HOLD the Demised Premises for a term specified in Item 4 of the Definitions commencing on the Lease Commencement Date and expiring on the Lease Expiration Date, as provided in Item 5 of the Definitions, unless sooner terminated or extended as hereinafter provided.

For purposes of this Lease, the first Lease Year shall be deemed to begin on the Rent Commencement Date and to end twelve (12) months thereafter; provided, if said first twelve (12) months' period does not end on the last day of a calendar month, the first Lease Year shall be extended to the end of said month, and each succeeding twelve (12) month period thereafter shall be deemed a Lease Year.

**SECTION 3.0 RENTAL:** The Tenant covenants and agrees that it will, without deduction, demand or set-off, pay to the Landlord for the use of the Demised Premises, rental as follows:

**SECTION 3.1 GUARANTEED MINIMUM RENTAL:** A guaranteed minimum rental at the rate specified in Item 6 of the Definitions, plus applicable state sales tax, subject to escalation as set forth in Item 6 of the Definitions. The Guaranteed Minimum Rental shall not commence until the Rent Commencement Date, which shall be the date set forth in Item 5 of the Definitions, unless otherwise specified, or the day Tenant opens for business in the Demised Premises, whichever shall first occur. When the Rent Commencement Date has been determined, Landlord and Tenant agree to enter into a written memorandum as to such date. All monthly installments of Guaranteed Minimum Rental shall be payable in advance on the first day of each and every month during the term of this Lease, commencing with the Rent Commencement Date. If the Rent Commencement Date is not the first day of a month, then Tenant shall pay on the Rent Commencement Date, a pro-rata portion of a monthly installment of Guaranteed Minimum Rent prorated on a per diem basis for the period from the rent commencement date through the last day of the month in which the Rent Commencement Date commences.

~~**SECTION 3.2 PERCENTAGE RENTAL:** In addition to the Guaranteed Minimum Rental, as aforesaid, the Tenant covenants and agrees to pay to the Landlord as additional rental, a sum equal to the amount, if any, of the percentage rent rate, as specified in Item 7 of the Definitions, of all gross sales made in, on or from the said Demised Premises during each Lease Year, as defined, less the aggregate of the Guaranteed Minimum Rental by Tenant for such Lease Year.~~

~~Said additional rental, plus applicable state sales tax, as set forth in Item 7 of the Definitions shall be paid in annual installments as follows: Within thirty (30) days after the end of each Lease Year, Tenant shall pay to the Landlord, after deducting therefrom the Guaranteed Minimum Rental paid for said Lease Year a sum of money equal to the above provided for percentage of the gross sales made in, on or from the Demised Premises for said Lease Year, computed on the above formula. This covenant and all other covenants of Tenant shall survive the expiration of this Lease.~~

~~For purposes of this Lease, the first Lease Year shall be deemed to begin on the Rent Commencement Date and to end twelve (12) months thereafter; provided, if said first twelve (12) months' period does not end on the last day of a calendar month, the first Lease Year shall be extended to the end of said month, and each succeeding twelve (12) month period thereafter shall be deemed a Lease Year.~~

~~If this Lease shall expire or be terminated on a date other than that fixed for its termination herein, then said additional rental shall be computed and apportioned at the rate and on the basis as herein set forth, and the payment of such additional percentage rental shall be made on the 20th day of the calendar month next succeeding the termination of this Lease. This covenant shall survive the expiration of this Lease.~~

~~On default in the payment of any additional rental, Landlord shall have the same rights and remedies as are provided for in this Lease and by law with respect to default in the payment of Guaranteed Minimum Rental.~~

~~**SECTION 4.0 SALES REPORTS:** The Tenant shall, throughout the term of this Lease, keep a full, true and accurate account of the entire gross sales of the business or businesses conducted in, on or from the Demised Premises.~~
~~Tenant shall and hereby agrees that it will furnish Landlord with reports in writing on or before the tenth (10th) day of the month next following the month for which each report is given, certified by Tenant, if an individual, or an authorized officer of the Tenant, if a corporation, in accordance with Item 7a, showing the amount of gross sales, as hereinafter defined, made in, on or from the Demised Premises during the preceding month.~~

~~The Tenant further agrees that it will submit to the Landlord within thirty (30) days after the expiration of each~~

6

Lease Year period, at the place where the rent herein reserved is then payable, a complete statement, certified by a Certified Public Accountant, showing in all reasonable detail the amount of gross sales, as hereinafter defined, made in, on or from the Demised Premises during said period and will submit and pay with said statement any additional rental which may be due and payable by Tenant. Tenant shall require its subtenants, if any, are permitted under the terms of this Lease, to furnish similar statements.

SECTION 5.0 GROSS SALES: The term "Gross Sales" as used herein shall be construed to include the entire amount of the actual sales price, whether for cash or otherwise, of all sales of merchandise, service, and other receipts whatsoever of all business conducted in, on or from the Demised Premises, including all deposits not refunded to purchasers, orders taken, although said orders may be filled elsewhere, and sales by any sublessee, concessionaire or licensee or otherwise in said Demised Premises. No deduction shall be allowed for uncollected or uncollectible credit accounts. Said term shall not include, however, any sums collected and paid out for any sales or excise tax imposed by any duly constituted Governmental Authority wherein tenant is regarded as the collecting agent, nor shall it include the exchange of merchandise between the stores of Tenant, if any, where such exchange of goods or merchandise is made solely for the convenient operation of the business of Tenant and not for the purpose of consummating a sale which has theretofore been made at, in, from or upon the Demised Premises in from, or upon the Demised Premises, nor shall it include the amount of returns to shippers or manufacturers, nor the amount of any cash or credit refund made upon any sale where the merchandise sold, or some part thereof, is thereafter returned by purchaser and accepted by Tenant. All sales shall be recorded in a cash register having sealed cumulative capacity and shall be reasonably approved by the Landlord.

SECTION 6.0 BOOKKEEPING RECORDS INSPECTION: Tenant shall keep at the Demised Premises or such other address as Landlord may approve in writing, true and accurate records and accounts, in accordance with approved accounting practice, of all the Gross Sales made in, on, or from the Demised Premises by Tenant for a period of at least three (3) years after rendering the said annual statements, and require all subtenants, concessionaires and licensees, if any, to likewise keep such records at the Demised Premises or at such other address as Landlord may approve in writing, all of which records and accounts shall, during the period they are required to be so kept and maintained, be open for inspection and audit by Landlord, or the duly authorized agent of Landlord. Such inspection or audit, however, shall only te made at reasonable times during Tenant's business hours.

If any such audit as aforesaid shall disclose any inaccuracies in said records which shall have produced a deficiency in percentage rental amounting to Two Hundred and Fifty Dollars ($250.00) or more, then and in that event, the Tenant shall pay any deficiency, plus the reasonable cost of such audit. If Tenant has deliberately understated gross sales in Tenant's reports to Landlord, Landlord may, in addition to any other remedies under this lease, cancel this lease.

Landlord covenants and agrees to keep confidential all information acquired aforesaid, except as disclosure may be compelled by law or be appropriate in legal proceedings or in connection with a leasing or sale or proposed leasing or sale of the Demised Premises, or in connection with the placing of a loan thereon.

SECTION 7.0 LATE CHARGE/NON-SUFFICIENT FUNDS PENALTY: Late Charge: Any amount due from Tenant to Landlord which is not paid when due shall bear one hundred dollar ($100.00) late charge after the fifth (5th) day said payment is due. Additionally, any monies due from Tenant to Landlord which is not paid by the tenth (10th) day of each month shall be subject to a one hundred dollar ($100.00) per day late charge. These charges shall be included with all payments made after the fifth (5th) day of the month. ii) Non-Sufficient Funds Penalty: Any rental payment to Landlord from Tenant which has been returned by the bank to the Landlord for non-sufficient funds shall be subject to a twenty-five dollar ($25.00) NSF Check Fee. Additionally, should two (2) checks be returned to Landlord for NSF within the space of six (6) months, Landlord may demand that Tenant's rental payments for the six (6) months immediately following shall be in certified U.S. funds only, which shall be defined as Money Order or Cashier's Check. All late fees and NSF fees shall be deemed as Additional Rent.

SECTION 8.0 SALES AND RENTAL TAX: Tenant covenants and agrees to pay to Landlord any and all sales and/or rental taxes imposed by the State of Florida or any other governmental agency with respect to all rents, additional rents and all other payments of monies, including but not limited to, common area maintenance charges and real estate taxes paid by Tenant to Landlord pursuant to the terms of this Lease.

SECTION 9.0 USE: It is understood and agreed between the parties hereto and Tenant covenants that said Demised Premises during the continuance of this Lease shall be used and occupied solely for the purpose specified in Item 8 of the Definitions, and for no other purpose or purposes, without the written consent of Landlord, and the Tenant agrees to cause the Demised Premises to be operated as set forth in Item 8 of the Definitions during the entire term of this Lease, unless prevented from doing so by causes beyond Tenant's control, and to conduct its business at all times in a high-class reputable manner. Tenant agrees that it will not violate any exclusive use rights granted to other tenants of the Shopping Center of which Tenant has been given, or in the future is given, written notice by Landlord. No auction, fire liquidation, or bankruptcy sales may be conducted in the herein Demised Premises without the previous written consent of the Landlord. The Tenant agrees that, except for reasons beyond Tenant's control, Tenant's business will be conducted in the Demised Premises during business hours customary in the Shopping Center, and Tenant will conduct such business in a lawful manner and in good faith and will generally use its best efforts to obtain the highest and best volume of business and gross sales from the Demised Premises. Tenant shall install and maintain at all times displays of merchandise in the display windows, if any, of the Demised Premises. Tenant agrees to continuously operate from the Lease Commencement Date under Tenant's trade name and be open for business a minimum of seven (7) days a week from 9:00 a.m. to 5:00 p.m.

SECTION 10.0 CARE OF PREMISES: The Tenant shall not perform any acts or carry on any practices which may injure the building or be a nuisance or menace to other tenants in the building in which the Demised Premises are located, and shall keep the Demised Premises, including the sidewalks, adjacent to the Demised Premises, and any other areas allocated for the use of the Tenants, clean and free from rubbish and dirt, at all times, and shall store all trash and garbage within the Demised Premises and arrange for the regular pickup of such trash and garbage at the Tenant's expense. The Tenant shall not burn any trash or garbage of any kind in or about the building. The plumbing facilities shall not be used for any other purpose than that for which they are constructed and no foreign substance of any kind shall be

thrown therein, and the expense of any breakage, stoppage, or damage shall be borne by the Tenant.

Tenant shall not keep or display any merchandise on or otherwise obstruct the sidewalks or areaways adjacent to the Demised Premises. Tenant shall not use or permit the use of any portion of said Demised Premises for any unlawful purpose or purposes. The Tenant shall maintain the show windows in a neat and clean condition.

**SECTION 11.0 REPAIRS:** Landlord shall make necessary structural repairs to the Demised Premises and shall keep in good condition and repair the foundations and roof of the Demised Premises, Landlord shall not be required to make any such repairs where same are caused or occasioned by any act, omission or negligence of Tenant, any subtenant, or concessionaire of Tenant, or any of their respective officers, employees, agents, customers, invitees, contractors. Landlord shall not be required to commence any such repair until notice shall be received from Tenant specifying the nature of the needed repair. Except for repairs required to be performed by Landlord under this Section, Tenant shall perform all repairs necessary to keep the Demised Premises in good order, repair and condition, and in a clean, sanitary and safe condition in accordance with law and in accordance with all directions, rules and regulations of governmental agencies having jurisdiction. Notwithstanding anything to the contrary stated herein, Tenant agrees to enter a maintenance contract with a licensed HVAC repair and Maintenance Company, at Tenant's expense, and said maintenance agreement shall require an inspection and maintenance of all HVAC units associated with the premises, at Tenant's expense. Failure of the Tenant to immediately enter such a maintenance agreement shall void any type of warranty or assurance by the Landlord, if expressly given to the Tenant in this lease that the HVAC will be working for a certain duration after turnover of the premises to the Tenant. Landlord, at Landlord's election, may enter a maintenance agreement on the HVAC, if the Tenant fails to do so, and charge the cost to the Tenant. Said cost shall be considered additional rental under this lease. Tenant will provide all documentation requested by the Landlord indicating there is a maintenance agreement in place for the HVAC unit and itemizing what specific services to be performed under said agreement. If the special provisions or construction exhibit of this lease recites an obligation by the Landlord to provide for a new HVAC for the Premises, the Landlord shall have ninety (90) days from the date of issuance of permit or consent/authority by the applicable governmental entity, for said HVAC installation to be completed.

Tenant shall keep and maintain in good order, condition and repair (which repair shall mean replacement if necessary) the Demised Premises and every part thereof, except as hereinbefore provided, including, without limitation, the exterior and interior portions of all doors, door checks, security gates, windows, glass, utility facilities, plumbing and sewage facilities within the Demised Premises or under the floor slab including free flow up the main sewer line, fixtures, heating, air-conditioning, including exterior mechanical equipment, exterior utility facilities and exterior electrical equipment serving the Demised Premises and interior walls, floors and ceilings, including compliance with applicable building codes. If Tenant refuses or neglects to commence or complete any of the obligations above set forth promptly and adequately, Landlord may, but shall not be required to do so, make or complete said maintenance or repairs and Tenant shall pay the cost thereof to Landlord upon demand.

**SECTION 12.0 ADVERTISING MEDIA:** The Tenant agrees not to use any advertising media in the Demised Premises that shall be deemed objectionable to the Landlord or other Tenants, such as loud speakers, phonographs or radio broadcasts in a manner to be heard outside the Demised Premises. Tenant will not place or suffer to be placed or maintained on any exterior door, wall, roof or window of the Demised Premises any sign, awning or canopy, or advertising matter or other thing of any kind, and will not place or maintain any decoration, lettering or advertising matter on the glass of any window or door of the Demised Premises without first obtaining Landlord's written approval and consent. Tenant further agrees to maintain such sign, awning, canopy, decoration, lettering, advertising matter or other thing as maybe approved, in good condition and repair at all times.

**SECTION 13.0 ALTERATIONS:** Tenant shall not make any changes or alterations in or to the Demised Premises without the written consent of Landlord. All alterations, additions, improvements and such fixtures, other than trade fixtures, which as a matter of law have become a part of the realty, which may be made or installed by either of the parties hereto upon the Demised Premises and which in any manner are attached to floors, walls, or ceilings, shall become the property of the Landlord upon installation (unless Landlord shall elect otherwise, which election shall be made by Landlord by giving notice thereof not less than ten (10) days prior to the expiration or other termination of this lease), and at the termination of this Lease shall remain upon and be surrendered with the Demised Premises as a part thereof. Any linoleum or other floor covering of similar character which may be cemented or otherwise adhesively affixed to the floor of the Demised Premises shall be and become the property of the Landlord. Tenant agrees to remove all signs and personal insignia at the termination of the Lease, and to repair any damages caused to the Demised Premises by reason of such removal. Tenant alterations must be performed by a licensed contractor under necessary local government approvals, with copies of lien waivers submitted to Landlord upon completion.

Should Landlord renovate or remodel the Shopping Center, Tenant agrees to comply and cooperate and to adhere to any new specification as to signage.

**SECTION 14.0 INDEMNITY-LIABILITY INSURANCE:** Tenant covenants and agrees to indemnify and save Landlord harmless from and against any and all claims for damages or injuries to goods, wares, merchandise and property and/or for any personal injury or loss of life in, upon, or about the Demised Premises or on the sidewalks immediately in front of the Demised Premises arising for any reason whatsoever during the term of this Lease. Tenant's insurance coverage must include the plate glass windows.

Tenant covenants to provide on or before the commencement date of the term herein and keep in force during the term of this Lease, a comprehensive liability policy of insurance insuring the Landlord and Tenant and any designee of Landlord against any liability whatsoever occasioned by accident on or about the Demised Premises, or any appurtenances thereto. Such policy is to be written by a good and solvent insurance company in the amount of One Million Dollars ($1,000,000.00) combined single limit. The original policy or evidence thereof (**to be provided to Landlord on a modified Acord 25 form only\***) together with evidence of payment therefor, shall be delivered to Landlord. Tenant shall renew said policy not less than thirty (30) days prior to the expiration date thereof from time to time, and furnish said renewals and evidence of payment therefor to Landlord. Said policy shall provide that it cannot be modified or terminated

8

without thirty (30) days written notice to the Landlord.

\*The evidence of insurance coverage will be provided to Landlord on an Acord 25 form that will be modified to delete the words "endeavor to" from the insured's obligation to notify Landlord, as shown below:

"SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING COMPANY WILL GIVE TEN (10) DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER, INCLUDING ALL ADDITIONAL INSUREDS, NAMED ON THE CERTIFICATE."

SECTION 15.0 FIRE INSURANCE: Tenant shall not carry any stock of goods or do anything in or about said Demised Premises which will in any way tend to increase the insurance rates on said Demised Premises. Tenant agrees to pay as additional rental any increase in premiums for insurance against loss by fire that may be charged during the term of this lease with respect to the insurance carried by the Landlord on said Demised Premises or the Building in which the Demised Premises are located resulting from the business carried on in the Demised Premises by the Tenant or the manner in which Tenant carries on said business. Tenant shall at Tenant's expense do whatever is required with respect to Tenant's equipment or Tenant's Fixtures of the operation of Tenant's business, so as to comply with the requirements or recommendations of the Landlord's insurance underwriters and all governmental authorities having jurisdiction, including the installation of sprinklers.

SECTION 16.0 ASSIGNMENT AND SUBLETTING: Tenant will not and may not permit the Demised Premises to be used by others, assign or mortgage this Lease in whole or in part, nor sublet all or any part of the Demised Premises, without the prior written consent of Landlord in each instance, which may be withheld at Landlord's sole discretion. The consent of Landlord to any assignment, mortgaging, or subletting shall not constitute a waiver of the necessity for such consent to any subsequent assignment, mortgaging, or subletting. This Prohibition against assigning or subletting shall be construed to include a prohibition against any assignment or subletting by operation of law. If this Lease is assigned, or if the Demised Premises or any part thereof be underlet or occupied by anybody other than Tenant, Landlord may collect rent from the assignee, under-tenant or occupant, and apply the net amount collected to the rent herein reserved, but no such assignment, underletting, occupancy or collection shall be deemed a waiver of this covenant, or the acceptance of the assignee, under-tenant or occupant as Tenant, or a release of Tenant from the further performance by Tenant of covenants on the part of Tenant herein contained. Notwithstanding any assignment or sublease, Tenant shall remain fully liable on this Lease and shall not be released from performing any of the terms, covenants and conditions of this Lease. If at any time during the term of this Lease any part or all of the corporate shares of Tenant shall be transferred by sale, assignment, bequest, inheritance, operation of law or other disposition so as to result in a change in the present effective voting control of Tenant by the person or persons owning a majority of said corporate shares on the date of this Lease, or if Tenant is a partnership and there shall be a change in the control of said partnership, Tenant shall promptly notify Landlord in writing of such change, and Landlord may terminate this Lease at any time after such change in control by giving Tenant ninety (90) days prior written notice of such termination. Tenant shall not permit any business to be operated in or from the Demised Premises by any concessionaire or licensee.

Tenant shall reimburse Landlord for the reasonable time and expense incurred by Landlord, the sum of Three Hundred and Fifty Dollars ($350.00) for processing and drafting documents related to any request of Tenant for approval by Landlord of assignment, subleases, assumption, transfer, addendums, releases or terminations of this Lease should the Landlord consent to such transactions. Said fee is due and payable at the time the transaction is executed.

SECTION 17.0 ACCESS TO PREMISES: Landlord shall have the right to enter upon the Demised Premises at all reasonable hours for the purpose of inspecting the same, showing same to prospective purchasers or mortgagees, or for making repairs, replacement, alterations, improvements and additions to the Demised Premises or to any property owned or controlled by the Landlord therein or to the Building in which the Demised Premises are located. If Landlord deems any repairs required to be made by the Tenant necessary, it may demand that the Tenant make the same forthwith, and if the Tenant refuses or neglects to commence such repairs and complete the same with reasonable dispatch after written notice by Landlord, the Landlord may make or cause such repairs to be made and shall not be responsible to the Tenant for any loss or damage that may accrue to Tenant's stock or business by reason thereof, and if the Landlord makes or causes such repairs to be made, Tenant agrees that it will forthwith, on demand, pay to the Landlord the cost thereof.

For a period commencing ninety (90) days prior to the termination of this Lease, Landlord may have reasonable access to the Demised Premises for the purpose of exhibiting the same to prospective tenants.

SECTION 18.0 UTILITIES: Tenant agrees to promptly pay all charges for electricity, gas, water, sewer, garbage, and other utilities supplied to the Demised Premises, whether determined by meter or otherwise. If such charges are not so paid, they shall be added to the next or any subsequent month's rent thereafter to become due as Landlord elects and be collectable as rent.

If the plans and specifications for the Demised Premises provide for a heating and/or air conditioning system to be furnished and installed by Landlord, the same, including the supporting structure for said system, shall be under the full control of Tenant, and Tenant agrees that all operation, upkeep, repairs and replacements will be at Tenant's expense.

SECTION 19.0 EMINENT DOMAIN: If the whole or any part of the Demised Premises shall be taken by any public authority under the power of eminent domain, then the term of this Lease shall cease on the part so taken from the day the possession of that part shall be required for any public purpose, and the rent shall be paid up to that day, and if such portion of the Demised Premises is so taken as to destroy the usefulness of the Demised Premises for the purpose for which the Demised Premises were leased, then, from that day the Tenant shall have the right either to terminate this Lease and declare the same null and void, or to continue in the possession of the remainder of the same under the terms herein provided, except that the minimum rent shall be reduced in proportion to the amount of the Demised Premises taken. If Tenant shall fail to terminate this lease as aforesaid within thirty (30) days after notice of said taking, said failure shall be regarded as a waiver of its right to cancel, whereupon this Lease shall continue for the then balance of the term. If Tenant exercises its right to cancel, all advance rent paid by Tenant shall be adjusted to the date of said taking. If more than twenty-five percent (25%) of the floor space of the Shopping Center shall be taken by any public authority under the power of eminent domain, or if so much of the parking facilities in the Shopping Center shall be so taken or conveyed that

9

the number of the parking spaces necessary, in Landlord's judgment, for the continued operation of the Shopping Center shall not be available, then in any such event Landlord may, by notice to Tenant, terminate this lease as of the date when possession shall have been taken. If this lease shall continue in effect, Landlord shall, at its expense but only to the extent of the net award or other compensation (after deducting all expenses in connection with obtaining same) available to Landlord for the improvements taken or conveyed (excluding any award or other compensation for land), make all necessary alterations so as to constitute the remaining Shopping Center a complete architectural and tenantable unit. All awards and compensation for any taking or conveyance, whether for the whole or a part of the Shopping Center, the Demised Premises or otherwise, shall be the property of Landlord, and Tenant hereby assigns to Landlord all of Tenant's right, title, and interest in and to any and all such awards and compensation, including, without limitation, any award or compensation for the value of the unexpired portion of the Term. Tenant shall be entitled to claim, prove and receive in the condemnation proceeding such award or compensation as may be allowed for its trade fixtures and loss of business, good will, depreciation or injury to and cost for removal of stock and trade, but only if such award or compensation shall be made by the condemning authority in addition to, and shall not result in reduction of, the award or compensation made by it to Landlord.

SECTION 20.0 DESTRUCTION-FIRE: If the Demised Premises shall be partially damaged by fire, the elements, unavoidable accident, or other casualty, Landlord shall, at its own expense, cause such damage to be repaired, but only to the extent such damage relates to improvements originally made at Landlord's expense by Landlord and only to the extent of insurance proceeds received by Landlord. If by reason of such occurrence, the Demised Premises shall be rendered untenantable, the Guaranteed Minimum Rental shall be abated during the period that Landlord is making Landlord's repairs. Said abatement to be proportionate to the portion of the Demised Premises rendered untenantable. If the Demised Premises shall be rendered wholly untenantable by reason of such occurrence, Landlord may, at its election, terminate this Lease and the tenancy hereby created by giving the Tenant, within the sixty (60) days following the date of said occurrence, written notice of Landlord's election so to do, and in the event of such termination, rent shall be adjusted as of such date. If Landlord does not elect to terminate this Lease, Landlord shall, at its own expense, cause such damage to be repaired, but only to the extent such damage relates to improvements originally made at Landlord's expense by Landlord and only to the extent of insurance proceeds received by Landlord. Nothing in this section shall be construed to permit the abatement in whole or in part of any additional rent. In the event that twenty-five percent (25%) or more of the rentable area of the Shopping Center shall be damaged or destroyed by fire or other cause, notwithstanding that the Demised Premises may be unaffected by such fire or other caused, Landlord may terminate this Lease and the tenancy hereby created by giving to the Tenant five (5) days' prior written notice of Landlord's election so to do, which notice shall be given, if at all, within sixty (60) days following the day of said occurrence. Rent shall be adjusted as of the date of such termination.

Landlord shall have no obligation to rebuild Tenants Demised Premises if Tenant is within twenty four (24) months of lease expiration unless Tenant extends lease or exercises any options it may have.

SECTION 21.0 DEFAULT OF TENANT: Remedies of Landlord for non-compliance: In the event that (i) the rent, including common area maintenance, real estate taxes, insurance, and/or any other payment required to be made by Tenant, specified herein is not paid at the time and place when and where due, (ii) the Demised Premises shall be deserted or vacated, (iii) the Tenant shall fail to comply with any term, provision, condition of this Lease, other than the payment of rent, or any of the rules and regulations now or hereafter established for the government of this building, (iv) any petition is filed by or against Tenant under any section or chapter of the National Bankruptcy Act as amended, (v) Tenant shall become insolvent or make a transfer in fraud of creditors, (vi) a receiver is appointed for a substantial part of the assets of Tenant and shall not cure such default, after notice to the Tenant of such failure to comply, and upon the occurrence of any one or more of the foregoing, Landlord shall have the option to proceed according to one or more of the following courses of action in addition to any other remedies at law:

1) Terminate this Lease, in which event Tenant shall immediately surrender the Demised Premises to Landlord, but if Tenant shall fail to do so, Landlord may, without further notice and prejudice to any other remedy Landlord may have for possession or arrearage in rent, enter upon the Demised Premises and expel or remove Tenant and its effects, by force if necessary, without being liable to prosecution or any claim for damages therefor, and Tenant hereby waives its rights to receive notice in accordance with Section 83.20, Florida Statutes, and agrees to indemnify Landlord for all loss and damage which Landlord may suffer by reason of such termination, whether through inability to relet the Demised Premises, or through decrease in rent, or otherwise; and/or

2) Declare the entire amount of the rent which would become due and payable during the remainder of the term of this Lease to be due and payable immediately, in which event, Tenant agrees to pay the same at once, together with all rents theretofore due, at Landlord's address as provided herein; provided, however, that such payment shall not constitute a penalty or forfeiture or liquidated damages, but shall merely constitute payment in advance of the rent for the remainder of the said term. The acceptance of such payment by Landlord shall not constitute a waiver of any failure of Tenant thereafter occurring to comply with any term, provision, condition or covenant of this Lease; and/or

3) Enter the Demised Premises as the agent of the Tenant, by force if necessary, without being liable to prosecution or any claim for damages therefor, and relet the Demised Premises as agent of the Tenant, and receive the rent therefor, and the Tenant shall pay the Landlord any deficiency that may arise by reason of such reletting on demand at the office of the Landlord; and/or

4) As agent of the Tenant, do whatever the Tenant is obligated to do by the provisions of this Lease and may enter the Demised Premises, by force if necessary, without being liable to prosecution of any claims for damages therefor, in order to accomplish this purpose. The Tenant agrees to reimburse the Landlord immediately upon demand for any expense which the Landlord may incur in thus affecting compliance with this Lease on behalf of the Tenant, and the Tenant further agrees that the Landlord shall not be liable for any damages resulting to the Tenant from such action, whether caused by the negligence of the Landlord or otherwise.

5) Automatically pledge any and all Security Deposits and Prepaid Rent toward Landlord's damages.

10

Pursuit by Landlord of any of the foregoing remedies shall not preclude the pursuit of any of the other remedies herein provided or any other remedies provided by law. No act or thing done by the Landlord or its agents during the term hereby granted shall be deemed an acceptance of a surrender of said Demised Premises, and no agreement to accept a surrender of said Demised Premises shall be valid unless the same be made in writing and subscribed by the Landlord. The mention in this Lease of any particular remedy shall not preclude the Landlord from any other remedy the Landlord might have, either in law or in equity, nor shall the waiver of or redress for any violation of any covenant or condition, in this Lease contained or any of the rules and regulations set forth herein, or hereafter adopted by Landlord, prevent a subsequent act, which would have originally constituted a violation, from having all the force and effect of an original violation. In case it should be necessary or proper for Landlord to bring any action under this Lease, or to consult or place said Tenant, or any amount payable by Tenant thereunder, with an attorney concerning or for the enforcement of any of Landlord's rights hereunder, then Tenant agrees in each and any such case to pay to Landlord a reasonable attorney's fee. The receipt by the Landlord of rent with knowledge of the breach of any covenant in this Lease contained shall not be deemed a waiver of such breach. No termination of this Lease prior to the normal ending thereof, by lapse of time or otherwise, shall effect Landlord's right to collect rent for the period prior to the termination thereof.

**SECTION 22.0 LANDLORD'S FEES:** It is further understood that the Tenant will pay in addition to the rentals and other sums agreed to be paid hereunder, all sums and expenses incurred by Landlord in enforcing, defending, or interpreting its rights hereunder, including without limitation, all court costs, all attorney's fees (whether incurred out of court, at trial, on appeal, or in bankruptcy proceedings), and all collection costs and fees charged by third parties. Tenant shall reimburse Landlord for the reasonable time and expense incurred by Landlord, the sum of Three Hundred and Fifty Dollars ($350.00) for processing and drafting documents related to any request of Tenant for approval by Landlord of assignment, subleases, assumption, transfer, addendums, releases or terminations of this Lease should the Landlord consent to such transactions. Said fee is due and payable at the time the transaction is executed.

**SECTION 23.0 NOTICE TO LANDLORD:** The checks for rental accruing hereunder shall be made payable and forwarded to Landlord at address specified in Item 9 of the Definitions, and all notices given to the Landlord hereunder shall be forwarded to the Landlord at the foregoing address, by certified mail, return receipt requested, until Tenant is notified otherwise in writing.

**SECTION 24.0 SERVICE OF NOTICE:** Tenant hereby appoints as its agent to receive the service of all dispossessory or distraint proceeding, legal notices and notices required under this Lease, the person in charge of said Demised Premises at the time, or occupying the Demised Premises, and if there is no person in charge of occupying the same, then such service or notice may be made by attaching the same on the main entrance of the Demised Premises. Landlord shall serve all notices to Tenant at address specified in Item 10 of the Definitions by certified mail, return receipt requested, prior to serving notice to the Demised Premises.

**SECTION 25.0 OBSERVANCE OF LAWS AND ORDINANCES:** Tenant agrees to observe, comply with and execute promptly at its expense during the term hereof, all laws, rules, requirements, orders, directives, ordinances and regulations of any and all governmental authorities or agencies and of all municipal departments, bureaus, boards and officials due to its use or occupancy of the Demised Premises.

**SECTION 26.0 STRIKES, ETC:** Anything in this agreement to the contrary notwithstanding, neither Landlord nor Tenant shall be deemed in default with respect to any provision, covenant or condition of this agreement on the part of either of them respectively to be performed if the performance thereof shall be delayed, interfered with or rendered impossible because of any strike, lockout, civil commotion, war, warlike operation, invasion, insurrection, rebellion, hostilities, revolution, military or usurped power, sabotage, inability to obtain any necessary material or service, act of God or other cause beyond the control of the party seeking to excuse such performance, provided such cause is not due to the act or neglect of such party; and provided further, however, that such performance shall be resumed and completed with due diligence and reasonable dispatch as soon as the contingency causing such delay or impossibility shall abate. Nothing in this paragraph contained shall operate or be construed to relieve Tenant of any obligation for the payment of minimum rent or additional rent.

**SECTION 27.0 RIGHT TO CURE DEFAULTS:** If Tenant shall fail to make repairs, maintain public liability insurance, comply with all laws and ordinances and regulations, pay all bills for utilities, or perform any other obligation on the part of Tenant to be performed, in accordance with the provisions of this Lease, then Landlord shall have the right and option, to perform such work or make such payments on behalf of Tenant, and Tenant agrees to reimburse Landlord promptly upon demand, together with interest at the rate of ten percent (10%) per annum, and upon its failure to do so, Landlord shall have all the remedies therefor as for non-payment of rental hereunder.

The right and option given in this paragraph shall not have the effect of releasing Tenant from the obligation to perform any of the covenants herein provided to be performed by Tenant or deprive Landlord of any legal rights which Landlord may have by reason of any such default.

**SECTION 28.0 NONLIABILITY FOR INJURY, LOSS OR DAMAGE:** Tenant acknowledges and agrees that Landlord shall not be liable or responsible in any way to Tenant or any other person for:

(i) any injury arising from or out of any occurrence in, upon, at, or relating to the Center or any part thereof or any loss or damage to property (including loss of use thereof) of Tenant or any other person located in the Center or any party thereof from any cause whatsoever, whether or not such injury, loss, or damage results from any fault, default, negligence, act, or omission of Landlord or its agents, servants, employees, or any other Person for whom Landlord is in law responsible;

(ii) (without limiting the generality of the foregoing provisions of this Section) any injury to Tenant or any other Person or loss or damage to property resulting from: fire; smoke, explosion; falling plaster, ceiling tiles, fixtures, or signs; broken glass; steam; gas; fumes; vapors; odors; dust; dirt; grease; acid; oil; any hazardous material or substance; debris; noise; air or noise pollution; theft; breakage; vermin; electricity; computer or electronic equipment or systems malfunction or stoppage; water; rain; flood; flooding;

11

freezing; tornado; windstorm; snow; sleet; hail; frost; ice; excessive heat or cold; sewage; sewer backup; toilet overflow; or leaks or discharges from any part of the Center (including the Demised Premises), or from any pipes, sprinklers, appliances, equipment (including, without limitation, heating, ventilating, and air-conditioning equipment); electrical or other wiring; plumbing fixtures; roof(s), windows, skylights, doors, trapdoors, or subsurface of any floor or ceiling of any part of the Center, or from the street or any other place, or by dampness or climatic conditions, or from any other cause whatsoever;

(iii)    any Injury, loss, or damage caused by other tenants or any Person in the Center, or by occupants of adjacent property thereto, or by the public, or by construction or renovation, or by any private, public, or quasi-public work, or by interruption, cessation, or failure of any public or other utility service, or caused by Force Majeure;

(iv)    any Injury to Tenant or any other Person or any loss or damage suffered to the Demised Premises or the contents thereof by reason of Landlord or its representatives entering the Demised Premises to undertake any work therein, or to exercise any of Landlord's rights or remedies hereunder, or to fulfill any of Landlord's obligations hereunder, or in the case of emergency; or

(v)    any Injury, loss, or damage to property caused by perils insured against or required to be insured against by Tenant pursuant to insurance clause(s) of the lease. Tenant shall promptly indemnify and hold Landlord harmless from and against any and all claims in connection with any Injury or any loss or damage to property referred to in this Section.

**SECTION 29.0 REAL ESTATE TAXES:** Tenant shall pay, as additional rent, Tenant's prorata share of the Real Estate Taxes, special assessments, taxes and fees assessed against the Shopping Center. Tenant shall pay to Landlord against Tenant's proportionate share of Real Estate Taxes a charge as set forth in Item 11 of the Definitions per month, plus state sales tax, in advance on the first day of each month, together with the monthly rental payment. At the end of each calendar year, Landlord will compute the actual prorata share of the Real Estate Taxes and assessments levied or imposed on the land and buildings comprising the Shopping Center payable by Tenant and shall notify Tenant of any deficiency which the Tenant is obligated to pay within ten (10) days after Landlord makes written request therefor; in the event of any overpayment by Tenant, such overpayment shall be credited toward future payments of Real Estate Taxes. The monthly estimated tax charge for each period may be adjusted based on Landlord's estimate of the Real Estate Taxes for each period.

**SECTION 30.0 OPERATING EXPENSES:** For purposes of this Lease, the phrase "Operating Expenses" includes the expenses of operating all areas, spaces and improvements in the Shopping Center which Landlord makes available from time to time for the use and benefit of the Tenants and occupants of this Shopping Center, including, without limitation, parking areas, roads, walkways, sidewalks, landscaped and planted areas, Shopping Center office, if any, public restrooms, if any. For purposes of this Lease the phrase "Operating Expenses" includes all maintenance and operating expenses of the shopping center (whether or not within the contemplation of the parties) for the maintenance, management, policing, repair, replacement, all insurance on buildings and common areas and operation of the shopping center and any part thereof, but not including leasing commissions, capital repairs, Tenant improvements, new construction and real estate taxes, plus fifteen percent (15%) of such cost and expense for Landlord's administrative and overhead cost and expense. During the period from the Rent Commencement Date until midnight of the December 31st next following (which period is hereinafter referred to as the "Short Year") Tenant shall pay to Landlord against Tenant's proportionate share of Operating Expenses for such period, a operating expense charge as specified in Item 12 of the Definitions per month, plus state sales tax, in advance on the first day of each month, except that if the Rent Commencement Date is not the first day of the month, the Operating Expense charge for the period commencing on the Rent Commencement Date and ending on the last day of the month in which the rent commencement occurs shall be apportioned on the basis of the number of days in said month and paid on the Rent Commencement Date. Thereafter during each calendar year, Tenant shall pay to Landlord on the first day of each month in advance against Tenant's proportionate share of Operating Expenses, one-twelfth (1/12) of Tenant's proportionate share of the Operating Expenses of the prior calendar year (with the Operating Expenses for the short year annualized for the purpose of making such computation in respect to payments against Tenant's proportionate share of Operating Expenses for the first full calendar year) except that until Landlord submits to Tenant the statement referred to in the next succeeding sentence, Tenant shall pay same at the same rate as that which Tenant was paid against Tenant's proportionate share of Operating Expenses during such prior calendar year, and within ten (10) days after submission of said statement, Landlord and Tenant shall adjust for any underpayment during the prior months of the then current calendar year. After December 31st of the year in which the Rent Commencement Date occurs, after the end of each calendar year, and after the end of the term of this Lease, Landlord shall submit to Tenant a statement in reasonable detail stating Tenant's proportionate share of the Operating Expenses for the short year, such calendar year, or partial calendar year in the event the term shall end on a date other than a December 31st, as the case may be, and stating the Operating Expenses for the period in question, and the figures used for computing Tenant's proportionate share, and if Tenant's proportionate share so stated for such period is more or less than the amount paid for such period, Tenant shall pay to Landlord the deficiency within ten (10) days after submission of such statement of Tenant's proportionate share. Landlord may adjust all Operating Expenses annually based on the previous year's costs.  Tenant's proportionate share of the Real Estate Tax, Operating Expenses and Insurance shall be determined by a fraction, the numerator of which shall be the number of square feet of floor space in Demised Premises and the denominator of which shall be the number of square feet of the gross leasable floor space in all of the buildings in the Shopping Center. The fraction shall be multiplied by the Operating Expenses or Real Estate Taxes to determine the amount owed. All items of Operating Expenses will be stated and all computations shall be made in accordance with generally accepted accounting principles. All payments to be made by Tenant under this Section shall constitute additional rent.

**SECTION 31.0 MERCHANTS ASSOCIATION/PROMOTION FUND:** Tenant covenants and agrees to maintain membership in and comply with the regulations of the Merchant's Association of the Shopping Center during the full term of this Lease, whether the Association is formed now or in the future. Current dues are as stated in Item 14 of the Definitions, payable monthly, subject to change by the Merchant's Association or Promotion Fund.

SECTION 32.0 SURRENDER AT END OF TERM: Upon the expiration of the term hereof or sooner termination of this Lease, Tenant agrees to surrender and yield possession of the Demised Premises to Landlord peacefully and without notice, and in good order and condition, but subject to ordinary wear and reasonable use thereof, and subject to such damage or destruction or condition as Tenant is not required to restore or remedy under other terms and conditions of this Lease.

SECTION 33.0 DEFINITION OF LANDLORD: The term "Landlord" as used in this lease means only the owner for the time being of the land and buildings comprising the Shopping Center so that, in the event of any sale of the Shopping Center, the Landlord shall be and is hereby entirely relieved of all covenants and obligations of the Landlord hereunder.

SECTION 34.0 TENANT DEFINED, USE OF PRONOUN: The word "Tenant" shall be deemed and taken to mean each and every person or party mentioned as a Tenant herein, be the same one or more and if there shall be more than one Tenant, any notice required or permitted by the terms of this Lease may be given by or to any one thereof, and shall have the same force and effect as if given by or to all thereof. The use of the neuter singular pronoun to refer to Landlord or Tenant shall be deemed a proper reference even though Landlord or Tenant may be an individual, a partnership, a corporation, or a group of two or more individuals or corporations. The necessary grammatical changes required to make the provision of this lease apply in the plural sense where there is more than one Landlord or Tenant and to either corporations, associations, partnerships, or individuals, males, or females, shall in all instances be assumed as though in each case fully expressed.

SECTION 35.0 SECURITY DEPOSIT: Tenant, contemporaneously with the execution of this lease, has deposited with the Landlord the sum as stated in Item 15 of the Definitions, receipt of which is hereby acknowledged by Landlord. Said deposit is made as security for the faithful performance by Tenant of all of the terms, covenants, and conditions of this lease by said Tenant to be kept and performed during the term hereof. If at any time during the term of this Lease any of the rent herein reserved shall be overdue and unpaid, or any other sum payable by Tenant to Landlord hereunder shall be overdue and unpaid then Landlord may, at the option of Landlord (but Landlord shall not be required to), appropriate and apply any portion of said deposit to the payment of any such overdue rent or other sum. In the event of the failure of Tenant to keep and perform any of the terms, covenants and conditions of this lease to be kept and performed by Tenant, then the Landlord, at his option, may appropriate and apply said entire deposit, or so much thereof as may be necessary, to compensate the landlord for loss or damage sustained or suffered by Landlord due to such breach on the part of Tenant. Should the entire deposit, or any portion thereof, be appropriated and applied by Landlord for the payment of overdue rent or other sums due and payable to Landlord by Tenant hereunder, then Tenant shall, upon the written demand of Landlord, forthwith remit to Landlord a sufficient amount in cash to restore said security to the original sum deposited, and Tenant's failure to do so within five (5) days after receipt of such demand shall constitute a breach of this lease. Should Tenant comply with all of said terms, covenants and conditions, and promptly pay all of the rental herein provided for as it falls due, and all other sums payable by Tenant to Landlord hereunder, the said deposit shall be returned to Tenant at the end of the term of this Lease, or upon the earlier termination of this Lease. Landlord may deliver the funds deposited hereunder by Tenant to the purchaser of Landlord's interest in the Demised Premises, in the event that such interest is sold, and thereupon Landlord shall be discharged from any further liability with respect to such deposit. The security deposit may be commingled with Landlord's general corporation funds and Landlord shall not have liability to Tenant for any interest on such security deposit.

SECTION 36.0 TRANSFER OF DEPOSIT: In the event of a sale or transfer of the Shopping Center or any portion thereof which includes the Demised Premises, or in the event of the making of a Lease of the Center or of any portion, or in the event of a sale or transfer of the leasehold estate under any such underlying Lease, the grantor, transferror or Landlord, as the case may be, will thereafter be entirely relieved of all terms, covenants and obligations thereafter to be performed by Landlord under this Lease to the extent of the interest or portion so sold, transferred or leased, and it shall be deemed and construed, without further agreement between the parties and the purchaser, transferee or Tenant, as the case may be, has assumed and agreed to carry out any and all covenants of Landlord hereunder; provided that (I) any amount then due and payable to Tenant or for which Landlord or the then grantor, transferror or Landlord would otherwise then be liable to pay to Tenant (it being understood that the owner of an undivided interest in the fee or any such lease shall be liable only for his or its proportionate share of such amount) shall be paid to Tenant or the obligations for said payment shall be assumed by the grantee or transferee; (ii) the interest of the grantor, transferror or Landlord, as Landlord, in any funds then in the hands of Landlord or then grantor, transferror or Landlord in which Tenant has an interest, shall be turned over, subject to such interest, to the then grantee, transferee or Tenant; and (iii) notice of such sale, transfer or Lease shall be delivered to Tenant.

SECTION 37.0 PERSONAL PROPERTY: As additional security for the performance of Tenant's obligations hereunder, Tenant hereby pledges and assigns to Landlord all the furniture, fixtures, goods, inventory, stock and chattels, and all other personal property of Tenant which are now or may hereafter be brought or put in the Demised Premises, and further grants to Landlord a security interest therein under the Uniform Commercial Code. For the purpose of securing the performance of all the obligations of Tenant hereunder, and at the request of Landlord, Tenant hereby agrees to execute and deliver to Landlord all financing statements, amendments thereto or other similar statements which Landlord may reasonably request. Nothing herein contained shall be deemed to be a waiver by Landlord of its statutory lien to rent and remedies, rights and privileges of Landlord in the case of default to Tenant as set forth above and shall not be exclusive and, in addition thereto, Landlord may also exercise and enforce all its rights at law or in equity which it may otherwise have as a result to Tenant's default hereunder. Landlord is herein specifically granted all of the rights of secured creditor under the Uniform Commercial Code with respect to the property in which Landlord has been granted a security interest by Tenant, including, but not limited to, the right to take possession of the above mentioned property and dispose of it by sale in a commercially reasonable manner. BY SIGNING THIS RENTAL AGREEMENT THE TENANT AGREES THAT UPON SURRENDER OR ABANDONMENT, AS DEFINED BY CHAPTER 83 OF THE FLORIDA STATUTES, OR UPON EVICTION, THE LANDLORD SHALL NOT BE LIABLE OR RESPONSIBLE FOR STORAGE OR DISPOSITION OF THE TENANT'S PERSONAL PROPERTY. Notwithstanding the same, Landlord has no obligation to preserve or protect Tenant's personal property remaining or located at or around the premises before, during or after the term of this agreement.

13

**SECTION 38.0 CONTROL OF COMMON AREAS BY LANDLORD:** All automobile parking areas, driveways, entrances and exits thereto, and other facilities furnished by Landlord in or near the Shopping Center including employee parking areas, the truck way or ways, loading docks, package pick-up stations, pedestrian sidewalks, and ramps, landscaped areas, exterior stairways, first-aid stations, comfort stations and other areas and improvements provided by Landlord for the general use in common of tenants, their officers, agents, employees and customers, and all other common areas, shall at all times be subject to the exclusive control and management of Landlord, and Landlord shall have the right from time to time to establish, modify and enforce reasonable rules and regulations with respect to all facilities and areas mentioned in this Section. Landlord shall have the right to construct, maintain and operate lighting facilities on all said areas and improvements; to police the same; from time to time to change the area, level, location and arrangements of parking areas and other facilities hereinabove referred to; to restrict parking by tenants, their officers, agents and employees to employee parking area; to enforce parking changes (by operation of meters or otherwise), with appropriate provisions for free parking ticket validating by tenants; to close all or any portion of said areas or facilities to such extent as may, in the opinion of Landlord's counsel, be legally sufficient to prevent a dedication thereof or the accrual of any rights to any person or the public therein; to close temporarily all or any portion of the parking areas or facilities; to discourage non-customer parking; and to do and perform such other acts in and to said areas and improvements as, in the use of good business judgment, Landlord shall determine to be advisable with a view to the improvement of the convenience and use thereof by tenants, their officers, agents, employees and customers. Landlord will operate and maintain the common areas referred to above in such manner as Landlord, in its sole discretion, shall determine from time to time. Without limiting the scope of such discretion, Landlord shall have the full right and authority to employ all personnel and to make all rules and regulations pertaining to and necessary for the proper operation and maintenance of the common areas and facilities. All common areas and facilities not within the Demised Premises, which Tenant may be permitted to use and occupy, are to be used and occupied under a revocable license, and if the amount of such areas be diminished. Landlord shall not be subject to any liability, nor shall Tenant be entitled to any compensation or diminution or abatement of rent nor shall such diminution of such areas be deemed constructive or actual eviction.

**SECTION 39.0 RULES AND REGULATIONS:** Any rules and regulations appended to this Lease are hereby made a part of this Lease, and Tenant agrees to comply with and observe the same. Tenant's failure to keep and observe said rules and regulations shall constitute a breach of the terms of this Lease in the manner as if the same were contained herein as covenants. Landlord reserves the right from time to time to amend or supplement said rules and regulations and to adopt and promulgate additional rules and regulations applicable to Demised Premises and the Shopping Center. Notice of such additional rules and regulations, and amendments and supplements, if any, shall be given to Tenant, and Tenant agrees thereupon to comply with and observe all such rules and regulations, and amendments thereto and supplements thereof, provided the same shall apply uniformly to all tenants of the Shopping Center.

**SECTION 40.0 OFFSET STATEMENT:** Within ten (10) days after request therefor by Landlord, or in the event that upon any sale, assignment or hypothecation of the Demised Premises and/or the land thereunder by Landlord, an offset statement shall be required from Tenant; Tenant agrees to deliver in recordable form a certificate to any proposed mortgagee or purchaser, or to Landlord, certifying (if such be the case) that this Lease is in full force and effect and that there are no defenses or offsets thereto, or stating those claimed by Tenants, and containing such other matters as may reasonably be requested by Landlord.

**SECTION 41.0 ATTORNMENT:** Tenant hereby agrees that Tenant will recognize as its landlord under this Lease and shall attorn to any person succeeding to the interest of Landlord in respect of the land and the buildings on or in which the demised premises is contained upon any foreclosure of any mortgage or deed of trust upon such land or buildings or upon the execution of any deed in lieu of such foreclosure in respect of such mortgage or deed of trust.

**SECTION 42.0 TAXES ON LEASEHOLD:** Tenant shall be responsible for and shall pay before delinquency all municipal, county or state taxes assessed during the term of this Lease against any leasehold interest or personal property of any kind, owned by or placed in, upon or about the Demised Premises by the Tenant.

**SECTION 43.0 LANDLORD'S COVENANT:** Upon payment by the Tenant of the rents herein provided, and upon the observance and performance of all the covenants, terms and conditions on Tenant's part to be observed and performed, Tenant shall peaceably and quietly hold and enjoy the Demised Premises for the term hereby demised without hindrance or interruption by Landlord or any other person or persons lawfully or equitable claiming by, through or under the Landlord, subject; nevertheless, to the terms and conditions of this Lease.

**SECTION 44.0 ACCORD AND SATISFACTION:** No endorsement or statement on any check or in any letter accompanying any check or payment as rent shall be deemed as accord and satisfaction, and Landlord may accept such check or payment without being subject to the terms of any such endorsement or statement and without prejudice to Landlord's right to recover the balance of all rent due Landlord or Landlord's right to pursue any other remedy in this Lease provided.

**SECTION 45.0 ENTIRE AGREEMENT:** This Lease and the Exhibits, and Rider, if any, attached hereto and forming a part hereof, set forth all the covenants, promises, agreements, conditions and understandings between Landlord and Tenant concerning the Demised Premises and there are no covenants, promises, agreements, conditions or understandings, either oral or written, between them other than are herein set forth. Except as herein otherwise provided, no subsequent alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by them.

**SECTION 46.0 NO PARTNERSHIP:** Landlord does not, in any way or for any purpose, become a partner of Tenant in the conduct of its business, or otherwise, or joint venture or a member of a joint enterprise with Tenant. The provisions of this Lease relating to the percentage rent payable hereunder are included solely for the purpose of providing a method whereby the rent is to be measured and ascertained.

**SECTION 47.0 CAPTIONS AND SECTION NUMBERS:** The captions, section numbers and index appearing in this Lease are inserted only as a matter of convenience and in no way define, limit, construe, or describe the scope or intent of such sections of this Lease nor in any way affect this Lease.

14

**SECTION 48.0 BROKER'S COMMISSION:** Each of the parties represents and warrants that there are no claims for brokerage commissions or finder's fees in connection with the execution of this Lease, except as listed Item 16, and each of the parties agrees to indemnify the other against, and hold it harmless from, all liabilities arising from any such claim (including, without limitation, the cost of counsel fees in connection therewith) unless otherwise stated in Item 16 of the Definitions.

**SECTION 49.0 PARTIAL INVALIDITY:** If any term, covenant or condition of this Lease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term, covenant or condition to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby and each term, covenant or condition of this Lease shall be valid and be enforced to the fullest extent permitted by law.

**SECTION 50.0 SUBORDINATION:** This Lease is subject and subordinate to any and all mortgages which may now or hereafter affect the real property of which the Demised Premises is a part thereof, and to all renewals, modifications and extensions thereof. The Tenant shall, upon twenty (20) days written request of Landlord, execute any subordination documents which Landlord may deem necessary and/or any modification of this Lease that might be required by any lending institution or other entity that may become a mortgagee as to the property of which the Demised Premises is a part. Tenant also agrees that if it shall fail at any time to execute, acknowledge or deliver any such instrument or document requested by Landlord, Landlord may, in addition to any other remedies available to it, execute, acknowledge and deliver such instrument as the attorney-in-fact of Tenant and in Tenant's name; and Tenant hereby makes, constitutes and irrevocably appoints Landlord as its attorney-in-fact for that purpose. Tenant shall not be required to execute any subordination agreement unless such agreement contains a non-disturbance provision in favor of Tenant which guarantees to the Tenant that the Mortgagee and its successors shall not disturb the Tenant's possession and quiet enjoyment so long as Tenant shall timely perform all of its covenants under the Lease. The subordination agreement shall further require the Mortgagee or Purchasee at a foreclosure sale to assume the obligations of the Landlord as of the day Mortgagee shall acquire title to the Demised Premises. The Tenant shall agree to attorn to the Mortgagee if Mortgagee shall become the owner of the Demised Premises.

**SECTION 51.0 SIGNS:** Tenant's sign shall be furnished and installed by Tenant on the facade provided, and shall be illuminated. Tenant must submit his sign layout to Landlord for approval prior to its fabrication and installation, in accordance with the Sign Criteria attached and made a part of this Lease. Tenant's signage must be installed and in working order within 15 days of Tenant opening for business. Tenant's sign shall remain illuminated from dusk until midnight on Monday through Sunday.

**SECTION 52.0 EMPLOYEE PARKING:** Tenant will cause its employees, officers and agents to park only in places designated by Landlord for employee parking. Landlord reserves the right to have towed any vehicle parked in violation of this clause at Tenant's expense.

**SECTION 53.0 WAIVER:** One or more waivers of any covenant or condition by the Landlord shall not be construed as a wavier of a subsequent breach of the same covenant or condition, and the consent or approval by the Landlord to or of any act by the Tenant requiring the Landlord's consent or approval shall not be deemed to waive or render unnecessary the Landlord's consent or approval to or of any subsequent similar act by the Tenant. The subsequent acceptance of rent hereunder by Landlord shall not be deemed to be a waiver of any preceding breach by Tenant of any term, covenant or condition of this Lease, other than the failure of Tenant to pay the particular rental so accepted, regardless of Landlord's knowledge of such preceding breach at the time of acceptance of such rent. No covenant, term or condition of this Lease shall be deemed to have been waived by Landlord, unless such waiver be in writing by Landlord.

**SECTION 54.0 FAILURE OF TENANT TO OPEN; FAILURE TO OPERATE:** It Tenant fails to open within thirty (30) days from the date which Landlord turns over the Demised Premises to Tenant, then Landlord may cancel this Lease at Landlord's option and all monies paid to Landlord shall remain the property of Landlord.

If Tenant fails to continually operate the store and ceases to operate for a period of more than three (3) consecutive days or five (5) days in any Lease Year, Landlord may at Landlord's option, terminate this Lease with five (5) days written notice and the Landlord reserves all rights to seek additional damages and causes of action against the Tenant for Breach of this Lease.

**SECTION 55.0 NON-LIABILITY OF LANDLORD:** The term Landlord as used in this Lease means only the owner or the mortgagee in possession for the time being of the building in which the Demised Premises is located or the owner of a leasehold interest in the building and/or the land thereunder so that in the event of sale of the building or an assignment of this Lease, or a demise of the building and/or land, Landlord shall be and hereby is entirely freed and relieved of all obligations of Landlord hereunder and it shall be deemed without further agreement between the parties and such purchaser(s), assignee(s) or lessee(s) that the purchaser, assignee or lessee has assumed and agreed to observe and perform all obligations of Landlord hereunder.

It is specifically understood and agreed that there shall be no personal liability on Landlord in respect to any of the covenants, conditions or provisions of this Lease; in the event of a breach or default by Landlord of any of its obligations under this Lease, Tenant shall look solely to the equity of Landlord in the Center for the satisfaction of Tenant's remedies.

**SECTION 56.0 CORPORATE STATUS:** If Tenant is a corporation, Tenant's corporate status shall continuously be in good standing active and current with the state of its incorporation and the state in which the Center is located at the time of execution of the Lease and at all times thereafter, and Tenant shall keep its corporate status active and current throughout the term of the Lease and any extensions or renewals. Tenant shall annually provide to the Landlord a current copy of the proper certification from the appropriate office of the state of its incorporation, and the state in which the Center is located, establishing that its status is current and active. Failure of Tenant to keep its corporate status active and current shall constitute a default under the terms of the Lease.

**SECTION 57.0 CONSTRUCTION INSURANCE AND INDEMNITY:** Tenant or Tenant's contractor shall indemnify and hold Landlord harmless from any and all claims for loss or damages or otherwise based upon or in any manner growing out of any alterations or construction undertaken by Tenant under the terms of this Lease, including all costs, damages, expenses, court costs and attorneys' fees incurred in or resulting from claims made by any person or persons, by other Tenants of the Demised Premises in the Center, their subtenants, agents, employees, customers and invitees.

Before undertaking any alterations or construction, Tenant shall obtain and pay for a public liability policy insuring Landlord and Tenant and any designee of Landlord against any liability which may arise on account of such proposed alterations or construction work in limits of not less than Two Million Dollars ($2,000,000.00) for combined single limit and a copy of such policy shall be delivered to Landlord prior to the commencement of such proposed work together with proof of payment of premium. Tenant shall also maintain at all times fire insurance with extended coverage in the name of Landlord and Tenant and any designee of Landlord as their interests may appear in the amount adequate to cover the cost of replacement of all alterations, decorations, additions or improvements in and to the Demised Premises and all trade fixtures therein, in the event of fire or extended coverage loss. Tenant shall deliver to Landlord copies of such fire insurance policies and liability insurance which shall contain a clause requiring the insurer to give Landlord ten (10) days notice of cancellation or modification of such policies.

**SECTION 58.0 MECHANIC'S LIENS AND ADDITIONAL CONSTRUCTION:** If by reason of any alteration, repair, labor performed or materials furnished to the Demised Premises for or on behalf of the Tenant any mechanics' or other lien shall be filed, claimed, perfected or otherwise established as provided by law against the Demised Premises, Tenant shall discharge or remove this lien by bonding or otherwise, within fifteen (15) days after notice from Landlord to Tenant of the filing of same. Notwithstanding any provision of this Lease seemingly to the contrary, Tenant shall never, under any circumstances, have the power to subject the interest of Landlord in the Demised Premises to any mechanics' or materialmen's liens or liens of any kind, nor shall any provision contained in this Lease ever be construed as empowering the Tenant to encumber or cause the Landlord to encumber the title or interest of Landlord in the Demised Premises.

Tenant hereby expressly acknowledges and agrees that no alterations, additions, repairs or improvements to the Demised Premises of any kind are required or contemplated to be performed as a prerequisite to the execution of this Lease and the effectiveness thereof according to its terms or in order to place the Demised Premises in a condition necessary for use of the Demised Premises for the purposes set forth in this Lease, that the Demised Premises are presently complete and usable for the purposes set forth in this Lease and that this Lease is in no way conditioned on Tenant making or being able to make alterations, additions, repairs or improvements to the Demised Premises, unless otherwise specified under the Special Provisions Section of the Definitions, not withstanding the fact that alterations, repairs, additions or improvements may be made by Tenant, for Tenant's convenience or for Tenant's purposes, subject to Landlord's prior written consent, at Tenant's sole cost and expense.

Landlord and Tenant expressly acknowledge and agree that neither the Tenant nor any one claiming by, through or under the Tenant, including without limitation contractors, sub-contractors, materialmen, mechanics and laborers, shall have any right to file or place any mechanics' or materialmen's liens of any kind whatsoever upon the Demised Premises nor upon any building or improvement thereon; on the contrary, any such liens are specifically prohibited. All parties with whom the Tenant may deal are hereby put on notice that the Tenant has no power to subject the Landlord's interest in the Demised Premises to any claim or lien of any kind or character any persons dealing with the Tenant must look solely to the credit of the Tenant for payment and not to the Landlord's interest in the Demised Premises or otherwise.

Any lien against the Demised Premises in violation of this paragraph shall be null and void and of no force or effect. In addition, Tenant shall cause any lien filed against the Demised Premises in violation of this paragraph to be canceled, released, discharged and extinguished within fifteen (15) days after Tenant receives notice of filing and shall indemnify and hold the Landlord harmless from and against any such lien and any costs, damages, charges and expenses, including, but not limited to, attorney's fees, incurred in connection with or with respect to any such lien.

The interest of the Landlord shall not be subject to liens for improvements made by the Tenant and Tenant shall notify the contractor making any such improvements of this provision. Tenant agrees that all work will be performed lien free and Tenant will indemnify Landlord from any claim of lien and will bond off any lien within thirty (30) days.

**S ECTION 59.0 TRADE FIXTURES:** All trade fixtures and equipment conveyed to or installed by Tenant in the Demised Premises shall be new or completely reconditioned.

Provided Tenant is not in default hereunder, Tenant shall have the right, at the termination of this Lease, to remove any and all trade fixtures, equipment and other items of personal property not constituting a part of the freehold which it may have stored or installed in the Demised Premises including, but not limited to counters, shelving, showcases, chairs, and movable machinery purchased or provided by Tenant and which are susceptible of being moved without damage to the building and the Demised Premises, provided this right is exercised before the Lease is terminated and provided that Tenant, at its own cost and expense, shall repair any damage to the Demised Premises caused thereby. The right granted Tenant in this Section 59, shall not include the right to remove any plumbing or electrical fixtures or equipment, heating or air conditioning equipment, floor-coverings (including wall-to-wall carpeting) glued or fastened to the floors or any paneling, tile or other materials fastened or attached to the walls or ceilings, all of which shall be deemed to constitute a part of the freehold; and, as a matter of course, shall not include the right to remove any fixtures or machinery that was furnished or paid for by Landlord. The Demised Premises and the immediate areas in front, behind and adjacent to it shall be left in a broom-clean condition. Should Tenant fail to comply with this provision, Landlord may deduct the cost of cleanup from Tenant's Security Deposit. If Tenant shall fail to remove its trade fixtures or other property at the termination of this Lease, such fixtures and other property not removed by Tenant shall be deemed abandoned by Tenant, and, at the option of Landlord, shall become the property of Landlord, and may be removed by the Landlord at Tenant's sole cost and expense.

**SECTION 60.0 HAZARDOUS MATERIALS:** "Hazardous Materials" includes, without limit, any flammable explosives, radioactive materials, petroleum, natural gas liquids, hazardous materials, hazardous wastes, hazardous or toxic substances, or any pollutant or contaminant defined as such, in or used by any federal, state, or local law, ordinance, rule, regulation, standard, order or decree which relates to protection of the public health, welfare and the environment,

16

including without limitation those relating to the storage, handling and use of chemicals and other hazardous materials, those relating to the generation, processing, treatment, storage, transport, disposal or other management of waste material of any kind and those relating to the protection of environmentally sensitive areas ("Environmental Laws").

Tenant shall not (either with or without negligence) cause or permit the escape, disposal or release of any biologically or chemically active or other hazardous substances, or materials. Tenant shall not allow the storage or use of such substances or materials in any manner not sanctioned by law or by the highest standards prevailing in the industry for the storage and use of such substances or materials, nor allow to be brought into the Demised Premises any such materials or substances. Without limitation, hazardous substances and materials shall include those described in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. Section 9601 et seq., the Resource Conservation and Recovery Act, as amended, 42 U.S.C. Section 6901 et seq., any applicable state or local laws and the regulations adopted under these acts. If any lender or governmental agency shall ever require testing to ascertain whether or not there has been any release of hazardous materials, then the reasonable costs thereof shall be reimbursed by Tenant to Landlord upon demand as additional charges if such requirement applies to the Demised Premises. In addition, Tenant shall execute affidavits, representations and the like from time to time at Landlord's request concerning Tenant's best knowledge and belief regarding the presence of hazardous substances or materials on the Demised Premises. In all events, Tenant shall indemnify Landlord in the manner elsewhere provided in this Lease from any release of hazardous materials on the Demised Premises occurring while Tenant is in possession or elsewhere if caused by Tenant or persons acting under Tenant. The within covenants shall survive the expiration or earlier termination of the Lease term. In addition to Section 60.0, Tenant must comply with any and all governmental ordinances regarding the disposing of any chemical and/or toxic waste. Upon Landlord's request, Tenant must supply Landlord with sufficient proof that Tenant is in compliance with all laws concerning hazardous waste and/or materials.

SECTION 61.0 NO OPTION: Notwithstanding anything to the contrary contained herein, the submission of this Lease for examination does not constitute a reservation of or option for the Demised Premises and this Lease becomes effective as a Lease only upon execution and delivery thereof by Landlord and Tenant.

SECTION 62.0 SECURITY FORCE: In addition to all other charges set forth in this Lease, Tenant shall pay its' prorata share, being at the present time, as stated in Item 13 of the Definitions, to be used for the purpose of maintaining a uniformed security force throughout the Shopping Center. It is recognized that the aforementioned charge is based on current conditions and this payment may be revised periodically as necessary to insure adequate protection. Any default in the payment of this amount shall be deemed a default of Tenant's obligations under this Lease.

SECTION 63.0 RIGHT TO RELOCATE: The purpose of the site plan attached hereto as Exhibit "A" is to show the approximate location of the Demised Premises. Landlord reserves the right at any time to relocate the various buildings, automobile parking areas, and other common areas shown on said site plan, and to relocate Tenant herein to comparable space.

SECTION 64.0 LANDLORD'S RIGHT TO PERFORM BUILDING RENOVATIONS: Tenant understands and agrees that Landlord may, at any time or from time to time during the term of this Lease, perform substantial renovation work in and to the Building or the mechanical systems serving the Building (which work may include, but need not be limited to, the repair or replacement of the Building's exterior facade, exterior window/glass, elevators, electrical systems, air conditioning and ventilating systems, plumbing system, common hallways, or lobby), any of which work may require access to the same within the Demised Premises.

Tenant agrees that:

a) Landlord shall have access to the Demised Premises at all reasonable times, upon reasonable notice, for the purpose of performing such work, and

b) Landlord shall incur no liability to Tenant, nor shall Tenant be entitled to any abatement of rent on account of any noise, vibration, or other disturbance to Tenant's business at the Demised Premises (provided that Tenant is not denied access to said Demised Premises) which shall arise out of said access by Landlord or by the performance by Landlord of the aforesaid renovations at the Building.

Landlord shall use reasonable efforts (which shall not include any obligation to employ labor at overtime rates) to avoid disruption of Tenant's business during any such entry upon the Demised Premises by Landlord. It is expressly understood and agreed by and between Landlord and Tenant that if Landlord shall commence any action or proceeding seeking injunctive, declaratory, or monetary relief in connection with the rights reserved to Landlord under this provision, or if Landlord shall commence any action or proceeding to obtain access to the Demised Premises in accordance with this provision, and if Landlord shall prevail in any such action, then Tenant shall pay to Landlord, as additional rent under this Lease, a sum equal to all legal fees, costs, and disbursements incurred by Landlord in any way related to or arising out of such action or proceeding.

SECTION 65.0 LEASE: The covenants and agreements herein contained shall bind, and the benefits and advantages thereof shall enure to the respective heirs, legal representatives, successors and permitted assigns of the parties hereto. Whenever used, the singular number shall include the plural, the plural shall include the singular, and the use of any gender shall include all genders. This Lease constitutes a Florida contract, and shall be construed according to the laws of that State.

SECTION 66.0 RADON GAS: Pursuant to Florida Statutes, 404.056(a), the following notification is provided:

Radon Gas is a naturally occurring radioactive gas that, when it is accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it overtime. Levels of radon that exceed Federal and State guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county public health unit.

17

**SECTION 67.0 CONFIDENTIALITY:** Tenant agrees that Tenant will not intentionally disclose or communicate any of the terms and conditions of this Lease to any other tenant of the Shopping Center or to any registered real estate broker, broker-salesman, or salesman engaged in the business of Shopping Center leasing agent. If Tenant should violate this confidentiality, Landlord shall have the irrevocable right to increase Tenant's base rental herein by an additional thirty percent (30%). Nothing contained herein above shall prohibit the Tenant from disclosing or communicating any of the terms or covenants of this Lease in any legal proceeding before any court of competent jurisdiction or for any reasonable business purpose, including but not limited to: loan or credit application, bookkeeping or tax reporting, or listing or sale of business. It being the intention herein, to allow Tenant to disclose or communicate said information without penalty as reasonably necessary in the course of its business.

**SECTION 68.0 AGENCY DISCLOSURE:**  Current Capital, by this document, giving notice that it is the agent and representative of the Landlord.

**SECTION 69.0 AGREEMENT TO COOPERATE:** Tenant agrees to execute any estoppel letters related to this tenancy within seven (7) days after Landlord requests the same.

**SECTION 70.0 WAIVER:** No waiver, expressed or implied, by Landlord of any provision herein shall be deemed to be a waiver of any other provision hereof or of any subsequent breach by Tenant of the same or any other provision. Landlord's consent to, or approval of, any act shall not be deemed to render unnecessary the obtaining of Landlord's consent to or approval of any subsequent act by Tenant. The acceptance of rent hereunder by Landlord shall not be a waiver of any preceding breach by Tenant of any provision hereof, regardless of Landlord's knowledge of such preceding breach at the time of acceptance of such rent.

**SECTION 71.0 CHOICE OF LAW & FORUM & WAIVER OF JURY TRIAL:** This contract shall be interpreted under Florida State Law and all disputes arising under it shall be heard in the 19th Judicial Circuit, in and for St. Lucie County, Florida.

WAIVER OF JURY TRIAL. ALL PARTIES TO THIS AGREEMENT AND/OR GUARANTY IRREVOCABLY WAIVE TRIAL BY JURY IN CONNECTION WITH PROCEEDINGS OR COUNTERCLAIMS BROUGHT BY EITHER PARTY RELATED TO THIS LEASE AGREEMENT, GUARANTY OR LEASEHOLD INTEREST AGAINST EACH OTHER.

**SECTION 72.0 PLAZA REMODELING:** Tenant agrees that in the event Landlord elects to remodel and/or update the exterior of the shopping center of which the demised premises forms a part, Tenant's annual rent for the duration of this lease and any extensions or renewals thereof shall be increased as follows (in addition to any other increases found within this lease): Tenant's annual increase in rent shall be the product of the cost of such remodeling multiplied by a fraction , the numerator of which is one fifth (1/5) the area of the demised premises, and the denominator of which is the total leasable area of the shopping center of which the Demise Premises forms a part. Landlord reserves the right to enlarge or diminish store sizes (other than the Demised Premises) and/or to construct additional buildings on the site of which the demised premises are a part. Landlord may elect to cause Tenant to relocate its business, within ninety (90) days after notice to do so, to another location within the Shopping Center if available, comparable in size to the Demised Premises at the prevailing market rental rate. Landlord and Tenant shall execute and deliver an amendment to this lease which shall substitute the new location for the Demised Premises described herein and shall modify the rents and additional charges hereunder based upon the square footage of the new location, if different from the Demised Premises; otherwise all of the terms and conditions of this lease shall be applicable to the new premises. If Landlord and Tenant cannot agree on a new location within sixty (60) days after notice of exercise by Landlord of its relocation option, then Landlord may elect to withdraw its notice requiring Tenant to relocate in which case Tenant at Landlord's sole option remain in possession of the Demised Premises or if Landlord shall not withdraw its request then this lease shall terminate at the end of such ninety (90) day period.

[SIGNATURES ON NEXT PAGE]

IN WITNESS WHEREOF, this Lease has been duly executed by the parties hereto, under seal, as of the day and year first written above.

Signed, sealed and delivered in the presence of;

WITNESSES (AS TO "LANDLORD"):

Signature of Witness

Printed Name of Witness

Signature of Witness

Printed Name of Witness

LANDLORD:

MORNINGSIDE SHOPPES, LLC, a Florida Limited Liability Company

By:  Morningside Center, Inc., a Florida corporation
Its:  Managing Member

By:
Name:  James L. Case
Title:  President

Date: _____

WITNESSES (AS TO "TENANT"):

Signature of Witness

Printed Name of Witness

Signature of Witness

Printed Name of Witness

TENANT:

JK GAS STATION SERVICES CORP, a Florida Corporation

By:

Date: 4/30/20 18

(SEAL)

**EXECUTION:**

**CORPORATE:**

THIS LEASE MUST BE EXECUTED FOR TENANT, IF A CORPORATION, BY THE PRESIDENT OR VICE-PRESIDENT AND THE SECRETARY OR ASSISTANT SECRETARY, UNLESS THE BYLAWS OR A RESOLUTION OF THE BOARD OF DIRECTORS SHALL OTHERWISE PROVIDE, IN WHICH EVENT A CERTIFIED COPY OF THE BYLAWS OR RESOLUTION, AS THE CASE MAY BE, MUST BE FURNISHED. ALSO, THE CORPORATE SEAL OF TENANT, IF TENANT HAS SUCH A SEAL, MUST BE AFFIXED.

**INDIVIDUAL:**

THIS LEASE MUST BE EXECUTED BY EACH INDIVIDUAL WHOSE NAME APPEARS UNDER THE SIGNATURE LINES. THEIR EXECUTION MUST BE WITNESSED BY TWO PERSONS WHO MUST SIGN AS WITNESS IN THE SPACE PROVIDED.

19

LL ___  IT ___

EXHIBIT B

LANDLORD'S AND TENANT'S WORK

## EXHIBIT D

### RULES AND REGULATIONS

Tenant covenants and agrees that Tenant at its own cost and expense:

(a) Will keep all exterior and interior store front surfaces clean and will maintain the rest of the Demised Premises and all corridors and loading areas immediately adjoining the demised premises in a clean, orderly and sanitary condition and free of insects, rodents, vermin and other pests;

(b) Will not permit accumulations of any refuse, but will remove the same and keep such refuse in odor-proof, rat-proof containers within the interior of the Demised Premises shielded from the view of the general public until removed and will not burn any refuse whatsoever but will cause all such refuse to be removed by such person or companies, including Landlord, as may be designated in writing by Landlord and will pay all charges therefor, which shall in all events be competitive within the same geographical area for similar services performed by a reputable person or company; provided, however that Landlord may decline to designate any such person or company in which event all such refuse shall be removed by such person or company as Tenant, subject to Landlord's prior written approval, shall select;

(c) Will replace promptly with glass of a like kind and quality any plate glass or window glass of the Demised Premises which may become cracked or broken;

(d) Will not, without Landlord's prior written consent, place or maintain any merchandise or other articles in any vestibule or entry of the Demised Premises or within two (2) feet of any entrance from the Demised Premises, on the footwalk adjacent thereto or elsewhere on the exterior thereof;

(e) Will not use or permit the use of any apparatus, or sound reproduction or transmission, or any musical instrument in such manner that the sound so reproduced, transmitted or produced shall be audible beyond the confines of the Demised Premises, and will not use any other advertising medium, including without limitation flashing lights, or search lights which may be heard or experienced outside of the Demised Premises;

(f) Will keep all mechanical apparatus free of vibration and noise which may be transmitted beyond the confines of the Demised Premises;

(g) Will not cause or permit objectionable odors to emanate or be dispelled from the Demised Premises;

(h) Will not solicit business, distribute handbills or other advertising matter or hold demonstrations in the parking areas or other Common Areas;

(i) Will not permit the parking of delivery vehicles so as to interfere with the use of any driveway, walk, parking area, or other Common Areas in the Shopping Center;

(j) Will comply with all laws, rules, regulations, guidelines, orders and ordinances of applicable federal, state and local governmental authorities, commissions, boards and agencies with respect to this Lease, the use of Demised Premises or any work to be performed in the Demised Premises by Tenant and Tenant shall secure all permits, leases and approvals required for Tenant's use of the Demised Premises. In addition, Tenant shall also comply with all recommendations of the Association of Fire Underwriters, Factory Mutual Insurance Companies, the Insurance Services Organization, or other similar body establishing standards for fire insurance ratings with respect to the use occupancy of the Demised Premises by Tenant, and will participate in periodic fire brigade instructions and drills at the request of Landlord and will supply, maintain, repair and replace for the Demised Premises any fire extinguisher or other fire prevention equipment and safety equipment (including insulation of approved hoods and ducts if cooking activity is conducted on the Demised Premises) required by the aforementioned rules, regulations and Associations or other body in order to obtain insurance at the lowest available premium rate throughout the term of this Lease;

(k) Will light the show windows of the Demised Premises and exterior signs each day of the year to the extent which shall be required by Landlord but in no event later than one hour after close of the Center;

(l) Will keep all outside areas immediately adjoining the Demised Premises including, but not limited to, sidewalks and loading docks free from ice and snow and Tenant hereby agrees that Tenant is solely liable for any accidents occurring on said outside areas due or alleged to be due to any accumulation of ice and snow;

(m) Will refer to the name of the Shopping Center in all advertising done to promote sales at its store or stores in the geographic area in which the Center is located;

(n) Will not use the plumbing facilities for any other purpose than that or which they are constructed and will not permit any foreign substance of any kind to be thrown therein and the expense of repairing any breakage, stoppage, seepage or damage, whether occurring on or off the Demised Premises, resulting from a violation of this provision by Tenant or Tenant's employees, agents or invitees shall be borne by Tenant. All grease traps and other plumbing traps shall be kept clean and operable by Tenant at Tenant's own cost and expense;

(o) Will not permit any shopping carts in the Common Areas even if taken there by customers;

(p) Will not place or cause or permit to be placed within the Demised Premises, pay telephones, vending machines (except those for the exclusive use of this Tenant's employees) or amusement devices of any kind without the prior written consent of Landlord.

(q) Tenant agrees to (i) allow Landlord access to Demised Premises at anytime for the purpose of inspection and/or repair to the fire sprinkler system, if applicable. Should access be denied, Tenant shall become liable and responsible for any problems or incidents which may occur due to said denial of access to Demised Premises (ii) keep the sprinkler heads, valves, boxes, etc. free of obstruction; (iii) ensure exits are free from obstruction and exit doors are in good working order; (iv) have the fire extinguisher inspected, tagged, refilled, or replaced, as necessary, according to the State, City, County and Federal laws and codes, by a certified inspector. Tenant, Tenant's employees, contractors, vendors, guests or invitees shall be prohibited under any circumstance, from disrupting the operation or effecting the sprinkler system, alarm, or monitoring equipment in any way.

Tenant shall not, under any circumstance, create a fire, safety or health hazard by neglecting any of the above stipulations. In the event a fire or other hazard occurs due to Tenant's negligence with regard to the above items, Tenant shall be held liable for the cost of repair(s) and shall be billed by Landlord for said repair(s). Tenant shall pay said bill upon receipt.

(r) No pets shall be allowed in the Demised Premises or in the Shopping Center, except when the retail sale or care of pets is the primary and permitted use.

21

EXHIBIT F

## GUARANTY OF LEASE

IN CONSIDERATION OF that certain Lease Agreement (the "Lease") dated May 1, 2018, which Lease has inured to the benefit of the undersigned (the "Guarantors"), and in consideration often dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in order to induce Landlord to enter into such Lease, the undersigned hereby jointly and severally make the following indemnification and agreements with and in favor of Landlord:

(a)      Guarantors hereby jointly and severally covenant and agree with Landlord (I) to make the due and punctual payment of all rent, monies and charges expressed to be payable under the Lease during the term thereof and all extensions or renewals thereof; (ii) to effect prompt and complete performance of all and each of the terms, covenants, conditions and provisions of the Lease contained on the part of the undersigned Guarantor to be kept, observed and performed during the term of the Lease and any extensions or renewals thereof; and (iii) to indemnify and save harmless Landlord from any loss, costs or damages arising out of any failure to pay the aforesaid rent, monies and charges or the failure to perform any of such terms, covenants, conditions and provisions.

(b)      In the event of a default under the Lease, Guarantors waive any right to require Landlord to (I) proceed against undersigned Guarantor or pursue any rights or remedies with respect to the Lease; (ii) proceed against or exhaust any security of undersigned Guarantor held by Landlord; (iii) pursue any other remedy whatsoever in Landlord's power. Landlord shall have the right to enforce this indemnity regardless of the acceptance of additional security from undersigned Guarantor and regardless of the release or discharge of Guarantor by Landlord or by others, or by operation of law.

(c)      Guarantors hereby expressly waive notice of the acceptance of this indemnity and all notice of non-performance, nonpayment or non-observance on the part of Guarantor of the terms, covenants or conditions and provisions of the Lease. Guarantors also hereby waive notice of any amendments to or extensions or renewals of the Lease and hereby confirm that their joint and several obligations hereunder shall not be affected or discharged by any amendments to or renewals or extensions of the Lease or assignments or subletting of the underlying lease.

(d)      Without limiting the generality of the foregoing, the joint and several liability of Guarantors under this Guaranty shall not be deemed to have been waiver, released, discharged, impaired or affected by reason of the release or discharge of the Guarantor in any receivership, bankruptcy, winding-up or other creditor's proceedings or the rejection, disaffirmance or disclaimer of the Lease by any party in any action or proceeding, and shall continue with respect to the periods prior thereto and thereafter, for and with respect to the term (and any extensions or renewals) contemplated and expressed in the Lease. The joint and several liability of the Guarantors shall not be affected by any repossession of the demised premises by Landlord, provided, however, that the net payments received by Landlord after deducting all costs and expenses of repossession and/or reletting the same, shall be credited from time to time by Landlord to the account of Guarantors and Guarantors shall pay any balance owing to Landlord from time to time, immediately upon demand therefor by Landlord. No payment by Guarantor to Landlord shall be construed as having been made unless and until the same can no longer be considered or construed to be a "preferential transfer" or otherwise avoidable transfer under applicable bankruptcy laws.

(e)      This Guaranty shall be one of payment and performance and not of collection.

(f)      Guarantors shall, without limiting the generality of the foregoing, be jointly and severally bound by this Guaranty in the same manner as though Guarantors were named in the Lease and Guarantors will pay the Landlord its reasonable attorneys fees and costs in the enforcement of this Guaranty.

(g)      With respect to all amounts paid by any Guarantors pursuant to this Guaranty, such Guarantors expressly waives and disclaims any right to, and agrees not to seek or claim, contribution, indemnification or reimbursement from Tenant, right of subrogation to the rights of Landlord, or right of recourse to any security for the debts and obligations of Tenant to Landlord. No payment hereunder by any Guarantors shall give rise to any claim by any Guarantors against Landlord. Upon the occurrence of a default, violation or event of default under the Lease, any and all debts and obligations of, and other payments from, Tenant to any Guarantors shall be deemed postponed in favor of and subordinated to the full payment and performance of all debts and obligations of Tenant to Landlord. At any such time or times after the occurrence of a default, violation or event of default under the Lease, and until the same shall have been cured or satisfied, any such subordinated interests or payments received by any Guarantor shall be received and held in trust for Landlord and promptly delivered to Landlord.

(h)      All of the terms, agreements and conditions of this Guaranty shall extend to and be jointly and severally binding upon Guarantors, their heirs, successors and assigns, and shall inure to the benefit of and be enforced by Landlord, its successors and assigns, and the holder of any mortgage to which the Lease may be subject and subordinate from time to time.

(i)      WAIVER OF JURY TRIAL. ALL PARTIES TO THIS AGREEMENT AND/OR GUARANTY IRREVOCABLY WAIVE TRIAL BY JURY IN CONNECTION WITH PROCEEDINGS OR COUNTERCLAIMS BROUGHT BY EITHER PARTY RELATED TO THIS LEASE AGREEMENT, GUARANTY OR LEASEHOLD INTEREST AGAINST EACH OTHER

IN WITNESS WHEREOF, the undersigned have executed this Guaranty as of   May 1, 2018.

WITNESS:

Signature of Witness

Emerson S. Pines
Printed Name of Witness

Signature of Witness

Felipe DeSouza
Printed Name of Witness

WITNESS:

_____
Signature of Witness

_____
Printed Name of Witness

_____
Signature of Witness

_____
Printed Name of Witness

GUARANTORS:

_____
Signature of Guarantor

Printed Name of Guarantor

HOME ADDRESS: _____
DL#: _____ STATE ____
DATE OF BIRTH: _____
SOCIAL SECURITY #: _____

GUARANTORS:

_____
Signature of Guarantor

_____
Printed Name of Guarantor

HOME ADDRESS: _____
DL#: _____ STATE _____
DATE OF BIRTH: _____
SOCIAL SECURITY #: _____

22

EXHIBIT G

## ENVIRONMENTAL ADDENDUM TO LEASE AGREEMENT

This Environmental Addendum To Lease ("Addendum") is made this __1ˢᵗ__ day of _____May_____, 2018, between JK GAS STATION SERVICES CORP a Florida Corporation (the "Tenant") and MORNINGSIDE SHOPPES, LLC (the "Landlord"); for the Demised Premises located at Unit 1736, located in the MORNINGSIDE SHOPPING CENTER.

1. "Environmental Law" shall mean all federal, state or local laws, regulations, ordinances, rules, judgments, orders, decrees, permits, or other restrictions relating to the environment, environmental, or health and safety, or effects from or the use, treatment, storage, manufacture, processing, distribution, transport, placement, handling, discharge, release, emission, generation, production, disposal, release or threatened release (collectively "handling") of pollutants, contaminants, chemicals, or industrial, toxic or hazardous substances, materials or wastes into the environment. "Waste" shall mean any contaminant, pollutant, chemical, waste, petroleum product, radioactive waste, poly-chlorinated biphenyl, asbestos, hazardous or toxic, substance, material or waste of any kind, including, without limitation, any substance regulated by any Environmental Law.

2. Compliance. As a material inducement to Landlord to lease the Demised Premises to Tenant, Tenant covenants and warrants that Tenant and Tenant's use of the Demised Premises will at all times comply with and conform to all Environmental Laws, including without limitation, those Environmental Laws which relate to the handling of any Waste on or about the Demised Premises. Tenant shall obtain and maintain all permits, licenses and authorization necessary for its use of the Demised Premises in compliance with all applicable laws including any Environmental Laws.

3. Notice to Landlord. Immediately upon discovery or notice of same ("Notice"), Tenant shall notify Landlord (including a copy of any written notice) of any; (i) actual, alleged or threatened violation or non-compliance of any Environmental Law on or about the Demised Premises, or (ii) breach of representation or warranty under this Addendum (collectively referred to as "Non-Compliance").

4. Right of Entry. Landlord or its designated agent(s) is given the right, but not the obligation, to inspect and monitor the Demised Premises and Tenant's use of the Demised Premises in order to confirm Tenant's compliance with the terms and conditions hereof.

5. Remediation. In the event of any Non-Compliance caused by Tenant, its employees, vendors or invitees, then Tenant shall promptly commence, and diligently pursue, at Tenant's sole expense, the cure of same, including without limitation the complete decontamination of any Waste on or about the Demised Premises (collectively "Remediation"). Such Remediation shall be completed to the satisfaction of Landlord and in compliance with Environmental Laws and procedures of all governmental agencies having jurisdiction over the Demised Premises. Prior to submission, Tenant shall provide Landlord with copies of any reports, plans, data, analyses, proposals to be submitted to such regulatory agency. Notwithstanding the above, Landlord shall have the right, but not the obligation to enter onto the Demised Premises and to take such other actions as it deems necessary or advisable to conduct Remediation, or to otherwise deal with any Notice or Non-Compliance which, in the sole opinion of the Landlord, could result in action against Tenant or Landlord. All reasonable costs and expenses incurred by Landlord in the exercise of any such rights shall be payable by Tenant on demand, shall be deemed additional rent hereunder, and subject to the indemnification provisions of paragraph 6, below.

6. Environmental Indemnification. Tenant hereby agrees that it will indemnify, defend, save and hold harmless Landlord, and its officers, directors, shareholders, employees, agents, and each of their successors and assigns (the "Indemnified Parties") against and from, and to reimburse the Indemnified Parties with respect to, any and all losses, liabilities, damages, interest, deficiencies, fines, penalties, costs and expenses, reasonable attorneys' fees and disbursements (whether in court, out of court, in bankruptcy or administrative proceedings or on appeal), including, without limitation, claims, suits and proceedings by federal state, county and local governmental authorities or private parties (collectively, the "Losses"), incurred by or asserted against the Indemnified Parties by reason or arising out of: (a) any Notice or Non-Compliance hereunder arising out of acts or omissions of Tenant, its employees, vendors or invitees; (b) the Handling of any Waste by Tenant, or any subtenant, licenses, concessionaire, manager, or other party occupying, using or affecting the Demised Premises as a result of or in connection with Tenant's operations on the Demised Premises; or (c)(i) any investigation, monitoring, clean-up, containment, removal, storage, or restoration work arising out of acts or omissions of Tenant, its employees, vendors or invitees, required by, or incurred by Landlord or any other person in a reasonable belief that such work is necessary or required by any Environmental Law, and (ii) any claims of third parties for loss, injury, expense, or damage arising out of the Handling of any Waste arising out of acts or omissions of Tenant, its employees, vendors or invitees, on, under, in, above, to or from the Demised Premises, or any Notice or Non-Compliance.

7. Survival/Default. Notwithstanding anything in this Lease to the contrary, the covenants, representations, warranties, indemnities and undertakings of Tenant set forth in this Addendum shall survive the expiration or termination of this Lease regardless of the method of expiration or termination of the Lease. The breach of any covenant, representation or warranty hereunder shall be deemed an event of default under the Lease.

8. Surrender/Environmental Risk. This Lease is intended to be, and shall be construed as, an absolutely net to Landlord of any environmental liability arising out of or in connection with Tenant's use of the Demised Premises. As a material inducement to Landlord to enter into this Lease, Tenant agrees to assume all responsibility and cost of any kind associated with or arising out of any Notice, Non-Compliance or environmental liability on or about the Demised Premises arising out of or in connection with Tenant's operations on the Demised Premises, to indemnify the Indemnified Parties as provided herein, and to fully comply with the terms and conditions of this Addendum. At the expiration or termination of this Lease, the Demised Premises shall be returned to Landlord in as good condition as at the commencement of this Lease notwithstanding any remediation levels for Waste or spill cleanup imposed by environmental Laws which may be in excess of the levels of such Wastes at the Demised Premises prior to the Lease Commencement Date.

9. Hazardous Materials. "Hazardous Materials" includes, without limit, any flammable explosives, radioactive materials, petroleum, natural gas liquids, hazardous materials, hazardous wastes, hazardous or toxic substances, or any pollutant or contaminant defined as such, in or used by any federal, state, or local law, ordinance, rule, regulation, standard, order or decree which relates to protection of the public health, welfare and the environment, including without limitation those relating to the storage, handling and use of chemicals and other hazardous materials, those relating to the generation, processing, treatment, storage, transport, disposal or other management of waste material of any kind and those relating to the protection of environmentally sensitive areas ("Environmental Laws").

Tenant shall not (either with or without negligence) cause or permit the escape, disposal or release of any biologically or chemically active or other hazardous substances, or materials. Tenant shall not allow the storage or use of such substances or materials in any manner not sanctioned by law or by the highest standards prevailing in the industry for the storage and use of such substances or materials, nor allow to be brought into the Demised Premises any such materials or substances. Without limitation, hazardous substances and materials shall include those described in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. Section 9601 at seq., the Resource Conservation and Recovery Act, as amended, 42 U.S.C. Section 6901 et seq., any applicable state or local laws and the regulations adopted under these acts. If any lender or governmental agency shall ever require testing to ascertain whether or not there has been any release of Hazardous Materials, then the reasonable costs thereof shall be reimbursed by Tenant to Landlord upon demand as additional charges if such requirement applies to the Demised Premises and arises out of acts or omissions of Tenant, its employees, vendors or invitees. In addition, Tenant shall execute affidavits, representations and the like from time to time at Landlord's request concerning Tenant's best knowledge and belief regarding the presence of hazardous substances or materials on the Demised Premises. In all events, Tenant shall indemnify Landlord in the manner elsewhere provided in this Lease from any release of Hazardous Materials on the Demised Premises occurring while Tenant is in possession, or elsewhere if caused by Tenant or persons acting under Tenant. The within covenants shall survive the expiration or earlier termination of the Lease term. In addition to Section 60.0, Tenant must comply with any and all governmental ordinances regarding the disposing of any chemical and/or toxic waste. Upon Landlord's request, Tenant must supply Landlord with sufficient proof that Tenant is in compliance with all laws concerning hazardous waste and/or materials.

WITNESS AS TO TENANT:                              TENANT:

                                                  JK GAS STATION SERVICES CORP a Florida Corporation

Signature of Witness

Printed Name of Witness                            Signature

Signature of Witness

Printed Name of Witness     Vanessa S. Pires

23

**EXHIBIT H**

## ASBESTOS-CONTAINING MATERIAL (ACM)

Most buildings constructed or renovated before 1981 contain some asbestos-containing materials (ACM). The presence of asbestos in a building does not pose a risk to the building occupants if the material is managed in a fashion which insured that it is not disturbed without proper precautions. OSHA has published a new rule (Occupational Exposure to Asbestos; Final Rule 59 Fed. Reg. 40,964; August 10, 1994, as amended) effective October 1, 1995, that imposes significant new worker protection, record keeping, record sharing and notice requirements on landlords, tenants, and their respective contractors when dealing with known ACM, or building materials installed before 1981 that are presumed to contain ACM (called "PACM" under the rule). If you are not familiar with these new requirements, we urge that you become familiar with them immediately - in addition to traditional "asbestos removal" projects, the rule covers a wide variety of building maintenance activities that previously were not regulated, including traditional custodial activities and other small repairs that may involve ACM or PACM.

Among other requirements, landlords and their tenants are required to keep and share information regarding the presence of any known ACM in the premises. (The notice and record keeping requirements of the rule are too extensive to summarize here in detail. It is each tenant's responsibility to ensure they are in compliance with all rule requirements.) In accordance with the rule, we request that you keep us apprised of any work within your unit that you perform in the future. Although you are required to maintain independent records of these matters, this information should be transmitted to us promptly to ensure the overall coordination of these matters through MORNINGSIDE SHOPPES SHOPPING CENTER.

In any case, no ACM or PACM should be removed or disturbed without prior written notice to Property Manager, and any other parties required to be notified under applicable law. All maintenance, custodial, or repair work, and all removal projects must be performed in strict accordance with all applicable rules and regulations, including OSHA's new rule and the worker protection, notice and record keeping requirements therein.

24

## CORPORATE CERTIFICATE

I, _Luiz Paiver_, certify that I am an officer of the corporation named as Tenant in the foregoing lease; that _TK Goias Statoy_ who signed said instrument on behalf of the Tenant is _President_ (title) of said corporation; and that said instrument was duly signed for and in behalf of said corporation by authority of its governing body and is within the scope of its corporate powers.

By: _____

Its: _____

(SEAL)

25

4/1/2022 11:56 AM

# Lease Ledger

Date: 10/26/2021

Property: xmorn

Tenant: xjkgas   JK Gas Station Service Corp.

From Date: 05/01/2018  To Date: 05/31/2019

Move In Date: 05/01/2018  Move Out Date: 05/31/2019

| Date | Description | Unit | Charge | Payment | Balance | Chg/Rec | Hold |
|------|-------------|------|--------|---------|---------|---------|------|
| 5/1/2018 | Security Deposit | | 3,314.80 | 0.00 | 3,314.80 | C-148672 | No |
| 5/1/2018 | Base Rent (05/2018) | | 1,000.00 | 0.00 | 4,314.80 | C-148673 | No |
| 5/1/2018 | Sales Tax (05/2018) | | 63.00 | 0.00 | 4,377.80 | C-148674 | No |
| 5/1/2018 | CAM - Est CAM (05/2018) | | 559.17 | 0.00 | 4,936.97 | C-148675 | No |
| 5/1/2018 | Sales Tax (05/2018) | | 35.23 | 0.00 | 4,972.20 | C-148676 | No |
| 5/1/2018 | Rent Abatement (05/2018) | | -1,000.00 | 0.00 | 3,972.20 | C-148677 | No |
| 5/1/2018 | Sales Tax (05/2018) | | -63.00 | 0.00 | 3,909.20 | C-148678 | No |
| 5/1/2018 | CAM Abatement (05/2018) | | -559.17 | 0.00 | 3,350.03 | C-148679 | No |
| 5/1/2018 | Sales Tax (05/2018) | | -35.23 | 0.00 | 3,314.80 | C-148680 | No |
| 5/2/2018 | Chk# 76116128-5 Security Dep, Prepaid Rent | | 0.00 | 9,944.40 | -6,629.60 | R-37013 | |
| 6/1/2018 | Rent Abatement (06/2018) | 1776 | -559.17 | 0.00 | -7,188.77 | C-149653 | No |
| 6/1/2018 | Sales Tax (06/2018) | | -35.23 | 0.00 | -7,224.00 | C-149654 | No |
| 6/1/2018 | Rent Abatement (06/2018) | 1776 | -1,000.00 | 0.00 | -8,224.00 | C-149655 | No |
| 6/1/2018 | Sales Tax (06/2018) | | -63.00 | 0.00 | -8,287.00 | C-149656 | No |
| 6/1/2018 | Base Rent (06/2018) | 1776 | 1,000.00 | 0.00 | -7,287.00 | C-149657 | No |
| 6/1/2018 | Sales Tax (06/2018) | | 63.00 | 0.00 | -7,224.00 | C-149658 | No |
| 6/1/2018 | CAM - Est CAM (06/2018) | 1776 | 559.17 | 0.00 | -6,664.83 | C-149659 | No |
| 6/1/2018 | Sales Tax (06/2018) | | 35.23 | 0.00 | -6,629.60 | C-149660 | No |
| 7/1/2018 | Base Rent (07/2018) | 1776 | 1,000.00 | 0.00 | -5,629.60 | C-151704 | No |
| 7/1/2018 | Sales Tax (07/2018) | | 63.00 | 0.00 | -5,566.60 | C-151705 | No |
| 7/1/2018 | CAM - Est CAM (07/2018) | 1776 | 559.17 | 0.00 | -5,007.43 | C-151706 | No |
| 7/1/2018 | Sales Tax (07/2018) | | 35.23 | 0.00 | -4,972.20 | C-151707 | No |
| 8/1/2018 | Base Rent (08/2018) | 1776 | 1,000.00 | 0.00 | -3,972.20 | C-153351 | No |
| 8/1/2018 | Sales Tax (08/2018) | | 63.00 | 0.00 | -3,909.20 | C-153352 | No |
| 8/1/2018 | CAM - Est CAM (08/2018) | 1776 | 559.17 | 0.00 | -3,350.03 | C-153353 | No |
| 8/1/2018 | Sales Tax (08/2018) | | 35.23 | 0.00 | -3,314.80 | C-153354 | No |
| 8/14/2018 | FPL Pro-Rated 17 Days (04/27-05/17/18) | | 75.77 | 0.00 | -3,239.03 | C-154718 | No |
| 8/14/2018 | FPL (05/17-06/18/18) | | 53.19 | 0.00 | -3,185.84 | C-154719 | No |

Page 1 of 3

4/1/2022 11:56 AM

## Lease Ledger

Date: 10/26/2021

Property: xmorr

Tenant: xjkgarr   JK Gas Station Service Corp

From Date: 05/01/2018  To Date: 05/31/2019

Move In Date: 05/01/2018  Move Out Date: 05/31/2019

| Date | Description | Unit | Charge | Payment | Balance | Chg/Rec | Hold |
|------|-------------|------|--------|---------|---------|---------|------|
| 8/14/2018 | FPL (06/18-07/18/18) | | 140.06 | 0.00 | -3,045.78 | C-154729 | No |
| 9/1/2018 | Base Rent (09/2018) | 1776 | 1,000.00 | 0.00 | -2,045.78 | C-155587 | No |
| 9/1/2018 | Sales Tax (09/2018) | | 63.00 | 0.00 | -1,982.78 | C-155588 | No |
| 9/1/2018 | CAM - Est CAM (09/2018) | 1776 | 559.17 | 0.00 | -1,423.61 | C-155590 | No |
| 9/1/2018 | Sales Tax (09/2018) | | 35.23 | 0.00 | -1,388.38 | C-155591 | No |
| 10/1/2018 | Base Rent (10/2018) | 1776 | 1,000.00 | 0.00 | -388.38 | C-157670 | No |
| 10/1/2018 | Sales Tax (10/2018) | | 63.00 | 0.00 | -325.38 | C-157673 | No |
| 10/1/2018 | CAM - Est CAM (10/2018) | 1776 | 559.17 | 0.00 | 233.79 | C-157675 | No |
| 10/1/2018 | Sales Tax (10/2018) | | 35.23 | 0.00 | 269.02 | C-157676 | No |
| 10/31/2018 | Late Fee Daily (Oct 11-31 = 21 days) | | 2,100.00 | 0.00 | 2,369.02 | C-161062 | No |
| 10/31/2018 | Waive Late Fee | | -2,100.00 | 0.00 | 269.02 | C-170562 | No |
| 11/1/2018 | Base Rent (11/2018) | 1776 | 1,000.00 | 0.00 | 1,269.02 | C-159305 | No |
| 11/1/2018 | Sales Tax (11/2018) | | 63.00 | 0.00 | 1,332.02 | C-159306 | No |
| 11/1/2018 | CAM - Est CAM (11/2018) | 1776 | 559.17 | 0.00 | 1,891.19 | C-159307 | No |
| 11/1/2018 | Sales Tax (11/2018) | | 35.23 | 0.00 | 1,926.42 | C-159308 | No |
| 11/30/2018 | Late Fee Daily (11/11-11/30=20 Days) | | 2,000.00 | 0.00 | 3,926.42 | C-164313 | No |
| 11/30/2018 | Waive Late Fee | | -2,000.00 | 0.00 | 1,926.42 | C-170563 | No |
| 12/1/2018 | Base Rent (12/2018) | 1776 | 1,000.00 | 0.00 | 2,926.42 | C-161853 | No |
| 12/1/2018 | Sales Tax (12/2018) | | 63.00 | 0.00 | 2,989.42 | C-161854 | No |
| 12/1/2018 | CAM - Est CAM (12/2018) | 1776 | 559.17 | 0.00 | 3,548.59 | C-161855 | No |
| 12/1/2018 | Sales Tax (12/2018) | | 35.23 | 0.00 | 3,583.82 | C-161856 | No |
| 12/28/2018 | Late Fee Daily (18 Days) | | 1,800.00 | 0.00 | 5,383.82 | C-167559 | No |
| 12/28/2018 | Waive Late Fee | | -1,800.00 | 0.00 | 3,583.82 | C-170564 | No |
| 1/1/2019 | Base Rent (01/2019) | 1776 | 1,000.00 | 0.00 | 4,583.82 | C-165925 | No |
| 1/1/2019 | Sales Tax (01/2019) | | 67.00 | 0.00 | 4,650.82 | C-165926 | No |
| 1/1/2019 | CAM - Est CAM (01/2019) | 1776 | 559.17 | 0.00 | 5,209.99 | C-165927 | No |
| 1/1/2019 | Sales Tax (01/2019) | | 37.46 | 0.00 | 5,247.45 | C-165928 | No |
| 1/1/2019 | Sales Tax - 2019 Adj | | 16.86 | 0.00 | 5,264.31 | C-167984 | No |

Page 2 of 3

4/1/2022 11:56 AM

## Lease Ledger

Date: 10/26/2021

Property: xmorn

Tenant: xjkgas - JK Gas Station Service Corp.

From Date: 05/01/2018  To Date: 05/31/2019

Move In Date: 05/01/2018  Move Out Date: 05/31/2019

| Date | Description | Unit | Charge | Payment | Balance | Chg/Rec | Hold |
|------|-------------|------|--------|---------|---------|---------|------|
| 1/18/2019 | Chk# 174 Apply to: Oct 2018-Feb 2019 R/C | | 0.00 | 6,929.31 | -1,665.00 | R-42606 | |
| 1/31/2019 | Late Fee Daily (Jan 11-18 - 8 days) | | 800.00 | 0.00 | -865.00 | C-170769 | No |
| 2/1/2019 | Base Rent (02/2019) | 1776 | 1,000.00 | 0.00 | 135.00 | C-168592 | No |
| 2/1/2019 | Sales Tax (02/2019) | | 67.00 | 0.00 | 202.00 | C-168593 | No |
| 2/1/2019 | CAM - Est CAM (02/2019) | | 559.17 | 0.00 | 761.17 | C-168594 | No |
| 2/1/2019 | Sales Tax (02/2019) | | 37.46 | 0.00 | 798.63 | C-168595 | No |
| 2/26/2019 | FPL (01/17-02/15/19) | | 138.41 | 0.00 | 937.04 | C-173810 | No |
| 3/1/2019 | Base Rent (03/2019) | 1776 | 1,000.00 | 0.00 | 1,937.04 | C-171643 | No |
| 3/1/2019 | Sales Tax (03/2019) | | 67.00 | 0.00 | 2,004.04 | C-171644 | No |
| 3/1/2019 | CAM - Est CAM (03/2019) | | 559.17 | 0.00 | 2,563.21 | C-171645 | No |
| 3/1/2019 | Sales Tax (03/2019) | | 37.46 | 0.00 | 2,600.67 | C-171646 | No |
| 3/19/2019 | Chk# 107 Applied to: Mar R/C/T/FPL | | 0.00 | 2,462.00 | 138.67 | R-44305 | |
| 3/29/2019 | FPL (02/15-03/18/19) | | 208.92 | 0.00 | 347.59 | C-176756 | No |
| 3/31/2019 | 2018 CAM Recon - Operating Expenses | | 458.96 | 0.00 | 806.55 | C-177184 | No |
| 3/31/2019 | Sales Tax - 2018 CAM Recon | | 30.75 | 0.00 | 837.30 | C-177185 | No |
| 4/1/2019 | Base Rent (04/2019) | 1776 | 1,000.00 | 0.00 | 1,837.30 | C-174610 | No |
| 4/1/2019 | Sales Tax (04/2019) | | 67.00 | 0.00 | 1,904.30 | C-174611 | No |
| 4/1/2019 | CAM - Est CAM (04/2019) | | 559.17 | 0.00 | 2,463.47 | C-174612 | No |
| 4/1/2019 | Sales Tax (04/2019) | | 37.46 | 0.00 | 2,500.93 | C-174613 | No |
| 4/28/2019 | FPL (03/18-04/17/19) | | 189.24 | 0.00 | 2,690.17 | C-180595 | No |
| 4/30/2019 | Late Fee Daily (20 Days) | | 2,000.00 | 0.00 | 4,690.17 | C-180724 | No |
| 5/1/2019 | Base Rent (05/2019) | 1776 | 1,050.00 | 0.00 | 5,740.17 | C-179581 | No |
| 5/1/2019 | Sales Tax (05/2019) | | 70.35 | 0.00 | 5,810.52 | C-179582 | No |
| 5/1/2019 | CAM - Est CAM (05/2019) | | 559.17 | 0.00 | 6,369.69 | C-179583 | No |
| 5/1/2019 | Sales Tax (05/2019) | | 37.46 | 0.00 | 6,407.15 | C-179584 | No |
| 5/27/2019 | FPL (04/17-05/16/19) | | 237.20 | 0.00 | 6,644.35 | C-183591 | No |
| 6/11/2019 | Security Deposit - apply to o/s charges | | -3,314.80 | 0.00 | 3,329.55 | C-183906 | No |

Page 3 of 3

# LL LAURENCE LEGAL

215 North Federal Highway
Dania Beach, Florida 33004
Telephone (954) 925-8228
Fax No. (954) 925-8299
contact@laurencelegal.com

December 9, 2019

Luiz Capuci Jr.
JK Gas Station Services Corp.
11285 Vanderbilt Cir.
Port St. Lucie, Florida 34987

**Re:    MORNINGSIDE SHOPPES LLC. v. JK GAS STATION SERVICES CORP. & LUIZ CAPUCI JR.**

Palm Beach County Court Case #502019 CA 7503 (MB)

**JUDGMENT AMOUNT: $25,127.33 PLUS INTEREST**

Dear Mr. Caupci:

The undersigned law firm represents, MORNINGSIDE SHOPPES LLC. On December 3, 2019, the the Hon. G. Joseph Curley entered a money Judgement against JK GAS STATION SERVICES CORP. AND LUIZ CAPUCI JR. in the sum of *$25,127.33* plus interest in the sum of $770.96 , resulting from your non-payment of rental on commercial leasehold space. Because you signed a personal guaranty, you are personally liable for this amount. A copy of the Judgement is enclosed.

There may also be additional expenses due and owing resulting from the breach of the commercial lease agreement, but before we institute collection proceedings which may include a levy or garnishment of your assets, please contact me so that we may discuss your options in resolving this dispute at this time. By doing so, you will avoid needless legal action which will result in additional legal fees and court costs imposed against you.

Finally, I am enclosing a document production request and Interrogatories in aid of execution which you must respond to in thirty (30) days. Please govern yourselves accordingly.

Very truly yours,
**DAVID L. LAURENCE P.A.**

DAVID L. LAURENCE, ESQ.

cc: Cohen Commercial

IN THE CIRCUIT COURT OF THE 15TH
JUDICIAL CIRCUIT IN AND FOR PALM
BEACH COUNTY, FLORIDA

MORNINGSIDE SHOPPES LLC

    Plaintiff,

vs.

JK GAS STATION SERVICES CORP.,
A FLORIDA CORPORATION, and
LUIZ CAPUCI JR., INDIVIDUALLY

    Defendants.

_____/

CIVIL DIVISION

CASE NO. 502019 CA 007503XXXXMB

### FINAL SUMMARY JUDGEMENT

**THIS CAUSE** having come before the Court on December 3, 2019 on the Plaintiff's Motion

for Final Summary Judgement in favor of the Plaintiff, **_MORNINGSIDE SHOPPES LLC_**, and against

the Defendants **JK GAS STATION CORP., A Florida Corporation, and LUIZ CAPUCI JR.,**

**Individually**, jointly and severally, and the court hearing argument of counsel, no opposing affidavits

being filed and being otherwise advised in the premises, it is:

    **ORDERED AND ADJUDGED** that:

    The Plaintiff, **_MORNINGSIDE SHOPPES LLC._**, shall recover from the Defendants **JK GAS**

**STATION CORP., A Florida Corporation, and LUIZ CAPUCI JR., Individually,** the sum of

**$11,914.45** for rent and leasing commissions through October 31, 2019; the sum of **$10,301.88** for

accelerated rent due from November 1, 2019 through end of lease on April 30, 2020; **$2,400.00** for

attorney's fees; and **$511.00** for court costs; for a total sum of **$25,127.33,** that shall bear interest at the

legal rate for which let execution issue.

Page 2 - CASE NO. 502019 CA 007503XXXXMB

The Plaintiff, *MORNINGSIDE SHOPPES LLC.*, shall also recover from the Defendants, **JK GAS STATION CORP., A Florida Corporation, and LUIZ CAPUCI JR., Individually,** jointly, and severally, the sum of **$770.96** in legal interest that shall bear interest at the legal rate for which let execution issue (the per diem rate is $4.32).

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida this ___ day of _____, 2019.

CIRCUIT COURT JUDGE

G. JOSEPH CURLEY, JR.

Copies furnished to:
David L. Laurence, Esq., 215 N. Federal Hwy, Dania Beach, FL 33004
Luiz Capuci Jr. & JK Gas Station Services Corp., ███████████ Port St. Lucie, Florida 34987

FINAL DISPOSITION FORM
(Fla.R.Civ.P. Form 1.998)
THE CLERK IS DIRECTED TO CLOSE THIS FILE
MEANS OF FINAL DISPOSITION

☐ Dismissed Before Hearing     ☐ Disposed by Non-Jury Trial
☐ Dismissed After Hearing      ☐ Disposed by Jury Trial
☐ Dismissed by Default         ☐ Other
☑ Disposed by Judge

2 of 2

# EXHIBIT 10

# CITY OF PORT ST. LUCIE UTILITY SYSTEMS DEPARTMENT
## CUSTOMER'S DEPOSIT RECEIPT & SERVICE AGREEMENT

Date

Tenant - **Received From:** LUIZ  CAPUCI

**Secondary Phone #:**

**Same Day Turn on Fee $:**

| | | |
|---|---|---|
| **Added to First Bill:** _____ (initials) | **Water Deposit:** | $50.00 | ○ Check# |
| **Paid:** _____ (initials) | **Sewer Deposit:** | $125.00 | ○ Cash |
| | **Total Deposit:** | $175.00 | ● Credit Card |

Customer requests water be left on and understands the release of liability to the City _____ OR _____
Agreed         Refused

S.T.E.P/GRINDER system brochure _____ or N/A     Use of City water for irrigation will result in high usage costs _____

This payment is to guarantee any and all indebtedness for water and/or sewer service which may be or become due to the City of Port St. Lucie Utilities Systems Department, its agents or employees (hereinafter called "Utility"), and by the Customer. Customer agrees that this Deposit, or any portion thereof, may be applied in discharge of any indebtedness of Customer to Utility. The Customer herein agrees that it is responsible for all service charges to the service address, until a request in writing for termination of service is provided to the City. Upon discontinuance of service covered by this Deposit and the presentation of this Receipt and proper identification, Utility agrees to refund to Customer the Deposit, less any amounts due Utility. Prior to the transfer of any service account to a new owner of the (serviced) property, the Customer agrees to provide Utility a copy of the Closing Statement.

This Deposit shall not preclude Utility from discontinuing for nonpayment, the service covered by this Deposit, regardless of the sufficiency of said Deposit to cover any indebtedness for such service.
Customer agrees to abide by all existing rules and regulations of the Utility and any amendments thereto. Copies of the rules and regulations and amendments are available for inspection at the City Clerk's Office.

Customer agrees that Utility shall, at all times, have access to Utility's facilities and the areas where such facilities are located will be kept free of shrubbery, trees, fences, interference from any pets and other obstructions. Customer agrees that it shall hold Utility harmless, and Utility shall not be liable for any damage or injury alleged to have occurred to real property, persons, or pets by the Utility conducting inspections and repairs to Utility lines, meters, and Utility's facilities.

Customer agrees that all bills for water and/or sewage charges will be paid within twenty (20) days of mailing or presentation. After five (5) days written notice if not so paid, Utility will have the right to disconnect service and charge a reasonable fee for reconnecting.

It is further understood and agreed that the sale of water to Customer occurs at the meter, and Utility has no responsibility relative to service or supplying water after the water passes through the meter. It is the Customer's responsibility to insure that all plumbing past the meter is shut off prior to the water service being activated. Utility's responsibility to gravity sewer service ceases at Customer's property line, and Utility's responsibility relative to low pressure sewer system ceases at the point at which the building's lateral enters the low pressure system unit.

**The Terms and Conditions Regarding Water and Wastewater service, adopted by the City Council of the City of Port St. Lucie, are listed on back of this service agreement. I have read and acknowledge receipt of this service Agreement by signature below.**

X _____    By _____
Customer                City of Port Saint Lucie Utility     Revised 12/16