# EXHIBIT 27A



UNITED STATES
**SECURITIES AND EXCHANGE COMMISSION**
175 W. JACKSON BOULEVARD, SUITE 1450
CHICAGO, IL 60604

CHICAGO
REGIONAL OFFICE

DIVISION OF ENFORCEMENT

Christine Jeon
Senior Counsel
(312) 353-7419
JeonC@sec.gov

December 29, 2021

**VIA SECURE E-MAIL** - cwellman@w-wlaw.com
Mining Capital Coin
c/o Chris Wellman, Esq.
Wellman & Warren, LLP
24411 Ridge Route Dr., Suite 200
Laguna Hills, CA 92653

Re: In the Matter of Mining Capital Coin, C-08791

Dear Mr. Wellman

The enclosed subpoena has been issued pursuant to a formal order entered by the United States Securities and Exchange Commission. Pursuant to Rule 8 of the United States Securities and Exchange Commission's Rules Relating to Investigations, 17 C.F.R. § 203.8, I have enclosed a subpoena for documents issued to your client, Mining Capital Coin ("MCC"), in connection with the above-referenced investigation.

The enclosed subpoena requires MCC to produce documents to the SEC by January 20, 2022. Please deliver one copy of the materials by **January 20, 2022 at 5:00 p.m. ET** to:

ENF-CPU (U.S. Securities & Exchange Commission)
14420 Albemarle Point Pl
Suite 102
Chantilly, VA 20151-1750

For smaller electronic productions under 10MB in size, the materials may be emailed to the following email address: ENF-CPU@sec.gov, with a second copy to JeonC@sec.gov.

Please also provide a duplicate copy of any document production cover letters to me at JeonC@sec.gov. Additionally, please include the SEC matter number and the name of the requesting attorney when responding.

Please carefully read the subpoena attachment, which contains, among other things, important instructions related to the manner of producing documents. In particular, if you prefer to send us copies of original documents, **the staff requests that you scan and produce hard copy documents, as well as electronic documents, in an electronic format consistent with the SEC Data Delivery Standards attached hereto. All electronic documents responsive to the subpoena, including all metadata, should also be produced in their native software format**. If you have any questions concerning the production of documents in an electronic format, please contact me as soon as possible and in any event before producing documents. For security reasons, we strongly encourage the encryption of sensitive documents before production.

When producing the records, please consecutively number and mark each document produced with a symbol that identifies it as being produced by MCC.

In your cover letter(s) accompanying the production of responsive documents, please enclose a list briefly describing each item sent. The list should identify the paragraph(s) in the subpoena attachment to which each item responds. Please also state in the cover letter(s) whether you believe your client has met the obligations of the subpoena by searching carefully and thoroughly for everything called for by the subpoena, and sending it all to us.

A copy of the subpoena should be included with the documents that are produced. Correspondence should reference case number, case name and requesting SEC staff member.

Passwords for documents, files, compressed archives, and encrypted media should be provided separately either via email addressed to ENF-CPU@sec.gov, or in a separate cover letter mailed separately from the data. Password correspondence should reference case number, case name and requesting SEC staff member.

In addition, for any documents that qualify as records of regularly conducted activities under Federal Rule of Evidence 902(11), please have the appropriate representative(s) of complete a business records certification (a sample of which is enclosed) and return it with the document production. Execution of this certification may allow the Commission to introduce the documents provided in any subsequent judicial proceeding, without requiring the testimony of a records custodian.

Enclosed is a copy of the Commission's Form 1662, entitled "Supplemental Information for Persons Requested to Supply Information Voluntarily or Directed to Supply Information Pursuant to a Commission Subpoena." This form explains how we may use the information that your client provides to the Commission and has other important information.

This investigation is a non-public, fact-finding inquiry. We are trying to determine whether there have been any violations of the federal securities laws. The investigation does not mean that we have concluded that anyone has violated the law. Also, the investigation does not mean that we have a negative opinion of any person, entity, or security.

If you have any questions or would like to discuss this matter, you may contact me at (312) 353-7419.

Sincerely,

/s *Christine Jeon*

CHRISTINE JEON
Senior Counsel
Division of Enforcement

Enclosures:     Subpoena and Attachment
                SEC Data Delivery Standards
                SEC Form 1662
                Business Records Certification



# SUBPOENA

# UNITED STATES OF AMERICA
# SECURITIES AND EXCHANGE COMMISSION

### In the Matter of Mining Capital Coin, C-08791

**To:**    Mining Capital Coin
c/o Chris Wellman, Esq.
Wellman & Warren, LLP
24411 Ridge Route Dr., Suite 200
Laguna Hills, CA 92653

---

☒    **YOU MUST PRODUCE** everything specified in the Attachment to this subpoena to officers of the Securities and Exchange Commission, at the place, date and time specified below:

ENF-CPU, U.S. Securities and Exchange Commission, 14420 Albemarle Point Pl., Suite 102, Chantilly, VA 20151-1750, no later than **January 20, 2022 at 5:00 p.m. ET.**

---

☐    **YOU MUST TESTIFY** before officers of the Securities and Exchange Commission, at the place, date and time specified below:

---

### FEDERAL LAW REQUIRES YOU TO COMPLY WITH THIS SUBPOENA.
If you do not comply with this subpoena, the SEC may bring an action in Federal Court to enforce this subpoena.
Failure to comply with a court order enforcing this subpoena may result in the court imposing a fine, imprisonment, or both.

---

By:  */s Christine Jeon*          Date:   December 29, 2021

Christine Jeon, Senior Counsel
U.S. Securities and Exchange Commission
Chicago Regional Office
175 W. Jackson, Suite 1450
Chicago, IL 60604

---

I am an officer of the U.S. Securities and Exchange Commission authorized to issue subpoenas in this matter. The Securities and Exchange Commission has issued a formal order authorizing this investigation under Section 20(a) of the Securities Act of 1933 and Section 21(a) of the Securities Exchange Act of 1934.

NOTICE TO WITNESS: If you claim a witness fee or mileage, submit this subpoena with the claim voucher.

## SUBPOENA ATTACHMENT FOR MINING CAPITAL COIN
In the Matter of Mining Capital Coin, C-08791

December 29, 2021

### Definitions

As used in this subpoena, the words and phrases listed below shall have the following meanings:

1. "Empires X" means the entity doing business under the name "Empires X Corp." ("Empires X"), including parents, subsidiaries, affiliates, predecessors, successors, officers, directors, employees, agents, general partners, limited partners, partnerships and aliases, code names, or trade or business names used by any of the foregoing.

2. "EmpX Management" means the entity doing business under the name "EmpX Management LLC" ("EmpX Management"), including parents, subsidiaries, affiliates, predecessors, successors, officers, directors, employees, agents, general partners, limited partners, partnerships and aliases, code names, or trade or business names used by any of the foregoing.

3. "Empires Consulting Group" means the entity doing business under the name "Empires Consulting Group, LLC" ("Empires Consulting Group"), including parents, subsidiaries, affiliates, predecessors, successors, officers, directors, employees, agents, general partners, limited partners, partnerships and aliases, code names, or trade or business names used by any of the foregoing.

4. "MCC" means the entity doing business under the name "Mining Capital Coin" ("MCC"), including parents, subsidiaries, affiliates, predecessors, successors, officers, directors, employees, agents, MCC Members, MCC Sponsors, MCC Managers, general partners, limited partners, partnerships and aliases, code names, or trade or business names used by any of the foregoing, including, but not limited to "MCC International Corp." and "Mining Capital Coin International Corp."

5. "CPTL Coin Corp." means the entity doing business under the name "CPTL Coin Corp." ("CPTL Coin Corp."), including parents, subsidiaries, affiliates, predecessors, successors, officers, directors, employees, agents, general partners, limited partners, partnerships and aliases, code names, or trade or business names used by any of the foregoing, including, but not limited to "CPTLCoin Corp."

6. "CPTL Coin Tokens" means the cryptocurrency using the prefix "CPTL," and includes variations, including, but not limited to, CPTL coin classic, CPTL coin extended, and CPTL coin new contract.

7. "Contact Information" includes full name, address, phone number(s), e-mail address(es), and any social media account names.

8.      "MCC Member" is any Person who provided any form of payment or consideration for any MCC membership package or any amount of CPTL Coin Tokens offered and sold by MCC, and whose membership was active at any time during the Relevant Time Period (regardless of whether membership may have expired during the Relevant Time Period). "MCC Member" also includes any Person who has an account on the MCC portal (myminingcapitalcoin.com/login.php).

9.      "MCC Sponsor" is any Person, firm, association, organization, partnership, business, corporation, or any private or public entity, who caused another Person to become an MCC Member through various means, including, but not limited to, marketing MCC or CPTL Coin Tokens, selling MCC membership packages or CPTL Coin Tokens, opening MCC accounts, receiving payment for MCC membership or CPTL Coin Tokens on behalf of MCC, recruiting the MCC Member, or including the MCC Member under the sub-group or binary wing of the MCC Sponsor.

10.     "MCC Manager" is any Person who participates in the management of any aspect, arm, division, or organization of MCC, and who has a higher level of responsibility than an MCC Sponsor and MCC Member.

11.     "Person" means a natural person, firm, association, organization, partnership, business, trust, corporation, bank or any other private or public entity.

12.     "Bitchain Exchanges" means the entity doing business under the name "Bitchain Exchanges" ("Bitchain Exchanges"), including parents, subsidiaries, affiliates, predecessors, successors, officers, directors, employees, agents, general partners, limited partners, partnerships and aliases, code names, or trade or business names used by any of the foregoing.

13.     "USA Exchanges" means the entity doing business under the name "USA Exchanges" ("USA Exchanges"), including parents, subsidiaries, affiliates, predecessors, successors, officers, directors, employees, agents, general partners, limited partners, partnerships and aliases, code names, or trade or business names used by any of the foregoing.

14.     "Bittech Wallet" means the entity doing business under the name "Bittech Wallet" ("Bittech Wallet"), including parents, subsidiaries, affiliates, predecessors, successors, officers, directors, employees, agents, general partners, limited partners, partnerships and aliases, code names, or trade or business names used by any of the foregoing.

15.     "Bittech Global Corp." means the entity doing business under the name "Bittech Global Corp." ("Bittech Global Corp."), including parents, subsidiaries, affiliates, predecessors, successors, officers, directors, employees, agents, general partners, limited partners, partnerships and aliases, code names, or trade or business names used by any of the foregoing.

16.     "Coinbase" means the entity doing business under the name "Coinbase, Inc." ("Coinbase"), including parents, subsidiaries, affiliates, predecessors, successors,

officers, directors, employees, agents, general partners, limited partners, partnerships and aliases, code names, or trade or business names used by any of the foregoing.

17.     "Document" shall include, but is not limited to, any written, printed, or typed matter including, but not limited to all drafts and copies bearing notations or marks not found in the original, letters and correspondence, interoffice communications, slips, tickets, records, worksheets, financial records, accounting documents, bookkeeping documents, memoranda, reports, manuals, telephone logs, facsimiles, messages of any type, telephone messages, text messages, voice mails, tape recordings, notices, instructions, minutes, summaries, notes of meetings, file folder markings, and any other organizational indicia, purchase orders, information recorded by photographic process, including microfilm and microfiche, computer printouts, spreadsheets, and other electronically stored information, including but not limited to writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations that are stored in any medium from which information can be retrieved, obtained, manipulated, or translated.

18.     "Communication" means any correspondence, contact, discussion, e-mail, instant message, social media posts, videos and messages, messages sent through applications, videos, or any other kind of oral or written exchange or transmission of information (in the form of facts, ideas, inquiries, or otherwise) and any response thereto between two or more Persons or entities, including, without limitation, all telephone conversations, face-to-face meetings or conversations, internal or external discussions, or exchanges of a Document or Documents.

19.     "Concerning" means directly or indirectly, in whole or in part, describing, constituting, evidencing, recording, evaluating, substantiating, concerning, referring to, alluding to, in connection with, commenting on, relating to, regarding, discussing, showing, describing, analyzing or reflecting.

20.     An "Agreement" means any actual or contemplated (i) written or oral Agreement; (ii) term or provision of such Agreement; or (iii) amendment of any nature or termination of such Agreement. A request for any Agreement among or between specified parties includes a request for all Documents Concerning (i) any actual or contemplated Agreement among or between such parties, whether or not such Agreement included any other Person; (ii) the drafting or negotiation of any such Agreement; (iii) any actual or contemplated demand, request or application for any such Agreement, and any response thereto; and (iv) any actual or contemplated objection or refusal to enter into any such Agreement, and any response thereto.

21.     The term "Reviewed" means examined, assessed, considered, analyzed or evaluated.

22.     The term "you" and "your" means the Person to whom or entity to which this subpoena was issued.

23.     To the extent necessary to bring within the scope of this this subpoena any information or

Documents that might otherwise be construed to be outside its scope:

a.    the word "or" means "and/or";

b.    the word "and" means "and/or";

c.    the functional words "each," "every" "any" and "all" shall each be deemed to include each of the other functional words;

d.    the masculine gender includes the female gender and the female gender includes the masculine gender; and

e.    the singular includes the plural and the plural includes the singular.

24.    **"Relevant Period" means the time period beginning January 1, 2018, or the earliest time for which records exist, whichever is earlier, and continuing to the present, unless otherwise specified.**

## Instructions

1.    Unless otherwise specified, this subpoena calls for production of the original Documents and all copies and drafts of same. Documents responsive to this subpoena may be in electronic or paper form. Electronic Documents such as email should be produced in accordance with the attached Document entitled SEC Data Delivery Standards. All responsive electronic Documents, including all metadata, should also be produced in their native software format.

2.    For Documents in paper format, you may send the originals, or, if you prefer, you may send copies of the originals. The Commission cannot reimburse you for the copying costs. If you are sending copies, the staff requests that you scan (rather than photocopy) hard copy Documents and produce them in an electronic format consistent with the SEC Data Delivery Standards. Alternatively, you may send us photocopies of the Documents in paper format. If you choose to send copies, you <u>must</u> secure and retain the originals and store them in a safe place. The staff may later request or require that you produce the originals.

3.    Whether you scan or photocopy Documents, the copies must be identical to the originals, including even faint marks or print. Also, please note that if copies of a Document differ in any way, they are considered separate Documents and you must send each one. For example, if you have two copies of the same letter, but only one of them has handwritten notes on it, you must send both the clean copy and the one with notes.

4.    In producing a photocopy of an original Document that contains post-it(s), notation flag(s), or other removable markings or attachments which may conceal all or a portion of the markings contained in the original Document, photocopies of the original Document both with and without the relevant post-it(s), notation flag(s), or removable markings or attachments should be produced.

5.    Documents should be produced as they are kept in the ordinary course of business or be organized and labeled to correspond with the categories in this request. In that regard, Documents should be produced in a unitized manner, i.e., delineated with staples or paper

clips to identify the Document boundaries.

6.      Documents should be labeled with sequential numbering (bates-stamped).

7.      You must produce all Documents created during, or Concerning, the period from January 1, 2018, or the earliest time for which records exist, whichever is earlier, to the date of this subpoena, unless otherwise specified.

8.      The scope of any given request should not be limited or narrowed based on the fact that it calls for Documents that are responsive to another request.

9.      You are not required to produce exact duplicates of any Documents that have been previously produced to the Securities and Exchange Commission staff in connection with this matter. If you are not producing Documents based upon a prior production, please identify the responsive Documents that were previously produced.

10.     For any Documents that qualify as records of regularly conducted activities under Federal Rule of Evidence 902(11), please complete a business records certification (a sample of which is enclosed) and return it with the Document production.

11.     This subpoena covers all Documents in or subject to your possession, custody or control, including all Documents that are not in your immediate possession but that you have the effective ability to obtain, that are responsive, in whole or in part, to any of the individual requests set forth below. If, for any reason – including a claim of attorney-client privilege – you do not produce something called for by the request, you should submit a list of what you are not producing. The list should be produced as an MS Excel file and describe each item separately, noting:

        a.      its author(s);
        b.      its date;
        c.      its subject matter;
        d.      the name of the Person who has the item now, or the last Person known to have it;
        e.      the names of everyone who ever had the item or a copy of it, and the names of everyone who was told the item's contents;
        f.      the basis upon which you are not producing the responsive Document;
        g.      the specific request in the subpoena to which the Document relates;
        h.      the attorney(s) and the client(s) involved; and
        i.      in the case of the work product doctrine, the litigation for which the Document was prepared in anticipation.

12.     If Documents responsive to this subpoena no longer exist because they have been lost, discarded, or otherwise destroyed, you should identify such Documents and give the date on which they were lost, discarded or destroyed.

## <u>Documents to be Produced</u>

1.   Documents sufficient to identify the relationship, affiliation, or connection between or among MCC and the following entities, including, but not limited to, similar Person(s) conducting work for both companies, software, members, wallets and financial accounts, and promotions offered to members:
     a.   Empires X
     b.   EmpX Management
     c.   Empires Consulting Group
     d.   Bitchain Exchanges

2.   Any and all videos, messages, or other Communications  Concerning any of the following entities, including, but not limited to any promotions or trial periods or membership:
     a.   Empires X
     b.   EmpX Management
     c.   Empires Consulting Group

3.   Documents and Communications Concerning the software development for and the Contact Information for the Person(s) responsible for:
     a.   any and all trading robots used by MCC
     b.   MCC's trading platform
     c.   MCC mining machines

4.   Documents Concerning any Agreements and payments made to the Person(s) responsible for software development and operation of:
     a.   any and all trading robots used by MCC
     b.   MCC's trading platform
     c.   MCC mining machines

5.   Documents sufficient to identify all transactions conducted by:
     a.   any and all trading robots used by MCC
     b.   MCC's trading platform
     c.   MCC mining machines

6.   A copy of the algorithm and code of the software program developed for:
     a.   any and all trading robots used by MCC
     b.   MCC's trading platform
     c.   MCC mining machines

7.   Documents sufficient to identify the quantity (if applicable), location, and identification information of:
     a.   any and all trading robots used by MCC
     b.   MCC's trading platform
     c.   MCC mining machines

8.  Documents sufficient to identify: (i) each Person (full name and Contact Information) who provided MCC any cash, digital asset, cryptocurrency, investment funds, consideration, or anything of value ("Funds"); (ii) the amount of Funds provided by each Person; (iii) the date the Funds were provided; (iv) the purpose of the Funds (*i.e.*, for a particular service or trading program); and (v) the financial accounts or wallet address where the Person's Funds were sent, for any of the following programs or services:
    a.  E-Money Trading Bot
    b.  MCC Bot Package
    c.  Software Trading Bot
    d.  MCC Real Estate
    e.  MCC trading platform
    f.  Insurance of MCC investments

9.  Documents Concerning any loans made to any MCC member, including, but not limited to any Bitcoin loans provided pursuant to any MCC trading robot program and the repayment of those loans.

10. Documents and Communications Concerning the completion of the MGM mall.

11. Documents sufficient to identify: (a) the location or url address of the MGM mall; and (b) Contact Information for each Person who has access or is otherwise a member of the MGM mall.

12. Documents Concerning any Funds provided in exchange for goods, services, or products sold at the MGM mall.

13. Documents and Communications Concerning the acquisition or purchase of any mining machines for MCC, including, but not limited to, the dates of acquisition or purchase, price, method of payment, and vendor.

14. An export of the data of the mining machines identified in Your response to Request No. 7. If you do not have access, please provide the name and Contact Information of the Person who has access to the mining machines.

15. Documents sufficient to identify any cryptocurrency and the quantity of cryptocurrency mined or otherwise created by the mining machines identified in Your response to Request No. 7.

16. Documents sufficient to identify the dates or time period when the mining machines identified in Your response to Request No. 7 were active, used, in operation, and/or working in the United States, including, but not limited to, Port St. Lucie, Florida.

17. Documents sufficient to identify the third-party service providers for electricity and internet service, to any location where the mining machines identified in Your response to Request No. 7 were active, used, in operation, and/or working.

18.   Any and all digital wallet address, including but not limited to, Bitcoin, Ethereum, and Litecoin to which cryptocurrency mined by MCC was sent to.

19.   Documents sufficient to identify mining pools utilized by MCC.

20.   Documents and Communications between MCC and mining pools identified in Your response to Request No. 19 above.

21.   Documents and Communications Concerning the receipt of the full balance of MCC users' CPTL wallets starting on December 20, 2021.

22.   Documents sufficient to identify the source of Funds, including, but not limited to, wallet addresses and financial accounts, provided to any MCC user who requested payment of the MCC user's CPTL wallets.

23.   Documents and Communications Concerning the conversion of any MCC user's account balance from any currency into CPTL.

24.   Documents sufficient to show the filing of taxes and the amount of gross reported income by MCC to any federal, state, or foreign government for tax years 2018, 2019, and 2020.

25.   Documents sufficient to disclose all domestic and foreign bank, brokerage, cryptocurrency, digital asset, or other financial accounts held by, for the benefit of, or on behalf of MCC, which MCC opened or closed, or directed to be opened or closed, or for which MCC became a beneficiary, since June 29, 2021.

26.   For each account identified in response to Request No. 25 above, Documents sufficient to identify:
   a.   Account number or digital address;
   b.   Name and address of financial institution or type of digital address;
   c.   Identity and Contact Information of account holder and authorized signer(s);
   d.   Account balance.

27.   Documents sufficient to identify:
   a.   Any and all digital asset exchanges where MCC or any Person working on behalf of MCC has an account;
   b.   Account number;
   c.   Identity and Contact Information of the Person(s) with authority over the account;
   d.   Account balance.

## DECLARATION OF [*Insert Name*] CERTIFYING RECORDS
## OF REGULARLY CONDUCTED BUSINESS ACTIVITY

I, the undersigned, [*insert name*], pursuant to 28 U.S.C. § 1746, declare that:

1. I am employed by Mining Capital Coin and by reason of my position am authorized and qualified to make this declaration. [*if possible supply additional information as to how person is qualified to make declaration, e.g., I am custodian of records, I am familiar with the company's recordkeeping practices or systems, etc.*]

2. I further certify that the documents [*attached hereto or submitted herewith*] and stamped [*insert bates range*] are true copies of records that were:

> (a) made at or near the time of the occurrence of the matters set forth therein, by, or from information transmitted by, a person with knowledge of those matters;

> (b) kept in the course of regularly conducted business activity; and

> (c) made by the regularly conducted business activity as a regular practice.

I declare under penalty of perjury that the foregoing is true and correct. Executed on [*date*].

_____
[*Name*]

## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## Supplemental Information for Persons Requested to Supply
## Information Voluntarily or Directed to Supply Information
## Pursuant to a Commission Subpoena

**A. False Statements and Documents**

Section 1001 of Title 18 of the United States Code provides that fines and terms of imprisonment may be imposed upon:

> [W]hoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully--
> (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
> (2) makes any materially false, fictitious, or fraudulent statement or representation; or
> (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry.

Section 1519 of Title 18 of the United States Code provides that fines and terms of imprisonment may be imposed upon:

> Whoever knowingly alters, destroys, mutilates, conceals. covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States . . ., or in relation to or contemplation of any such matter.

**B. Testimony**

If your testimony is taken, you should be aware of the following:

1. *Record.* Your testimony will be transcribed by a reporter. If you desire to go off the record, please indicate this to the Commission employee taking your testimony. who will determine whether to grant your request. The reporter will not go off the record at your, or your counsel's. direction.

2. *Counsel.* You have the right to be accompanied, represented and advised by counsel of your choice. Your counsel may advise you before, during and after your testimony; question you briefly at the conclusion of your testimony to clarify any of the answers you give during testimony; and make summary notes during your testimony solely for your use. If you are accompanied by counsel, you may consult privately.

If you are not accompanied by counsel, please advise the Commission employee taking your testimony if, during the testimony, you desire to be accompanied, represented and advised by counsel. Your testimony will be adjourned once to afford you the opportunity to arrange to be so accompanied. represented or advised.

You may be represented by counsel who also represents other persons involved in the Commission's investigation. This multiple representation, however, presents a potential conflict of interest if one client's interests are or may be adverse to another's. If you are represented by counsel who also represents other persons involved in the investigation, the Commission will assume that you and counsel have discussed and resolved all issues concerning possible conflicts of interest. The choice of counsel, and the responsibility for that choice, is yours.

3. *Transcript Availability.* Rule 6 of the Commission's Rules Relating to Investigations, 17 CFR 203.6, states:

> A person who has submitted documentary evidence or testimony in a formal investigative proceeding shall be entitled, upon written request, to procure a copy of his documentary evidence or a transcript of his testimony on payment of the appropriate fees: *Provided, however,* That in a nonpublic formal investigative proceeding the Commission may for good cause deny such request. In any event, any witness, upon proper identification, shall have the right to inspect the official transcript of the witness' own testimony.

If you wish to purchase a copy of the transcript of your testimony. the reporter will provide you with a copy of the appropriate form. Persons requested to supply information voluntarily will be allowed the rights provided by this rule.

4. *Perjury.* Section 1621 of Title 18 of the United States Code provides that fines and terms of imprisonment may be imposed upon:

> Whoever--
> (1) having taken an oath before a competent tribunal. officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare,

depose, or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true; or

(2) in any declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, United States Code, willfully subscribes as true any material matter which he does not believe to be true.

5.    *Fifth Amendment and Voluntary Testimony.* Information you give may be used against you in any federal, state, local or foreign administrative, civil or criminal proceeding brought by the Commission or any other agency.

You may refuse, in accordance with the rights guaranteed to you by the Fifth Amendment to the Constitution of the United States, to give any information that may tend to incriminate you.

If your testimony is not pursuant to subpoena, your appearance to testify is voluntary, you need not answer any question, and you may leave whenever you wish. Your cooperation is, however, appreciated.

6.    *Formal Order Availability.* If the Commission has issued a formal order of investigation, it will be shown to you during your testimony, at your request. If you desire a copy of the formal order, please make your request in writing.

## C. Submissions and Settlements

Rule 5(c) of the Commission's Rules on Informal and Other Procedures, 17 CFR 202.5(c), states:

Persons who become involved in . . . investigations may, on their own initiative, submit a written statement to the Commission setting forth their interests and position in regard to the subject matter of the investigation. Upon request, the staff, in its discretion, may advise such persons of the general nature of the investigation, including the indicated violations as they pertain to them, and the amount of time that may be available for preparing and submitting a statement prior to the presentation of a staff recommendation to the Commission for the commencement of an administrative or injunction proceeding. Submissions by interested persons should be forwarded to the appropriate Division Director or Regional Director with a copy to the staff members conducting the investigation and should be clearly referenced to the specific investigation to which they relate. In the event a recommendation for the commencement of an enforcement proceeding is presented by the staff, any submissions by interested persons will be forwarded to the Commission in conjunction with the staff memorandum.

The staff of the Commission routinely seeks to introduce submissions made pursuant to Rule 5(c) as evidence in Commission enforcement proceedings, when the staff deems appropriate.

Rule 5(f) of the Commission's Rules on Informal and Other Procedures, 17 CFR 202.5(f), states:

In the course of the Commission's investigations, civil lawsuits, and administrative proceedings, the staff, with appropriate authorization, may discuss with persons involved the disposition of such matters by consent, by settlement, or in some other manner. It is the policy of the Commission, however, that the disposition of any such matter may not, expressly or impliedly, extend to any criminal charges that have been, or may be, brought against any such person or any recommendation with respect thereto. Accordingly, any person involved in an enforcement matter before the Commission who consents, or agrees to consent, to any judgment or order does so solely for the purpose of resolving the claims against him in that investigative, civil, or administrative matter and not for the purpose of resolving any criminal charges that have been, or might be, brought against him. This policy reflects the fact that neither the Commission nor its staff has the authority or responsibility for instituting, conducting, settling, or otherwise disposing of criminal proceedings. That authority and responsibility are vested in the Attorney General and representatives of the Department of Justice.

## D. Freedom of Information Act

The Freedom of Information Act, 5 U.S.C. 552 (the "FOIA"), generally provides for disclosure of information to the public. Rule 83 of the Commission's Rules on Information and Requests, 17 CFR 200.83, provides a procedure by which a person can make a written request that information submitted to the Commission not be disclosed under the FOIA. That rule states that no determination as to the validity of such a request will be made until a request for disclosure of the information under the FOIA is received. Accordingly, no response to a request that information not be disclosed under the FOIA is necessary or will be given until a request for disclosure under the FOIA is received. If you desire an acknowledgment of receipt of your written request that information not be disclosed under the FOIA, please provide a duplicate request, together with a stamped, self-addressed envelope.

### E. Authority for Solicitation of Information

*Persons Directed to Supply Information Pursuant to Subpoena.* The authority for requiring production of information is set forth in the subpoena. Disclosure of the information to the Commission is mandatory, subject to the valid assertion of any legal right or privilege you might have.

*Persons Requested to Supply Information Voluntarily.* One or more of the following provisions authorizes the Commission to solicit the information requested: Sections 19 and/or 20 of the Securities Act of 1933; Section 21 of the Securities Exchange Act of 1934; Section 321 of the Trust Indenture Act of 1939; Section 42 of the Investment Company Act of 1940; Section 209 of the Investment Advisers Act of 1940; and 17 CFR 202.5. Disclosure of the requested information to the Commission is voluntary on your part.

### F. Effect of Not Supplying Information

*Persons Directed to Supply Information Pursuant to Subpoena.* If you fail to comply with the subpoena, the Commission may seek a court order requiring you to do so. If such an order is obtained and you thereafter fail to supply the information, you may be subject to civil and/or criminal sanctions for contempt of court. In addition, Section 21(c) of the Securities Exchange Act of 1934, Section 42(c) of the Investment Company Act of 1940, and Section 209(c) of the Investment Advisers Act of 1940 provide that fines and terms of imprisonment may be imposed upon any person who shall, without just cause, fail or refuse to attend and testify or to answer any lawful inquiry, or to produce books, papers, correspondence, memoranda, and other records in compliance with the subpoena.

*Persons Requested to Supply Information Voluntarily.* There are no direct sanctions and thus no direct effects for failing to provide all or any part of the requested information.

### G. Principal Uses of Information

The Commission's principal purpose in soliciting the information is to gather facts in order to determine whether any person has violated, is violating, or is about to violate any provision of the federal securities laws or rules for which the Commission has enforcement authority, such as rules of securities exchanges and the rules of the Municipal Securities Rulemaking Board. Facts developed may, however, constitute violations of other laws or rules. Information provided may be used in Commission and other agency enforcement proceedings. Unless the Commission or its staff explicitly agrees to the contrary in writing, you should not assume that the Commission or its staff acquiesces in, accedes to, or concurs or agrees with, any position, condition, request, reservation of right, understanding, or any other statement that purports, or may be deemed, to be or to reflect a limitation upon the Commission's receipt, use, disposition, transfer, or retention, in accordance with applicable law, of information provided.

### H. Routine Uses of Information

The Commission often makes its files available to other governmental agencies, particularly United States Attorneys and state prosecutors. There is a likelihood that information supplied by you will be made available to such agencies where appropriate. Whether or not the Commission makes its files available to other governmental agencies is, in general, a confidential matter between the Commission and such other governmental agencies.

Set forth below is a list of the routine uses which may be made of the information furnished.

1. To appropriate agencies, entities, and persons when (1) the SEC suspects or has confirmed that there has been a breach of the system of records, (2) the SEC has determined that as a result of the suspected or confirmed breach there is a risk of harm to individuals, the SEC (including its information systems, programs, and operations), the Federal Government, or national security; and (3) the disclosure made to such agencies, entities, and persons is reasonably necessary to assist in connection with the SEC's efforts to respond to the suspected or confirmed breach or to prevent, minimize, or remedy such harm.

2. To other Federal, state, local, or foreign law enforcement agencies; securities self-regulatory organizations; and foreign financial regulatory authorities to assist in or coordinate regulatory or law enforcement activities with the SEC.

3. To national securities exchanges and national securities associations that are registered with the SEC, the Municipal Securities Rulemaking Board; the Securities Investor Protection Corporation; the Public Company Accounting Oversight Board; the Federal banking authorities, including, but not limited to, the Board of Governors of the Federal Reserve System, the Comptroller of the Currency, and the Federal Deposit Insurance Corporation; state securities regulatory agencies or organizations; or regulatory authorities of a foreign government in connection with their regulatory or enforcement responsibilities.

4. By SEC personnel for purposes of investigating possible violations of, or to conduct investigations authorized by, the Federal securities laws.

5. In any proceeding where the Federal securities laws are in issue or in which the Commission, or past or present members of its staff, is a party or otherwise involved in an official capacity.

6. In connection with proceedings by the Commission pursuant to Rule 102(e) of its Rules of Practice, 17 CFR 201.102(e).

7. To a bar association, state accountancy board, or other Federal, state, local, or foreign licensing or oversight authority; or professional association or self-regulatory authority to the extent that it performs similar functions (including the Public Company Accounting Oversight Board) for investigations or possible disciplinary action.

8. To a Federal, state, local, tribal, foreign, or international agency, if necessary to obtain information relevant to the SEC's decision concerning the hiring or retention of an employee; the issuance of a security clearance; the letting of a contract; or the issuance of a license, grant, or other benefit.

9. To a Federal, state, local, tribal, foreign, or international agency in response to its request for information concerning the hiring or retention of an employee; the issuance of a security clearance; the reporting of an investigation of an employee; the letting of a contract; or the issuance of a license, grant, or other benefit by the requesting agency, to the extent that the information is relevant and necessary to the requesting agency's decision on the matter.

10. To produce summary descriptive statistics and analytical studies, as a data source for management information, in support of the function for which the records are collected and maintained or for related personnel management functions or manpower studies; may also be used to respond to general requests for statistical information (without personal identification of individuals) under the Freedom of Information Act.

11. To any trustee, receiver, master, special counsel, or other individual or entity that is appointed by a court of competent jurisdiction, or as a result of an agreement between the parties in connection with litigation or administrative proceedings involving allegations of violations of the Federal securities laws (as defined in section 3(a)(47) of the Securities Exchange Act of 1934, 15 U.S.C. 78c(a)(47)) or pursuant to the Commission's Rules of Practice, 17 CFR 201.100 through 900 or the Commission's Rules of Fair Fund and Disgorgement Plans, 17 CFR 201.1100 through 1106, or otherwise, where such trustee, receiver, master, special counsel, or other individual or entity is specifically designated to perform particular functions with respect to, or as a result of, the pending action or proceeding or in connection with the administration and enforcement by the Commission of the Federal securities laws or the Commission's Rules of Practice or the Rules of Fair Fund and Disgorgement Plans.

12. To any persons during the course of any inquiry, examination, or investigation conducted by the SEC's staff, or in connection with civil litigation, if the staff has reason to believe that the person to whom the record is disclosed may have further information about the matters related therein, and those matters appeared to be relevant at the time to the subject matter of the inquiry.

13. To interns, grantees, experts, contractors, and others who have been engaged by the Commission to assist in the performance of a service related to this system of records and who need access to the records for the purpose of assisting the Commission in the efficient administration of its programs, including by performing clerical, stenographic, or data analysis functions, or by reproduction of records by electronic or other means. Recipients of these records shall be required to comply with the requirements of the Privacy Act of 1974, as amended, 5 U.S.C. 552a.

14. In reports published by the Commission pursuant to authority granted in the Federal securities laws (as such term is defined in section 3(a)(47) of the Securities Exchange Act of 1934, 15 U.S.C. 78c(a)(47)), which authority shall include, but not be limited to, section 21(a) of the Securities Exchange Act of 1934, 15 U.S.C. 78u(a)).

15. To members of advisory committees that are created by the Commission or by Congress to render advice and recommendations to the Commission or to Congress, to be used solely in connection with their official designated functions.

16. To any person who is or has agreed to be subject to the Commission's Rules of Conduct, 17 CFR 200.735-1 through 200.735-18, and who assists in the investigation by the Commission of possible violations of the Federal securities laws (as such term is defined in section 3(a)(47) of the Securities Exchange Act of 1934, 15 U.S.C. 78c(a)(47)), in the preparation or conduct of enforcement actions brought by the Commission for such violations, or otherwise in connection with the Commission's enforcement or regulatory functions under the Federal securities laws.

17. To a Congressional office from the record of an individual in response to an inquiry from the Congressional office made at the request of that individual.

18. To members of Congress, the press, and the public in response to inquiries relating to particular Registrants and their activities, and other matters under the Commission's jurisdiction.

19. To prepare and publish information relating to violations of the Federal securities laws as provided in 15 U.S.C. 78c(a)(47)), as amended.

20. To respond to subpoenas in any litigation or other proceeding.

21. To a trustee in bankruptcy.

22. To any governmental agency, governmental or private collection agent, consumer reporting agency or commercial reporting agency, governmental or private employer of a debtor, or any other person, for collection,

including collection by administrative offset, Federal salary offset, tax refund offset, or administrative wage garnishment, of amounts owed as a result of Commission civil or administrative proceedings.

23. To another Federal agency or Federal entity, when the SEC determines that information from this system of records is reasonably necessary to assist the recipient agency or entity in (1) responding to a suspected or confirmed breach or (2) preventing, minimizing, or remedying the risk of harm to individuals, the recipient agency or entity (including its information systems, programs, and operations), the Federal Government, or national security, resulting from a suspected or confirmed breach.

\* \* \* \* \*

*Small Business Owners:* The SEC always welcomes comments on how it can better assist small businesses. If you would like more information, or have questions or comments about federal securities regulations as they affect small businesses, please contact the Office of Small Business Policy, in the SEC's Division of Corporation Finance, at 202-551-3460. If you would prefer to comment to someone outside of the SEC, you can contact the Small Business Regulatory Enforcement Ombudsman at http://www.sba.gov/ombudsman or toll free at 888-REG-FAIR. The Ombudsman's office receives comments from small businesses and annually evaluates federal agency enforcement activities for their responsiveness to the special needs of small business.



**U.S. Securities and Exchange Commission**

<u>**Data Delivery Standards**</u>

This document describes the technical requirements for paper and electronic document productions to the U.S. Securities and Exchange Commission (SEC). **\*\*_Any questions or proposed file formats other than those described below must be discussed with the legal and technical staff of the SEC Division of Enforcement prior to submission._\*\***

General Instructions ................................................................................................................................................ 1

Delivery Formats ..................................................................................................................................................... 2

   I.  Imaged Productions ......................................................................................................................................... 3

      1.  Images .......................................................................................................................................... 3

      2.  Image Cross-Reference File .......................................................................................................... 3

      3.  Data File ....................................................................................................................................... 3

      4.  Text ............................................................................................................................................. 3

      5.  Linked Native Files ....................................................................................................................... 3

   II.  Native File Productions without Load Files ..................................................................................................... 4

   III.  Adobe PDF File Productions .......................................................................................................................... 4

   IV.  Audio Files ..................................................................................................................................................... 4

   V.  Video Files ..................................................................................................................................................... 4

   VI.  Electronic Trade and Bank Records ................................................................................................................ 4

   VII.  Electronic Phone Records .............................................................................................................................. 4

   VIII.  Audit Workpapers ........................................................................................................................................ 5

   IX.  Mobile Device Data ...................................................................................................................................... 5

**General Instructions**

Due to COVID-19 restrictions the current, temporary mailing address for all <u>physical productions</u> sent to the SEC is:
**ENF-CPU (U.S. Securities & Exchange Commission), 14420 Albemarle Point Place, Suite 102, Chantilly, VA 20151-1750**

Electronic files must be produced in their native format, i.e. the format in which they are ordinarily used and maintained during the normal course of business. For example, an MS Excel file must be produced as an MS Excel file rather than an image of a spreadsheet. *(Note: An Adobe PDF file is **not** considered a native file unless the document was initially created as a PDF.)*

In the event produced files require the use of proprietary software not commonly found in the workplace, the SEC will explore other format options with the producing party.

The proposed use of file de-duplication methodologies or *computer-assisted review* or *technology-assisted review* (TAR) during the processing of documents must be discussed with and approved by the legal and technical staff of the Division of Enforcement (ENF). If your production will be de-duplicated it is vital that you 1) preserve any unique metadata associated with the duplicate files, for example, custodian name and file location and, 2) make that unique metadata part of your production to the SEC.

Rev 8/2021

SEC Division of Enforcement

Data Delivery Standards

General requirements for **ALL** document productions are:

1.  A cover letter must be included with each production and should include the following information:
    a.  Case number, case name and requesting SEC staff member name
    b.  A list of each piece of media included in the production with its unique production volume number
    c.  A list of custodians, identifying the Bates range for each custodian
    d.  The time zone in which the emails were standardized during conversion
    e.  Whether the production contains native files produced from Mac operating system environments
2.  Data can be produced on CD, DVD, thumb drive, etc., using the media requiring the least number of deliverables and labeled with the following:
    a.  Case number
    b.  Production date
    c.  Producing party
    d.  Bates range (if applicable)
3.  All submissions must be organized by **custodian** unless otherwise instructed.
4.  All document family groups, i.e. email attachments, embedded files, etc., should be produced together and children files should follow parent files sequentially in the Bates numbering.
5.  All load-ready collections should include only one data load file and one image pointer file.
6.  All load-ready text must be produced as separate document-level text files.
7.  All load-ready collections should account for custodians in the custodian field.
8.  All load-ready collections must provide the extracted contents of any container files to ensure all relevant files are produced as separate records.
9.  Audio files should be separated from data files if both are included in the production.
10. Only alphanumeric characters and the underscore character are permitted in file names and folder names. Special characters are not permitted.
11. All electronic productions submitted on media must be produced using industry standard self-extracting encryption software.
12. The SEC uses 7zip to access compressed files. Note that the SEC **cannot** accept files that use AES-256 Jpeg or pkAES-256-Cert Deflate compression methods, even if the files are created with 7zip. If you have any questions or need additional information, please reach out to the requesting SEC staff member.
13. Electronic productions of 20 GB or less are strongly encouraged to be submitted via Secure File Transfer. All Secure File Transfers should be sent to the SEC Centralized Production Unit (ENF-CPU@sec.gov) with a CC to the requesting SEC staff member. If you do not have your own Secure File Transfer application, you may reach out to the requesting SEC staff member for a link to the SEC system in order to upload your production. If using the SEC Secure File Transfer system, you will NOT be able to CC individuals outside the SEC on your upload transmission. Note that the SEC **cannot** accept productions made using file sharing sites such as Google Drive, Microsoft Office 365 or Dropbox.
14. Productions containing BSA or SAR material must be delivered on encrypted physical media. The SEC **cannot** accept electronic transmission of BSA or SAR material. Any BSA or SAR material produced should be segregated and appropriately marked as BSA or SAR material, or should be produced separately from other case related material.
15. Passwords for electronic documents, files, compressed archives and encrypted media must be provided separately either via email or in a cover letter apart from the media.
16. All electronic productions should be produced free of computer viruses.
17. Before producing forensically collected images, parties should reach out to the requesting SEC staff member in order to discuss appropriate handling.
18. Before producing unique data sets (large sets of relational data, website reconstruction, chat room data, etc.), parties should reach out to the requesting SEC staff member in order to discuss an appropriate production format.
19. Additional technical descriptions can be found in the addendum to this document.

**\*Please note that productions sent to the SEC via United States Postal Service are subject to Mail Irradiation, and as a result electronic productions may be damaged.\***

Rev 8/2021

**Delivery Formats**

**I.    Imaged Productions**
The SEC prefers that all scanned paper and electronic file collections be produced in a structured format including industry standard load files, Bates numbered image files, native files and searchable document-level text files.

**1.   Images**
   a.   Black and white images must be 300 DPI Group IV single-page TIFF files
   b.   Color images must be produced in JPEG format
   c.   File names cannot contain embedded spaces or special characters (including the comma)
   d.   Folder names cannot contain embedded spaces or special characters (including the comma)
   e.   All image files must have a unique file name, i.e. Bates number
   f.   Images must be endorsed with sequential Bates numbers in the lower right corner of each image
   g.   The number of image files per folder should not exceed 2,000 files
   h.   Excel spreadsheets should have a placeholder image named by the Bates number of the file
   i.   AUTOCAD/photograph files should be produced as a single page JPEG file

**2.   Image Cross-Reference File**
The image cross-reference file (.LOG or .OPT) links the images to the database records. It should be a comma-delimited file consisting of seven fields per line with a line in the cross-reference file for every image in the database with the following format:

   *ImageID,VolumeLabel,ImageFilePath,DocumentBreak,FolderBreak,BoxBreak,PageCount*

**3.   Data File**
The data file (.DAT) contains all of the fielded information that will be loaded into the database.

   a.   The first line of the .DAT file must be a header row identifying the field names
   b.   The .DAT file must use the following *Concordance®* default delimiters:
         Comma ¶ ASCII character (020)
         Quote þ ASCII character (254)
   c.   If the .DAT file is produced in Unicode format it must contain the byte order marker
   d.   Date fields should be provided in the format: mm/dd/yyyy
   e.   Date and time fields must be two separate fields
   f.   The time zone must be included in all time fields
   g.   If the production includes imaged emails and attachments, the attachment fields must be included to preserve the parent/child relationship between an email and its attachments
   h.   An OCRPATH field must be included to provide the file path and name of the extracted text file on the produced storage media.  The text file must be named after the FIRSTBATES.  Do not include the text in the .DAT file.
   i.   For productions with native files, a LINK field must be included to provide the file path and name of the native file on the produced storage media. The native file must be named after the FIRSTBATES.
   j.   BEGATTACH and ENDATTACH fields must be two separate fields
   k.   A complete list of metadata fields is available in **Addendum A** to this document

**4.   Text**
Text must be produced as separate document-level text files, not as fields within the .DAT file. The text files must be named per the FIRSTBATES/Image Key and the full path to the text file (OCRPATH) should be included in the .DAT file. Text files may be in either ANSI or Unicode format, however, ALL text files must be in the same format within the same production. Note that productions containing text with foreign characters must produce text files in Unicode format to preserve the foreign characters. Text files must be in a separate folder, and the number of text files per folder should not exceed 2,000 files. There should be no special characters (including commas) in the folder names. For redacted documents, provide the full text for the redacted version.

**5.   Linked Native Files**
Copies of original email and native file documents/attachments must be included for all electronic productions.
   a.   Native file documents must be named per the FIRSTBATES number
   b.   The full path of the native file must be provided in the .DAT file for the LINK field
   c.   The number of native files per folder should not exceed 2,000 files

**II.   Native File Production without Load Files**

With prior approval, native files may be produced without load files. The native files must be produced as they are maintained in the normal course of business and organized by custodian-named file folders. When approved, native email files (.PST or .MBOX) may be produced. A separate folder should be provided for each custodian.

**III.   Adobe PDF File Production**

With prior approval, Adobe PDF files may be produced in native file format.

1. All PDFs must be unitized at the document level, i.e., each PDF must represent a discrete document.
2. PDF files should be produced in separate folders named by the custodian. The folders should not contain any special characters (including commas).
3. All PDF files must contain embedded text that includes all discernible words within the document, not selected text or image only. This requires all layers of the PDF to be flattened first.
4. If PDF files are Bates endorsed, the PDF files must be named by the Bates range.

**IV.   Audio Files**

Audio files from telephone recording systems must be produced in a format that is playable using Microsoft Windows Media Player™. Additionally, the call information (metadata) related to each audio recording MUST be provided. The metadata file must be produced in a delimited text format. Field names must be included in the first row of the text file. The metadata must include, at a minimum, the following fields:

1) Caller Name:          Caller's name or account/identification number
2) Originating Number:   Caller's phone number
3) Called Party Name:    Called party's name
4) Terminating Number:   Called party's phone number
5) Date:                 Date of call
6) Time:                 Time of call
7) Filename:             Filename of audio file

**V.   Video Files**

Video files must be produced in a format that is playable using Microsoft Windows Media Player™.

**VI.   Electronic Trade and Bank Records**

When producing electronic trade records, bank records, or financial statements, provide the files in one of the following formats:

1. MS Excel spreadsheet with header information detailing the field structure. If any special codes exist in the dataset, a separate document must be provided that details all such codes. If details of the field structure do not fit in the header, a separate document must be provided that includes such details.

2. Delimited text file with header information detailing the field structure. The preferred delimiter is a vertical bar "|". If any special codes exist in the dataset, a separate document must be provided that details all such codes. If details of the field structure do not fit in the header, a separate document must be provided that includes such details.

**VII.   Electronic Phone Records**

When producing electronic phone records, provide the files in the following format:

1. MS Excel spreadsheet with header information detailing the field structure. If any special codes exist in the dataset, a separate document must be provided that details all such codes. If details of the field structure do not fit in the header, a separate document must be provided that includes such details. Data must be formatted in its native format (i.e. dates in a date format, numbers in an appropriate numerical format, and numbers with leading zeroes as text).
   a. The metadata that must be included is outlined in **Addendum B** of this document. Each field of data must be loaded into a separate column. For example, Date and Start_Time must be produced in separate columns and not combined into a single column containing both pieces of information. Any fields of data that are provided in addition to those listed in **Addendum B** must also be loaded into separate columns.

U.S. Securities and Exchange Commission
Data Delivery Standards

### VIII. Audit Workpapers

The SEC prefers for workpapers to be produced in two formats: (1) With Bates numbers in accordance with the SEC Data Delivery Standards; and (2) in native format or if proprietary software was used, on a standalone laptop with the appropriate software loaded so that the workpapers may be reviewed as they would have been maintained in the ordinary course of business. The laptop must have printing capability, and when possible, the laptop should be configured to enable a Virtual Machine (VM) environment.

### IX. Mobile Device Data

Before producing mobile device data (including but not limited to text messages) parties should reach out to the requesting SEC staff member in order to discuss the appropriate production format.

# ADDENDUM A

The metadata of electronic document collections should be extracted and provided in a .DAT file using the field definition and formatting described below:

| Field Name | Sample Data | Description |
|---|---|---|
| FIRSTBATES | EDC0000001 | First Bates number of native file document/email |
| LASTBATES | EDC0000001 | Last Bates number of native file document/email<br>**The LASTBATES field should be populated<br>for single page documents/emails. |
| ATTACHRANGE | EDC0000001 - EDC0000015 | Bates number of the first page of the parent document to the Bates number of the last page of the last attachment "child" document |
| BEGATTACH | EDC0000001 | First Bates number of attachment range |
| ENDATTACH | EDC0000015 | Last Bates number of attachment range |
| PARENT_BATES | EDC0000001 | First Bates number of parent document/Email<br>**This PARENT_BATES field should be populated<br>in each record representing an attachment "child"<br>document |
| CHILD_BATES | EDC0000002; EDC0000014 | First Bates number of "child" attachment(s); can be more than one Bates number listed depending on the number of attachments<br>**The CHILD_BATES field should be populated in<br>each record representing a "parent" document |
| CUSTODIAN | Smith, John | Email: Mailbox where the email resided<br>Native: Name of the individual or department from whose files the document originated |
| FROM | John Smith | Email: Sender<br>Native: Author(s) of document<br>**semi-colon should be used to separate multiple<br>entries |
| TO | Coffman, Janice; LeeW [mailto:LeeW@MSN.com] | Recipient(s)<br>**semi-colon should be used to separate multiple<br>entries |
| CC | Frank Thompson [mailto: frank_Thompson@cdt.com] | Carbon copy recipient(s)<br>**semi-colon should be used to separate multiple<br>entries |
| BCC | John Cain | Blind carbon copy recipient(s)<br>**semi-colon should be used to separate multiple<br>entries |
| SUBJECT | Board Meeting Minutes | Email: Subject line of the email<br>Native: Title of document (if available) |
| FILE_NAME | BoardMeetingMinutes.docx | Native: Name of the original native file, including extension |
| DATE_SENT | 10/12/2010 | Email: Date the email was sent<br>Native: (empty) |
| TIME_SENT/TIME_ZONE | 07:05 PM GMT | Email: Time the email was sent/ Time zone in which the emails were standardized during conversion.<br>Native: (empty)<br>**This data must be a separate field and cannot be<br>combined with the DATE_SENT field |
| TIME_ZONE | GMT | The time zone in which the emails were standardized during conversion.<br>Email: Time zone<br>Native: (empty) |

6

U.S. Securities and Exchange Commission
Data Delivery Standards

| LINK | D:\001\EDC0000001.msg | Hyperlink to the email or native file document **The linked file must be named per the FIRSTBATES number |
| MIME_TYPE | application/msword | The content type of an email or native file document as identified/extracted from the header |
| FILE_EXTEN | MSG | The file type extension representing the email or native file document; will vary depending on the format |
| AUTHOR | John Smith | Email: (empty) Native: Author of the document |
| LAST_AUTHOR | Jane Doe | Email: (empty) Native: Last Author of the document |
| DATE_CREATED | 10/10/2010 | Email: (empty) Native: Date the document was created |
| TIME_CREATED/TIME_ZONE | 10:25 AM GMT | Email: (empty) Native: Time the document was created including time zone **This data must be a separate field and cannot be |
| DATE_MOD | 10/12/2010 | Email: (empty) Native: Date the document was last modified |
| TIME_MOD/TIME_ZONE | 07:00 PM GMT | Email: (empty) Native: Time the document was last modified including the time zone **This data must be a separate field and cannot be |
| DATE_ACCESSD | 10/12/2010 | Email: (empty) Native: Date the document was last accessed |
| TIME_ACCESSD/TIME_ZONE | 07:00 PM GMT | Email: (empty) Native: Time the document was last accessed including the time zone **This data must be a separate field and cannot be |
| PRINTED_DATE | 10/12/2010 | Email: (empty) Native: Date the document was last printed |
| FILE_SIZE | 5,952 | Size of native file document/email in KB |
| PGCOUNT | 1 | Number of pages in native file document/email |
| PATH | J:\Shared\SmithJ\October Agenda.doc | Email: (empty) Native: Path where native file document was stored including original file name. |
| INTFILEPATH | Personal Folders\Deleted Items\Board Meeting Minutes.msg | Email: original location of email including original file name. Native: (empty) |
| INTMSGID | <000805e2e71b$75977050$cb 8306d1@MSN> | Email: Unique Message ID Native: (empty) |

Rev 8/2021

| HEADER | Return-Path: <example_from@dc.edu> X-SpamCatcher-Score:1[X] Received:from[136.167.40.119] (HELO dc.edu) by fe3.dc.edu (CommuniGate Pro SMTP4.1.8) with ESMTP-TLS id 61258719 for example_to@mail.dc.edu; Mon, 23 Aug 2004 11:40:10 -0400 Message-ID: <4129F3CA.2020509@dc.edu> Date: Mon, 23 Aug 2005 11:40:36 -400 From:      Taylor      Evans <example_from@dc.edu> User-Agent:Mozilla/5.0 (Windows;U; Windows NT 5.1; en-US;rv:1.0.1) Gecko/20020823 Netscape/7.0 X-Accept-Language:en-us,en MIME-Version:1.0 To:        Jon        Smith <example_to@mail.dc.edu> Subject:Business Development Meeting Content-Type: text/plain;charset=us-ascii; format=flowed Content-Transfer-Encoding:7bit | Email: The email header information Native: (empty) |
|---|---|---|
| MD5HASH | d131dd02c5e6eec4693d9a069 8aff95c 2fcab58712467eab4004583eb 8fb7f89 | MD5 Hash value of the document. |
| OCRPATH | TEXT/001/EDC0000001.txt | Path to extracted text of the native file |

Sample Image Cross-Reference File:

```
IMG0000001,,E:\001\IMG0000001.TIF,Y,,,
IMG0000002,,E:\001\IMG0000002.TIF,,,,
IMG0000003,,E:\001\IMG0000003.TIF,,,,
IMG0000004,,E:\001\IMG0000004.TIF,Y,,,
IMG0000005,,E:\001\IMG0000005.TIF,Y,,,
IMG0000006,,E:\001\IMG0000006.TIF,,,,
```

## ADDENDUM B

For Electronic Phone Records, include the following fields in separate columns:

For Calls:

1) Account Number
2) Connection Date – Date the call was received or made
3) Connection Time – Time call was received or made
4) Seizure Time – Time it took for the call to be placed in seconds
5) Originating Number – Phone that placed the call
6) Terminating Number – Phone that received the call
7) Elapsed Time – The length of time the call lasted, preferably in seconds
8) End Time – The time the call ended
9) Number Dialed – Actual number dialed
10) IMEI Originating – Unique id to phone used to make call
11) IMEI Terminating– Unique id to phone used to receive call
12) IMSI Originating – Unique id to phone used to make call
13) IMSI Terminating- Unique id to phone used to receive call
14) Call Codes – Identify call direction or other routing information
15) Time Zone – Time Zone in which the call was received or placed, if applicable

For Text messages:

1) Account Number
2) Connection Date – Date the text was received or made
3) Connection Time – Time text was received or made
4) Originating Number – Who placed the text
5) Terminating Number – Who received the text
6) IMEI Originating – Unique id to phone used to make text
7) IMEI Terminating– Unique id to phone used to receive text
8) IMSI Originating - Unique id to phone used to make text
9) IMSI Terminating- Unique id to phone used to receive text
10) Text Code – Identify text direction, or other text routing information
11) Text Type Code – Type of text message (sent SMS, MMS, or other)
12) Time Zone – Time Zone in which the call was received or placed, if applicable

For Mobile Data Usage:

1) Account Number
2) Connection Date – Date the data was received or made
3) Connection Time – Time data was received or made
4) Originating number – Number that used data
5) IMEI Originating – Unique id of phone that used data
6) IMSI Originating - Unique id of phone that used data
7) Data or Data codes – Identify data direction, or other data routing information
8) Time Zone – Time Zone in which the call was received or placed, if applicable

Rev 8/2021

# EXHIBIT 27

Scott W. Wellman
Scott R. Warren
Anabella Q. Bonfa
Christopher A. Wellman

**WELLMAN & WARREN LLP**
**ATTORNEYS AT LAW**
24411 Ridge Route, Suite 200
Laguna Hills, California 92653

949/580-3737
800/444-6587
FAX 949/580-3738
www.w-wlaw.com

January 20, 2022

**VIA EMAIL**

Christine Jeon
United States Securities and Exchange Commission
175 W. Jackson Blvd., Suite 1450
Chicago, IL 60604
JeonC@sec.gov

Subject: *Response to Subpoena and Document Production Request re: Mining Capital Coin (c/o Luiz Capuci) and in the Matter of Mining Capital Coin C-08791*

Dear Ms. Jeon:

As you are aware, I am representing Mining Capital Coin in this matter. The client and I have reviewed the subpoena issued on December 29, 2021 and respond to each of the document Requests in the subpoena as follows:

## *DOCUMENTS TO BE PRODUCED*

## *RESPONSE TO REQUIRED DOCUMENT NO. 1:*

Objection. Overbroad as drafted. Vague as to the phrases "affiliation, relationship, or connection." The requests also exceed the jurisdiction of the Securities and Exchange Commission investigative powers. Without waiving the foregoing, Responding Party answer as follows:

    a. Responding Party has no documents to produce as there is no affiliation, relationship, or connection between MCC and Empires X;

    b. Responding Party has no documents to produce as there is no affiliation, relationship, or connection between MCC and EmpX Management;

    c. Responding Party has no documents to produce as there is no affiliation, relationship, or connection between MCC and Empires Consulting Group.

January 20, 2022
Page 2 of 8
_____

    d.  Such documents have already been produced and are within the possession, custody, and control of the SEC.

## RESPONSE TO REQUIRED DOCUMENT NO. 2:

Objection. Overbroad as drafted. The requests also exceed the jurisdiction of the Securities and Exchange Commission investigative powers. Without waiving the foregoing, Responding Party answer as follows:

    a.    Responding Party has no documents to produce as there is no affiliation, relationship, or connection between MCC and Empires X;

    b.    Responding Party has no documents to produce as there is no affiliation, relationship, or connection between MCC and EmpX Management;

    c.    Responding Party has no documents to produce as there is no affiliation, relationship, or connection between MCC and Empires Consulting Group.

## RESPONSE TO REQUIRED DOCUMENT NO. 3:

Objection. Overbroad as drafted. Vague as to the phrases "trading robots," "software development," and "trading platforms." The requests also exceed the jurisdiction of the Securities and Exchange Commission investigative powers. Without waiving the foregoing, Responding Party answer as follows:

    a.    Responding Party has no documents to produce because it has never been involved with "trading robots";

    b.    Responding Party has no documents to produce because it has never been involved with "trading platforms";

    c.    Responding Party has no documents to produce, as there is no "software development" for mining machines. However, Responding Party will produce the contact information for the person responsible for the mining machines, which is contained on Exhibit "A" of this production.

## RESPONSE TO REQUIRED DOCUMENT NO. 4:

Objection. Overbroad as drafted. Vague as to the phrases "operation," "trading robots," "software development," and "trading platforms." The requests also exceed the jurisdiction of the Securities and Exchange Commission investigative powers. Without waiving the foregoing, Responding Party answer as follows:

    a.    Responding Party has no documents to produce because it has never been involved with "trading robots";

January 20, 2022
Page 3 of 8

b.   Responding Party has no documents to produce because it has never been involved with "trading platforms";

c.   Responding Party no longer has possession, custody, or control of such documents. Such documents may be obtained from the person responsible for the mining machines, whose information has been provided in response to this subpoena.

## RESPONSE TO REQUIRED DOCUMENT NO. 5 :

Objection. Overbroad as drafted. Vague as to the phrases "trading robots" and "trading platforms." The requests also exceed the jurisdiction of the Securities and Exchange Commission investigative powers. Without waiving the foregoing, Responding Party answer as follows:

a.   Responding Party has no documents to produce because it has never been involved with "trading robots";

b.   Responding Party has no documents to produce because it has never been involved with "trading platforms";

c.   Responding Party does not have possession, custody, or control of such documents. Those documents are in the possession and control of Robert Souza, whose contact information has been produced in response to this subpoena as Exhibit "A."

## RESPONSE TO REQUIRED DOCUMENT NO. 6:

Objection. Overbroad as drafted. Vague as to the phrases "trading robots," "Trading Platforms," "algorithm" and "code of software program." The requests also exceed the jurisdiction of the Securities and Exchange Commission investigative powers. Without waiving the foregoing, Responding Party answer as follows:

a.   Responding Party has no documents to produce because it has never been involved with "trading robots";

b.   Responding Party has no documents to produce because it has never been involved with "trading platforms";

c.   Responding Party has no documents to produce, as there are no "algorithms" or "codes" created by MCC for the mining machines.

## RESPONSE TO REQUIRED DOCUMENT NO. 7:

Objection. Overbroad as drafted. Vague as to the phrases "trading robots" and "trading platforms." The requests also exceed the jurisdiction of the Securities and Exchange Commission investigative powers. Without waiving the foregoing, Responding Party answer as follows:

January 20, 2022
Page 4 of 8

a.  Responding Party has no documents to produce because it has never been
    involved with "trading robots";
b.  Responding Party has no documents to produce because it has never been
    involved with "trading platforms";
c.  Responding Party does not have documents within his possession. However,
    Responding Party will produce information regarding the location and quantity of
    the mining machines in Exhibit "A" of this production.

**RESPONSE TO REQUIRED DOCUMENT NO. 8:**

Objection. Overbroad as drafted. The requests also exceed the jurisdiction of the
Securities and Exchange Commission investigative powers. Without waiving the foregoing,
Responding Party answer as follows: Responding Party does not have possession, custody, or
control of such documents therefore responding party has no documents to produce

**RESPONSE TO REQUIRED DOCUMENT NO. 9:**

Objection. Overbroad as drafted. The requests also exceed the jurisdiction of the
Securities and Exchange Commission investigative powers. Without waiving the foregoing,
Responding Party answer as follows: Responding Party has no documents to produce, as no such
loans ever existed.

**RESPONSE TO REQUIRED DOCUMENT NO. 10:**

Objection. Overbroad as drafted. The requests also exceed the jurisdiction of the
Securities and Exchange Commission investigative powers. Without waiving the foregoing,
Responding Party answer as follows: Responding Party has no documents within his possession,
custody, and control. The MGM mall was owned and controlled by a third party, whose contact
information is listed in Exhibit "A" of this production.

**RESPONSE TO REQUIRED DOCUMENT NO. 11:**

Objection. Overbroad as drafted. The requests also exceed the jurisdiction of the
Securities and Exchange Commission investigative powers. Without waiving the foregoing,
Responding Party answer as follows: Responding Party has no documents within his possession,
custody, and control. The MGM mall was owned and controlled by a third party, whose contact
information is listed in Exhibit "A" of this production.

**RESPONSE TO REQUIRED DOCUMENT NO. 12:**

Objection. Overbroad as drafted. The requests also exceed the jurisdiction of the
Securities and Exchange Commission investigative powers. Without waiving the foregoing,

January 20, 2022
Page 5 of 8

Responding Party answer as follows: Responding Party has no documents to produce because the MGM Mall was never completed.

## RESPONSE TO REQUIRED DOCUMENT NO. 13:

Objection. Overbroad as drafted. The requests also exceed the jurisdiction of the Securities and Exchange Commission investigative powers. Without waiving the foregoing, Responding Party answer as follows: Responding Party will produce documents within its possession, custody, and control. Responding Party has requested an invoice from the supplier to produce and will provide that information once Responding Party is in possession of it.

## RESPONSE TO REQUIRED DOCUMENT NO. 14:

Objection. Overbroad as drafted. Vague and to the term "data." The requests also exceed the jurisdiction of the Securities and Exchange Commission investigative powers. Without waiving the foregoing, Responding Party answer as follows: Responding Party does not have possession, custody, or control of such documents. Those documents are in the possession and control of Robert Souza, whose contact information has been produced in response to this subpoena as Exhibit "A."

## RESPONSE TO REQUIRED DOCUMENT NO. 15:

Objection. Overbroad as drafted. The requests also exceed the jurisdiction of the Securities and Exchange Commission investigative powers. Without waiving the foregoing, Responding Party answer as follows: Responding Party does not have possession, custody, or control of such documents. Those documents are in the possession and control of Robert Souza, whose contact information has been produced in response to this subpoena as Exhibit "A."

## RESPONSE TO REQUIRED DOCUMENT NO. 16:

Objection. Overbroad as drafted. Vague and to the phrase "active, used, in operation, and/or working." The requests also exceed the jurisdiction of the Securities and Exchange Commission investigative powers. Without waiving the foregoing, Responding Party answer as follows: There are no documents to produce because the specified machines were never "active, used, in operation, and/or working." The mining machines were never activated to begin mining and were subsequently stored away before any mining commenced.

## RESPONSE TO REQUIRED DOCUMENT NO. 17:

Objection. Overbroad as drafted. Vague and to the phrase "active, used, in operation, and/or working." The requests also exceed the jurisdiction of the Securities and Exchange Commission investigative powers. Without waiving the foregoing, Responding Party answer as

follows: There are no documents to produce because the specified machines were never "active, used, in operation, and/or working." The mining machines were never activated to begin mining and were subsequently stored away before mining commenced. That being said, Responding Party will produce documents showing the electricity bill where the mentioned mining machines were kept.

**RESPONSE TO REQUIRED DOCUMENT NO. 18:**

Objection. Overbroad as drafted. The requests also exceed the jurisdiction of the Securities and Exchange Commission investigative powers. Without waiving the foregoing, Responding Party answer as follows: Responding Party will produce documents within its possession, custody, and control.

**RESPONSE TO REQUIRED DOCUMENT NO. 19:**

Objection. Overbroad as drafted. Vague and to the phrase "mining pools." The requests also exceed the jurisdiction of the Securities and Exchange Commission investigative powers. Without waiving the foregoing, Responding Party answer as follows: Responding Party does not have possession, custody, or control of such documents. Those documents are in the possession and control of Robert Souza, whose contact information has been produced in response to this subpoena as Exhibit "A."

**RESPONSE TO REQUIRED DOCUMENT NO. 20:**

Objection. Overbroad as drafted. Vague and to the phrase "mining pools." The requests also exceed the jurisdiction of the Securities and Exchange Commission investigative powers. The request is unintelligible as drafted, as it is unclear what is meant by the phrase, "communications between MCC and mining pools . . ." Responding Party is willing to further meet and confer to understand what is being requested.

**RESPONSE TO REQUIRED DOCUMENT NO. 21:**

Objection. Overbroad as drafted. The requests also exceed the jurisdiction of the Securities and Exchange Commission investigative powers. The request is unintelligible as drafted, as it is unclear what is meant by the phrase, "the full balance of the MCC users' CPTL wallets . . ." Responding Party is willing to further meet and confer to understand what is being requested.

**RESPONSE TO REQUIRED DOCUMENT NO. 22:**

Objection. Overbroad as drafted. The requests also exceed the jurisdiction of the Securities and Exchange Commission investigative powers. The request is unintelligible as

January 20, 2022
Page 7 of 8

drafted, as it is unclear what is meant by the phrase, "who requested payment of the MCC user's CPTL wallets . . ." Responding Party is willing to further meet and confer to understand what is being requested.

**RESPONSE TO REQUIRED DOCUMENT NO. 23:**

Objection. Overbroad as drafted. Vauge as to the term "conversion." The requests also exceed the jurisdiction of the Securities and Exchange Commission investigative powers. Without waiving the foregoing, Responding Party answer as follows: Responding Party did not "conver[t]" crypto currency into CPTL.

**RESPONSE TO REQUIRED DOCUMENT NO. 24**

Objection. Overbroad as drafted. The requests also exceed the jurisdiction of the Securities and Exchange Commission investigative powers. Without waiving the foregoing, Responding Party answer as follows: MCC did not file taxes in the United States. As to taxes relating to outside the United States, MCC refuses to produce that information based on its objections.

**RESPONSE TO REQUIRED DOCUMENT NO. 25:**

Objection. Overbroad as drafted. The requests also exceed the jurisdiction of the Securities and Exchange Commission investigative powers. Without waiving the foregoing, Responding Party answer as follows: Responding Party has no documents to produce, as MCC did not open or close any accounts since June 29, 2021.

**RESPONSE TO REQUIRED DOCUMENT NO. 26:**

Objection. Overbroad as drafted. The requests also exceed the jurisdiction of the Securities and Exchange Commission investigative powers. Without waiving the foregoing, Responding Party answer as follows: Responding Party has no documents to produce, as MCC did not open or close any accounts since June 29, 2021.

**RESPONSE TO REQUIRED DOCUMENT NO. 27:**

Objection. Overbroad as drafted. The requests also exceed the jurisdiction of the Securities and Exchange Commission investigative powers. Invades privacy of third parties not living in the United States.

Regards,

Chris Wellman
CW/hf

## Exhibit "A"

1. Contact information for person responsible for mining machines:

   Gerson Carvalho
   ███████████-0855

2. Location of Mining Machines:

   Zona Rural, Foz do Iguacu - PR - 85851-000 – Brazil

3. Quantity of Mining Machines as of February 2020:

   83450

4. Robert Souza Contact Information:

   Phone Number: ██████████2292
   Address: ████████████████Uberaba, MG Brasil

5. Contact information for MGM Mall:

   533 Ho, Heungan-daero, Dongan-gu, Anyang-si, Gyeonggi-do, Republic of
   Korea 13951.

# EXHIBIT 28

# C-08791

# *Piers, Emerson - Vol. I.20220111.369994-C*

*1/11/2022 9:46 AM*

**Condensed Transcript**

**Prepared by:**

Dora M. Morales
C-08791

Thursday, January 13, 2022

Page 1

1 THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

2

3 In the Matter of:          )

4                   ) File No. C-08791-A

5 MINING CAPITAL COIN     )

6

7 WITNESS:  Emerson S. Piers

8 PAGES:   1 through 163

9 PLACE:    Securities and Exchange Commission

10       175 W. Jackson Blvd.

11       Chicago, Illinois

12 DATE:    Tuesday, January 11, 2022

13

14       The above-entitled matter came on for hearing,

15 via WebEx, pursuant to notice, at 9:46 a.m.

16 Central Standard Time.

17

18

19

20

21

22

23

24       Diversified Reporting Services, Inc.

25       (202)467-9200

Page 2

1 APPEARANCES:

2

3 On behalf of the Securities and Exchange Commission:

4     CHRISTINE BAUTISTA JEON, ESQ.

5     AMY FLAHERTY HARTMAN, Assistant Regional Director

6     JONATHAN POLISH, ESQ.

7     LARRY BRANNON

8     175 W. Jackson Blvd.

9     Chicago, Illinois

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1 APPEARANCES(CONT.):

2

3 On behalf of the Witness:

4     THEODORE T. POULOS, ESQ.

5     MICHAEL MAINOE COTSIRILOS, ESQ.

6     Tighe, Streicker, Poulos & Campbell, LTD.

7     33 N. Dearborn

8     Suite 600

9     Chicago, IL 60602

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1           C O N T E N T S

2

3 WITNESS:                    EXAMINATION

4 Emerson S. Piers                 5

5

6

7 EXHIBITS   DESCRIPTION              IDENTIFIED

8 1      SEC's Form 5062              6

9 9      MCC-Emerson-13-46            114

10 71     Business presentation        124

11 86     Letter                 8

12 87     Subpoena                 9

13 88     Background questionnaire       41

14 89     MCC Emerson 67              78

15 90     Video                83

16 90-A    Video                83

17 92     MCC-Emerson 026145            53

18 93     Articles of dissolution        54

19 99     2018 tax return            26

20 100     MCCEmerson 48 to 54            34

21 101     MCCEmerson-26123-26131           35

22 102     MCC-Emerson261 through 33-26141  38

23

24

25

Page 5

1    P R O C E E D I N G S
2         MS. JEON:  We're on the record at
3    9:46 a.m., Central Standard Time.  It's
4    Tuesday, January 11, 2022.
5         Will the witness please state and
6    spell your full name for the record?
7         MR. POULOS:  Go ahead, you can do
8    this.
9         MR. PIERS:  My name is Emerson Souza
10   Piers.
11        MS. JEON:  Mr. Piers, can you spell your full
12   name for the record for the court reporter?
13        MR. PIERS:  Yes, Emerson, E-M-E-R-S-O-N; Souza,
14   S-O-U-Z-A; Piers, P-I-E-R-S.
15        MS. JEON:  Mr. Piers, can you please
16   raise your right hand?
17        Do you swear to tell the truth the
18   whole truth and nothing but the truth?
19        MR. PIERS:  I do.
20   Whereupon,
21        EMERSON PIERS
22   was called as a witness and, having been first duly
23   sworn, was examined and testified as follows:
24        EXAMINATION
25        MS. JEON:  You can put your hand down.

Page 6

1         My name is Christine Jeon.  I'm an
2    attorney with the Division of Enforcement with
3    the Security Exchange Commission.  And with us
4    today, is Amy and Jonathan, senior trial
5    attorney, and Larry Brannon, with the Division
6    of Enforcement.
7         We're all officers of the Security
8    Exchange Commission, with the offices of
9    today's proceeding.  This entitled in the
10   matter of Mining Capital Coin.  The purpose of
11   this investigation is to determine whether
12   there has been violations or certain divisions
13   of the federal laws.
14        The facts developed in this
15   investigation might constitute with federal and
16   state or criminal laws.
17        Prior to the opening of the record,
18   you're shown a copy of the formal order and
19   formal order in this investigation in this
20   matter.  And those documents can be made
21   available for you throughout today's testimony.
22        Mr. Piers, have you had an
23   opportunity to review the formal order and
24   supplemental formal order in the investigation
25   in this matter?

Page 7

1    A    Yes, I have.
2    Q    Also, prior to the opening of the
3    record, you were shown the SEC's Form 5062,
4    which I'm showing on the screen, which is
5    marked as Exhibit 1.
6         Mr. Piers, have you had an
7    opportunity to read Exhibit 1?
8    A    Yes, I have.
9    Q    Do you have any questions about
10   Exhibit 1?
11   A    No, I do not.
12   Q    Mr. Piers, you're represented by
13   two attorneys today, who are connected to this
14   Web-ex, correct?
15   A    Yes, that is correct.
16        MS. JEON:  Counsel, can you please
17   state and spell your full name for the record?
18        MR. POULOS:  Yes, I'm Theodore Poulos,
19   for Mr. Piers.
20        MR. MAIONE:  Michael Maione, for
21   Mr. Piers, as well.
22        MS. JEON:  Good morning, gentleman.
23   Q    Mr. Piers, I'm going to direct this
24   question to you.  Are you representing any
25   individuals or companies in this sting

Page 8

1    investigation?
2    A    Yes, I am.
3    Q    And can you identify who the
4    individuals and those entities are?
5    A    In addition to Emerson Piers, I'm
6    representing Enoque Piers, and representing a
7    number of different corporate entities, Emerson
8    Piers X.
9         MR. POULOS:  You didn't tell me that
10   you were going to ask these questions.
11   Q    Is the other one Q Management, LLC?
12   A    That is correct.
13   Q    And that so Mr. Piers, I want to go
14   over an Exhibit 1, in the middle, where it
15   talks about how -- I'll read it to you.
16        "You may be represented by counsel
17   who represents other in multiple representation
18   however potential conflict of interest is one
19   client's interest are at risk to another.
20        If you're represented by counsel
21   who also represents other persons involvement
22   in the investigation, the commission will
23   assume that you and counsel will discuss and
24   resolve all possible conflicts of interest."
25        The choice of counsel is yours, do

Page 9

1  you understand what I have just read?
2      A    Yes.
3      Q    And then we'll move on to the next
4  exhibit, that is Exhibit 86.
5           Exhibit 86 is a letter that I sent
6  yesterday to Mr. Poulous, that discussed the
7  procedures of today's remote.  As we're opposed
8  to doing it in person, there is certain
9  procedures that the SEC is asking both you and
10 your counsel to be obeyed by?
11          Did you have a chance to go over
12 these procedures with your attorney?
13     A    Yes.
14     Q    Do you agree to obey by these
15 procedures?
16     A    Yes, I do.
17          MS. JEON:  And counsel, do you also
18 agree to obey by the procedures in Exhibit 86?
19          MR. POULOS:  Yes.  Can you go to the
20 second page, please.
21          MS. JEON:  Do you want to take your
22 yes answer back first?
23          MR. POULOS:  Okay, that is fine, we
24 agree to obey by it.
25          MS. JEON:  Okay.  Great.

Page 10

1           Sometimes you can see when the
2  exhibits are on Web-ex, the formatting is
3  different.  For sample, my signature is
4  italicized, the original signature is
5  italicized I just want to know if they are
6  different.
7           I'm going to move on to Exhibit 87.
8  Exhibit 87 is a subpoena addressed to Emerson
9  Piers, dated September 13, 2021.
10     Q    Mr. Piers, is this the subpoena
11 pursuant to which you are appearing here for
12 your testimony?
13     A    Yes, it is.
14     Q    Okay.  Great.  Before we get into
15 the substance of things, I need to go over some
16 ground rules, so bear with me as I read through
17 these.
18          Everything we say today is being
19 recorded by the reporter and will be
20 transcribed to a written transcript.  We need
21 to be as clear as possible so the reporter can
22 record everything that we say.  Please answer
23 my questions with a verbal response.  Please
24 don't shake your head or say uh-huh.  Please
25 answer my question before you start the answer,

Page 11

1  I'll let you finish your response before asking
2  a question.  If you don't hear a question,
3  please say so and I'll repeat it.
4           Mr. Piers, how many languages do
5  you speak?
6      A    Three languages.
7           MR. POULOS:  Hang on.  Sir, that is
8  not appropriate answer.
9      Q    Okay.
10     A    On the advice of my attorneys, I
11 invoke to answer the question based on my Fifth
12 Amendment rights.
13          MR. ROSENBERG:  We want to confirm
14 when you say your Fifth Amendment rights --
15          MR. POULOS:  That is the right, I'm
16 referring to and advising him to invoke.
17          MR. POLISH:  For security reasons --
18          MS. JEON:  Sure.  I'm going to read
19 this script, and then we can proceed, but let
20 me know if anyone has any questions about it.
21     Q    Mr. Piers, I'm not authorized to
22 compel you to give authorized testimony for
23 privilege, and I have no intention of doing so.
24          In addition, I don't have an
25 authority by granting your immunity from

Page 12

1  prosecution.  Any question that I ask today,
2  will be with the understanding that if you wish
3  to assert your privilege, you merely state that
4  you refuse to answer on the grounds that any
5  time to incriminate you.
6           In other words, you are not
7  compelled to answer any questions if you
8  believe that a truthful answer to the question
9  that you intend to show you committed a crime,
10 and you wish to insert your privilege against
11 self-incrimination; do you understand this?
12          MR. POULOS:  He is following the
13 advice of his attorney.
14          MS. JEON:  Okay.  I saw him shaking
15 his head.  Can he answer the question if he
16 understands what I just read?
17     A    Yes, I'm following the advice of my
18 attorney.
19     Q    I have two more things to read to
20 you.  You should also be aware if you refuse to
21 answer a question based on your Fifth Amendment
22 privilege in a civil action, that the SEC may
23 determine to bring against you.  That means
24 that the judge or jury will be incur that your
25 answer to the question might incriminate you.

Page 13

1      Do you understand this?
2      MR. POULOS:  He is following the
3  advice of his attorney.
4      MS. JEON:  Are you directing him not
5  to respond?
6      MR. POULOS:  Yes.  I don't think it's
7  accurate in this context.  In any event, I
8  don't think that admonishment as necessary.  He
9  understands his rights as he discussed them
10  with me.
11      MS. JEON:  For the record, the witness
12  is not going to answer my question.  But do you
13  understand what I just read, correct.
14      MR. POULOS:  Correct.
15      MS. JEON:  Is there anything else that
16  Mr. Piers wants to say when he invokes his
17  Fifth Amendment?
18      Can we agree when he invokes his
19  Fifth Amendment, he can respond to the
20  question?
21      MR. POULOS:  Yes, that is fine.
22   Q   I just want to confirm, Mr. Piers,
23  you understand English, correct?
24   A   Yes.
25   Q   You don't need the assistance of a

Page 14

1  foreign language interpreter today, do you?
2   A   No.
3   Q   Just a couple of more ground rules.
4  If you don't understand the question, please
5  let me know and I'll clarify or rephrase.  If
6  you need a break for any reason, let me know,
7  and I'll instruct the court reporter to go off
8  the record at the request of a combined
9  officer.
10      I plan on taking a break around
11  every hour or so, but again, let me know if you
12  or your counsel would like a break.
13      Do you understand what I have just
14  read to you?
15   A   I understand.
16   Q   Is there anything that might impair
17  your ability to understand the questions that I
18  ask today?
19   A   No.
20   Q   Are you currently under the
21  influence of medication or alcohol or other
22  substances?
23   A   No.
24   Q   Have you told anyone that you're
25  testifying before the SEC today, a part from

Page 15

1  your attorney?
2      MR. POULOS:  Don't answer that
3  question.
4      MS. JEON:  So Ted, I want to make
5  sure.  Is that a Fifth Amendment aversion or
6  you're directing him not to respond?
7      MR. POULOS:  I'm going to ask him to
8  assert his Fifth Amendment privilege.
9   Q   So Mr. Piers, do you assert your
10  Fifth Amendment privilege?  Have you told
11  anyone that you're testifying before the SEC
12  today?
13   A   I assert the Fifth Amendment.
14   Q   Is it your aversion in response to
15  any questions that I would ask in regards to
16  speaking to any individuals about this
17  investigation, apart from your attorney?
18      MS. JEON:  What other questions would
19  you ask?  I can go through them.  Do you want
20  me to go through them, Ted?
21      MR. POULOS:  Yes.
22   Q   So the first question, have you
23  told anyone that you're testifying before the
24  SEC, to which he invoked the fifth.  The
25  follow-up question, have you followed-up with

Page 16

1  anyone, should be apart from your attorney?
2      MR. POULOS:  Assert that.
3   A   I assert the Fifth.
4   Q   Have you spoken to anyone with
5  regards to the SEC, in this matter, in general?
6   A   I assert the Fifth.
7      MS. JEON:  So he is going to say "I
8  assert the Fifth" verse the Fifth Amendment?  I
9  just want to be clear on the colloquy.
10   A   I assert the Fifth Amendment.
11   Q   That is fine, we understand.
12      What is the last time that you
13  spoke to Lou Wise?
14   A   I assert the Fifth Amendment.
15      MR. POULOS:  From here on out, you can
16  simply say "Fifth Amendment".
17   Q   Have you spoken to Mr. Capuci about
18  this investigation?
19      MR. POULOS:  Can you spell that name
20  one more time?
21      MS. JEON:  C-A-P-U-C-I.
22      MR. POULOS:  His first.
23      MS. JEON:  Louis, middle name is
24  initial C., Carlos, C-A-P-U-C-I, the last name,
25  Junior.

1    Q    So the question is, have you spoken
2  to Mr. Capuci about this investigation?
3    A    Fifth Amendment.
4    Q    Have you spoken to Mr. Capuci about
5  your testimony?
6    A    Fifth Amendment.
7    Q    Did you and Mr. Capuci discuss what
8  your testimony will be today?
9    A    Fifth Amendment.
10   Q    Mr. Piers, is your attorney to
11 about self-incrimination to respond to any
12 question that I would ask with regards to your
13 communication about Mr. Capuci, about your in
14 investigation or your attorney?
15       MR. POULOS:  What other questions are
16 those?
17       MS. JEON:  I think that we covered
18 them.
19       MR. POULOS:  I think that question is
20 inappropriate.  I can only give advice on the
21 questions that I know.  Without knowing them, I
22 can't advise him.
23       MS. JEON:  You can just say -- Ted,
24 and Jonathan, if you feel free to interject.
25 My opinion is that for us to get through today,

1  you can say I'm advising my client not to
2  answer that question.
3         Amanda if you have a question he
4  should make his objection.  We think it's a
5  proper question.  We'll ask it.  If you have an
6  objection, you can make your objection.
7       MR. POULOS:  I object to those
8  questions, I think are inappropriate.  I can
9  only give him advice on a question-by-question
10 basis.  I think it's highly unlikely, but I
11 think the general question is inappropriate.
12   Q    Okay.  John Muratore, why don't you
13 capture all of that and object to form.  And
14 we'll understand the nature of your objection,
15 because you just described it.
16       MR. POULOS:  Objection to form.
17       MS. JEON:  I'm sorry, you said object
18 to form.
19       MR. POULOS:  Yes.
20       MS. JEON:  And I think how would if at
21 all would the witness response.
22       MR. POULOS:  I would direct him not to
23 answer the question.  If he is not answering
24 because he is invoking the Fifth.
25       MS. JEON:  That is fine.  Let's just

1  do that.  Beyond that, I don't think there is a
2  basis to instruct him not to answer.  But I
3  assume what you are doing, is that you're
4  having him not answer based on his rights
5  against self-incrimination, correct?
6       MR. POULOS:  Not in response to that
7  question.
8         For the record, would you continue to
9  assert your Fifth Amendment privilege if I ask
10 you any questions about X, we can end the
11 entire day today, with one question would you
12 insert your Fifth Amendment with any question
13 about Empires, about Capital Coin, we can cover
14 today's session in five questions, under that
15 approach.  But he is taking advice to answer
16 any questions, I as his counsel, I would advise
17 him to assert his Fifth Amendment, even though
18 it's entirely appropriate.
19        I always have an issue with these
20 problems, would you assert the Fifth Amendment
21 with any questions about this.  I think it's
22 entirely inappropriate with an attorney
23 advising his client, to asserting the Fifth
24 Amendment.
25        I'm sorry to be so hypertechnical, I

1  think that question is inappropriate.  I can't
2  determine what advice, specifically, to give
3  him.
4         That question has no value, even if
5  you asserted the Fifth for the commission in
6  use for any further proceeding, an aversion is
7  only appropriate, only specific to a
8  question-by-question, and on that basis, I do
9  object to the form, and I instruct him not to
10 answer the question.  On a technicality, I
11 can't determine what advice to give him.  So
12 I'm advising him not to answer the question.
13       MS. JEON:  We are going to have to
14 reserve our rights on that, Ted.  I don't think
15 an instruction not to answer is appropriate.  I
16 never heard a court sustain an objection not to
17 answer based on form.  You know, that is just
18 like textbook rules of evidence.  If you are
19 going to -- obviously, your client is going to
20 do what your client is going to do.  But the
21 repercussions of this might be because we might
22 have to come back and do this over again,
23 because your instructions isn't well taken.  I
24 want to note for the record.
25       MR. POULOS:  I objected to form

Page 21

1 because you asked me to object it as a form
2 question.  So that is why I objected to form.
3 I know you can't refuse to answer a question
4 based on the objection, I have articulated my
5 and the basis for the client not to respond to
6 that question.  But we can see how it goes.
7 And we'll take it one step at a time.
8         Listen I'm not interested in -- if
9 you have questions, when you say any further
10 questions, Christine, just ask your questions,
11 you know there is no reason to short circuit
12 this.  If you have questions, ask them.  If you
13 have factual questions, ask them.  To ascertain
14 that question would you continue to -- to me
15 would you advice your client to assert the
16 Fifth Amendment.  If you have factual questions
17 just ask them.  And then I will give him advice
18 and we can proceed.
19    Q    Right I understand your position
20 Ted.  I do appreciate Ted, going forward we
21 should have some agreement that your client can
22 go that based upon my attorneys advice?
23    A    That is clearly what he is doing
24 here I'm on the record here instructing him not
25 to answer the question.

Page 22

1    Q    The transcript has to read Q and A
2 if not the 5th Amendment then?
3         MR. POULOS:  That is fine.
4         MS. JEON:  Is that okay?
5         MR. POULOS:  I just instruct him not
6 to answer the question.  Feel free to ask him r
7 you following your attorneys advice.
8    Q    I'll do that.  There is a lot of
9 back and forth.  Before I continue and step
10 away from this quote on quote side bar,
11 anything else to add Jonathan or?
12         MR. POULOS:  No.  John Muratore the
13 only other point I want to add there is a
14 limited basis not to answer a client a
15 question.  And so one of those would be if the
16 question an attack or in that regard if you
17 seek to illicit privileged information and
18 obviously in the context of the Fifth Amendment
19 beyond that an instruction is not to answer is
20 improper.
21         So I wanted to sit and have that
22 reflective on the record to the extent that
23 this becomes problematic that is the basis for
24 us to continue this testimony.
25         So I just wanted that on the record.

Page 23

1    Q    Okay, thank Jonathan I'm going to
2 continue to re-ask the question and Ted you can
3 feel free to state the objection again for your
4 client to say that your following the advice of
5 my counsel.
6         Mr. Piers is it your intension to
7 assert your Fifth Amendment privilege with self
8 in cytoplasm ration any question that I would
9 ask you with any communications Mr. Capuci
10 about this investigation or your testimony
11 screw?
12    A    I'm following the advice of my
13 counsel.
14    Q    Mr. Piers where are you currently
15 located a?
16         MR. POULOS:  Assert that.
17    A    I assert the Fifth Amendment.
18    Q    Are you currently in did you by?
19    A    I assert the Fifth Amendment.
20    Q    When did you arrive in Dubai?
21    A    I assert the Fifth Amendment.
22         MR. POULOS:  Object to form.
23    Q    When did you arrive in Dubai?
24         MR. POULOS:  It assume a fact not in
25 evidence that he is in fact in Dubai presently.

Page 24

1    Q    Why are you in Dubai?
2    A    I assert the Fifth Amendment.
3    Q    Are you working in did you by?
4    A    I assert the Fifth Amendment.
5    Q    Have you ever been arrested in
6 Dubai?
7    A    I assert the Fifth Amendment.
8    Q    Mr. Piers, is it your intension to
9 assert your Fifth Amendment privilege in
10 response to any question that I would ask you
11 about your current location?
12    A    On the advice of my counsel.
13         MR. POULOS:  I'm advising Mr. Piers
14 not to answer that inappropriate question for
15 the reasons previously articulated.
16    Q    Mr. Piers, are you following the
17 advice of your counsel?
18    A    I am following the advice of my
19 client.
20    Q    Against self-incrimination about
21 anything that I would ask you or whether you
22 have ever been arrested in Dubai?
23    A    I am following the advice of my
24 client.
25    Q    When you say that your following

Page 25

1 the advice of counsel, are you responding --
2          MR. POULOS:  Correct.
3   A    Correct.
4   Q    Are you a US citizen?
5   A    I assert the Fifth Amendment.
6   Q    Do you plan on returning to the
7 United States?
8   A    I assert the Fifth Amendment.
9   Q    When do you plan on returning to
10 the United States?
11   A    I assert the Fifth Amendment.
12   Q    Is it your intension to assert your
13 Fifth Amendment privilege with
14 self-incrimination in response to any question
15 that I would ask you in response?
16   A    I'm following the advice of my
17 counsel.
18   Q    And that advice is not to answer
19 that question, correct?
20          MR. POULOS:  Yes.
21   Q    Mr. Piers, do you say yes?
22   A    Yes.
23   Q    Mr. Piers, what do you currently do
24 for a living?
25   A    I assert the Fifth Amendment.

Page 26

1   Q    What is your source of income,
2 currently?
3   A    I assert the Fifth Amendment.
4   Q    What has been your source of income
5 from January 2018 to the present?
6   A    I assert the Fifth Amendment.
7   Q    I'm going to show you an exhibit,
8 Exhibit 99, I represent to you, this is a 2018
9 tax return that was produced to the SEC in
10 response to the SEC's subpoena issued to you.
11 Please take your time reviewing Exhibit 99, and
12 let me know when you're done reviewing the
13 questions, and let me know when you're ready.
14   A    I'm ready.
15   Q    Have you seen Exhibit 99 before?
16 Well the exhibit that is marked as Exhibit 99.
17          MR. POULOS:  Fifth Amendment.
18   A    Fifth Amendment.
19   Q    Exhibit 99, this is a 2018 1040 tax
20 return with your name on it, right?
21   A    Fifth Amendment.
22   Q    Is this the final tax return that
23 you've filled with the IRS?
24   A    Fifth Amendment.
25   Q    You filed it single, correct?

Page 27

1   A    Fifth Amendment.
2   Q    I'm going to move to Page 4 of
3 Exhibit 99.  Let me know if you need to magnify
4 this or use the screen in any way.
5          MR. POULOS:  What page is the exhibit?
6          MS. JEON:  This is page 4 of Exhibit
7 99.
8   Q    On page 4, you've recorded that
9 your gross income of 2018 was $50,000, correct?
10   A    Fifth Amendment.
11   Q    And you indicated that your job was
12 a contractor, correct?
13   A    Fifth Amendment.
14   Q    What contracting work did you do in
15 2018?
16   A    Fifth Amendment.
17   Q    In part 2, this is still page 4 of
18 Exhibit 99, you list, or it's listed, that car
19 and truck expenses were $9 thousand, correct?
20   A    Fifth Amendment.
21   Q    What were those car and truck
22 expenses for?
23   A    Fifth Amendment.
24   Q    What did those car and truck
25 expenses consist of?

Page 28

1   A    I assert the Fifth Amendment.
2   Q    In paragraph 22, under part 2, it's
3 indicated that it was $3 spent in this tax
4 year.  What supplies made up that figure?
5   A    I assert the Fifth Amendment.
6   Q    How did you determine the amount to
7 enter if into this tax form, that is Exhibit
8 99?
9   A    I assert the Fifth Amendment.
10   Q    Mr. Piers, is it your intention to
11 self-incrimination in response to any question
12 that I would ask about the 2019 tax form?
13   A    I am following the advice of my
14 counsel.
15   Q    To not answer that question,
16 correct?
17          MR. POULOS:  He is answering that
18 question with that answer.
19          MS. JEON:  Can he just say, Ted, I'm
20 following the advice of my counsel.  It needs
21 to be clear for the record.
22   A    I'm following the advice of my
23 counsel.
24          MR. POULOS:  I would like to go off
25 the record.

Page 29

1      (Whereupon, a discussion was held off
2 the record.)
3      Q   Sure, thank you.
4      It's 10:18 Central stand time and
5 we're going off the record.
6      (Whereupon, a short recess was held
7 at this time.)
8      MS. JEON:  Okay.  Let's go on the
9 record.  It's 10:23 a.m., Central Standard
10 Time, and were back on the record.
11      Q   Mr. Piers, before the break, there
12 was a question pending for you, I believe,
13 which was:  Is it your intention to assert your
14 Fifth Amendment privilege against
15 self-incrimination in response to any question
16 I would ask you about Exhibit 99?  I had asked
17 --
18      A   I am sorry --
19      Q   I'm sorry, in addition to that, I
20 had asked if you're refusing to answer that
21 question upon your advice of counsel?
22      A   I would follow my attorney's
23 advice.
24      MS. JEON:  Ted, do you want to leave
25 it at that?

Page 30

1      MR. POULOS:  Yes.
2      MS. HARTMAN:  Ted, I think that the
3 challenge is sometimes you're jumping in with
4 advice to take five, and sometimes you're
5 advice is not to answer.
6      And so as to you giving that advice
7 every time, to be clear, before he says that,
8 we would ask that you clarify that he is
9 following the advice not to answer or you would
10 specifically instruct him not to answer when he
11 says he is following your advice.  Just to be
12 clear on the record.
13      MR. POLISH:  So to be clear on the
14 record.  So the question is, would you continue
15 to assert your Fifth Amendment privilege on
16 that, and his response to that question is, "I
17 would follow my attorney's advice with respect
18 to any further questions," okay?
19      That is his answer to the question.
20 It's an appropriate response to that question,
21 okay?
22      MS. HARTMAN:  Your advice is -- I
23 guess what I'm saying is, sometimes you're
24 injecting with advice of taking Five, and
25 sometimes in your response to that specific

Page 31

1 question, I understand your advice is is
2 instructing him not to answer.
3      MR. POULOS:  Let me be clear.  Let me
4 clear this up.  I did not instruct him not to
5 answer that question.  His response to that
6 question is that I would follow my attorney's
7 advice.
8      MS. HARTMAN:  And what is the advice?
9      MR. POULOS:  What is my advice?
10      MS. HARTMAN:  I guess -- I am
11 personally confused right now, and I think the
12 record may be confusing as to when your advice
13 is instructing him not to answer, versus when
14 your advice is to take -- to assert his Fifth
15 Amendment right.
16      MR. POULOS:  So if I instruct him to
17 assert his Fifth Amendment right, he will say
18 "Fifth Amendment," okay?
19      In response to this question, and
20 any future questions about would you continue
21 to assert your Fifth Amendment privilege in
22 response to any questions about X, his answer
23 is, "I would follow my attorney's advice with
24 respect to any further questions," okay?  That
25 is what he would do.

Page 32

1      So that is his answer to the
2 question.  He is answering the question.  That
3 is an answer to that question, "Would you
4 assert your Fifth Amendment?"  And his answer
5 is that he would follow my attorney's advice.
6      Q   Jonathan, do you have anything to
7 say?
8      MR. POLISH:  No, Ted, I
9 understand -- I understand your position.  I
10 guess that we've had some dialogue back and
11 forth, and I think that our respective
12 positions are set forth on the record.
13      MR. POULOS:  I just want to be clear,
14 I have modified our position.
15      I am not allowing him to not answer
16 the question.  He has answered the question.
17      MS. HARTMAN:  That is whether there
18 was confusion on my part, Ted, earlier, there
19 was instruction not to answer and I was trying
20 to get clarity.
21      MR. POULOS:  And I understand that.
22 Let's just continue.
23      MR. POLISH:  Okay.
24      MS. JEON:  I wanted to say that I
25 would follow up the advice of not to answer the

Page 33

1  question, but I'm not going to ask that
2  follow-up question going forward based upon the
3  dialogue just now.
4      MR. POULOS:  Okay.
5    Q   Okay.  So moving on, I'm going to
6  show you Exhibit 100.  Exhibit 100 is a 2019
7  Form 1040, bearing the name Emerson Piers.
8  It's Bates number MCCEmerson 48 to 54.
9      Mr. Piers, please take your time in
10 reviewing Exhibit 100, and let me know when
11 you're ready, by stating "I'm ready".
12   A   I'm ready.
13   Q   I'm going to move to page 5 of the
14 same exhibit, Exhibit 100.
15      Actually, before I get there, I
16 want to ask you, have you seen this document
17 that was marked as Exhibit 100?
18      MR. POULOS:  Fifth Amendment.
19   A   I assert the Fifth Amendment.
20   Q   On page 5 of Exhibit 100, which is
21 a Schedule C for the Form 1040, bearing your
22 name and your Social Security, it states that
23 your principle business or profession is
24 contractor; do you see that?
25   A   I assert the Fifth Amendment.

Page 34

1    Q   What contracting work did you do in
2  2019?
3    A   I assert the Fifth Amendment.
4    Q   Schedule C in Exhibit 100, also
5  states that your gross income for 2019 was
6  $50,000; is that right?
7    A   I assert the Fifth Amendment.
8    Q   Was your gross income $50,000 in
9  2019?
10   A   I assert the Fifth Amendment.
11   Q   What was the source of income that
12 $50,000 was reported on the Schedule C?
13   A   I assert the Fifth Amendment.
14   Q   The $50,000 income does not include
15 any income from a company called Mining Capital
16 Coin, does it?
17   A   I assert the Fifth Amendment.
18   Q   How did you determine the amount
19 that you've entered into the form, into Exhibit
20 100, which is the Form 1040, including Schedule
21 C?
22   A   I assert the Fifth Amendment.
23   Q   And going back to page 1 of Exhibit
24 100.  Actually, it's page 2 of Exhibit 100.
25      At the bottom, it lists your

Page 35

1  preparers name as Leigh Mccloun (phonetic).
2  Who is Leigh Mccloun?
3    A   I assert the Fifth Amendment.
4    Q   What documents did you provide to
5  Leigh Mccloun to come up with the numbers that
6  are in Exhibit 100?
7    A   I assert the Fifth Amendment.
8    Q   Mr. Piers, is it your intention to
9  assert the Fifth Amendment privilege against
10 self-incrimination in response to any question
11 that I would ask in Exhibit 100?
12   A   I would follow my attorney's
13 advice.
14      MS. JEON:  I'm going to go over a
15 couple of more exhibits, and then we can take a
16 break, okay.
17      I'm moving onto Exhibit 101.  Exhibit
18 101 is another form 1040/2018 tax return --
19 actually, I think that I need to take a break
20 because the PDF came out bad.
21      It's 10:32 a.m., and we are going off
22 the record.
23      (Whereupon, a discussion was held off
24 the record.)
25      MS. JEON:  It's 10:45 Central Standard

Page 36

1  Time, and we are going back on record.
2    Q   And I'm going to show you, Mr.
3  Piers, Exhibit 101.  Exhibit 101, let me get
4  the Bates number for you.  In Exhibit 101, is
5  Bates number MCCEmerson-26123-26131.  This is a
6  2018 tax return in response to your subpoena.
7      Mr. Piers, can you take your time
8  and review Exhibit 101, and let me know when
9  you're ready.
10   A   I'm ready.
11   Q   Mr. Piers, have you seen Exhibit
12 101?
13   A   I assert the Fifth Amendment.
14   Q   Is the document Exhibit 101, has
15 that been filled with the IRS?
16   A   I assert the Fifth Amendment.
17   Q   Exhibit 101 is a Form 1040 for the
18 tax year 2018, filed as single, correct?
19   A   I assert the Fifth Amendment.
20   Q   I'm going to move to page 6 of
21 Exhibit 101.  On page 6, which is Schedule C of
22 the 2018, 1040, it states that your principle
23 business was computing software developer; do
24 you see that?
25   A   I assert the Fifth Amendment.

Page 37

1   Q   Is that statement true?
2   A   I assert the Fifth Amendment.
3   Q   In part 1 of Schedule C, it states
4 that your gross income for 2018 was $367,824;
5 do you see that?
6   A   I assert the Fifth Amendment.
7   Q   Is that statement true?
8   A   I assert the Fifth Amendment.
9   Q   On part 2 of Schedule C, where it
10 list expenses, are those expenses accurate?
11   A   I assert the Fifth Amendment.
12   Q   What is the basis for claiming --
13 what is your basis of claiming $26,356 as
14 current truck expenses?
15   A   I assert the Fifth Amendment.
16   Q   What is your basis for claiming
17 19,524 of contract laborers?
18   A   I assert the Fifth Amendment.
19   Q   What are the other expenses that
20 you list in paragraph -- for line item 27 other
21 expenses for $14,239?
22   A   I assert the Fifth Amendment.
23   Q   What software did you develop in
24 2018?
25   A   I assert the Fifth Amendment.

Page 38

1   Q   You were never a software
2 developer, were you?
3   A   I assert the Fifth Amendment.
4   Q   You didn't receive any training in
5 software development, have you?
6   A   I assert the Fifth Amendment.
7   Q   Why did you produce two different
8 1040s for 2018?
9   A   I assert the Fifth Amendment.
10   Q   Which 1040 is accurate?
11   A   I assert the Fifth Amendment.
12   Q   And I'm moving to Exhibit 102.
13       Exhibit 102 is a Form 1040, for tax
14 year 2019, bearing the name Emerson S. Piers,
15 filed as single. Let me read the Bates number
16 for the record, MCC-Emerson261 through
17 33-26141.
18       Mr. Piers, please take your time
19 and review Exhibit 102, and let me know when
20 you're ready?
21   A   I'm ready.
22   Q   Okay. Have you seen the document
23 marked as Exhibit 102 before?
24   A   I assert the Fifth Amendment.
25   Q   This is a tax Form 1040 for the

Page 39

1 year of 2019, that you've filed as a single
2 status, correct?
3   A   I assert the Fifth Amendment.
4   Q   Was this 1040 filled with the IRS?
5   A   I assert the Fifth Amendment.
6   Q   I'm going to move to page 6 of
7 Exhibit 102.
8       Page 6 is a Schedule C for tax year
9 2019, in the name of Emerson S Piers.  On the
10 Schedule C, it states that your principle
11 business for tax year 2019, was computing,
12 comma, software developer; do you see that?
13   A   I assert the Fifth Amendment.
14   Q   Is that representation true?
15   A   I assert the Fifth Amendment.
16   Q   In this version of the 1040 for tax
17 year -- I'm sorry.  In this version of Schedule
18 C, tax year 2019, part 1, line 1, it states
19 that your gross receipts for sales were
20 312,035; do you see that?
21   A   I assert the Fifth Amendment.
22   Q   Is that representation true?
23   A   I assert the Fifth Amendment.
24   Q   What is the source of income for
25 that figure that I've just read?

Page 40

1   A   I assert the Fifth Amendment.
2   Q   Do you have any documentation for
3 supporting that figure, that I've just read?
4   A   I assert the Fifth Amendment.
5   Q   Does that income include income you
6 received from a company called Mining Capital
7 Coin?
8   A   I assert the Fifth Amendment.
9   Q   What computer or computing or
10 software developing business did you conduct in
11 2019?
12   A   I assert the Fifth Amendment.
13   Q   Did you develop any software in
14 2019?
15   A   I assert the Fifth Amendment.
16   Q   What is the basis for the expenses
17 in part 2, in Schedule C?
18   A   I assert the Fifth Amendment.
19   Q   There is no basis for the expenses
20 that you claim in part 2 Schedule C, is there?
21   A   I assert the Fifth Amendment.
22   Q   Why did you produce to the SEC, two
23 different 1040 forms in Schedule C, for the tax
24 year 2019?
25   A   I assert the Fifth Amendment.

Page 41

1   Q   Which form is Schedule C, is true
2  or accurate?
3   A   I assert the Fifth Amendment.
4   Q   I'm going to move on to 88.
5       MR. POULOS:  I'm sorry, can you
6  recircle back, and put the first exhibit on the
7  screen, please.  Exhibit 100.
8   Q   Going back to page 1 of Exhibit
9  100, on the screen.
10       Just, Ted, for the record, Exhibit
11  100 is Bates number MCCEmerson48-54.  Let me
12  know if you need more time?
13       MR. POULOS:  Great.  Thank you.  I got
14  it.
15       MS. JEON:  You're good.  I'm going to
16  move on to Exhibit 88.  Exhibit 88 is a
17  background questionnaire dated October 13,
18  2021, with typed answers, and it has your name,
19  Emerson Souza Piers, as well.  It looks like
20  that I need to correct this PDF, as well.
21       Just bear with me one second.  Can
22  we go off record for two seconds, I apologize?
23       MR. POULOS:  Sure.
24       MS. JEON:  It's 10:54 a.m., and we
25  are going off record.

Page 42

1       (Whereupon, a short recess was held
2  at this time.)
3       MS. JEON:  It's 10:58 a.m., Central
4  Standard Time, and we are going back on record.
5   Q   Mr. Piers, I'm showing on the
6  screen Exhibit 88, which is your background
7  questionnaire, it's about eight pages.  Can you
8  take your time in reviewing it, and let me know
9  when you're ready.
10   A   I'm ready.
11   Q   Mr. Piers, did you complete this
12  background questionnaire?
13   A   I assert the Fifth Amendment.
14   Q   Did you type the answers in this
15  background questionnaire?
16   A   I assert the Fifth Amendment.
17   Q   Are your answers accurate, true and
18  complete?
19   A   I assert the Fifth Amendment.
20   Q   Would you like to add or change
21  anything in your background questionnaire
22  today?
23   A   I assert the Fifth Amendment.
24   Q   I'm showing you on the screen, page
25  4 of Exhibit 88; do you see page 4?

Page 43

1   A   Yes.
2   Q   For number 22, the question is:
3  "Are you now, or have you ever been, a manager
4  or member of any privately held company,
5  corporation or other corporate forms?"  In your
6  answer, you provide three companies, E&J
7  Granite Install, LLC, Empires X Corp., and
8  Florida Counter Tops and Tiles, LLC; is that
9  correct?
10   A   I assert the Fifth Amendment.
11   Q   What is Empire X Corp?
12   A   I assert the Fifth Amendment.
13   Q   What business does Empire X Corp
14  conduct?
15   A   I assert the Fifth Amendment.
16   Q   Where does Empire X Corp conduct
17  it's business?
18   A   I assert the Fifth Amendment.
19   Q   Empires X Corp conducts business in
20  the United States, correct?
21   A   I assert the Fifth Amendment.
22   Q   When did Empires X Corp form?
23   A   I assert the Fifth Amendment.
24   Q   Since Empires X Corp was formed, it
25  conducted business in the United States, didn't

Page 44

1  it?
2   A   I assert the Fifth Amendment.
3   Q   Since Empire X Corp was formed, it
4  has investors in the United States, correct?
5   A   I assert the Fifth Amendment.
6   Q   What is your position with Empires
7  X Corp?
8   A   I assert the Fifth Amendment.
9   Q   Empires X Corp is named after you,
10  correct?
11   A   I assert the Fifth Amendment.
12   Q   You are a board member of Empires X
13  Corp, aren't you?
14   A   I assert the Fifth Amendment.
15   Q   Moving on to number 23 of this
16  background questionnaire Exhibit 88, it asked
17  you for a listing of brokerage accounts that
18  you've held in your name individually or
19  jointly.
20       Your answer to that question is
21  none; do you see that?
22   A   Yes.
23   Q   Is that answer true?
24   A   I assert the Fifth Amendment.
25   Q   Do you have any securities or

Page 45

1 brokerage accounts that you've held in your
2 name individually, or jointly?
3     A   I assert the Fifth Amendment.
4     Q   Do you have any digital access
5 accounts that hold cryptocurrency that is held
6 in your name individually, or jointly?
7     A   I assert the Fifth Amendment.
8     Q   Have you trade any securities
9 including stock or cryptocurrencies?
10     A   I assert the Fifth Amendment.
11     Q   Have you opened any securities
12 account, or digital access accounts, since
13 you've completed this -- or since this
14 questionnaire was completed, that appears to be
15 in October of 2021?
16     A   I assert the Fifth Amendment.
17     Q   Do you have control or access to
18 any securities or digital asset accounts,
19 between since the time period of January 2021
20 until the present?
21     A   I assert the Fifth Amendment.
22     Q   I'm going to move on to question
23 number 26, which is on page 5 of Exhibit 88.
24       Question 26 asks for bank accounts
25 held in your name at any financial

Page 46

1 institutions.  In response, you write, E&J
2 Granite Install, LLC, at Chase; do you see
3 that?  Is that true?
4     A   I assert the Fifth Amendment.
5     Q   Is there any other bank accounts
6 that have been in your name since January of
7 2018, I'm going to change the end date to the
8 present?
9     A   I assert the Fifth Amendment.
10     Q   Do you have any bank accounts, to
11 which you have access or otherwise control,
12 that is not in your name, between January 1st,
13 2018, until the present?
14     A   I assert the Fifth Amendment.
15     Q   You were the authorized signer on a
16 JP Morgan Chase account in the matter of MCC
17 International Corp., weren't you?
18     A   I assert the Fifth Amendment.
19       MR. POULOS:  Can you repeat the
20 question?  I'm sorry, Christine.
21       MS. JEON:  Sure, I'll try and repeat
22 it to the best of my ability, but we can also
23 ask the court reporter.
24     Q   I think the question was, you were
25 the authorized signer of a JP Morgan Chase bank

Page 47

1 account in the name of MCC International Corp.?
2 Mr. Piers you've opened the bank account MCC
3 International Corp. at JP Morgan Chase,
4 correct?
5     A   I assert the Fifth Amendment.
6     Q   That account received funds related
7 to Mining Capital Coin,which for short, I'm
8 going to call MCC, today; is that correct?
9     A   I assert the Fifth Amendment.
10     Q   You've received investor funds
11 related to MCC in the MCC International Corp.
12 bank account at JP Morgan Chase, correct?
13     A   I assert the Fifth Amendment.
14     Q   You received compensation related
15 to MCC in this JP Morgan Chase bank account,
16 which is titled MCC International Corp.,
17 correct?
18     A   I assert the Fifth Amendment.
19     Q   Why didn't you list the MCC
20 International Corp. on your questionnaire?
21     A   I assert the Fifth Amendment.
22     Q   Is there any other bank accounts
23 that you've used or had access to, between
24 January 1, 2018, until the present?
25     A   I assert the Fifth Amendment.

Page 48

1     Q   Which financial accounts -- in
2 which financial accounts have you received any
3 compensation or salary for any work that you do
4 between January 1, 2018, until the present?
5     A   I assert the Fifth Amendment.
6     Q   I'm going to move to question 35 of
7 Exhibit 88, which is about your educational
8 history.  In your answer to question 5, is that
9 you've attended Woodfield High School, and that
10 for college, you attended a community college;
11 do you see that?
12     A   I see that.
13     Q   And you also stated that you didn't
14 graduate from community college; do you see
15 that?
16     A   I see that.
17     Q   Did you ever attend Harvard?
18     A   Can you repeat the question.
19     Q   Did you ever attend Harvard?
20     A   I assert the Fifth Amendment.
21     Q   You never attended Harvard did you?
22     A   I assert the Fifth Amendment.
23     Q   I'm going to move to question 42,
24 which is on page 8 of Exhibit 88.
25       Question 42 deals with your

1 employment history.  And the relevant time
2 period for question 42 is -- well, I'll just
3 read it.  Question 42 states your employment
4 activity beginning with the present and working
5 backwards to date, to the date that you
6 completed high school. 1
7         In question 42, you answered that
8 you were the VP of communication at Mining
9 Capital Coin, which for short, I'm going to
10 call MCC; is that answer true?
11    A   I assert the Fifth Amendment.
12    Q   Did you live in Florida when you
13 worked for MCC?
14    A   Can you repeat the question.
15    Q   Did you live in Florida when you
16 worked for MCC?
17    A   I assert the Fifth Amendment.
18    Q   You list yourself as the owner of
19 Empires X Corp., correct?
20    A   I assert the Fifth Amendment.
21    Q   How much money did you make, or how
22 much income did you make, from Empires X Corp.?
23    A   I assert the Fifth Amendment.
24    Q   Did you have any business partners
25 with Empires X Corp.?

1    A   I assert the Fifth Amendment.
2    Q   Flavio Mendes Gonvalves, let me
3 spell that.  Flavio, F-L-A-V-I-O; middle name
4 Mendes, M-E-N-D-E-S; last name Gonvalves,
5 G-O-N-V-A-L-V-E-S, is your business partner at
6 Empires X Corp., correct?
7    A   I assert the Fifth Amendment.
8    Q   Joshua Edward Nicholas is your head
9 trader at Empires X Corp., correct?
10    A   I assert the Fifth Amendment.
11        MR. MAIONE:  I'm sorry, could you
12 spell the last name you've just said.
13        MS. JEON:  It's Nicholas,
14 N-I-C-H-O-L-A-S.
15        MR. MAIONE:  Oh, I see, thank you.
16    Q   Is Empire still in business?
17    A   I assert the Fifth Amendment.
18    Q   Are you affiliated with a company
19 called EMPX Management, spelled E-M-P, capital
20 X, space, Management, LLC?
21    A   I assert the Fifth Amendment.
22    Q   What is your role with EMPX
23 Management, LLC?
24    A   I assert the Fifth Amendment.
25    Q   How much money do you earn from

1 EMPX Management, LLC?
2    A   I assert the Fifth.
3    Q   Mr. Gonvalves is your business
4 partner at EMPX Management, LLC, correct?
5    A   I assert the Fifth Amendment.
6    Q   Who else worked for EMPX
7 Management, LLC?
8    A   I assert the Fifth Amendment.
9    Q   What does EMPX Management, LLC do
10 for it's business?
11    A   I assert the Fifth Amendment.
12    Q   How is EMPX Management, LLC
13 different, if at all, from Empires X?
14    A   I assert the Fifth Amendment.
15    Q   Is it a DBA, for Empires X?
16    A   I assert the Fifth Amendment.
17    Q   Are you affiliated with a company
18 called Empires Consulting Group, LLC?
19    A   I assert the Fifth Amendment.
20        MR. POULOS:  Christine, can you repeat
21 the name of the entity.
22        MS. JEON:  Are you affiliated with a
23 company called Empires Consulting Group, LLC?
24 And I think he already answered, so I'll move
25 on.

1    Q   What is your role with Empires
2 Consulting Group, LLC?
3    A   I assert the Fifth Amendment.
4    Q   What does Empires Consulting Group
5 do for it's business?
6    A   I assert the Fifth Amendment.
7    Q   How much income have you received
8 from Empires Consulting Group, LLC?
9    A   I assert the Fifth Amendment.
10    Q   Are there any other companies that
11 you've worked for, or did work for, that are
12 not listed in your background questionnaire?
13    A   I assert the Fifth Amendment.
14    Q   Didn't you do work with Unique
15 Counters, LLC?
16    A   I assert the Fifth Amendment.
17        MR. POULOS:  Christine, can you repeat
18 the entity.
19        MS. JEON:  Unique, U-N-I-Q-U-E;
20 Counters, C-O-U-N-T-E-R-S, LLC.
21    Q   Do you have access to a bank
22 account in the name of Unique Counters, LLC?
23    A   I assert the Fifth Amendment.
24    Q   Do you have access to a bank
25 account under the name of Unique Counters, LLC,

Page 53

1 don't you?
2     A   I assert the Fifth Amendment.
3     Q   Okay.  I'm going to show you
4 Exhibit 92.  Mr. Piers, please take your time
5 in reviewing Exhibit 92.  It's a one-page
6 document, and let me know when you're ready.
7 And for the record, the Bates number for 92 is
8 MCC-Emerson 026145.
9     A   I'm ready.
10     Q   I'll represent to you, that your
11 former attorney, Chris Wellman, produced this
12 document in response to an SEC subpoena sent to
13 you, in this investigation.
14        Have you seen the document marked
15 as Exhibit 92 before?
16     A   I assert the Fifth Amendment.
17     Q   Did you type the answer in Exhibit
18 92?
19     A   I assert the Fifth Amendment.
20     Q   Did you provide the information in
21 Exhibit 92, in order to respond to the SEC's
22 subpoena in this investigation?
23     A   I assert the Fifth Amendment.
24     Q   Exhibit 92 provides a link for the
25 business relation E&J Granite Install, LLC and

Page 54

1 Empires X Corp; do you see that?
2     A   Yes, I see that.
3     Q   And when you click on the link for
4 Empires X Corp., let me go through it.
5        MS. JEON:  Let's go off record for one
6 minute.
7        It's 11:14 a.m., Central Standard
8 Time.
9        (Whereupon, a short recess was held
10 at this time.)
11        MS. JEON:  It's 1:15, Central Standard
12 Time, and we are going back on record.
13     Q   I'm showing you Exhibit 93; do you
14 see that on your screen, Mr. Piers?
15     A   Yes, I do.
16     Q   Please take your time and review
17 Exhibit 93, and let me know when you're ready.
18     A   I'm ready.
19     Q   Have you seen the document marked
20 as Exhibit 93, that is articles of dissolution,
21 filed September 19, 2020?
22     A   I assert the Fifth Amendment.
23     Q   That is your name on the signature
24 line, it says Emerson Piers, as President,
25 correct?

Page 55

1     A   I assert the Fifth Amendment.
2     Q   Why did you file this articles of
3 dissolution for Empires X Corp.?
4     A   I assert the Fifth Amendment.
5     Q   Who filed this articles of
6 dissolution in Exhibit 93?
7     A   I assert the Fifth Amendment.
8     Q   Did Empires X Corp. conduct
9 business after September 19, 2020?
10     A   I assert the Fifth Amendment.
11     Q   I'm going to go back to Exhibit 92,
12 that is your typed answer.  In Exhibit 92, you
13 list a coin-based account, correct?
14     A   I assert the Fifth Amendment.
15     Q   How many coin-based accounts do you
16 have in your name?
17     A   I assert the Fifth Amendment.
18     Q   You have at least three in your
19 name, correct?
20     A   I assert the Fifth Amendment.
21     Q   How many coin-based accounts do you
22 have control over?
23     A   I assert the Fifth Amendment.
24     Q   Empires X Corp. has a coin-based
25 account, correct?

Page 56

1     A   I assert the Fifth Amendment.
2     Q   Do you receive investor funds in
3 all of your coin-base accounts, correct?
4     A   I assert the Fifth Amendment.
5     Q   You receive investor -- MCC
6 investor funds in your coin-base accounts,
7 correct?
8     A   I assert the Fifth Amendment.
9     Q   Do you also receive investor funds
10 in at least one coin-based account, correct?
11     A   I assert the Fifth Amendment.
12     Q   What do you do with digital access
13 that is in your coin-based account?
14     A   I assert the Fifth Amendment.
15     Q   Isn't it true that you usually
16 immediately trade the digital assets for cash?
17     A   I assert the Fifth Amendment.
18     Q   Then you transfer the cash to a
19 PayPal account or bank account?
20     A   I assert the Fifth Amendment.
21     Q   Then you spend the cash on personal
22 items, correct?
23     A   I assert the Fifth Amendment.
24     Q   Isn't it true that you received
25 over at least two million dollars in digital

1 access in the coin-based account?
2     A    I assert the Fifth Amendment.
3         MR. POULOS:  How much was that,
4 Christine?
5         MS. JEON:  At least two million.
6     Q    Sometimes you transfer the cash in
7 your coin-based account, to your PayPal
8 account, correct?
9     A    I assert the Fifth Amendment.
10    Q    How many PayPal accounts do you
11 have?
12    A    I assert the Fifth Amendment.
13    Q    And sometimes you transfer cash
14 from your coin-based account to your E&J
15 Granite Install account at JP Morgan Chase,
16 correct?
17    A    I assert the Fifth Amendment.
18    Q    And sometimes you transfer cash to
19 your personal account at Suncoast Credit Union?
20        MR. POULOS:  What was the name of
21 that?
22        MS. JEON:  Suncoast.
23    A    I assert the Fifth Amendment.
24    Q    And sometimes you transfer the cash
25 to a DBVA account ending 2973, correct?

1     A    I assert the Fifth Amendment.
2         MR. POULOS:  Could you repeat that
3 again, too, Christine.
4         MS. JEON:  DBVA account ending 2973.
5     Q    Did you receive funds relating to
6 MCC and other digital asset accounts, besides
7 coin base?
8     A    I assert the Fifth Amendment.
9     Q    Do you have any other accounts that
10 hold digital assets between January 2018, until
11 the present?
12    A    I assert the Fifth Amendment.
13    Q    Do you have a Binance account,
14 right?  B-I-N-A-N-C-E.
15    A    I assert the Fifth Amendment.
16    Q    Why didn't you list your Binance
17 account on the document marked as Exhibit 92?
18    A    I assert the Fifth Amendment.
19    Q    What other digital asset accounts
20 that you own or control, have received funds
21 related to Empire X?
22    A    I assert the Fifth Amendment.
23    Q    What other digital access accounts
24 do you own or control, have funds related to
25 MCC?

1     A    I assert the Fifth Amendment.
2     Q    What other digital asset accounts
3 that you own or control, receive funds related
4 to EMPX Management?
5     A    I assert the Fifth Amendment.
6     Q    Do you have any digital asset
7 accounts that you have access to, that receive
8 funds related to Empire Consulting Group, LLC?
9     A    I assert the Fifth Amendment.
10    Q    Are the social of funds in all of
11 your digital accounts, investor funds?
12    A    I assert the Fifth Amendment.
13    Q    Do you have experience trading
14 securities, including stocks?
15    A    I assert the Fifth Amendment.
16    Q    Do you have experience trading
17 cryptocurrency or any digital assets?
18    A    I assert the Fifth Amendment.
19    Q    Have you ever provided investment
20 as a way to provide income?
21    A    I assert the Fifth Amendment.
22    Q    Have you ever provided financial
23 consulting?
24    A    I assert the Fifth Amendment.
25    Q    What training and experience do you

1 have, to provide financial consulting?
2     A    I assert the Fifth Amendment.
3     Q    You do not have any training and
4 experience to provide financial consulting, do
5 you?
6     A    I assert the Fifth Amendment.
7     Q    What is the approximate value of
8 cryptocurrency or digital assets, that you've
9 had, from 2019 until the present?
10    A    I assert the Fifth Amendment.
11    Q    How much in cryptocurrency do you
12 currently own?
13    A    I assert the Fifth Amendment.
14    Q    Where are those digital assets
15 held?
16    A    I assert the Fifth Amendment.
17    Q    What is the approximate total
18 balance of cash in the financial accounts you
19 have in your name or otherwise, have access to?
20    A    I assert the Fifth Amendment.
21    Q    How much have you earned since
22 January of 2018, until the present?
23    A    I assert the Fifth Amendment.
24    Q    Do you have any other properties in
25 the United States, including real properties?

Page 61

1    A   I assert the Fifth Amendment.
2    Q   Do you have any vehicles,
3 motorcycles or boats, in the United States?
4    A   I assert the Fifth Amendment.
5    Q   Is anyone holding any property or
6 assets for you?
7    A   I assert the Fifth Amendment.
8    Q   What was your role at Mining
9 Capital Coin?
10    A   I assert the Fifth Amendment.
11    Q   Did you use the title of marketing
12 director at MCC?
13    A   I assert the Fifth Amendment.
14    Q   Did you describe yourself as vice
15 president of MCC?
16    A   I invoke the Fifth Amendment.
17    Q   You did work at MCC between at
18 least 2018 to 2020, correct?
19    A   I assert the Fifth Amendment.
20    Q   You also worked for MCC in 2021,
21 correct?
22    A   I assert the Fifth Amendment.
23    Q   What task did you perform in your
24 various roles at MCC?
25    A   I assert the Fifth Amendment.

Page 62

1    Q   You've created marketing materials
2 for MCC, correct?
3    A   I assert the Fifth Amendment.
4    Q   You've created videos and business
5 presentations to promote MCC, right?
6    A   I assert the Fifth Amendment.
7    Q   You helped recruit members for MCC,
8 right?
9    A   I assert the Fifth Amendment.
10    Q   You work to increase MCC
11 membership, correct?
12    A   I assert the Fifth Amendment.
13    Q   CPTL, all capitals, C-P-T-L, which
14 is Capital Coins, that is a digital asset
15 created by MCC, right?
16    A   I assert the Fifth Amendment.
17    Q   Did you work on the launch on CPTL
18 on public digital exchanges?
19    A   I assert the Fifth Amendment.
20    Q   Did you work on the launch you
21 promoted at CPTL?
22    A   I assert the Fifth Amendment.
23    Q   And you've worked to increase the
24 volume at CPTL by telling others to purchase
25 CPTL?

Page 63

1    A   I assert the Fifth Amendment.
2        MR. MAIONE:  Could you repeat one
3 thing for me?  You've said did you work on the
4 law for CPTL, I think you've might have said
5 that the name of a platform?
6        MS. JEON:  I just said digital public
7 exchanges.
8    Q   You've also hired people to work
9 for MCC, right?
10    A   I assert the Fifth Amendment.
11    Q   You conducted business
12 presentations in the United States for MCC,
13 right?
14    A   I assert the Fifth Amendment.
15    Q   You recruited MCC members in the
16 United States, correct?
17    A   I assert the Fifth Amendment.
18        MR. POULOS:  Excuse me, Christine,
19 please don't take this the right way.  I want
20 to confirm that to the extent that you are
21 asking leading questions and making assertions
22 of fact, that you have evidence to support, as
23 a good-faith basis, to support those assertions
24 of fact.
25        MS. JEON:  I'm going to pause, I need

Page 64

1 to confer.  Do you want to take a break?
2        MR. POULOS:  Yes.  Yes.  Emerson.
3 Let's come back at 11:40, that is 12 minutes
4 from now.  You can stop video, and I'll call
5 you and Mike.  Okay.
6        MS. JEON:  So 11:40, Central Time,
7 and we are going off record at 11:28, Central
8 Time.
9        Thank you.
10        (Whereupon, a short recess was held at
11 this time.)
12        MS. JEON:  The time is 11:42, Central
13 Standard Time, and we are going back on record.
14        Ted, before the break, I believe you
15 asked me if there is a good-faith basis for my
16 leading question; is that right?
17        MR. POULOS:  Yes.
18        MS. JEON:  My answer is that all of my
19 questions adhere to the federal rules of
20 evidence and are consistent with my ethical
21 obligations.
22        MR. POULOS:  And so I want to say for
23 the record, Christine, I say this respectfully,
24 you know, I may just be wrong on the facts and
25 I don't say this to quibble about the facts,

1 but a witness invoking the Fifth does not
2 provide free range for a question or to simply
3 ask questions in the form of asserting a fact
4 is true, without evidence to support that
5 assertion of fact.
6        And so I believe that there is no
7 evidence, because Mr. Piers did not work for
8 MCC for 2021, and there was an assertion, that
9 in fact, he did. I believe that there is no
10 evidence to support that assertion, and the
11 record will end up being what it is.
12       And I am troubled by assertions of
13 fact, if it's not a good-faith basis founded in
14 actual evidence to support that assertion of
15 fact.
16       MS. JEON: Okay, so, are you --
17       MS. HARTMAN: I was going to say --
18 this is Amy -- I think there is two things I
19 need to point out. One is, we have made a
20 representation. We have a good-faith basis for
21 our questioning. And two, this is an
22 opportunity for your client to answer
23 questions. If we're incorrect or
24 misunderstanding something, there is an
25 opportunity in these questions, to answer the

1 question. And if they chose to take advantage
2 of the Fifth Amendment privilege,
3 self-incrimination, that's within their rights.
4       MR. POULOS: Right.
5       MS. HARTMAN: But to the extent there
6 is information contrary of what we understand
7 the evidence to be, this is now the opportunity
8 to address it. And that needs to come from the
9 witness, and not through counsel, through the
10 form of the testimony. That is the one thing
11 that I just want to point out is, we're not
12 suggesting that we're requiring him to or
13 forcing him to, we're just reminding you that
14 there is an opportunity, if we're
15 misunderstanding the evidence, to correct it,
16 if you think, from your impression that, we
17 have incorrect information.
18       MR. POULOS: Look, as staff is aware,
19 I got involved in this case relatively
20 recently. There has been a long history with
21 this investigation, that I'm playing catch-up
22 with, to try and get up to speed.
23       That I said early on to you all,
24 that if we can push back this deposition by,
25 you know, a few months, to allow me to do

1 further due diligence, I may advise him to go
2 ahead and answer the questions.
3        Given the fact that I haven't had
4 the opportunity to do the due diligence that I
5 think is necessary for any good counsel to
6 advise his client to answer questions in an
7 investigation of this type, that I would be
8 forced to advise him to assert the Fifth
9 Amendment. That is the route that we're
10 taking, and the hand that I'm dealt.
11       And I understand that, to the extent
12 that the commission is looking for information
13 from Mr. Piers, a simply question, "Did you do
14 any work for MCC in 2021," is an appropriate
15 question. A question of you, in fact, you did
16 do work for MCC in 2021 contains an assertion
17 of fact. And I think, and I always felt this
18 way, that we are all officers of the Court, and
19 it requires some evidence to actually support
20 an assertion of fact in a question of this,
21 especially when you know the witness is going
22 to be asserting the Fifth Amendment.
23       I just wanted to raise that as a
24 concern. I am not quibbling, and I think that
25 I said when I first went down this road, I

1 assume that you have some evidence to assume
2 the assertion of fact. I am going to repeat
3 that I think that you have some evidence of
4 assertion of fact, as opposed to merely asking
5 an open-ended question. So I made my record on
6 that, and we can proceed. Thank you.
7        MR. POLISH: I don't feel like we need
8 to keep going back and forth. I think that
9 everyone has stated their position for the
10 record.
11       Unless, Christine, you feel some
12 burden, we can resume the questioning.
13       MS. JEON: I have no burden desire,
14 we'll proceed.
15    Q   Mr. Piers, did you do any work
16 related to MCC in 2021?
17    A   I assert the Fifth Amendment.
18    Q   Did you, through your company,
19 offer MCC members the opportunity to invest in
20 Empire, to invest in 2021?
21    A   I assert the Fifth Amendment.
22    Q   Did you recruit MCC members in the
23 United States?
24    A   I assert the Fifth Amendment.
25    Q   Do you know any MCC members in the

Page 69

1 United States?
2      A   I assert the Fifth Amendment.
3      Q   Are there any MCC members in the
4 United States?
5      A   I assert the Fifth Amendment.
6      Q   There were at least 2000 accounts
7 of MCC members in the United States, correct?
8      A   I assert the Fifth Amendment.
9      Q   The president and CEO of MCC is
10 Louis C. Capuci, Jr., right?
11      A   I assert the Fifth Amendment.
12      Q   You knew Mr. Capuci as Junior?
13      A   I assert the Fifth Amendment.
14      Q   Mr. Capuci also went by the name of
15 Junior Caputti, C-A-P-U-T-T-I?
16      A   I assert the Fifth Amendment.
17      Q   Did Junior request you to create
18 marketing materials for MCC?
19      A   I assert the Fifth Amendment.
20      Q   Did Junior approve all of MCC
21 marketing materials, including business
22 presentations for MCC?
23      A   I assert the Fifth Amendment.
24      Q   You've traveled with Junior to
25 different countries to promote MCC, correct?

Page 70

1      A   I assert the Fifth Amendment.
2      Q   Are the funds for you to pay for
3 your travel expenses, funded by MCC membership
4 funds?
5      A   I assert the Fifth Amendment.
6      Q   Did you and Junior talk about MCC
7 membership?
8      A   I assert the Fifth Amendment.
9      Q   Did you and Junior talk about MCC
10 members in the United States?
11      A   I assert the Fifth Amendment.
12      Q   Did you know that Junior was aware
13 that there were MCC members in the United
14 States?
15      A   I assert the Fifth Amendment.
16      Q   Junior lived in the United States
17 when you did work for MCC, correct?
18      A   I assert the Fifth Amendment.
19      Q   Does Junior have any role with your
20 companies including Empire X Corp.?
21      A   I assert the Fifth Amendment.
22      Q   Your brother is Enoque Pires,
23 E-N-O-Q-U-E; Pires, P-I-R-E-S?
24      A   I assert the Fifth Amendment.
25      Q   Did you recruit your brother to

Page 71

1 work for MCC?
2      A   I assert the Fifth Amendment.
3      Q   What work did your brother do for
4 MCC?
5      A   I assert the Fifth Amendment.
6      Q   Your brother, Enoque Pires, did
7 information technology support work for MCC,
8 correct?
9      A   I assert the Fifth Amendment.
10      Q   Your brother Enoque Pires works
11 with you now, correct?
12      A   I assert the Fifth Amendment.
13      Q   Your brother Enoque works with you
14 at Empires X Corp., providing information
15 technology support, correct?
16      A   I assert the Fifth Amendment.
17      Q   Your brother Enoque Pires' salary
18 at MCC was between 8,000 and 10,000 per month
19 in bitcoin, right?
20      A   I assert the Fifth Amendment.
21      Q   If that was his salary, what was
22 your salary?
23      A   I assert the Fifth Amendment.
24      Q   How long have you known Flavio
25 Mendes Gonvalves?

Page 72

1      A   I assert the Fifth Amendment.
2      Q   What role did Mr. Gonvalves have
3 with MCC?
4      A   I assert the Fifth Amendment.
5      Q   What role does Mr. Gonvalves have
6 with Empires X?
7      A   I assert the Fifth Amendment.
8      Q   What role does Mr. Gonzalez have or
9 had with EMPX Management, LLC?
10      A   I assert the Fifth Amendment.
11      Q   What role, if any, did
12 Mr. Gonvalves have with Empires Consulting
13 Group, LLC?
14      A   I assert the Fifth Amendment.
15      Q   Did Mr. Gonvalves design the back
16 office, spelled B-A-C-K, base office of MCC?
17      A   I assert the Fifth Amendment.
18      Q   Do you know if Mr. Gonvalves has a
19 company called Technology 2 U, spelled the
20 number 2, the letter U, Corp.?
21      A   I assert the Fifth Amendment.
22      Q   Have you ever done work for
23 Technology 2 U Corp.?
24      A   I assert the Fifth Amendment.
25      Q   Have you ever done work for Hi-Tech

1 Commerce and Logistics?
2     A   I assert the Fifth Amendment.
3         MR. POULOS:  What was that entity,
4 Christine?
5         MS. JEON:  Hi, spelled H-I, and Tech
6 Commerce and Logistics.
7     Q   What did MCC do for it's business?
8     A   I assert the Fifth Amendment.
9     Q   How did MCC get income?
10    A   I assert the Fifth Amendment.
11    Q   How did MCC earn a profit?
12    A   I assert the Fifth Amendment.
13    Q   How does one become a member of
14 MCC?
15    A   I assert the Fifth Amendment.
16    Q   To be a member, you have to be
17 invited by an existing member, correct?
18    A   I assert the Fifth Amendment.
19    Q   When you worked for MCC, was their
20 a fee to be a member?
21    A   I assert the Fifth Amendment.
22    Q   When you worked check?
23    A   I assert the Fifth Amendment.
24        MR. POULOS:  Christine, I didn't make
25 out that question.  Was there a what number?

1         MS. JEON:  A fee, F-E-E.
2     Q   There was a $50 membership,
3 correct?
4     A   I assert the Fifth Amendment.
5     Q   MCC members could choose different
6 mining packages in order to be a member, right?
7     A   I assert the Fifth Amendment.
8     Q   After purchasing a package, members
9 can make money in various ways, right?
10    A   I assert the Fifth Amendment.
11    Q   Members can make money opening MCC
12 additional accounts?
13    A   I assert the Fifth Amendment.
14    Q   Members can make money by asserting
15 the profit shares?
16    A   I assert the Fifth Amendment.
17    Q   Members can make money by receiving
18 guaranteed monthly or weekly payments?
19    A   I assert the Fifth Amendment.
20    Q   Members can make money by
21 participating in what was called a binar,
22 B-I-N-A-R, program?
23    A   I assert the Fifth Amendment.
24    Q   Members can also make money by
25 receiving a certain percentage of the

1 activation fee of accounts opened under that --
2 or by that MCC member, correct?
3     A   I assert the Fifth Amendment.
4     Q   Members can win prizes such as
5 luxury cars, right?
6     A   I assert the Fifth Amendment.
7     Q   MCC offers other programs, correct?
8     A   I assert the Fifth Amendment.
9     Q   MCC sold it's services of trading
10 bots?
11    A   I assert the Fifth Amendment.
12    Q   There was a program called the E
13 hyphen Money Bot B-O-T program, correct?
14    A   I assert the Fifth Amendment.
15    Q   As part of the program, a robot
16 supposedly traded MCC funds, right?
17    A   I assert the Fifth Amendment.
18    Q   MCC offered insurance of
19 investments, correct?
20    A   I assert the Fifth Amendment.
21    Q   MCC officered a program called MCC
22 Real Estate, right?
23    A   I assert the Fifth Amendment.
24    Q   And there were various versions of
25 CPTL coin traded by MCC, right?

1     A   I assert the Fifth Amendment.
2     Q   There were CPTLN for Capital Coin U,
3 right?
4     A   I assert the Fifth Amendment.
5     Q   There is CPTLC for Capital Coin
6 Classic?
7     A   I assert the Fifth Amendment.
8     Q   And there was CPTLX for Capital Coin
9 Extended, right?
10    A   I assert the Fifth Amendment.
11    Q   MCC also mined cryptocurrency,
12 correct?
13    A   I assert the Fifth Amendment.
14    Q   What is the MCC's back space
15 office?
16    A   I assert the Fifth Amendment.
17    Q   Is the back office the website
18 where MCC members can view their accounts
19 online, and make their transactions?
20    A   I assert the Fifth Amendment.
21    Q   Is the MCC back office website
22 mineminingcapital.com?
23    A   I assert the Fifth Amendment.
24    Q   In order to access MCC back office,
25 you need a login and password, right?

1    A   I assert the Fifth Amendment.
2    Q   When you worked for MCC, you knew
3  that a person from the US can log onto the back
4  office?
5    A   I assert the Fifth Amendment.
6    Q   When you worked for MCC, you knew
7  that a person from the US has to log on to the
8  back office using a VPN, right?
9    A   I assert the Fifth Amendment.
10    Q   Did MCC institute the VPN policy
11  after the SEC opened it's first investigation,
12  which was around 2019?
13    A   I assert the Fifth Amendment.
14    Q   Did you know that when an MCC
15  member signed up for the back office, that
16  member provides contact information, including
17  an address, correct?
18    A   I assert --
19    Q   Let me -- that was a double
20  question. Let me rephrase that.
21        When you worked for MCC, did you
22  know that when a member signs up for the back
23  office account, he or she can provide contact
24  information, including an address?
25    A   I assert the Fifth Amendment.

1    Q   At some point, there was no option
2  to put an address in the country United States?
3    A   I assert the Fifth Amendment.
4    Q   There was an option for country
5  codes OT?
6      MR. POULOS:  What was that?
7      MS. JEON:  OT, so Oscar, Tango.
8    Q   What does OT stand for?
9    A   I assert the Fifth Amendment.
10    Q   OT means "other," correct?
11    A   I assert the Fifth Amendment.
12    Q   Did you know that many MCC members
13  used back office accounts using country code
14  OT?
15    A   I assert the Fifth Amendment.
16    Q   Was country code OT created as a
17  loophole for US residents to be MCC members
18  after the SEC opened it's first investigation?
19    A   I assert the Fifth Amendment.
20    Q   How many MCC members were there
21  when you worked for MCC?
22    A   I assert the Fifth Amendment.
23    Q   How many MCC members in the United
24  States were there when you worked for MCC?
25    A   I assert the Fifth Amendment.

1    Q   I'm going to show you an exhibit,
2  this is Exhibit 89.  So Exhibit 89 is Bates
3  number MCC Emerson 67.
4        This is just the first page that is
5  marked with Exhibit 89, for the record.  Let me
6  try and show you the later version.  Can you
7  see the excel spreadsheet?
8    A   Excuse me, repeat the question.
9    Q   So you see that row 1 is a header,
10  that contains -- that describes the content of
11  the columns, correct?
12    A   I assert the Fifth Amendment.
13    Q   I want to show you, that there is
14  2,501 lines on this excel spreadsheet; do you
15  see that?
16    A   I assert the Fifth Amendment.
17    Q   If we don't count the header line,
18  there is about 2500 lines, right?
19    A   I assert the Fifth Amendment.
20    Q   It's my understanding, that these
21  lines represent each MCC member accounts.  Do
22  each of these lines represent member accounts?
23    A   I assert the Fifth Amendment.
24    Q   Did you produce this membership in
25  this investigation?  Did you produce this

1  document 89, in this investigation, correct?
2    A   I assert the Fifth Amendment.
3    Q   And you produced this marked
4  Exhibit 89, again, in this SEC investigation?
5    A   I assert the Fifth Amendment.
6      MS. JEON:  Ted, can I confirm
7  something with you?
8      MR. POULOS:  Yes.  Give me one second.
9  Christine, can you clarify, I think that you've
10  said that you've produced this excel sheet in
11  the investigation, and then you said that you
12  produced it, again, in the investigation.  Can
13  you clarify those questions, please.
14    Q   So document marked Exhibit 89, is a
15  list that you produced in the SEC
16  investigation, right?
17    A   I assert the Fifth Amendment, but I
18  would like to confirm with Ted.
19      MR. POULOS:  Okay, and we'll do that
20  in a second.  Then ask the next question.
21    Q   So the follow-up question is, the
22  document was marked in Exhibit 89 was produced
23  in the current SEC investigation, as well, it's
24  the same document, right?
25      MR. POULOS:  I see.  Let's go off the

Page 81

1 record. We will mute our microphones, and end
2 the video.
3         MS. JEON: Sure. I just want to
4 make sure you have the Bates number
5 MCC-Emerson67.
6         It's 12:04 p.m., and we are going
7 off record.
8         (Whereupon, a short recess was held
9 at this time.)
10         MS. JEON: It's 12:09, Central
11 Standard Time, and we are going back on record.
12     Q   Mr. Piers, I have on the screen
13 Exhibit 89. I want to note for the record,
14 it's corrected Exhibit 9, where the row 1
15 header is now legible.
16         Do you now see the new Exhibit 89?
17     A   I do see it.
18     Q   When was the list created?
19     A   I assert the Fifth Amendment.
20     Q   This list was created before your
21 first testimony before the SEC in February
22 2020, right?
23     A   I assert the Fifth Amendment.
24     Q   Do you know that Mr. Capuci
25 produced the membership list with about 65,000

Page 82

1 MCC membership accounts, in this investigation?
2     A   I assert the Fifth Amendment.
3     Q   Have you seen the list? The
4 membership list, MCC -- I'm sorry, have you
5 seen the MCC membership list that Mr. Capuci
6 listed, in this investigation?
7     A   I assert the Fifth Amendment.
8     Q   Do you know how MCC's membership
9 grew from 2,500 accounts to 65,000 accounts?
10     A   I assert the Fifth Amendment.
11     Q   Was the membership list you
12 provided to the SEC, that is Bates number
13 MCC-Emerson67, accurate and complete?
14     A   I assert the Fifth Amendment.
15     Q   Were US members omitted from the
16 membership list that you provided, through your
17 counsel at the time, to the SEC?
18     A   I assert the Fifth Amendment.
19     Q   Why are US members omitted from
20 this membership list, Bates numbered
21 MCC-Emerson67?
22     A   I assert the Fifth Amendment.
23         MS. JEON: Okay. It's 12:11 p.m., and
24 we are going off record.
25         (Whereupon, a short recess was held

Page 83

1 off the record.)
2         (Whereupon, a discussion was held
3 off the record.)
4         MS. JEON: It's 1:01 p.m., and we are
5 back on record.
6     Q   Just for the record, Mr. Piers,
7 during the break, you did not have any
8 substantive conversations with the SEC about
9 what your testimony should be, correct?
10     A   That is correct.
11     Q   I'm going to show you Exhibit 90,
12 it's going to be a video that I'm going to
13 play.
14         This is a screen shot that I took
15 of the video entitled "The Best Infrastructure
16 on the Market". This video is 12 minutes long.
17         MR. POULOS: If I can ask a
18 foundational question, I'm seeing the website
19 Mining Capital Coin, is that where this video
20 comes from?
21     Q   I don't think that I can disclose.
22 I don't think that I can answer that question,
23 Ted. I can tell you that your client did not
24 produce this.
25         MR. POULOS: Okay, thank you.

Page 84

1     Q   So I marked the actual video
2 Exhibit 90-A and sometimes the Webex is
3 difficult.
4         (Whereupon, the video was playing.)
5         MR. POULOS: I was going to say, if we
6 can rewind from the beginning. I think that
7 everyone needs to mute their microphones.
8     Q   Let me mute my microphone.
9         So I'm going to start from the
10 beginning of Exhibit 90A.
11     A   I assert the Fifth Amendment.
12     Q   Did you hear the speaker say my
13 name is Emerson Piers?
14     A   I assert the Fifth Amendment.
15     Q   In this video, can you see there is
16 a PowerPoint or some kind of business
17 presentation that is being shown?
18     A   I assert the Fifth Amendment.
19     Q   Are you familiar with the
20 audio/video file?
21     A   I assert the video Fifth Amendment.
22     Q   Do you know when this video was
23 created?
24     A   I assert the Fifth Amendment.
25     Q   Do you know what the purpose of

1 this video was?
2    A   I assert the Fifth Amendment.
3    Q   Do you know if this video was
4 provided to MCC members and respective members?
5    A   I assert the Fifth Amendment.
6    Q   Let me continue playing a little
7 bit.
8        (Whereupon, the video was continued
9 playing.)
10       MS. JEON:  Okay, I just played up
11 until 27 seconds of this video.  Let me know if
12 anyone wants to hear it again, I know that it
13 goes very quickly.
14   Q   So in this video, the speaker, who
15 identified themselves as Emerson Piers, MCC was
16 started in the United States, did you hear
17 that?
18       MR. POULOS:  Can you replay it to that
19 mark?
20       Emerson, when she plays, you need to
21 mute your microphone.  Can we do that one more
22 time, please, with muted microphones.
23       MS. JEON:  Yes, of course.
24       (Whereupon, the video was playing.)
25       MS. JEON:  I think I went to 27

1 seconds, so I'll try and stop at the same time.
2 I stopped the video at 26 seconds.
3    Q   Mr. Piers, did you hear in the
4 video?  The speaker who identified themselves
5 that the company was started in the United
6 States?  Oh, you're muted.
7    A   I assert the Fifth Amendment.
8    Q   Is that statement true?
9    A   I assert the Fifth Amendment.
10   Q   Did you hear the speaker who
11 identified himself as Emerson Piers, also state
12 that MCC has mining facilities in Miami,
13 Florida?
14   A   I assert the Fifth Amendment.
15   Q   Is that statement true?
16   A   I assert the Fifth Amendment.
17   Q   MCC never had mining facilities in
18 Miami, Florida?
19   A   I assert the Fifth Amendment.  I
20 would like to confirm this with, Ted.
21       MS. JEON:  I'm sorry, Ted, you're
22 muted.  We didn't hear what you said.
23
24       MR. POULOS:  I'm sorry.  Emerson,
25 let's hold off that consultation.  But I

1 appreciate the point there, okay.
2        MS. JEON:  I just have a couple of
3 these, I'm not going to stop every second.
4 Hopefully, this will go faster, just in terms
5 of, I'm not going to ask about every single
6 statement.  I just want you to know.  We are
7 going to go back.  I'm going to play up to one
8 minute and 8 seconds.  And I'm going to mute
9 myself, as well, while I play it.
10       (Whereupon, the video was playing.)
11   Q   So I played up until one minute and
12 13 seconds.  Mr. Piers, did you hear the
13 speaker, who identifies himself as Emerson
14 Piers in this video, state that, "we have a
15 mining of cryptocurrency which is already
16 taking place in Florida"?
17   A   I assert the Fifth Amendment.
18   Q   Is that statement true?
19   A   I assert the Fifth Amendment.
20   Q   I'm going to continue playing this.
21 Again, I'm going to play until about one minute
22 and 56 seconds.
23       (Whereupon, the video was continued
24 playing.)
25       Okay.  I played until about one

1 minute and 59 seconds.
2    Q   Did you hear the speaker on the
3 video, who identified himself as Emerson Piers,
4 state, "Also, we have equipment, such as the
5 robot, that does all the trade for us"; did you
6 hear that?
7    A   I assert the Fifth Amendment.
8    Q   Is that statement true?
9    A   I assert the Fifth Amendment.
10   Q   Did MCC ever have robots that did
11 trades?
12   A   I assert the Fifth Amendment.
13   Q   How many robots did MCC have that
14 did trades?
15   A   I assert the Fifth Amendment.
16   Q   Who programs the MCC robots that
17 did trades?
18   A   I assert the Fifth Amendment.
19   Q   What were the MCC robots trading
20 with?
21   A   I assert the Fifth Amendment.
22   Q   Who is responsible for managing the
23 MCC robots?
24   A   I assert the Fifth Amendment.
25   Q   How much did it cost, when you

1 worked for MCC, to manage the MCC robots?
2     A   I assert the Fifth Amendment.
3     Q   How much did it cost to run the MCC
4 robots that did trade?
5     A   I assert the Fifth Amendment.
6     Q   What documentary evidence do you
7 have, that shows that MCC has robots that did
8 trades?
9     A   I assert the Fifth Amendment.
10     MS. JEON:  Okay.  I'm going to
11 continue to play for a little bit.  I'm going
12 to try to rewind to 1:56 here, so that I can
13 back up a little bit.  I'm going to continue
14 playing and mute myself.
15     (Whereupon, the video continued
16 playing.)
17
18     MR. POULOS:  Emerson, don't forget to
19 mute.
20     Q   I played up to two minutes and 26
21 seconds of this video.  And if you me to go
22 back and play, let me know.
23     Did you hear the speaker on the
24 video, who identifies themselves as Emerson
25 Piers, that MCC does exchange for other

1 currencies, such as bitcoin, theorem, lightcoin
2 -- no, actually sorry, let me make sure I'm
3 doing this slide.
4
5     Do you see the slide that says
6 bitcoin currency exchange, Mr. Piers?
7     A   Yes, I can.
8     MS. JEON:  Let me go back and play it.
9 I'm sorry, everyone.  I'm going to go back to
10 2:07.  Let me go back to 1:41.
11     Q   Mr. Piers, what is a Bohr rock
12 market?
13     A   I assert the Fifth Amendment.
14     Q   Do you know who the person is in
15 Brazil who does the trading in the Bohr rock
16 market for MCC?
17     A   I assert the Fifth Amendment.
18     Q   It says MCC trades in the Bohr rock
19 market?
20     A   I assert the Fifth Amendment.
21     Q   What is MCC trading with in the
22 Bohr rock market?
23     A   I assert the Fifth Amendment.
24     Q   What evidence or documents exhibit,
25 that show MCC trades in the Bohr rock market?

1     A   I assert the Fifth Amendment.
2     MS. JEON:  Okay.  I'll continue
3 playing for a little bit.
4     (Whereupon, the video continued
5 playing.)
6     Q   Okay, so I played up to 2:24,
7 again, so we can hear it again.
8     Did you hear the speaker on the
9 video, who identified themselves as Emerson
10 Piers, that MCC mines Reddcoin and bitcoin?
11     A   I assert the Fifth Amendment.
12     Q   Is there any evidence or documents
13 showing that MCC mines Reddcoin or bitcoin
14 check?
15     A   I assert the Fifth Amendment.
16     Q   Did you hear the speaker in this
17 audio, who identify themselves as Emerson
18 Piers, state that MCC does exchange for other
19 currencies such as bitcoin, Reddcoin, Ripple,
20 all of the other cryptocurrencies?
21     A   I assert the Fifth Amendment.
22     Q   Is that statement true?
23     A   I assert the Fifth Amendment.
24     Q   Who is conducting these
25 cryptocurrencies exchanges throughout MCC?

1     A   I assert the Fifth Amendment.
2     Q   Did you ever conduct cryptocurrency
3 exchanges for MCC?
4     A   I assert the Fifth Amendment.
5     Q   At around the two minute and 20
6 second mark, the speaker, who identified
7 himself as Emerson Piers, stated, "This is how
8 the company generates its gaining and how the
9 company works"; did you hear that?
10     A   I assert the Fifth Amendment.
11     Q   Is that statement true?
12     A   I assert the Fifth Amendment.
13     Q   Does MCC generate gains by mining
14 digital assets and trading digital assets?
15     A   I assert the Fifth Amendment.
16     Q   Who is conducting the mining?
17     A   I assert the Fifth Amendment.
18     Q   Who manages the mining machine?
19     A   I assert the Fifth Amendment.
20     Q   Are the mining machines different
21 from the robots?
22     A   I assert the Fifth Amendment.
23     Q   Who is conducting the trading of
24 the digital assets?
25     A   I assert the Fifth Amendment.

1      MS. JEON:  I'm going to play -- I'm
2  going to go until about 3 minutes and 30
3  seconds.
4          (Whereupon, the video continued
5  playing. )
6      Q   I played up until 3 minutes and 55
7  seconds.  Did you hear the speaker on this
8  video, who identified himself as Emerson Piers,
9  state, "If you start by Thursday, our deadline
10 is Thursday, you start receiving by the
11 following Monday"?
12     A   I assert the Fifth Amendment.
13     Q   Is that statement true?
14     A   I assert the Fifth Amendment.
15     Q   Did you hear the speaker, who
16 identifies himself as Emerson Piers, say
17 something along the lines of, "This gives MCC
18 enough time to generate to a prior money
19 cryptocurrency exchange Forex market and/or
20 mining, and this allows us to be already paying
21 you within the four days"?
22     A   I assert the Fifth Amendment.
23     Q   Is this statement true?
24     A   I assert the Fifth Amendment.
25     Q   How does MCC apply membership money

1  into the cryptocurrency exchange?
2      A   I assert the Fifth Amendment.
3      Q   How does MCC apply membership money
4  to the Forex market?
5      A   I assert the Fifth Amendment.
6      Q   How does MCC apply membership money
7  into mining?
8      A   I assert the Fifth Amendment.
9      Q   How does applying membership money
10 to the cryptocurrency exchange Forex market or
11 mining, allow MCC to be paying members within
12 four days?
13     A   I assert the Fifth Amendment.
14     Q   Who is responsible for paying MCC
15 members?
16     A   I assert the Fifth Amendment.
17     Q   Do you know how much membership
18 money MCC has received between January 2018
19 until the present?
20     A   I assert the Fifth Amendment.
21     Q   Do you know how much funds MCC
22 members, or the value of the funds MCC members
23 were paid, between 2018 -- January 2018, until
24 the present?
25     A   I assert the Fifth Amendment.

1      Q   What documents show these figures
2  that I have just described, how much money MCC
3  members provided MCC?
4      A   I assert the Fifth Amendment.
5      Q   Who is responsible for managing the
6  financial documents of MCC?
7      A   I assert the Fifth Amendment.
8          MS. JEON:  I'm going to continue
9  playing until about four minutes and 38
10 seconds.
11         (Whereupon, the video continued
12 playing.)
13     Q   I played up to three minutes and 36
14 seconds, did you hear the person in this video,
15 who identified themselves as Emerson Piers, go
16 through the monthly earnings of the various
17 mining packages offered by MCC?
18     A   I assert the Fifth Amendment.
19     Q   So the monthly earnings that are
20 currently shown on this slide, which is at four
21 minutes and 36 seconds, it shows monthly
22 earnings between $40 and $560; do you see that?
23     A   I assert the Fifth Amendment.
24     Q   Are those monthly earnings
25 guaranteed?

1      A   I assert the Fifth Amendment.
2      Q   How is MCC able to pay members the
3  monthly earnings?
4      A   I assert the Fifth Amendment.
5      Q   What is the source of the monthly
6  earnings that is paid to MCC members?
7      A   I assert the Fifth Amendment.
8      Q   Is the source of the MCC monthly
9  earnings that is paid to MCC members, does that
10 consist of other MCC membership money?
11     A   I assert the Fifth Amendment.
12         MS. JEON:  Okay.  I'm going to play
13 for a little longer, four minutes and thirty
14 seconds now.
15         (Whereupon the video was playing.)
16     Q   Did you hear the person playing in
17 the video, who identified themselves as Emerson
18 Piers, say, "In about four months you are going
19 to have your return"?
20     A   I assert the Fifth Amendment.
21     Q   Do you know if that statement is
22 true?
23     A   I assert the Fifth Amendment.
24     Q   Do you know if all MCC members have
25 been able to withdraw his or her original

Page 97

1 investment?
2     A    I assert the Fifth Amendment.
3     Q    Do you know if all MCC members
4 request to withdraw funds, has been honored?
5     A    I assert the Fifth Amendment.
6     Q    Do you know if MCC members have
7 lost money?
8     A    I assert the Fifth Amendment.
9     Q    When you worked for MCC, were you
10 aware of any complaints by MCC members, for not
11 receiving the funds that they requested from
12 their accounts?
13    A    I assert the Fifth Amendment.
14        MS. JEON:  I'm going to continue
15 playing for a little bit.  I'm at four minutes
16 and 46 seconds.  I'm going to keep playing.
17        (Whereupon, the video continued
18 playing.)
19        I played up to five minutes and 34
20 seconds.
21    Q    Mr. Piers, did you hear the person
22 who identified himself as Emerson Piers in this
23 video, state, "Immediately after the person has
24 signed up, you get paid in your back office"?
25    A    I assert the Fifth Amendment.

Page 98

1     Q    Is that statement true?
2     A    I assert the Fifth Amendment.
3     Q    Did you hear the person in the
4 video, who identified themselves as Emerson
5 Piers, saying, "Everything you get paid into
6 your back office"?
7     A    I assert the Fifth Amendment.
8     Q    So MCC members they can see their
9 balance, including weekly and monthly earnings
10 in their back office?
11    A    I assert the Fifth Amendment.
12    Q    Who is updating the back office and
13 account balancing?
14    A    I assert the Fifth Amendment.
15    Q    Are those back office accounts
16 balances from MCC members fiction?
17    A    I assert the Fifth Amendment.
18        MS. JEON:  Okay.  I'm going to
19 continue playing.  We're at five minutes and 34
20 seconds.  Now I'm going to continue playing
21 until around eight minutes.
22        (Whereupon, the video continued
23 playing.)
24    Q    Okay.  I played up until eight
25 minutes and 20 seconds.

Page 99

1        Mr. Piers, did you hear the person
2 who identified themselves as Emerson Piers,
3 state that the withdrawals will be released on
4 the first and 15th of each month?
5     A    I assert the Fifth Amendment.
6     Q    Is that statement true?
7     A    I assert the Fifth Amendment.
8     Q    Do you know who is releasing the
9 withdrawals?
10    A    I assert the Fifth Amendment.
11    Q    Did you hear the speaker, who
12 identified himself as Emerson Piers, state that
13 payment will be received within seven business
14 days?
15    A    I assert the Fifth Amendment.
16    Q    Is that statement true?
17    A    I assert the Fifth Amendment.
18    Q    So all requests to withdraw funds
19 by MCC members, honor such that payment was
20 received within the seven business days?
21    A    I assert the Fifth Amendment.
22    Q    Who is making the payment to MCC
23 members?
24    A    I assert the Fifth Amendment.
25    Q    Are there any documents showing how

Page 100

1 and when MCC members were given payments?
2     A    I assert the Fifth Amendment.
3     Q    Were the payments to MCC members
4 made in cryptocurrencies?
5     A    I assert the Fifth Amendment.
6     Q    What robots were involved in
7 getting payments back to MCC members, if any?
8     A    I assert the Fifth Amendment.
9     Q    Who controlled the wallets that
10 were related to payment funding MCC member
11 payments?
12    A    I assert the Fifth Amendment.
13    Q    Who controlled or had access to any
14 wallets, to any MCC membership funds?
15    A    I assert the Fifth Amendment.
16        MS. JEON:  I'm going to continue
17 playing.  I am starting at eight minutes and 20
18 seconds.
19        (Whereupon, the video continued
20 playing.)
21    Q    Mr. Piers, I stopped it at nine
22 minutes and 59 seconds.  Can you explain to me,
23 is it true that after 52 weeks, that a member
24 has to renew his or her account by paying a
25 fee?

1     A   I assert the Fifth Amendment.
2     Q   So if a member does not pay a fee,
3   does that member have access to his or her
4   account anymore?
5     A   I assert the Fifth Amendment.
6     Q   If the member doesn't pay a fee,
7   then that member doesn't have access to his or
8   her investment fund?
9     A   I assert the Fifth Amendment.
10     Q   What is the annual fee?
11     A   I assert the Fifth Amendment.
12     Q   Does the renewal fee need to be
13   paid in cryptocurrency?
14     A   I assert the Fifth Amendment.
15     Q   Do membership packages, when they
16   are paid for by members, do they have to be
17   paid for in cryptocurrency?
18     A   I assert the Fifth Amendment.
19     Q   At some point, did MCC accept cash
20   as a form of payment by members?
21     A   I assert the Fifth Amendment.
22     Q   Did the policy change at some
23   point, that the cash was no longer accepted or
24   recommended, but cryptocurrency was asked for
25   the membership funds?

1     A   I assert the Fifth Amendment.
2     Q   When you worked for MCC, when a
3   member provided membership funds, whether in
4   cash or in cryptocurrency, where did those
5   funds go?
6     A   I assert the Fifth Amendment.
7     Q   How were the funds spent?
8     A   I assert the Fifth Amendment.
9     Q   Does MCC membership funds
10   eventually make it's way up to you?
11     A   I assert the Fifth Amendment.
12     Q   Did MCC membership funds, some of
13   them, also make their way up to Mr. Capuci?
14     A   I assert the Fifth Amendment.
15     Q   Who is responsible for directing
16   where MCC membership funds should be
17   transferred?
18     A   I assert the Fifth Amendment.
19     Q   Who is responsible for determining
20   how MCC membership funds should be spent?
21     A   I assert the Fifth Amendment.
22     Q   Was MCC membership funds the only
23   source of MCC income when you worked for MCC?
24     A   I assert the Fifth Amendment.
25     Q   What other sources of income were

1   there for MCC, apart from membership funds?
2     A   I assert the Fifth Amendment.
3       MS. JEON:  Okay I'm going to continue
4   playing.  We're at 9 minutes and 59 seconds.
5       (Whereupon, the video continued
6   playing.)
7     Q   Okay Mr. Piers, did you hear the
8   speaker, who identified himself as Emerson
9   Piers, go over some items that can be won as
10   prizes for MCC members who reach at a certain
11   amount, at certain levels?
12     A   I assert the Fifth Amendment.
13     Q   Do you know if MCC has given away
14   any of the gifts that were shown in this video,
15   Exhibit 98?
16     A   I assert the Fifth Amendment.
17     Q   Did you invest in MCC?
18     A   I assert the Fifth Amendment.
19       MS. JEON:  Okay.  I'm done with this
20   Exhibit.
21       Do you want to take a break, Ted?
22   You're muted.
23       MR. POULOS:  I'm okay.  It's up you.
24     Q   I have another video it's a minute
25   and two seconds long.  I'm fine going forward,

1   if the witness is fine, and you are fine.
2       MR. POULOS:  Sure.
3       MS. JEON:  I'm going to show you
4   Exhibit 74, that is just the screen shot from
5   the actual video.  Let me see if I have the
6   actual video here.
7       Let's go off record for one second
8   at 1:44, Central Standard Time.
9       (Whereupon, a short discussion was
10   held at this time.)
11       MS. JEON:  Okay.  I'm going to show
12   you natively, just for the purposes of time,
13   but this is a screen shot from Exhibit 74.  And
14   then I have the video.  I'm going to show him
15   74, so I can't change it to 74A.  Just
16   understand that the full video is part of the
17   record.
18       So this is one minute and 2 seconds
19   long, this Exhibit 74.  I intend on playing
20   throughout.
21       (Whereupon, Exhibit 74, was
22   playing.)
23     Q   Okay.  So Mr. Piers, did you create
24   that video, which is Exhibit 74, that I've just
25   played?

1    A   I assert the Fifth Amendment.
2    Q   Is that you depicted in the video
3 that I've just showed?
4    A   I assert the Fifth Amendment.
5    Q   Did you introduce yourself as
6 Emerson Piers on the video?
7    A   I assert the Fifth Amendment.
8    Q   The video showed an office of MCC,
9 that was located in Florida, correct?
10   A   I assert the Fifth Amendment.
11   Q   And in this video, the MCC office,
12 the inside of it and outside of it, was shown,
13 right?
14   A   I assert the Fifth Amendment.
15   Q   Where was the MCC Florida office
16 located?
17   A   I assert the Fifth Amendment.
18   Q   Did the MCC Florida -- did MCC have
19 an office located in Port St. Lucie, Florida?
20   A   I assert the Fifth Amendment.
21   Q   Who runs the office?
22   A   I assert the Fifth Amendment.
23   Q   Did you see the video of a person
24 who identified himself as Emerson Piers, state,
25 "We have here a few trades going on right now,

1 a few live trades"?
2    A   I assert the Fifth Amendment.
3    Q   Are those statements true?
4    A   I assert the Fifth Amendment.
5    Q   Was there ever live trading by MCC,
6 that took place in that MCC Florida office?
7    A   I assert the Fifth Amendment.
8    Q   Did MCC or anyone at MCC in
9 Florida, do trading?
10   A   I assert the Fifth Amendment.
11   Q   Did you hear the person on the
12 video, who identify themselves as Ernerson
13 Piers, state, "You can see here, we're mining
14 right now"?
15   A   I assert the Fifth Amendment.
16   Q   Is that statement true?
17   A   I assert the Fifth Amendment.
18   Q   And in that video, did you hear or
19 see the person who identified themselves as
20 Emerson Piers, state here, something along the
21 lines of, "I have the present of the first
22 leader to reach one of the goals in the career
23 plans, a Ferrari"; did you hear that?
24   A   I assert the Fifth Amendment.
25   Q   Was that your Ferrari shown on the

1 video?
2    A   I assert the Fifth Amendment.
3    Q   Who purchased the Ferrari on the
4 video?
5    A   I assert the Fifth Amendment.
6    Q   Was the Ferrari obtained with MCC
7 membership funds?
8    A   I assert the Fifth Amendment.
9    Q   How many different Ferraris did you
10 have between 2018 until the present?
11   A   I assert the Fifth Amendment.
12   Q   I'm going to move on to Exhibit 91.
13 Exhibit 91 are two photos, two pages.  So
14 please take your time in reviewing these
15 photos, and let me know when you're ready,
16 Mr. Piers.
17   A   Yes, I'm ready.
18   Q   Have you seen this Ferrari just
19 depicted in Exhibit 91?
20   A   I assert the Fifth Amendment.
21   Q   Is the Ferrari in Exhibit 91,
22 different from the Ferrari shown in the video I
23 played as Exhibit 74?
24   A   I assert the Fifth Amendment.
25   Q   Is the Ferrari an Exhibit 91, was

1 that Ferrari obtained with MCC membership
2 funds?
3    A   I assert the Fifth Amendment.
4    Q   Who's Ferrari -- do you know who
5 owns this Ferrari, in Exhibit 91?
6    A   I assert the Fifth Amendment.
7    Q   Did you drive this Ferrari, Mr.
8 Piers?
9    A   I assert the Fifth Amendment.
10   Q   Do you see the logo or the same
11 sticker on the Ferrari, www..mcctradingbot.com?
12   A   I assert the Fifth Amendment.
13   Q   Did you purchase any vehicle when
14 you worked for MCC?
15   A   I assert the Fifth Amendment.
16   Q   Did you lease any vehicle when you
17 worked for MCC?
18   A   I assert the Fifth Amendment.
19   Q   You acquired a Harley Davidson when
20 you worked for MCC, right?
21   A   I assert the Fifth Amendment.
22   Q   Was that Harley Davidson obtained
23 with MCC membership funds?
24   A   I assert the Fifth Amendment.
25   Q   When you promoted MCC, did you do

1 so in order to increase MCC membership?
2    A   I assert the Fifth Amendment.
3    Q   Would you agree that you made
4 promises that MCC members would receive returns
5 on money?
6    A   I assert the Fifth Amendment.
7    Q   Did you make false promises and
8 false representations to MCC members and
9 prospective members?
10    A   I assert the Fifth Amendment.
11    Q   Did you take MCC membership funds
12 with the intention of not paying all of the
13 funds back, as promised?
14    A   I assert my Fifth Amendment.
15    Q   Did you know that when MCC did pay
16 members back, the source of those funds were
17 other MCC membership funds?
18    A   I assert the Fifth Amendment.
19    Q   I'm going to show you Exhibit 62.
20       Exhibit 62 is a screen shot taken
21 from the MCC back office. It consists of 4
22 pages. Take your time in reviewing it, and let
23 me know when you're ready.
24    A   Yes, I'm ready.
25    Q   What is the MCC trading platform?

1    A   I assert the Fifth Amendment.
2    Q   Have you seen any of the pages that
3 were in Exhibit 62 before?
4    A   I assert the Fifth Amendment.
5    Q   Do you know -- I'm showing the
6 first page of Exhibit 62, where it says 6.83
7 percent, Thursday, August 1, 2019. Does that
8 mean that the MCC trading platform earned 6.83
9 percent, that that was the gain?
10    A   I assert the Fifth Amendment.
11    Q   Do you know who is responsible for
12 making these posts on the MCC back office?
13    A   I assert the Fifth Amendment.
14    Q   Who runs the MCC trading platform?
15    A   I assert the Fifth Amendment.
16    Q   Is the MCC trading platform
17 different bots?
18    A   I assert the Fifth Amendment.
19    Q   Okay.
20       MR. POULOS: Christine, before we get
21 too far, Exhibit 74, does the exhibit reflect
22 when that video was made?
23       MS. JEON: We can talk offline.
24    Q   I'm going to move to Exhibit 94.
25 Exhibit 94 is a JP Morgan Chase account for the

1 account MCC International Corp. This Exhibit
2 consist of several pages, and take your time,
3 and let me know when you're ready. This
4 Exhibit is eight pages.
5    A   I'm ready.  1
6    Q   Mr. Piers, you were an authorized
7 signer for the MCC International Corp. JP
8 Morgan account in December 2018, right?
9    A   I assert the Fifth Amendment.
10    Q   I have here highlighted on Exhibit
11 -- on a December 3, 2018 transaction, it's a
12 wire from the discover Church of Christ, care
13 of Earl Jackson, for one platinum and two
14 bronze packages investments; do you see that?
15    A   I assert the Fifth Amendment.
16    Q   That particular transaction, it was
17 $2,390, right?
18    A   I assert the Fifth Amendment.
19    Q   Is the $2,390 membership fund for a
20 person named Earl Jackson?
21    A   I assert the Fifth Amendment.
22    Q   What was done with the $2,390,
23 after it was received in the MCC International
24 Corp. account?
25    A   I assert the Fifth Amendment.

1    Q   Was that money spent on personal
2 use?
3    A   I assert the Fifth Amendment.
4    Q   There is also a December 5, 2018
5 wire in from a Mr. Irfan, I-R-F-A-N, Khalid,
6 K-H-A-L-I-D, in the amount of $40,990. There
7 is a note here in the wire detail, it says
8 "Further credit to trading account"; do you see
9 that?
10    A   I assert the Fifth Amendment.
11    Q   Was Mr. Irfan providing the $40,990
12 for the MCC account?
13    A   I assert the Fifth Amendment.
14    Q   Was this $40,990 spent on personal
15 items by you?
16    A   I assert the Fifth Amendment.
17       MS. JEON: Do you want a break, Ted,
18 it's 2:00.
19       MR. POULOS: Are you about done?
20       MS. JEON: Let's go off record. It's
21 2:15 p.m., Central Standard Time.
22       (Whereupon, a discussion was held off
23 the record.)
24       MS. JEON: It's 2:03 p.m., Central
25 Standard Time, and we are going back on record.

1    Q   Mr. Piers, once you received MCC
2  membership funds, did you provide those funds
3  to any third-party responsible for trading?
4    A   I assert the Fifth Amendment.
5    Q   Did you spend MCC membership funds
6  on luxury cars or vehicles?
7    A   I assert the Fifth Amendment.
8    Q   Did you spend MCC membership funds
9  on living expenses?
10    A   I assert the Fifth Amendment.
11    Q   Did you spend MCC membership funds
12  on child support?
13    A   I assert the Fifth Amendment.
14    Q   Did you spend MCC funds on personal
15  home decor?
16    A   I assert the Fifth Amendment.
17    Q   Do you know how MCC membership
18  funds got to Mr. Capuci?
19    A   I assert the Fifth Amendment.
20    Q   Do you know what he did with MCC
21  membership funds?
22    A   I assert the Fifth Amendment.
23    Q   Did you ever talk to Mr. Capuci
24  about what you were both doing with member MCC
25  membership funds?

1    A   I assert the Fifth Amendment.
2    Q   Did you observe or know, that
3  Mr. Capuci was spending MCC membership funds on
4  personal items?
5    A   I assert the Fifth Amendment.
6    Q   Did Mr. Capuci spend MCC membership
7  funds on luxury cars, such as Ferraris, a
8  Porsche, a Range Rover, and a Mercedes?
9    A   I assert the Fifth Amendment.
10    Q   Do you know if Mr. Capuci spent MCC
11  membership funds on a yacht?
12    A   I assert the Fifth Amendment.
13    Q   Do you know if Mr. Capuci spent MCC
14  membership funds on living expenses?
15    A   I assert the Fifth Amendment.
16    Q   I'm going to show you Exhibit 9.
17  Let me read the Bates number of this.  Exhibit
18  9 is Bates number MCC-Emerson-13-46.
19        Mr. Piers, does -- this particular
20  exhibit is several pages long.  Please take
21  your time in reviewing it, and let me know when
22  you're ready.  Let me know when you're ready,
23  Mr. Piers.
24    A   I'm ready.
25    Q   Did you produce Exhibit 9 through

1  your counsel, in this investigation?
2    A   I assert the Fifth Amendment.
3    Q   Did you create this business
4  presentation?
5    A   I assert theFifth Amendment.
6    Q   Did Mr. Capuci approve this
7  presentation?
8    A   I assert the Fifth Amendment.
9    Q   Going to page 10 of Exhibit 9,
10  where the title is Forex market.  Do you see
11  where it states, "We invest intelligently, not
12  only in stock, but also in the future market";
13  do you see that?
14    A   I do see it, what is written there.
15    Q   Is that statement true?
16    A   I assert the Fifth Amendment.
17    Q   What stock is MCC investing in?
18    A   I assert the Fifth Amendment.
19    Q   Do you see on page 10 of Exhibit 9,
20  where it says, "Mining capital coin connects
21  you to traders worldwide, that operate on your
22  behalf, using artificial intelligence also
23  known as trading bots?
24    A   I assert the Fifth Amendment.
25    Q   Is that statement true?

1    A   I assert the Fifth Amendment.
2    Q   Do you know who the traders are
3  worldwide, that is generally describe on page
4  10 of Exhibit 9?
5    A   I assert the Fifth Amendment.
6    Q   What do you know about the
7  artificial intelligence that is also known as
8  trading bots?
9    A   I assert the Fifth Amendment.
10    Q   I'm going to jump to page 12 of
11  this Exhibit.  Do you see where it says how to
12  start your business, with business spelled as
13  B-U-S-S-I-N-E-S-S?
14    A   I do see that.
15    Q   Did you check this out?
16    A   I assert the Fifth Amendment.
17    Q   I'm going to go to Exhibit 95.
18  Exhibit 95 is a business presentation several
19  pages long, where it says business portfolio
20  2019, with business spelled as
21  B-U-S-S-I-N-E-S-S; do you see that?
22    A   Yes, I do see that.
23    Q   This is 22 pages, do you want to
24  please take your time in reviewing the exhibit,
25  and let me know when you're ready?

1    A    Yes, I'm ready.
2    Q    Mr. Piers, were you working for MCC
3 in 2019?
4    A    I assert the Fifth Amendment.
5    Q    Have you seen this presentation
6 before?
7    A    I assert the Fifth Amendment.
8    Q    Did you create this presentation?
9    A    I assert the Fifth Amendment.
10    Q    Did Mr. Capuci approve this
11 presentation?
12    A    I assert the Fifth Amendment.
13    Q    Was this presentation provided to
14 MCC members or MCC potential members?
15    A    I assert the Fifth Amendment.
16    Q    On page 10 of Exhibit 95, is that a
17 picture of you?
18    A    I assert the Fifth Amendment.
19    Q    Page 10, at the title, it says
20 co-founder and then it says Emerson Piers, do
21 you see that?
22    A    I assert the Fifth Amendment.
23    Q    Were you the co-founder of MCC?
24    A    I assert the Fifth Amendment.
25    Q    Page 10 of Exhibit 95 says, "He

1 graduated from Havard, H-A-V-A-R-D, University,
2 with a dual degree in business administration
3 and computer science"; do you see that?
4    A    I assert the Fifth Amendment.
5    Q    Is that statement true?
6    A    I assert the Fifth Amendment.
7    Q    Do you know if there is a Havard
8 University?
9    A    I assert the Fifth Amendment.
10    Q    I'm showing you page 7 of Exhibit
11 95, where the title is founder of MCC, and it
12 says Junior Caputti, C-A-P-U-T-T-I; do you see
13 that?
14    A    I assert the Fifth Amendment.
15    Q    It states, "While majoring on
16 computer science in Havard University, Junior
17 was told about bitcoin by his teacher in 2010";
18 do you see that?
19    A    I assert the Fifth Amendment.
20    Q    Do you know if Junior went to
21 Havard University H-A-V-A-R-D?
22    A    I assert the Fifth Amendment.
23    Q    I'm going to move to page 16 of
24 Exhibit 95. The title on the slide is how many
25 Capital Coin makes a profit. Do you see where

1 it says MCC mines at a cost of 2 cents per KWH,
2 with 45,198 asset mining machines?
3    A    I assert the Fifth Amendment.
4    Q    Do you know if that statement is
5 true?
6    A    I assert the Fifth Amendment.
7    Q    Does KWH stand for Kilowatt Hour?
8    A    I assert the Fifth Amendment.
9    Q    Do you see where it says that MCC
10 has partnered up with the World Bank to secure
11 an investment in eco-friendly power generators?
12    A    I assert the Fifth Amendment.
13    Q    Is that statement true?
14    A    I assert the Fifth Amendment.
15    Q    Did MCC ever have 45,198 active
16 mining machines?
17    A    I assert the Fifth Amendment.
18    Q    I'm going to move to the next page.
19 This is page 17 of Exhibit 95. Do you see the
20 second bullet point, where it says trading
21 generating 1 to 1.5 per day?
22    A    I assert the Fifth Amendment.
23    Q    Is that statement true?
24    A    I assert the Fifth Amendment.
25    Q    Do you see where it says on the

1 last bullet point at the bottom, "Forex trading
2 generates 0.6 percent to 1 percent per day"?
3    A    I assert the Fifth Amendment.
4    Q    Is that statement true?
5    A    I assert the Fifth Amendment.
6    Q    Under that statement, MCC operates
7 in the Forex market with the semi-autorobotic
8 trading; do you see that?
9    A    I assert the Fifth Amendment.
10    Q    Is that statement true?
11    A    I assert the Fifth Amendment.
12    Q    What is the difference between
13 semi-autorobotic trading and robotic trading?
14    A    I assert the Fifth Amendment.
15    Q    What is semi-autorobotic trading?
16    A    I assert the Fifth Amendment.
17    Q    On page 19, mining profit example.
18 I'm still on Exhibit 95. Do you see where it
19 says "MCC purchases each machine F9J, for $150?
20    A    I assert the Fifth Amendment.
21    Q    Is that statement true?
22    A    I assert the Fifth Amendment.
23    Q    What is an F9J machine?
24    A    I assert the Fifth Amendment.
25    Q    Do you see where it says each

Page 121

1  machine generates $59 profit, per month?
2      A    I assert the Fifth Amendment.
3      Q    Is that statement true?
4      A    I assert the Fifth Amendment.
5      Q    Please explain to us how a mining
6  machine can generate $59 profit per month.
7      A    I assert the Fifth Amendment.
8      Q    Do you see the remaining
9  calculations -- I'm sorry, do you see the
10  calculations on the remaining three bullet
11  points of slide 19, in Exhibit 95?
12      A    I assert the Fifth Amendment.
13      Q    Who came up with these figures?
14      A    I assert the Fifth Amendment.
15      Q    Did you write these figures?  Did
16  you write what is in the last three bullet
17  points of page 19, of Exhibit 95?
18      A    I assert the Fifth Amendment.
19      Q    Please explain to us how a $2,000
20  package has a promised return of 3 percent.
21      A    I assert the Fifth Amendment.
22      Q    Do you see at the bottom, under the
23  last bullet point, says "MCC investors of
24  $2,000 packages, this will generate 392.1
25  million profit with mining itself, per year";

Page 122

1  do you see that?
2      A    I assert the Fifth Amendment.
3      Q    Can you explain how that works; how
4  does the receipt of 100,000 investors, who
5  invest $2,000 packages, generate 392.1 million
6  in profit?
7      A    I assert the Fifth Amendment.
8      Q    How is mining involved in this
9  $392.1 million dollar profit?
10      A    I assert the Fifth Amendment.
11      Q    Do the calculations on page 19 of
12  Exhibit 95, take into account for any cost of
13  electricity?
14      A    I assert the Fifth Amendment.
15      Q    How do you estimate the cost of
16  electricity to the cost of the mining machines?
17      A    I assert the Fifth Amendment.
18      Q    Who was responsible for paying the
19  electricity bill for MCC mining machines?
20      A    I assert the Fifth Amendment.
21      Q    Where are MCC mining machines
22  located?
23      A    I assert the Fifth Amendment.
24      Q    Do you know if MCC ever had mining
25  machines?

Page 123

1      A    I assert the Fifth Amendment.
2      Q    On Page 20 of Exhibit 95, the title
3  of this slide is Arbitrage Trade Profit
4  Example.  It's two bullet points.  The first
5  bullet point says, "With Arbitrage Trade, every
6  $2,000 package generates around 30 percent
7  profit per month, for MCC"; do you see that?
8      A    I assert the Fifth Amendment.
9      Q    How was that 30 percent profit
10  arrived at?
11      A    I assert the Fifth Amendment.
12      Q    Do you see at the bottom, where it
13  says, If MCC receives 100,000 investors of
14  $2,000 packages, this will generate 120,000,000
15  profit with mining itself, per year?
16      A    I assert the Fifth Amendment.
17      Q    Is that statement true?
18      A    I assert the Fifth Amendment.
19      Q    How is mining involved in this
20  calculation of the 120 million dollar profit?
21      A    I assert the Fifth Amendment.
22      Q    Did you write or approve the
23  statements that are on page 20 of Exhibit 95?
24      A    I assert the Fifth Amendment.
25      Q    Did you write or approve the

Page 124

1  representations in Exhibit 95?
2      A    I assert the Fifth Amendment.
3      Q    On page 21 of Exhibit 95, it
4  states, "With Forex trade, every $2,000 package
5  generates 28 percent profit per month, for
6  MCC"; do you see that?
7      A    I assert the Fifth Amendment.
8      Q    Is that statement true?
9      A    I assert the Fifth Amendment.
10      Q    Do you see at the bottom, where it
11  says, "If MCC receives 100,000 investors of
12  $2,000 packages, this will generate 72,000,000
13  profit with Forex trading itself, per year".
14      A    I assert the Fifth Amendment.
15      Q    Can you explain how the 72 million
16  was arrived at?
17      A    I assert the Fifth Amendment.
18      Q    Did MCC ever receive 100,000
19  investors?
20      A    I assert the Fifth Amendment.
21      Q    I'm going to go to Exhibit 71.
22  Exhibit 71 is another business presentation
23  entitled Mining Capital Coin.  This is 38 pages.
24  Please take your time in reviewing it.  And let
25  me know when you're ready.

1      MS. JEON:  And, I can also take a
2  break whenever anyone wants, just let me know.
3      MR. POULOS:  There are no Bates stamps
4  associated with this document either?
5      MS. JEON:  No, I'm sorry.
6    A   I'm ready.
7    Q   Mr. Piers, have you seen the
8  Exhibit 71 before?
9    A   I assert the Fifth Amendment.
10   Q   Do you know when the document
11  marked as Exhibit 71 was traded?
12   A   I assert the Fifth Amendment.
13   Q   Who created the document marked as
14  Exhibit 71?
15   A   I assert the Fifth Amendment.
16   Q   Did you have a role in creation or
17  editing of Exhibit 71, of the document marked
18  as Exhibit 71?
19   A   I assert the Fifth Amendment.
20   Q   Do you know if Exhibit 71, was
21  provided to MCC members or the perspective
22  members?
23   A   I assert the Fifth Amendment.
24   Q   I'm going to go to page 10 of
25  Exhibit 71.  On page 10 at the bottom, where it

1  says, "With the latest generation machines, the
2  company has it's crypto located in Iceland".
3    A   I assert the Fifth Amendment.
4    Q   Is that statement true?
5    A   I assert the Fifth Amendment.
6    Q   What is a crypto mining park?
7    A   I assert the Fifth Amendment.
8    Q   Does MCC have any mining machines
9  in Iceland?
10   A   I assert the Fifth Amendment.
11   Q   Does MCC have any mining machines
12  in Vermont?
13   A   I assert the Fifth Amendment.
14   Q   When you worked for MCC, where did
15  it have its mining machines?
16   A   I assert the Fifth Amendment.
17      MS. JEON:  I would like to move to
18  Exhibit 96.  It's a video.  It's 6 minutes
19  long.  I can play it.
20      It's six minutes long, and let's
21  just play it.  This is a screen shot of the
22  audio file, and it's marked as 96-A, and
23  everyone please mute when we play, so there is
24  no echo, please.
25      (Whereupon, the continued Exhibit

1  was playing.)
2    Q   So I played up to one minute and 39
3  seconds.
4      Do you recognize the voice on the
5  video that I have played, that was marked as
6  Exhibit 96-A?
7    A   I assert the Fifth Amendment.
8    Q   It appears in the video one person
9  is speaking, correct?
10   A   I assert the Fifth Amendment.
11   Q   And there is no business
12  presentation in the audio file that I have
13  shown to you so far, correct?
14   A   I assert the Fifth Amendment.
15   Q   Did you create this audio file?
16   A   I assert the Fifth Amendment.
17   Q   When was the audio file created?
18   A   I assert the Fifth Amendment.
19   Q   Was there a script for this audio
20  file?  I mean for the audio, I'm sorry?
21   A   I assert the Fifth Amendment.
22   Q   Was the audio file provided to MCC
23  members?
24   A   I assert the Fifth Amendment.
25   Q   Did you hear the speaker explain

1  that Capital Coin was to be a payment platform?
2    A   I assert the Fifth Amendment.
3    Q   Did you hear the speaker in Exhibit
4  96-A state something along the lines that
5  Capital Coin will essentially be decentralized
6  because it will be a payment platform like
7  bitcoin and theorem?
8    A   I assert the Fifth Amendment.
9    Q   Do you know what the purpose of
10  this audio file was?
11   A   I assert the Fifth Amendment.
12      MS. JEON:  I'm going to continue
13  playing.  We're starting at one minute 39
14  seconds, and I'm going to mute myself.
15   Q   Mr. Piers, did you hear the speaker
16  in the video state that casinos will be using
17  Capital Coin?
18   A   I assert the Fifth Amendment.
19   Q   Is that statement true?
20   A   I assert the Fifth Amendment.
21   Q   Are there any written agreements
22  with any casino, where it provides that the
23  casinos will be using Capital Coin or any
24  variation of Capital Coin?
25   A   I assert the Fifth Amendment.

1    Q   Did you hear the speaker say that
2 MGM Mall will be using Capital Coin?
3    A   I assert the Fifth Amendment.
4    Q   What is the MGM Mall?
5    A   I assert the Fifth Amendment.
6    Q   Did you hear the speaker say that
7 MCC Pay, will be using Capital Coin?
8    A   I assert the Fifth Amendment.
9    Q   Is that statement true?
10   A   I assert the Fifth Amendment.
11   Q   What is MCC Pay?
12   A   I assert the Fifth Amendment.
13   Q   So is the speaker trying to explain
14 that Capital Coin X is only available to MCC
15 members?
16   A   I assert the Fifth Amendment.
17   Q   Is it true that payouts to MCC
18 members, at some point, were in Capital Coin X?
19   A   I assert the Fifth Amendment.
20   Q   Is it true that the -- sorry, let
21 me rephrase that.  Is it true that payouts to
22 MCC members, were in Capital Coin X, so as not
23 to depreciate the value of Capital Coin?
24   A   I assert the Fifth Amendment.
25   Q   Capital Coin was available on

1 certain public markets, right?
2    A   I assert the Fifth Amendment.
3    Q   Who decided that payouts to MCC
4 members were to be in Capital Coin X?
5    A   I assert the Fifth Amendment.
6    Q   When did payouts to MCC members
7 change to the currency of Capital Coin X?
8    A   I assert the Fifth Amendment.
9        MS. JEON:  Okay.  I'm going to
10 continue to play at -- were at two minutes and
11 35 seconds.
12       (Whereupon, the video continued
13 playing.)
14
15   Q   Mr. Piers, do you know what a swap
16 is?
17   A   I assert the Fifth Amendment.
18   Q   Does swap mean conversion?
19   A   I assert the Fifth Amendment.
20   Q   Okay.  Did you hear the entire
21 video or audio of the 6 minute and one second
22 that I played?
23   A   I assert the Fifth Amendment.
24   Q   So correct me if I'm wrong, was
25 Capital Coin X created in order to not

1 depreciate the value of Capital Coin, because
2 Capital Coin was traded on the public market?
3    A   I assert the Fifth Amendment.
4    Q   And MCC members, is it true that
5 MCC members, at some point, were only paid in
6 Capital Coin X, so if more members were paid in
7 cap Capital Coin X, that may affect the value
8 and price of Capital Coin X, right?
9    A   I assert the Fifth Amendment.
10   Q   Do you know who was instructed that
11 this audio be created?
12   A   I assert the Fifth Amendment.
13   Q   At some point, did MCC convert MCC
14 member balances from theorem or bitcoin,
15 through Capital Coin, without the members'
16 consent?
17   A   I assert the Fifth Amendment.
18   Q   If that did happen, do you know
19 when that conversion occurred?
20   A   I assert the Fifth Amendment.
21   Q   Were MCC members paid in
22 Capital Coin X without their consent?
23   A   I assert the Fifth Amendment.
24   Q   When you worked for MCC, or did
25 work for MCC, were you aware of Capital Coin's

1 value?
2    A   I assert the Fifth Amendment.
3    Q   Is it true that the Capital Coin and
4 the variation of that coin, was never higher
5 than a dollar?
6    A   I assert the Fifth Amendment.
7    Q   Is it true that Capital Coin, that
8 there has been an application with coin base to
9 lift Capital Coin?
10   A   I assert the Fifth Amendment.
11   Q   I'm going to show you Exhibit 58.
12 That is a Capital Coin white paper.  It's 16
13 pages.  And take your time in reviewing this,
14 and let me know when you're ready.
15   A   Okay, I'm ready.
16   Q   Have you seen the document marked
17 as Exhibit 58 before?
18   A   I assert the Fifth Amendment.
19   Q   Did you have any role in drafting
20 or editing the document marked as Exhibit 58?
21   A   I assert the Fifth Amendment.
22   Q   Do you know who approved of this
23 document, marked as Exhibit 58?
24   A   I assert the Fifth Amendment.
25   Q   The document marked as Exhibit 58

1  was circulated to MCC members, correct?
2      A   I assert the Fifth Amendment.
3      Q   Did Mr. Capuci approve the
4  documents in Exhibit 58?
5      A   I assert the Fifth Amendment.
6      Q   I'm going to go to page 6 of
7  Exhibit 58. Do you see where it says,
8  "Capital Coin is now backed by one of the
9  biggest solely-owned gold, oil, and crypto
10  miners of Africa and North America"?
11      A   I assert the Fifth Amendment.
12      Q   Is that statement true?
13      A   I assert the Fifth Amendment.
14      Q   Do you see where it says
15  "Capital Coin is backed by a privately-owned
16  gold, oil, and crypto mining enterprise?
17      A   I assert the Fifth Amendment.
18      Q   Is that statement true?
19      A   I assert the Fifth Amendment.
20      Q   Do you know what the name is of the
21  privately-owned gold, oil, and crypto mining
22  enterprise that is described on page 6 of
23  Exhibit 58?
24      A   I assert the Fifth Amendment.
25      Q   On page 6, in the third paragraph,

1  do you see where it states, "Capital Coin is
2  currently the sixth biggest crypto mining
3  company globally"?
4      A   I assert the Fifth Amendment.
5      Q   Is that statement true?
6      A   I assert the Fifth Amendment.
7      Q   What facts support that statement?
8      A   I assert the Fifth Amendment.
9      Q   Do you know when this document
10  marked as Exhibit 58, was created?
11      A   I assert the Fifth Amendment.
12      Q   Do you know if in 2018, or 2019, or
13  2020, if Capital Coin was the sixth biggest
14  mining company globally?
15      A   I assert the Fifth Amendment.
16      Q   Do you see the last sentence,
17  "Capital Coin recently acquired over 45.000
18  mining machines in a deal with Chinese miners?
19      A   I assert the Fifth Amendment.
20      Q   Is that statement true?
21      A   I assert the Fifth Amendment.
22      Q   Who paid for the mining machines?
23      A   I assert the Fifth Amendment.
24      Q   What kind of mining machines were
25  purchased?

1      A   I assert the Fifth Amendment.
2      Q   How much was each mining machine?
3      A   I assert the Fifth Amendment.
4      Q   Where were the machines stored or
5  located?
6      A   I assert the Fifth Amendment.
7      Q   Is there a contract regarding the
8  steel with the Chinese miners?
9      A   I assert the Fifth Amendment.
10      Q   Who signed the contract?
11      A   I assert the Fifth Amendment.
12      Q   Okay. I want to go to page 11.
13  I'm going to go to page 11 of Exhibit 58. At
14  the top, it says, signed contracts in December
15  of 2018, that "Capital Coin has commenced with
16  the partnership of DRC Gold Mining, located in
17  the Republic of Africa"; do you see that?
18      A   I assert the Fifth Amendment.
19      Q   Is that statement true?
20      A   I assert the Fifth Amendment.
21      Q   Where can we find these signed
22  contracts?
23      A   I assert the Fifth Amendment.
24      Q   Who signed the contract?
25      A   I assert the Fifth Amendment.

1      Q   I'm moving to a different topic.
2  Do you know what Bitchain Exchanges is?
3      A   I assert the Fifth Amendment.
4      Q   Do you know who owns or controls
5  Bitchain Exchanges?     1
6      A   I assert the Fifth Amendment.
7          MR. POULOS: Christine, what phrase
8  are you using?
9          MS. JEON: I'm going to spell it for
10  the record. Bitchin is spelled
11  B-I-T-C-H-A-I-N, space, Exchanges,
12  E-X-C-H-A-N-G-E-S.
13      Q   Mr. Piers, do you have any role, or
14  did you have any role with Bitchain Exchanges?
15      A   I assert the Fifth Amendment.
16      Q   Is Bitchain Exchanges affiliated
17  with MCC?
18      A   I assert the Fifth Amendment.
19      Q   Does Mr. Capuci pay the people who
20  work for Bitchain?
21      A   I assert the Fifth Amendment.
22      Q   Who works for the Bitchain
23  Exchanges?
24      A   I assert the Fifth Amendment.
25      Q   In order for MCC members to

1 withdraw from their account, they have to open
2 an account with Bitchain Exchanges, right?
3     A   I assert the Fifth Amendment.
4     Q   And after opening an account with
5 Bitchain Exchanges, MCC members have to
6 transfer the funds they seek to withdraw, from
7 the MCC back office, to Bitchain Exchanges,
8 right?
9     A   I assert the Fifth Amendment.
10    Q   Are you aware of any
11 representations by MCC to pay MCC members the
12 full value of there CPTL wallet?
13    A   I assert the Fifth Amendment.
14    Q   I'm going to show you Exhibit 72.
15 That is a one-page screen shot.  Have you seen
16 Exhibit 72?
17    A   I assert the Fifth Amendment.
18    Q   Do you recognize the handwriting of
19 what is depicted in Exhibit 72?
20    A   I assert the Fifth Amendment.
21    Q   Is that Mr. Capuci's handwriting in
22 Exhibit 72?
23    A   I assert the Fifth Amendment.
24    Q   Do you see your name under CFOs,
25 stuffy on the right side, there is a bubble

1 that says "EMP," does EMP obtain to you?
2     A   I assert the Fifth Amendment.
3     Q   Do you know when this, I'll call it
4 a chart, when this chart was created?
5     A   I assert the Fifth Amendment.
6     Q   Does CEO Junior, does that refer to
7 Mr. Caputti?  It's the second circle from the
8 top.
9     A   I assert the Fifth Amendment.
10    Q   Does this work chart show that Mr.
11 Caputti is the CEO of MCC and Bitchain?
12    A   I assert the Fifth Amendment.
13    Q   Do you know what it states under
14 Bitchain?  Can you tell us what that reads?
15    A   I assert the Fifth Amendment.
16    Q   And on the left side, it looks like
17 that it says, and correct me if I'm wrong, it
18 looks like it says GM worldwide, and the name
19 J-U-N-I, or something; do you see that?
20    A   I assert the Fifth Amendment.
21    Q   Does that name refer to Enoque,
22 your brother?
23    A   I assert the Fifth Amendment.
24    Q   Okay.
25        MR. POULOS:  I'm sorry, can you go

1 back to that for one second?
2        MS. JEON:  So the next exhibit is
3 Exhibit 79.  It's a video that is nine minutes
4 and 30 seconds long.  However, I only have
5 questions about the first four minutes.
6        Do you want me to play the entire
7 video that is part of the file or are you okay
8 with me playing only the first four minutes?
9        MR. POULOS:  I would prefer if you
10 play it all the way through.
11        MS. JEON:  So I'll stop it at the
12 beginning, more so, when I have questions.
13        MR. POULOS:  This is exhibit what?
14        MS. JEON:  Exhibit 79.  It should be
15 an exhibit sticker on there.  I'll put it on
16 there.  And I just ask when I play the video,
17 that everyone goes on mute so we don't hear the
18 echo.
19        (Whereupon, the video was playing.)
20    Q   Okay, Mr. Piers, I played up to one
21 minute and 26 seconds; do you recognize the
22 person that is shown at one minute and 26
23 seconds of this video?
24    A   I assert the Fifth Amendment.
25    Q   Is that Mr. Capuci, that is shown

1 here, at one minute and 26 seconds?
2     A   I assert the Fifth Amendment.
3     Q   Did you hear Mr. Capuci say MCC has
4 a partnership with the Clinton Foundation of
5 the United States?
6     A   I assert the Fifth Amendment.
7     Q   Is that statement true?
8     A   I assert the Fifth Amendment.
9     Q   Are there any documents showing a
10 partnership showing MCC and the Clinton
11 Foundation?
12    A   I assert the Fifth Amendment.
13        MS. JEON:  I'll continue playing and
14 showing at one minute and 20 seconds.  I
15 stopped the video at three minutes and 35
16 seconds.
17        (Whereupon, the video continued
18 playing.)
19    Q   Mr. Piers, did you see in here,
20 yourself talking on that video that I've just
21 played?
22    A   I assert the Fifth Amendment.
23    Q   It looks like that you were
24 speaking to Urban people would you agree?
25    A   I assert the Fifth Amendment.

1    Q   Were you speaking to a room of
2 people in Africa?
3    A   I assert the Fifth Amendment.
4    Q   Approximately when did you make
5 that presentation to the room of people in
6 Africa?
7    A   I assert the Fifth Amendment.
8    Q   Did you state on this video that
9 our machines, we mine bitcoin, likecoin and
10 another coin?
11    A   I assert the Fifth Amendment.
12    Q   What was the last coin that you've
13 stated? I didn't quite hear it.
14    A   I assert the Fifth Amendment.
15    Q   You've also stated that our
16 machines have the capability to send $10,000 to
17 the next party; is that statement true?
18    A   I assert the Fifth Amendment.
19    Q   What machines are you referring to?
20    A   I assert the Fifth Amendment.
21    Q   How can a machine have the
22 capability to send $10,000 to the next party?
23    A   I assert the Fifth Amendment.
24    Q   Did MCC have machines that had the
25 capability to send $10,000 to the next party?

1    A   I assert the Fifth Amendment.
2    MS. JEON:  I'm going to play the rest
3 of the video. I'm starting at three minutes
4 and 35 seconds. I'm going to play it for the
5 nine minutes and 36 seconds, which is the
6 entirety of the video, and I'll put myself on
7 mute.
8    (Whereupon, the video was being
9 played.)
10    Q   Mr. Piers, the video in Exhibit 79,
11 which is nine minutes and 36 seconds long, that
12 was probably available on the internet,
13 correct?
14    A   I assert the Fifth Amendment.
15    Q   Did you have any role in editing
16 this video?
17    A   I assert the Fifth Amendment.
18    MS. JEON:  It's 3:08 p.m, Central
19 Standard Time, now it's 3:09 p.m., and let's go
20 off record.
21    (Whereupon, a short discussion was
22 held off the record.)
23    MR. POULOS:  All right. We can get
24 going.
25    Q   This is recording at 3:48, Central

1 Time, and we are going back on record.
2    For the record, you did not have
3 any substantive conversations with the SEC
4 during the break, about what your testimony
5 should be, correct?
6    A   That is correct.
7    Q   Mr. Piers, who decides what fees to
8 impose on MCC members?
9    A   I assert the Fifth Amendment.
10    Q   Did you have any role in deciding
11 on what fees to impose on the MCC members?
12    A   I assert the Fifth Amendment.
13    Q   Did MCC charge a KY fee or
14 know-your-customer fee?
15    A   I assert the Fifth Amendment.
16    Q   How much was the KY fee?
17    A   I assert the Fifth Amendment.
18    Q   Who performed the KY fee procedure?
19    A   I assert the Fifth Amendment.
20    Q   Did MCC use a company called
21 Cambridge, C-A-M-B-R-I-D-G-E, Block Chain,
22 B-L-O-C-K, C-H-A-I-N, to do any KYC procedures
23 on any MCC members' accounts?
24    A   I assert the Fifth Amendment.
25    Q   Is there a contract between

1 Cambridge Block Chain and MCC?
2    A   I assert the Fifth Amendment.
3    Q   How much did MCC pay to Cambridge
4 Block Chain, to do KYC procedures?
5    A   I assert the Fifth Amendment.
6    Q   How did MCC spend the KYC fees that
7 it received from MCC members?
8    MR. POULOS:  Can you repeat that?
9    MS. JEON:  I believe the question was:
10 How much did MCC spend the KYCTs it received
11 from its MCC members.
12
13    MR. POULOS:  Okay.
14    MS. JEON:  I can't recall if he
15 answered the question.
16    A   I assert the Fifth Amendment.
17    Q   Mr. Piers, what are gas fees?
18
19    MR. POULOS:  Did you say gas fees.
20    MS. JEON:  Yes, gas, G-A-S fees.
21    A   I assert the Fifth Amendment.
22    Q   Did MCC charge its members gas
23 fees?
24    A   I assert the Fifth Amendment.
25    Q   How much were the gas fees charged

Page 145

1  to the MCC members?
2      A   I assert the Fifth Amendment.
3      Q   How were the gas fees paid by the
4  MCC members, spent by the MCC?
5      A   I assert the Fifth Amendment.
6      Q   Does the company Empire X Corp.,
7  have a similar business model as MCC?
8      A   I assert the Fifth Amendment.
9      Q   How does Empire X Corp. differ from
10  MCC in terms of services offered?
11      A   I assert the Fifth Amendment.
12      Q   Does EMPX Management, LLC, have a
13  similar business model than MCC?
14      A   I assert the Fifth Amendment.
15      Q   How does EMPX Management, LLC,
16  differ from MCC in terms of the services
17  offered?
18      A   I assert the Fifth Amendment.
19      Q   Did Empires X offer a trial
20  membership at any point in time?
21      A   I assert the Fifth Amendment.
22      Q   Did Empires X extend any promotions
23  to MCC members?
24      A   I assert the Fifth Amendment.
25      Q   What is the difference between an

Page 146

1  affiliate, verses an investor, with Empires X?
2      A   I assert the Fifth Amendment.
3      Q   Is the difference that an affiliate
4  markets Empires X Corp. and brings other
5  investors in?
6      A   I assert the Fifth Amendment.
7      Q   And that's similar to how leaders
8  market MCC and bring new MCC members in, right?
9      A   I assert the Fifth Amendment.
10      Q   Does Empires X or EMPX Management,
11  LLC, have any affiliates for investors who are
12  or were MCC members?
13      A   I assert the Fifth Amendment.
14      Q   Mr. Piers, did you represent that
15  Empire X offers securities investment?
16      A   I assert the Fifth Amendment.
17      Q   Have you ever represented that
18  Empires X affiliates who invest 200 or more in
19  bitcoin or theorem, can earn up to 1 percent
20  daily?
21      A   I assert the Fifth Amendment.
22      Q   Did you ever represent that
23  affiliates with Empires X, who invest $200, can
24  receive up to $0.6 a day -- I'm sorry, 0.6
25  percent, a day?

Page 147

1      A   I assert the Fifth Amendment.
2      Q   Did you represent that investors
3  who invest $400, and when I say $400 -- I'll
4  correct that.
5          Did you represent that investors
6  who invest $400, receive up to 1 percent a day?
7      A   I assert my Fifth Amendment.
8      Q   Does Empires X pay commission to
9  the affiliates who recruit to the affiliates?
10      A   I assert the Fifth Amendment.
11      Q   Must affiliates and investors who
12  provide to funds to Empires X, do so in
13  cryptocurrency?
14      A   I assert the Fifth Amendment.
15      Q   Does Empires X have trading bots
16  that earn profits for investors?
17      A   I assert the Fifth Amendment.
18      Q   Do you have, or have you ever held,
19  Zoom meetings with Empires X affiliates?
20
21          MR. POULOS:   What kind of meetings.
22          MS. JEON:  Zoom, Z-O-O-M.
23      A   I assert the Fifth Amendment.
24      Q   Did you ever hold meetings that
25  were announced via Webex, to the Empires X

Page 148

1  affiliates and investors?
2      A   I assert the Fifth Amendment.
3      Q   I'm going to show you Exhibit 97.
4  Exhibit 97 are screen shots from the YouTube
5  video?
6          MR. MAIONE:  What was the Exhibit
7  before 97?  What was the number before that?
8          MS. JEON:  This is Exhibit 97.  It's a
9  25-page PowerPoint presentation that is part of
10  a YouTube video that title appears on the
11  upper-left part of the screen here, which is
12  Empires X trading bot - meet the owners and the
13  head traders.
14          The video is over one hour long, so
15  I don't plan on playing it here.  But I can
16  make it available to you in another way.  It's
17  publically available; is that okay?
18
19          MR. POULOS:  Sure.
20          MS. JEON:  Thank you.
21      Q   And Mr. Piers, please take your
22  time in reviewing the 25 pages that is Exhibit
23  97, and let me know when you're ready.
24      A   Ready.
25      Q   Have you seen these slides before?

1    A   I assert the Fifth Amendment.
2    Q   Did you have any role in creating,
3 editing or approving any of these slides?
4    A   I assert the Fifth Amendment.
5    Q   When were these slides created?
6    A   I assert the Fifth Amendment.
7    Q   Did you present these slides during
8 the YouTube video, whose title I just read?
9    A   I assert the Fifth Amendment.
10   Q   I'm going to move along here.  On
11 page 4 of Exhibit 97, this depicts the pictures
12 of you, correct?
13   A   I assert the Fifth Amendment.
14   Q   Page 4 of Exhibit 97 consists of
15 the board of Empires X, correct.
16   A   I assert the Fifth Amendment.
17   Q   Mr. Piers, can you explain to us
18 this slide, which is page 7 of Exhibit 97
19 shows?
20   A   I assert the Fifth Amendment.
21   Q   Would you agree that slide 7 shows
22 daily returns to investors?
23   A   I assert the Fifth Amendment.
24   Q   Is a bot generating these returns?
25   A   I assert the Fifth Amendment.

1    Q   Can you describe for us what the
2 bot does?
3    A   I assert the Fifth Amendment.
4    Q   Does any bots really exist that
5 trades funds?
6    A   I assert the Fifth Amendment.
7    Q   Mr. Piers, can you tell me what
8 page 8 of Exhibit 97 shows?
9    A   I assert the Fifth Amendment.
10   Q   Do you agree that page 8 shows
11 daily returns for affiliates?
12   A   I assert the Fifth Amendment.
13   Q   Are these promised daily returns
14 for affiliates?
15   A   I assert the Fifth Amendment.
16   Q   On page -- on slide 9 of Exhibit
17 97, do you see where it says, "Private
18 investment will generate for capitol indication
19 10 percent"?
20   A   I assert the Fifth Amendment.
21   Q   How is private investments
22 different from affiliates or the investor page
23 that we saw on pages 7 and 8 of Exhibit 97?
24   A   I assert the Fifth Amendment.
25   Q   Does page 9 show the daily returns

1 for private investments?
2    A   I assert the Fifth Amendment.
3    Q   I'm moving to page 13 of Exhibit
4 97.  Do you see page 13 on your screen?
5    A   I assert the Fifth Amendment.
6    Q   What is the difference between
7 capital and profit?
8    A   I assert the Fifth Amendment.
9    Q   Do you see under profits, where it
10 says X bot profits - every Friday (payments
11 every Monday)?
12   A   I assert the Fifth Amendment.
13   Q   Are X bot payments made every
14 Monday?
15   A   I assert the Fifth Amendment.
16   Q   Does this policy change at any
17 point in time?
18   A   I assert the Fifth Amendment.
19   Q   Were all requests to withdraw
20 profits honored?
21   A   I assert the Fifth Amendment.
22   Q   Did you receive any complaints from
23 any investors or affiliates at Empires X, that
24 they did not receive the money that they
25 requested from a job, to their account?

1    A   I assert the Fifth Amendment.
2    Q   Do you see on page 13, where it
3 says under capital any capital -- I'm sorry, it
4 says -- it says the last sentence, "Capital
5 payments can be requested any time, any day and
6 will be paid on the next Monday, with all other
7 payments"; do you see that?
8    A   I assert the Fifth Amendment.
9    Q   Did Empires X pay all requests for
10 capital payments the next Monday?
11   A   I assert the Fifth Amendment.
12   Q   After it was requested?
13   A   I assert the Fifth Amendment.
14   Q   And it looks like there is a 20
15 percent fee applied for any capitol withdrawal
16 from an investor account; is that right?
17   A   I assert the Fifth Amendment.
18   Q   Did those fees change at any point
19 in time?
20   A   I assert the Fifth Amendment.
21   Q   Did the fees charged for
22 withdrawal, change in late 2021?
23   A   I assert the Fifth Amendment.
24   Q   Were investors or affiliates
25 informed about the changes commenced before

1 they invested with Empires X?
2     A    I assert the Fifth Amendment.
3     Q    Did Empires X, at some point, also
4 impose a new restriction, that after three
5 withdrawals, an account would be closed?
6     A    I assert the Fifth Amendment.
7     Q    Investors of Empires X were not
8 informed of this restriction about closing the
9 account after three withdrawals, before they
10 invested, were they?
11     A    I assert the Fifth Amendment.
12     Q    Why was this restriction to close
13 accounts after three withdrawals; why was that
14 restriction imposed?
15     A    I assert the Fifth Amendment.
16     Q    Was that restriction imposed
17 because Empires X didn't have the funds to
18 honor the withdrawal request?
19     A    I assert the Fifth Amendment.
20     Q    How are funds provided to Empires X
21 investors or affiliates spent?
22     A    I assert the Fifth Amendment.
23     Q    Did you or Flavio Gonvalves spend
24 any investor funds on personal use?
25     A    I assert the Fifth Amendment.

1     Q    Did Empires X provide account
2 statements to investors or affiliates?
3     A    I assert the Fifth Amendment.
4     Q    Did you, at any point in time,
5 state that Empires X has submitted an SEC
6 license request?
7     A    I assert the Fifth Amendment.
8     Q    If you made that statement --
9
10          MR. POULOS:   Did you say SEC.
11          MS. JEON:   SEC license request.
12
13          MR. POULOS:   SEC, that is you guys.
14          MS. JEON:   Yes, correct.
15     Q    Mr. Piers, if you made that
16 statement, when did you make that statement?
17     A    I assert the Fifth Amendment.
18     Q    Do you know when Empire X submitted
19 an SEC license request?
20     A    I assert the Fifth Amendment.
21     Q    Did Empires X submit a license
22 request?
23     A    I assert the Fifth Amendment.
24     Q    What is an SEC license request?
25     A    I assert the Fifth Amendment.

1     Q    Did you ever state that the first
2 time Empires X filed with the SEC, the company
3 was denied?
4     A    I assert the Fifth Amendment.
5     Q    Did you ever state that the SEC
6 denied the company a license because the SEC
7 wanted Empires X to change things?
8     A    I assert the Fifth Amendment.
9     Q    Did you ever state or represent,
10 that Empires X submitted a request for a State
11 of Florida hedge fund license?
12     A    I assert the Fifth Amendment.
13     Q    What is a hedge fund license?
14     A    I assert the Fifth Amendment.
15     Q    Did you ever represent Empires X
16 was a hedge fund?
17     A    I assert the Fifth Amendment.
18     Q    I'm going to show you Exhibit 98.
19 Exhibit 98 is a capture of the Empires X
20 telegram channel.  The address appears on the
21 upper right-hand corner of the screen, which is
22 https://t.me/empires _X.
23          Have you seen this telegram channel
24 before Mr. Piers?
25     A    I assert the Fifth Amendment.

1     Q    Do you run the telegram channel of
2 Empires X?
3     A    I assert the Fifth Amendment.
4     Q    What are Empires X bots?
5     A    I assert the Fifth Amendment.
6     Q    Are you responsible for what is
7 written on the telegram channel?
8     A    I assert the Fifth Amendment.
9     Q    Did you write or approve the
10 statements shown on Exhibit 98?
11     A    I assert the Fifth Amendment.
12     Q    Did you write or approve the
13 statements shown in Exhibit 98, that is quote,
14 they have about 10 SEC license traders, end
15 quote?
16     A    I assert the Fifth Amendment.
17     Q    What are the names of Empires X
18 Corp. traders?
19     A    I assert the Fifth Amendment.
20     Q    Is Josh or David Nicholas one of
21 Empires X traders?
22     A    I assert the Fifth Amendment.
23     Q    Are you aware that Mr. Nicholas has
24 had disciplinary history with the National
25 Teachers Association?

Page 157

```
1     A   I assert the Fifth Amendment.
2     Q   Are you aware that Mr. Nicholas is
3  barred from applying for membership for the
4  National Teachers Association arising from a
5  2020 complaint?
6     A   I assert the Fifth Amendment.
7     Q   Did you hire Mr. Nicholas?
8     A   I assert the Fifth Amendment.
9     Q   Was any research conducted into
10 Mr. Nicholas' background, before he was hired
11 as head trader of Empire Corp.?
12    A   I assert the Fifth Amendment.
13    Q   Did you place Mr. Nicholas on
14 FINRAs, that's F-I-N-R-A, all capital letters,
15 on FINRAS broker check ?
16    A   I assert the Fifth Amendment.
17    Q   Were you aware that Mr. Nicholas
18 left Merrill Lynch after he forged a client
19 document?
20    A   I assert the Fifth Amendment.
21    Q   Were you aware that Mr. Nicholas
22 was charged with wilfully providing false and
23 misleading information to the National Teachers
24 Association?
25    A   I assert the Fifth Amendment.
```

Page 158

```
1     Q   Was Mr. Nicholas' disciplinary
2  history disclosed to Empires X investors,
3  before they invested?
4     A   I assert the Fifth Amendment.
5     Q   Did there ever come a point in
6  time, that Empires X didn't have enough money
7  to pay it's investors what they requested,
8  meaning their withdrawal request?
9     A   I assert the Fifth Amendment.
10    Q   Did Empires X ever pay old
11 investors with new investor money?
12    A   I assert the Fifth Amendment.
13    Q   Has there ever been Empires X
14 investors or affiliates located in the United
15 States?
16    A   I assert the Fifth Amendment.
17    Q   Besides you, Mr. Gonvalves and
18 Mr. Nicholas, you also worked for Empires X
19 between January 2008, until the present?
20    A   I assert the Fifth Amendment.
21    Q   What are the ways that you
22 communicate with the people that you do work
23 for Empires X?
24    A   I assert the Fifth Amendment.
25    Q   Do you use WhatsApp?
```

Page 159

```
1     A   I assert the Fifth Amendment.
2     Q   Do you use WeChat, W-E-C-H-A-T?
3     A   I assert the Fifth Amendment.
4     Q   How many Empires X investors and
5  affiliates were there from January 2002, until
6  the present?
7     A   I assert the Fifth Amendment.
8     Q   Do you or anyone from Empires X,
9  communicate with investors and affiliates via
10 WhatsApp?
11    A   I assert the Fifth Amendment.
12    Q   Was there a Facebook page for
13 Empires X Corp.?
14    A   I assert the Fifth Amendment.
15    Q   What websites were used to promote
16 Empires X business?
17    A   I assert the Fifth Amendment.
18    Q   Did you control or contribute to
19 any websites or social media pages that promote
20 Empires X business?
21    A   I assert the Fifth Amendment.
22    Q   Do any brokerage accounts exist
23 that hold Empires X investor funds?
24    A   I assert the Fifth Amendment.
25    Q   How many different brokerage
```

Page 160

```
1  accounts exist that hold the Empires X investor
2  funds?
3     A   I assert the Fifth Amendment.
4     Q   Which brokerage firms does Empires X use?
5     A   I assert the Fifth Amendment.
6     Q   Who has authority over the
7  brokerage accounts at Empires X?
8     A   I assert the Fifth Amendment.
9     Q   Do you know what the approximate
10 balance of each of the brokerage accounts used
11 by Empire X is?
12    A   I assert the Fifth Amendment.
13    Q   Does Empire X or anyone who works
14 for Empires X, have an account with TD
15 Ameritrade?
16    A   I assert the Fifth Amendment.
17    Q   Does Empire X or anyone who works
18 for Empires X, have an account with Season
19 Ameritrade?
20    A   I assert the Fifth Amendment.
21    Q   Do you know where Joshua David
22 Nicholas has a brokerage account?
23    A   I assert the Fifth Amendment.
24    Q   How is Mr. Nicholas compensated for
25 being a trader at Empires X Corp.?
```

Page 161

1    A   I assert the Fifth Amendment.
2    Q   What is Mr. Nicholas trading?
3    A   I assert the Fifth Amendment.
4        MS. JEON:  I think that those are all
5   of the questions that I have, but let me just
6   pause to see if Amy, or Jonathan, or Larry have
7   any questions.
8        MR. POULOS:   The very last note that
9   I made, is on the very last question that you
10  asked, is on the very last line of the last
11  page, on my legal pad.
12       MS. JEON:  I planned it that way.
13       MS. BRANNON:  I have no questions at all.
14       MS. JEON:  Do you have any questions
15  that you would like to ask.
16       MR. POULOS:   No questions at this time.
17   Q   Would you like to add or check any
18  statements that you've made today?
19   A   No.
20       MS. JEON:  It's 4:15 p.m., Central
21  Standard Time, and we are going off record, on
22  January 11, 2022.  We're off record.
23       (Whereupon, at 4:15 p.m. Central
24  Standard Time, the examination was concluded.)
25       * * * * *

Page 162

1    PROOFREADER'S CERTIFICATE
2
3  In the Matter of:   MINING CAPITAL COIN
4  Witness:      Emerson Piers
5  File Number:    C-08791- A
6  Date:        Tuesday, January 11, 2022
7  Location:      Chicago, Illinois
8
9       This is to certify that I, Christine Boyce.
10  (the undersigned), do hereby certify that the foregoing
11  transcript is a complete, true and accurate transcription
12  of all matters contained on the recorded proceedings of
13  the investigative testimony.
14
15
16  _____    _____ _____
17  (Proofreader's Name)       1-12-2022
18
19
20
21
22
23
24
25

Page 163

1        CERTIFICATION
2
3  I, Larin Kaywood, a Notary Public for and
4  within the State of New York, do hereby certify:
5  That the witness whose testimony as herein set
6  forth, was duly sworn by me; and that the within
7  transcript is a true record of the testimony
8  given by said witness.
9  I further certify that I am not related to any
10  of the parties to this action by blood or
11  marriage, and that I am in no way interested in
12  the outcome of this matter.
13  IN WITNESS WHEREOF, I have hereunto set my
14  hand this 12th day of January, 2022.
15
16
17
18
19
20
21
22
23
24
25

# Transcript Word Index

**[& - 312,035]**

## &

**&**
3:6

## 0

**0.6**
120:2 146:24,24
**026145**
4:17 53:8
**08791**
1:4 162:5

## 1

**1**
1:8 4:8 7:5,7,10 8:14 34:23
37:3 39:18,18 41:8 47:24
48:4 49:6 79:9 81:14 110:7
111:5 119:21 120:2 136:5
146:19 147:6
**1.5**
119:21
**1:01**
83:4
**1:15**
54:11
**1:41**
90:10
**1:44**
104:8
**1:56**
89:12
**10**
115:9,19 116:4 117:16,19
117:25 125:24,25 150:19
156:14
**10,000**
71:18 141:16,22,25
**10:18**
29:4
**10:23**
29:9
**10:32**
35:21
**10:45**
35:25
**10:54**
41:24
**10:58**
42:3
**100**
4:20 33:6,6,10,14,17,20
34:4,20,24,24 35:6,11 41:7
41:9,11
**100,000**
122:4 123:13 124:11,18
**101**
4:21 35:17,18 36:3,3,4,8,12

**101 (cont.)**
36:14,17,21
**102**
4:22 38:12,13,19,23 39:7
**1040**
26:19 33:7,21 34:20 36:17
36:22 38:10,13,25 39:4,16
40:23
**1040/2018**
35:18
**1040s**
38:8
**11**
1:12 5:4 135:12,13 161:22
162:6
**11:14**
54:7
**11:28**
64:7
**11:40**
64:3,6
**11:42**
64:12
**1-12-2022**
162:17
**114**
4:9
**12**
64:3 83:16 116:10
**12:04**
81:6
**12:09**
81:10
**12:11**
82:23
**120**
123:20
**120,000,000**
123:14
**124**
4:10
**12th**
163:14
**13**
10:9 41:17 87:12 151:3,4
152:2
**13-46**
4:9 114:18
**14,239**
37:21
**150**
120:19
**15th**
99:4
**16**
118:23 132:12

**163**
1:8
**17**
119:19
**175**
1:10 2:8
**19**
54:21 55:9 120:17 121:11
121:17 122:11
**19,524**
37:17
**1st**
46:12

## 2

**2**
27:17 28:2 34:24 37:9
40:17,20 72:19,20,23
104:18 119:1
**2,000**
121:19,24 122:5 123:6,14
124:4,12
**2,390**
111:17,19,22
**2,500**
82:9
**2,501**
79:14
**2:00**
112:18
**2:03**
112:24
**2:07**
90:10
**2:15**
112:21
**2:24**
91:6
**20**
92:5 98:25 100:17 123:2,23
140:14 152:14
**200**
146:18,23
**2000**
69:6
**2002**
159:5
**2008**
158:19
**2010**
118:17
**2018**
4:19 26:5,8,19 27:9,15 36:6
36:18,22 37:4,24 38:8 46:7
46:13 47:24 48:4 58:10
60:22 61:18 94:18,23,23
107:10 111:8,11 112:4

**2018 (cont.)**
134:12 135:15
**2019**
28:12 33:6 34:2,5,9 38:14
39:1,9,11,18 40:11,14,24
60:9 77:12 110:7 116:20
117:3 134:12
**202**
1:25
**2020**
54:21 55:9 61:18 81:22
134:13 157:5
**2021**
10:9 41:18 45:15,19 61:20
65:8 67:14,16 68:16,20
152:22
**2022**
1:12 5:4 161:22 162:6
163:14
**21**
124:3
**22**
28:2 43:2 116:23
**23**
44:15
**25**
148:9,22
**2500**
79:18
**26**
4:19 45:23,24 86:2 89:20
139:21,22 140:1
**26,356**
37:13
**26123-26131**
4:21 36:5
**27**
37:20 85:11,25
**28**
124:5
**2973**
57:25 58:4

## 3

**3**
28:3 93:2,6 111:11 121:20
**3:08**
142:18
**3:09**
142:19
**3:48**
142:25
**30**
93:2 123:6,9 139:4
**312,035**
39:20

[33 - additional]

**33**
  3:7
**33-26141**
  4:22 38:17
**34**
  4:20 97:19 98:19
**35**
  4:21 48:6 130:11 140:15
  142:4
**36**
  95:13,21 142:5,11
**367,824**
  37:4
**38**
  4:22 95:9 124:23
**39**
  127:2 128:13
**392.1**
  121:24 122:5,9

**4**

**4**
  27:2,6,8,17 42:25,25
  109:21 149:11,14
**4:15**
  161:20,23
**40**
  95:22
**40,990**
  112:6,11,14
**400**
  147:3,3,6
**41**
  4:13
**42**
  48:23,25 49:2,3,7
**45,198**
  119:2,15
**45.000**
  134:17
**46**
  97:16
**467-9200**
  1:25
**48**
  4:20 33:8

**5**

**5**
  4:4 33:13,20 45:23 48:8
  112:4
**50**
  74:2
**50,000**
  27:9 34:6,8,12,14
**5062**
  4:8 7:3

**52**
  100:23
**53**
  4:17
**54**
  4:18,20 33:8
**55**
  93:6
**56**
  87:22
**560**
  95:22
**58**
  132:11,17,20,23,25 133:4,7
  133:23 134:10 135:13
**59**
  88:1 100:22 103:4 121:1,6
**5th**
  22:2

**6**

**6**
  4:8 36:20,21 39:6,8 126:18
  130:21 133:6,22,25
**6.83**
  110:6,8
**600**
  3:8
**60602**
  3:9
**62**
  109:19,20 110:3,6
**65,000**
  81:25 82:9
**67**
  4:14 79:3

**7**

**7**
  118:10 149:18,21 150:23
**71**
  4:10 124:21,22 125:8,11,14
  125:17,18,20,25
**72**
  124:15 137:14,16,19,22
**72,000,000**
  124:12
**74**
  104:4,13,15,19,21,24
  107:23 110:21
**74a**
  104:15
**78**
  4:14
**79**
  139:3,14 142:10

**8**

**8**
  4:11 48:24 87:8 150:8,10
  150:23
**8,000**
  71:18
**83**
  4:15,16
**86**
  4:11 9:4,5,18
**87**
  4:12 10:7,8
**88**
  4:13 41:4,16,16 42:6,25
  44:16 45:23 48:7,24
**89**
  4:14 79:2,2,5 80:1,4,14,22
  81:13,16

**9**

**9**
  4:9,12 27:19 81:14 103:4
  114:16,18,25 115:9,19
  116:4 150:16,25
**9:46**
  1:15 5:3
**90**
  4:15,16 83:11 84:2
**90a**
  84:10
**91**
  107:12,13,19,21,25 108:5
**92**
  4:17 53:4,5,7,15,18,21,24
  55:11,12 58:17
**93**
  4:18 54:13,17,20 55:6
**94**
  110:24,25
**95**
  116:17,18 117:16,25
  118:11,24 119:19 120:18
  121:11,17 122:12 123:2,23
  124:1,3
**96**
  126:18,22 127:6 128:4
**97**
  148:3,4,7,8,23 149:11,14
  149:18 150:8,17,23 151:4
**98**
  103:15 155:18,19 156:10
  156:13
**99**
  4:19 26:8,11,15,16,19 27:3
  27:7,18 28:8 29:16

**a**

**a.m.**
  1:15 5:3 29:9 35:21 41:24
  42:3 54:7
**ability**
  14:17 46:22
**able**
  96:2,25
**accept**
  101:19
**accepted**
  101:23
**access**
  45:4,12,17 46:11 47:23
  52:21,24 56:12 57:1 58:23
  59:7 60:19 76:24 100:13
  101:3,7
**account**
  45:12 46:16 47:1,2,6,12,15
  56:19,19 57:1,7,8,14,15,19
  57:25 58:4,13,17 77:23
  98:13 100:24 101:4 110:25
  111:1,8,24 112:8,12 122:12
  137:1,2,4 151:25 152:16
  153:5,9 154:1 160:14,18,22
**accounts**
  44:17 45:1,5,12,18,24 46:5
  46:10 47:22 48:1,2 55:15
  55:21 56:3,6 57:10 58:6,9
  58:19,23 59:2,7,11 60:18
  69:6 74:12 75:1 76:18
  78:13 79:21,22 82:1,9,9
  97:12 98:15 143:23 153:13
  159:22 160:1,7,10
**accurate**
  13:7 37:10 38:10 41:2
  42:17 82:13 162:11
**acquired**
  108:19 134:17
**action**
  12:22 163:10
**activation**
  75:1
**active**
  119:15
**activity**
  49:4
**actual**
  65:14 84:1 104:5,6
**add**
  22:11,13 42:20 161:17
**addition**
  8:5 11:24 29:19
**additional**
  74:12

**[address - approach]**

**address**
66:8 77:17,24 78:2 155:20
**addressed**
10:8
**adhere**
64:19
**administration**
118:2
**admonishment**
13:8
**advantage**
66:1
**advice**
11:10 12:13,17 13:3 17:20
18:9 19:15 20:2,11 21:15
21:17,22 22:7 23:4,12
24:12,17,18,23 25:1,16,18
28:13,20,22 29:21,23 30:4
30:5,6,9,11,17,22,24 31:1,7
31:8,9,12,14,23 32:5,25
35:13
**advise**
17:22 19:16 67:1,6,8
**advising**
11:16 18:1 19:23 20:12
24:13
**affect**
131:7
**affiliate**
146:1,3
**affiliated**
50:18 51:17,22 136:16
**affiliates**
146:11,18,23 147:9,9,11,19
148:1 150:11,14,22 151:23
152:24 153:21 154:2
158:14 159:5,9
**africa**
133:10 135:17 141:2,6
**agree**
9:14,18,24 13:18 109:3
140:24 149:21 150:10
**agreement**
21:21
**agreements**
128:21
**ahead**
5:7 67:2
**alcohol**
14:21
**allow**
66:25 94:11
**allowing**
32:15
**allows**
93:20

**amanda**
18:3
**amendment**
11:12,14 12:21 13:17,19
15:5,8,10,13 16:8,10,14,16
17:3,6,9 19:9,12,17,20,24
21:16 22:2,18 23:7,17,19
23:21 24:2,4,7,9 25:5,8,11
25:13,25 26:3,6,17,18,21
26:24 27:1,10,13,16,20,23
28:1,5,9 29:14 30:15 31:15
31:17,18,21 32:4 33:18,19
33:25 34:3,7,10,13,17,22
35:3,7,9 36:13,16,19,25
37:2,6,8,11,15,18,22,25
38:3,6,9,11,24 39:3,5,13,15
39:21,23 40:1,4,8,12,15,18
40:21,25 41:3 42:13,16,19
42:23 43:10,12,15,18,21,23
44:2,5,8,11,14,24 45:3,7,10
45:16,21 46:4,9,14,18 47:5
47:9,13,18,21,25 48:5,20
48:22 49:11,17,20,23 50:1
50:7,10,17,21,24 51:5,8,11
51:14,16,19 52:3,6,9,13,16
52:23 53:2,16,19,23 54:22
55:1,4,7,10,14,17,20,23
56:1,4,8,11,14,17,20,23
57:2,9,12,17,23 58:1,8,12
58:15,18,22 59:1,5,9,12,15
59:18,21,24 60:2,6,10,13
60:16,20,23 61:1,4,7,10,13
61:16,19,22,25 62:3,6,9,12
62:16,19,22 63:1,10,14,17
66:2 67:9,22 68:17,21,24
69:2,5,8,11,13,16,19,23
70:1,5,8,11,15,18,21,24
71:2,5,9,12,16,20,23 72:1,4
72:7,10,14,17,21,24 73:2,8
73:10,12,15,18,21,23 74:4
74:7,10,13,16,19,23 75:3,6
75:8,11,14,17,20,23 76:1,4
76:7,10,13,16,20,23 77:1,5
77:9,13,25 78:3,9,11,15,19
78:22,25 79:12,16,19,23
80:2,5,17 81:19,23 82:2,7
82:10,14,18,22 84:11,14,18
84:21,24 85:2,5 86:7,9,14
86:16,19 87:17,19 88:7,9
88:12,15,18,21,24 89:2,5,9
90:13,17,20,23 91:1,11,15
91:21,23 92:1,4,10,12,15
92:17,19,22,25 93:12,14,22
93:24 94:2,5,8,13,16,20,25
95:4,7,18,23 96:1,4,7,11,20
96:23 97:2,5,8,13,25 98:2,7

**amendment (cont.)**
98:11,14,17 99:5,7,10,15
99:17,21,24 100:2,5,8,12
100:15 101:1,5,9,11,14,18
101:21 102:1,6,8,11,14,18
102:21,24 103:2,12,16,18
105:1,4,7,10,14,17,20,22
106:2,4,7,10,15,17,24
107:2,5,8,11,20,24 108:3,6
108:9,12,15,18,21,24 109:2
109:6,10,14,18 110:1,4,10
110:13,15,18 111:9,15,18
111:21,25 112:3,10,13,16
113:4,7,10,13,16,19,22
114:1,5,9,12,15 115:2,5,8
115:16,18,24 116:1,5,9,16
117:4,7,9,12,15,18,22,24
118:4,6,9,14,19,22 119:3,6
119:8,12,14,17,22,24 120:3
120:5,9,11,14,16,20,22,24
121:2,4,7,12,14,18,21
122:2,7,10,14,17,20,23
123:1,8,11,16,18,21,24
124:2,7,9,14,17,20 125:9
125:12,15,19,23 126:3,5,7
126:10,13,16 127:7,10,14
127:16,18,21,24 128:2,8,11
128:18,20,25 129:3,5,8,10
129:12,16,19,24 130:2,5,8
130:17,19,23 131:3,9,12,17
131:20,23 132:2,6,10,18,21
132:24 133:2,5,11,13,17,19
133:24 134:4,6,8,11,15,19
134:21,23 135:1,3,6,9,11
135:18,20,23,25 136:3,6,15
136:18,21,24 137:3,9,13,17
137:20,23 138:2,5,9,12,15
138:20,23 139:24 140:2,6,8
140:12,22,25 141:3,7,11,14
141:18,20,23 142:1,14,17
143:9,12,15,17,19,24 144:2
144:5,16,21,24 145:2,5,8
145:11,14,18,21,24 146:2,6
146:9,13,16,21 147:1,7,10
147:14,17,23 148:2 149:1,4
149:6,9,13,16,20,23,25
150:3,6,9,12,15,20,24
151:2,5,8,12,15,18,21
152:1,8,11,13,17,20,23
153:2,6,11,15,19,22,25
154:3,7,17,20,23,25 155:4
155:8,12,14,17,25 156:3,5
156:8,11,16,19,22 157:1,6
157:8,12,16,20,25 158:4,9
158:12,16,20,24 159:1,3,7
159:11,14,17,21,24 160:3,5

**amendment (cont.)**
160:8,12,16,20,23 161:1,3
**america**
133:10
**ameritrade**
160:15,19
**amount**
28:6 34:18 103:11 112:6
**amy**
2:5 6:4 65:18 161:6
**announced**
147:25
**annual**
101:10
**answer**
9:22 10:22,25,25 11:8,11
12:4,7,8,15,21,25 13:12
15:2 18:2,23 19:2,4,15
20:10,12,15,17 21:3,25
22:6,14,19 24:14 25:18
28:15,18 29:20 30:5,9,10
30:19 31:2,5,13,22 32:1,3,4
32:15,19,25 43:6 44:20,23
48:8 49:10 53:17 55:12
64:18 65:22,25 67:2,6
83:22
**answered**
32:16 49:7 51:24 144:15
**answering**
18:23 28:17 32:2
**answers**
41:18 42:14,17
**anymore**
101:4
**apart**
15:17 16:1 103:1
**apologize**
41:22
**appearances**
2:1 3:1
**appearing**
10:11
**appears**
45:14 127:8 148:10 155:20
**application**
132:8
**applied**
152:15
**apply**
93:25 94:3,6
**applying**
94:9 157:3
**appreciate**
21:20 87:1
**approach**
19:15

[appropriate - backed]

**appropriate**
11:8 19:18 20:7,15 30:20
67:14
**approve**
69:20 115:6 117:10 123:22
123:25 133:3 156:9,12
**approved**
132:22
**approving**
149:3
**approximate**
60:7,17 160:9
**approximately**
141:4
**arbitrage**
123:3,5
**arising**
157:4
**arrested**
24:5,22
**arrive**
23:20,23
**arrived**
123:10 124:16
**articles**
4:18 54:20 55:2,5
**articulated**
21:4 24:15
**artificial**
115:22 116:7
**ascertain**
21:13
**asked**
21:1 29:16,20 44:16 64:15
101:24 161:10
**asking**
9:9 11:1 63:21 68:4
**asks**
45:24
**assert**
12:3 15:8,9,13 16:2,3,6,8
16:10,14 19:9,17,20 21:15
23:7,16,17,19,21 24:2,4,7,9
25:5,8,11,12,25 26:3,6 28:1
28:5,9 29:13 30:15 31:14
31:17,21 32:4 33:19,25
34:3,7,10,13,17,22 35:3,7,9
36:13,16,19,25 37:2,6,8,11
37:15,18,22,25 38:3,6,9,11
38:24 39:3,5,13,15,21,23
40:1,4,8,12,15,18,21,25
41:3 42:13,16,19,23 43:10
43:12,15,18,21,23 44:2,5,8
44:11,14,24 45:3,7,10,16
45:21 46:4,9,14,18 47:5,9
47:13,18,21,25 48:5,20,22

**assert (cont.)**
49:11,17,20,23 50:1,7,10
50:17,21,24 51:2,5,8,11,14
51:16,19 52:3,6,9,13,16,23
53:2,16,19,23 54:22 55:1,4
55:7,10,14,17,20,23 56:1,4
56:8,11,14,17,20,23 57:2,9
57:12,17,23 58:1,8,12,15
58:18,22 59:1,5,9,12,15,18
59:21,24 60:2,6,10,13,16
60:20,23 61:1,4,7,10,13,19
61:22,25 62:3,6,9,12,16,19
62:22 63:1,10,14,17 67:8
68:17,21,24 69:2,5,8,11,13
69:16,19,23 70:1,5,8,11,15
70:18,21,24 71:2,5,9,12,16
71:20,23 72:1,4,7,10,14,17
72:21,24 73:2,8,10,12,15
73:18,21,23 74:4,7,10,13
74:16,19,23 75:3,6,8,11,14
75:17,20,23 76:1,4,7,10,13
76:16,20,23 77:1,5,9,13,18
77:25 78:3,9,11,15,19,22
78:25 79:12,16,19,23 80:2
80:5,17 81:19,23 82:2,7,10
82:14,18,22 84:11,14,18,21
84:24 85:2,5 86:7,9,14,16
86:19 87:17,19 88:7,9,12
88:15,18,21,24 89:2,5,9
90:13,17,20,23 91:1,11,15
91:21,23 92:1,4,10,12,15
92:17,19,22,25 93:12,14,22
93:24 94:2,5,8,13,16,20,25
95:4,7,18,23 96:1,4,7,11,20
96:23 97:2,5,8,13,25 98:2,7
98:11,14,17 99:5,7,10,15
99:17,21,24 100:2,5,8,12
100:15 101:1,5,9,11,14,18
101:21 102:1,6,8,11,14,18
102:21,24 103:2,12,16,18
105:1,4,7,10,14,17,20,22
106:2,4,7,10,15,17,24
107:2,5,8,11,20,24 108:3,6
108:9,12,15,18,21,24 109:2
109:6,10,14,18 110:1,4,10
110:13,15,18 111:9,15,18
111:21,25 112:3,10,13,16
113:4,7,10,13,16,19,22
114:1,5,9,12,15 115:2,5,8
115:16,18,24 116:1,5,9,16
117:4,7,9,12,15,18,22,24
118:4,6,9,14,19,22 119:3,6
119:8,12,14,17,22,24 120:3
120:5,9,11,14,16,20,22,24
121:2,4,7,12,14,18,21
122:2,7,10,14,17,20,23

**assert (cont.)**
123:1,8,11,16,18,21,24
124:2,7,9,14,17,20 125:9
125:12,15,19,23 126:3,5,7
126:10,13,16 127:7,10,14
127:16,18,21,24 128:2,8,11
128:18,20,25 129:3,5,8,10
129:12,16,19,24 130:2,5,8
130:17,19,23 131:3,9,12,17
131:20,23 132:2,6,10,18,21
132:24 133:2,5,11,13,17,19
133:24 134:4,6,8,11,15,19
134:21,23 135:1,3,6,9,11
135:18,20,23,25 136:3,6,15
136:18,21,24 137:3,9,13,17
137:20,23 138:2,5,9,12,15
138:20,23 139:24 140:2,6,8
140:12,22,25 141:3,7,11,14
141:18,20,23 142:1,14,17
143:9,12,15,17,19,24 144:2
144:5,16,21,24 145:2,5,8
145:11,14,18,21,24 146:2,6
146:9,13,16,21 147:1,7,10
147:14,17,23 148:2 149:1,4
149:6,9,13,16,20,23,25
150:3,6,9,12,15,20,24
151:2,5,8,12,15,18,21
152:1,8,11,13,17,20,23
153:2,6,11,15,19,22,25
154:3,7,17,20,23,25 155:4
155:8,12,14,17,25 156:3,5
156:8,11,16,19,22 157:1,6
157:8,12,16,20,25 158:4,9
158:12,16,20,24 159:1,3,7
159:11,14,17,21,24 160:3,5
160:8,12,16,20,23 161:1,3

**asserted**
20:5
**asserting**
19:23 65:3 67:22 74:14
**assertion**
65:5,8,10,14 67:16,20 68:2
68:4
**assertions**
63:21,23 65:12
**asset**
45:18 58:6,19 59:2,6 62:14
119:2
**assets**
56:16 58:10 59:17 60:8,14
61:6 92:14,14,24
**assistance**
13:25
**assistant**
2:5

**associated**
125:4
**association**
156:25 157:4,24
**assume**
8:23 19:3 23:24 68:1,1
**attack**
22:16
**attend**
48:17,19
**attended**
48:9,10,21
**attorney**
6:2,5 9:12 12:13,18 13:3
15:1,17 16:1 17:10,14
19:22 53:11
**attorneys**
7:13 11:10 21:22 22:7
**attorney's**
29:22 30:17 31:6,23 32:5
35:12
**audio**
84:20 91:17 126:22 127:12
127:15,17,19,20,22 128:10
130:21 131:11
**august**
110:7
**authority**
11:25 160:6
**authorized**
11:21,22 46:15,25 111:6
**autorobotic**
120:7,13,15
**available**
6:21 129:14,25 142:12
148:16,17
**aversion**
15:5,14 20:6
**aware**
12:20 66:18 70:12 97:10
131:25 137:10 156:23
157:2,17,21

**b**

**back**
9:22 20:22 22:9 29:10
32:10 34:23 36:1 41:6,8
42:4 54:12 55:11 64:3,13
66:24 68:8 72:15 76:14,17
76:21,24 77:3,8,15,22
78:13 81:11 83:5 87:7
89:13,22 90:8,9,10 97:24
98:6,10,12,15 100:7 109:13
109:16,21 110:12 112:25
137:7 139:1 143:1
**backed**
133:8,15

[background - chain]

**background**
4:13 41:17 42:6,12,15,21
44:16 52:12 157:10
**backwards**
49:5
**bad**
35:20
**balance**
60:18 98:9 160:10
**balances**
98:16 131:14
**balancing**
98:13
**bank**
45:24 46:5,10,25 47:2,12
47:15,22 52:21,24 56:19
119:10
**bar**
22:10
**barred**
157:3
**base**
56:3,6 58:7 72:16 132:8
**based**
11:11 12:21 19:4 20:17
21:4,22 33:2 55:13,15,21
55:24 56:10,13 57:1,7,14
**basis**
18:10 19:2 20:8 21:5 22:14
22:23 37:12,13,16 40:16,19
63:23 64:15 65:13,20
**bates**
33:8 36:4,5 38:15 41:11
53:7 79:2 81:4 82:12,20
114:17,18 125:3
**bautista**
2:4
**bear**
10:16 41:21
**bearing**
33:7,21 38:14
**beginning**
49:4 84:6,10 139:12
**behalf**
2:3 3:3 115:22
**believe**
12:8 29:12 64:14 65:6,9
144:9
**best**
46:22 83:15
**beyond**
19:1 22:19
**biggest**
133:9 134:2,13
**bill**
122:19

**binance**
58:13,16
**binar**
74:21
**bit**
85:7 89:11,13 91:3 97:15
**bitchain**
136:2,5,14,16,20,22 137:2
137:5,7 138:11,14
**bitchin**
136:10
**bitcoin**
71:19 90:1,6 91:10,13,19
118:17 128:7 131:14 141:9
146:19
**block**
143:21 144:1,4
**blood**
163:10
**blvd**
1:10 2:8
**board**
44:12 149:15
**boats**
61:3
**bohr**
90:11,15,18,22,25
**bot**
75:13 148:12 149:24 150:2
151:10,13
**bots**
75:10 110:17 115:23 116:8
147:15 150:4 156:4
**bottom**
34:25 120:1 121:22 123:12
124:10 125:25
**boyce**
162:9
**brannon**
2:7 6:5 161:13
**brazil**
90:15
**break**
14:6,10,12 29:11 35:16,19
64:1,14 83:7 103:21 112:17
125:2 143:4
**bring**
12:23 146:8
**brings**
146:4
**broker**
157:15
**brokerage**
44:17 45:1 159:22,25 160:4
160:7,10,22

**bronze**
111:14
**brother**
70:22,25 71:3,6,10,13,17
138:22
**bubble**
137:25
**bullet**
119:20 120:1 121:10,16,23
123:4,5
**burden**
68:12,13
**business**
4:10 33:23 36:23 39:11
40:10 43:13,17,19,25 49:24
50:5,16 51:3,10 52:5 53:25
55:9 62:4 63:11 69:21 73:7
84:16 99:13,20 115:3
116:12,12,18,19,20 118:2
124:22 127:11 145:7,13
159:16,20

**c**

**calculation**
123:20
**calculations**
121:9,10 122:11
**call**
47:8 49:10 64:4 138:3
**called**
5:22 34:15 40:6 50:19
51:18,23 72:19 74:21 75:12
75:21 143:20
**cambridge**
143:21 144:1,3
**campbell**
3:6
**cap**
131:7
**capability**
141:16,22,25
**capital**
1:5 6:10 19:13 34:15 40:6
47:7 49:9 50:19 61:9 62:14
76:2,5,8 83:19 115:20
118:25 124:23 128:1,5,17
128:23,24 129:2,7,14,18,22
129:23,25 130:4,7,25 131:1
131:2,6,7,8,15,22,25 132:3
132:7,9,12 133:8,15 134:1
134:13,17 135:15 151:7
152:3,3,4,10 157:14 162:3
**capitals**
62:13
**capitol**
150:18 152:15

**capture**
18:13 155:19
**capuci**
16:17 17·2,4,7,13 23:9
69:10,12,14 81:24 82:5
102:13 113:18,23 114:3,6
114:10,13 115:6 117:10
133:3 136:19 139:25 140:3
**capuci's**
137:21
**caputti**
69:15 118:12 138:7,11
**car**
27:18,21,24
**care**
111:12
**career**
106:22
**carlos**
16:24
**cars**
75:5 113:6 114:7
**case**
66:19
**cash**
56:16,18,21 57:6,13,18,24
60:18 101:19,23 102:4
**casino**
128:22
**casinos**
128:16,23
**catch**
66:21
**central**
1:16 5:3 29:4,9 35:25 42:3
54:7,11 64:6,7,12 81:10
104:8 112:21,24 142:18,25
161:20,23
**cents**
119:1
**ceo**
69:9 138:6,11
**certain**
6:12 9:8 74:25 103:10,11
130:1
**certificate**
162:1
**certification**
163:1
**certify**
162:9,10 163:4,9
**cfos**
137:24
**chain**
143:21 144:1,4

[challenge - continue]

**challenge**
30:3

**chance**
9:11

**change**
42:20 46:7 101:22 104:15
130:7 151:16 152:18,22
155:7

**changes**
152:25

**channel**
155:20,23 156:1,7

**charge**
143:13 144:22

**charged**
144:25 152:21 157:22

**chart**
138:4,4,10

**chase**
46:2,16,25 47:3,12,15
57:15 110:25

**check**
73:22 91:14 116:15 157:15
161:17

**chicago**
1:11 2:9 3:9 162:7

**child**
113:12

**chinese**
134:18 135:8

**choice**
8:25

**choose**
74:5

**chose**
66:1

**chris**
53:11

**christ**
111:12

**christine**
2:4 6:1 21:10 46:20 51:20
52:17 57:4 58:3 63:18
64:23 68:11 73:4,24 80:9
110:20 136:7 162:9

**church**
111:12

**circle**
138:7

**circuit**
21:11

**circulated**
133:1

**citizen**
25:4

**civil**
12:22

**claim**
40:20

**claiming**
37:12,13,16

**clarify**
14:5 30:8 80:9,13

**clarity**
32:20

**classic**
76:6

**clear**
10:21 16:9 28:21 30:7,12
30:13 31:3,4 32:13

**clearly**
21:23

**click**
54:3

**client**
18:1 19:23 20:19,20 21:5
21:15,21 22:14 23:4 24:19
24:24 65:22 67:6 83:23
157:18

**client's**
8:19

**clinton**
140:4,10

**close**
153:12

**closed**
153:5

**closing**
153:8

**code**
78:13,16

**codes**
78:5

**coin**
1:5 6:10 19:13 34:16 40:7
47:7 49:9 55:13,15,21,24
56:3,6,10,13 57:1,7,14 58:7
61:9 75:25 76:2,5,8 83:19
115:20 118:25 124:23
128:1,5,17,23,24 129:2,7
129:14,18,22,23,25 130:4,7
130:25 131:1,2,6,7,8,15,22
132:3,4,7,8,9,12 133:8,15
134:1,13,17 135:15 141:10
141:12 162:3

**coins**
62:14

**coin's**
131:25

**college**
48:10,10,14

**colloquy**
16:9

**columns**
79:11

**combined**
14:8

**comma**
39:12

**commenced**
135:15 152:25

**commerce**
73:1,6

**commission**
1:1,9 2:3 6:3,8 8:22 20:5
67:12 147:8

**committed**
12:9

**communicate**
158:22 159:9

**communication**
17:13 49:8

**communications**
23:9

**community**
48:10,14

**companies**
7:25 43:6 52:10 70:20

**company**
34:15 40:6 43:4 50:18
51:17,23 68:18 72:19 86:5
92:8,9 126:2 134:3,14
143:20 145:6 155:2,6

**compel**
11:22

**compelled**
12:7

**compensated**
160:24

**compensation**
47:14 48:3

**complaint**
157:5

**complaints**
97:10 151:22

**complete**
42:11,18 82:13 162:11

**completed**
45:13,14 49:6

**computer**
40:9 118:3,16

**computing**
36:23 39:11 40:9

**concern**
67:24

**concluded**
161:24

**conduct**
40:10 43:14,16 55:8 92:2

**conducted**
43:25 63:11 157:9

**conducting**
91:24 92:16,23

**conducts**
43:19

**confer**
64:1

**confirm**
11:13 13:22 63:20 80:6,18
86:20

**conflict**
8:18

**conflicts**
8:24

**confused**
31:11

**confusing**
31:12

**confusion**
32:18

**connected**
7:13

**connects**
115:20

**consent**
131:16,22

**consist**
27:25 96:10 111:2

**consistent**
64:20

**consists**
109:21 149:14

**constitute**
6:15

**consultation**
86:25

**consulting**
51:18,23 52:2,4,8 59:8,23
60:1,4 72:12

**cont**
3:1

**contact**
77:16,23

**contained**
162:12

**contains**
67:16 79:10

**content**
79:10

**context**
13:7 22:18

**continue**
19:8 21:14 22:9,24 23:2

[continue - determine]

continue (cont.)
30:14 31:20 32:22 85:6
87:20 89:11,13 91:2 95:8
97:14 98:19,20 100:16
103:3 128:12 130:10
140:13
continued
85:8 87:23 89:15 91:4 93:4
95:11 97:17 98:22 100:19
103:5 126:25 130:12
140:17
contract
37:17 135:7,10,24 143:25
contracting
27:14 34:1
contractor
27:12 33:24
contracts
135:14,22
contrary
66:6
contribute
159:18
control
45:17 46:11 55:22 58:20,24
59:3 159:18
controlled
100:9,13
controls
136:4
conversations
83:8 143:3
conversion
130:18 131:19
convert
131:13
copy
6:18
corner
155:21
corp
43:7,11,13,16,19,22,24
44:3,7,9,13 46:17 47:1,3,11
47:16,20 49:19,22,25 50:6
50:9 54:1,4 55:3,8,24 70:20
71:14 72:20,23 111:1,7,24
145:6,9 146:4 156:18
157:11 159:13 160:25
corporate
8:7 43:5
corporation
43:5
correct
7:14,15 8:12 13:13,14,23
19:5 25:2,3,19 26:25 27:9
27:12,19 28:16 36:18 39:2

correct (cont.)
41:20 43:9,20 44:4,10 47:4
47:8,12,17 49:19 50:6,9
51:4 54:25 55:13,19,25
56:3,7,10,22 57:8,16,25
61:18,21 62:2,11 63:16
66:15 69:7,25 70:17 71:8
71:11,15 73:17 74:3 75:2,7
75:13,19 76:12 77:17 78:10
79:11 80:1 83:9,10 105:9
127:9,13 130:24 133:1
138:17 142:13 143:5,6
147:4 149:12,15 154:14
corrected
81:14
cost
88:25 89:3 119:1 122:12,15
122:16
cotsirilos
3:5
counsel
7:16 8:16,20,23,25 9:10,17
14:12 19:16 23:5,13 24:12
24:17 25:1,17 28:14,20,23
29:21 66:9 67:5 82:17
115:1
count
79:17
counter
43:8
counters
52:15,20,22,25
countries
69:25
country
78:2,4,13,16
couple
14:3 35:15 87:2
course
85:23
court
5:12 14:7 20:16 46:23
67:18
cover
19:13
covered
17:17
cptl
62:13,17,21,24,25 63:4
75:25 137:12
cptlc
76:5
cptln
76:2
cptlx
76:8

create
69:17 104:23 115:3 117:8
127:15
created
62:1,4,15 78:16 81:18,20
84:23 125:13 127:17
130:25 131:11 134:10
138:4 149:5
creating
149:2
creation
125:16
credit
57:19 112:8
crime
12:9
criminal
6:16
crypto
126:2,6 133:9,16,21 134:2
cryptocurrencies
45:9 91:20,25 100:4
cryptocurrency
45:5 59:17 60:8,11 76:11
87:15 92:2 93:19 94:1,10
101:13,17,24 102:4 147:13
currencies
90:1 91:19
currency
90:6 130:7
current
24:11 37:14 80:23
currently
14:20 23:14,18 25:23 26:2
60:12 95:20 134:2
customer
143:14
cytoplasm
23:8

d

daily
146:20 149:22 150:11,13
150:25
date
1:12 46:7 49:5,5 162:6
dated
10:9 41:17
david
156:20 160:21
davidson
108:19,22
day
19:11 119:21 120:2 146:24
146:25 147:6 152:5 163:14
days
93:21 94:12 99:14,20

dba
51:15
dbva
57:25 58:4
deadline
93:9
deal
134:18
deals
48:25
dealt
67:10
dearborn
3:7
december
111:8,11 112:4 135:14
decentralized
128:5
decided
130:3
decides
143:7
deciding
143:10
decor
113:15
degree
118:2
denied
155:3,6
depicted
105:2 107:19 137:19
depicts
149:11
deposition
66:24
depreciate
129:23 131:1
describe
61:14 116:3 150:1
described
18:15 95:2 133:22
describes
79:10
description
4:7
design
72:15
desire
68:13
detail
112:7
determine
6:11 12:23 20:2,11 28:6
34:18

**determining**
102:19
**develop**
37:23 40:13
**developed**
6:14
**developer**
36:23 38:2 39:12
**developing**
40:10
**development**
38:5
**dialogue**
32:10 33:3
**differ**
145:9,16
**difference**
120:12 145:25 146:3 151:6
**different**
8:7 10:3,6 38:7 40:23 51:13
69:25 74:5 92:20 107:9,22
110:17 136:1 150:22
159:25
**difficult**
84:3
**digital**
45:4,12,18 56:12,16,25
58:6,10,19,23 59:2,6,11,17
60:8,14 62:14,18 63:6
92:14,14,24
**diligence**
67:1,4
**direct**
7:23 18:22
**directing**
13:4 15:6 102:15
**director**
2:5 61:12
**disciplinary**
156:24 158:1
**disclose**
83:21
**disclosed**
158:2
**discover**
111:12
**discuss**
8:23 17:7
**discussed**
9:6 13:9
**discussion**
29:1 35:23 83:2 104:9
112:22 142:21
**dissolution**
4:18 54:20 55:3,6

**diversified**
1:24
**division**
6:2,5
**divisions**
6:12
**document**
33:16 36:14 38:22 53:6,12
53:14 54:19 58:17 80:1,14
80:22,24 125:4,10,13,17
132:16,20,23,25 134:9
157:19
**documentary**
89:6
**documentation**
40:2
**documents**
6:20 35:4 90:24 91:12 95:1
95:6 99:25 133:4 140:9
**doing**
9:8 11:23 19:3 21:23 90:3
113:24
**dollar**
122:9 123:20 132:5
**dollars**
56:25
**double**
77:19
**drafting**
132:19
**drc**
135:16
**drive**
108:7
**dual**
118:2
**dubai**
23:20,23,25 24:1,6,22
**due**
67:1,4
**duly**
5:22 163:6

e

**e&j**
43:6 46:1 53:25 57:14
**earl**
111:13,20
**earlier**
32:18
**early**
66:23
**earn**
50:25 73:11 146:19 147:16
**earned**
60:21 110:8

**earnings**
95:16,19,22,24 96:3,6,9
98:9
**echo**
126:24 139:18
**eco**
119:11
**editing**
125:17 132:20 142:15
149:3
**educational**
48:7
**edward**
50:8
**eight**
42:7 98:21,24 100:17 111:4
**either**
125:4
**electricity**
122:13,16,19
**emerson**
1:7 4:4,9,14,17 5:9,13,21
8:5,7 10:8 33:7 38:14 39:9
41:19 53:8 54:24 64:2 79:3
84:13 85:15,20 86:11,24
87:13 88:3 89:18,24 91:9
91:17 92:7 93:8,16 95:15
96:17 97:22 98:4 99:2,12
103:8 105:6,24 106:12,20
114:18 117:20 162:4
**ernerson261**
4:22 38:16
**emerson67**
81:5 82:13,21
**emp**
138:1,1
**empire**
43:11,13,16 44:3 50:16
58:21 59:8 68:20 70:20
145:6,9 146:15 154:18
157:11 160:11,13,17
**empires**
19:13 43:7,19,22,24 44:6,9
44:12 49:19,22,25 50:6,9
51:13,15,18,23 52:1,4,8
54:1,4 55:3,8,24 71:14 72:6
72:12 145:19,22 146:1,4,10
146:18,23 147:8,12,15,19
147:25 148:12 149:15
151:23 152:9 153:1,3,7,17
153:20 154:1,5,21 155:2,7
155:10,15,19,22 156:2,4,17
156:21 158:2,6,10,13,18,23
159:4,8,13,16,20,23 160:1
160:4,7,14,18,25

**employment**
49:1,3
**empx**
50:19,22 51:1,4,6,9,12 59:4
72:9 145:12,15 146:10
**ended**
68:5
**enforcement**
6:2,6
**english**
13:23
**enoque**
8:6 70:22 71:6,10,13,17
138:21
**enter**
28:7
**entered**
34:19
**enterprise**
133:16,22
**entire**
19:11 130:20 139:6
**entirely**
19:18,22
**entirety**
142:6
**entities**
8:4,7
**entitled**
1:14 6:9 83:15 124:23
**entity**
51:21 52:18 73:3
**equipment**
88:4
**especially**
67:21
**esq**
2:4,6 3:4,5
**essentially**
128:5
**estate**
75:22
**estimate**
122:15
**ethical**
64:20
**event**
13:7
**eventually**
102:10
**evidence**
20:18 23:25 63:22 64:20
65:4,7,10,14 66:7,15 67:19
68:1,3 89:6 90:24 91:12
**ex**
7:14 10:2

[examination - fifth]

**examination**
4:3 5:24 161:24

**examined**
5:23

**example**
120:17 123:4

**excel**
79:7,14 80:10

**exchange**
1:1,9 2:3 6:3,8 89:25 90:6
91:18 93:19 94:1,10

**exchanges**
62:18 63:7 91:25 92:3
136:2,5,11,14,16,23 137:2
137:5,7

**excuse**
63:18 79:8

**exhibit**
7:5,7,10 8:14 9:4,4,5,18
10:7,8 26:7,8,11,15,16,16
26:19 27:3,5,6,18 28:7
29:16 33:6,6,10,14,14,17
33:20 34:4,19,23,24 35:6
35:11,17,17 36:3,3,4,8,11
36:14,17,21 38:12,13,19,23
39:7 41:6,7,8,10,16,16 42:6
42:25 44:16 45:23 48:7,24
53:4,5,15,17,21,24 54:13
54:17,20 55:6,11,12 58:17
79:1,2,2,5 80:4,14,22 81:13
81:14,16 83:11 84:2,10
90:24 103:15,20 104:4,13
104:19,21,24 107:12,13,19
109:20 110:3,6,21,21,24,25
111:1,4,10 114:16,17,20,25
115:9,19 116:4,11,17,18,24
117:16,25 118:10,24
119:19 120:18 121:11,17
122:12 123:2,23 124:1,3,21
124:22 125:8,11,14,17,18
125:20,25 126:18,25 127:6
128:3 132:11,17,20,23,25
133:4,7,23 134:10 135:13
137:14,16,19,22 139:2,3,13
139:14,15 142:10 148:3,4,6
148:8,22 149:11,14,18
150:8,16,23 151:3 155:18
155:19 156:10,13

**exhibits**
4:7 10:2 35:15

**exist**
150:4 159:22 160:1

**existing**
73:17

**expenses**
27:19,22,25 37:10,10,14,19
37:21 40:16,19 70:3 113:9
114:14

**experience**
59:13,16,25 60:4

**explain**
100:22 121:5,19 122:3
124:15 127:25 129:13
149:17

**extend**
145:22

**extended**
76:9

**extent**
22:22 63:20 66:5 67:11

**f**

**f9j**
120:19,23

**facebook**
159:12

**facilities**
86:12,17

**fact**
23:24,25 63:22,24 65:3,5,9
65:13,15 67:3,15,17,20
68:2,4

**facts**
6:14 64:24,25 134:7

**factual**
21:13,16

**faith**
63:23 64:15 65:13,20

**false**
109:7,8 157:22

**familiar**
84:19

**far**
110:21 127:13

**faster**
87:4

**february**
81:21

**federal**
6:13,15 64:19

**fee**
73:20 74:1 75:1 100:25
101:2,6,10,12 143:13,14,16
143:18 152:15

**feel**
17:24 22:6 23:3 68:7,11

**fees**
143:7,11 144:6,17,19,20,23
144:25 145:3 152:18,21

**felt**
67:17

**ferrari**
106:23,25 107:3,6,18,21,22
107:25 108:1,4,5,7,11

**ferraris**
107:9 114:7

**fiction**
98:16

**fifth**
11:11,14 12:21 13:17,19
15:5,8,10,13,24 16:3,6,8,8
16:10,14,16 17:3,6,9 18:24
19:9,12,17,20,23 20:5
21:16 22:18 23:7,17,19,21
24:2,4,7,9 25:5,8,11,13,25
26:3,6,17,18,21,24 27:1,10
27:13,16,20,23 28:1,5,9
29:14 30:15 31:14,17,18,21
32:4 33:18,19,25 34:3,7,10
34:13,17,22 35:3,7,9 36:13
36:16,19,25 37:2,6,8,11,24
37:18,22,25 38:3,6,9,11,24
39:3,5,13,15,21,23 40:1,4,8
40:12,15,18,21,25 41:3
42:13,16,19,23 43:10,12,15
43:18,21,23 44:2,5,8,11,14
44:24 45:3,7,10,16,21 46:4
46:9,14,18 47:5,9,13,18,21
47:25 48:5,20,22 49:11,17
49:20,23 50:1,7,10,17,21
50:24 51:2,5,8,11,14,16,19
52:3,6,9,13,16,23 53:2,16
53:19,23 54:22 55:1,4,7,10
55:14,17,20,23 56:1,4,8,11
56:14,17,20,23 57:2,9,12
57:17,23 58:1,8,12,15,18
58:22 59:1,5,9,12,15,18,21
59:24 60:2,6,10,13,16,20
60:23 61:1,4,7,10,13,16,19
61:22,25 62:3,6,9,12,16,19
62:22 63:1,10,14,17 65:1
66:2 67:8,22 68:17,21,24
69:2,5,8,11,13,16,19,23
70:1,5,8,11,15,18,21,24
71:2,5,9,12,16,20,23 72:1,4
72:7,10,14,17,21,24 73:2,8
73:10,12,15,18,21,23 74:4
74:7,10,13,16,19,23 75:3,6
75:8,11,14,17,20,23 76:1,4
76:7,10,13,16,20,23 77:1,5
77:9,13,23 78:3,9,11,15,19
78:22,25 79:12,16,19,23
80:2,5,17 81:19,23 82:2,7
82:10,14,18,22 84:11,14,18
84:21,24 85:2,5 86:7,9,14
86:16,19 87:17,19 88:7,9
88:12,15,18,21,24 89:2,5,9

**fifth (cont.)**
90:13,17,20,23 91:1,11,15
91:21,23 92:1,4,10,12,15
92:17,19,22,25 93:12,14,22
93:24 94:2,5,8,13,16,20,25
95:4,7,18,23 96:1,4,7,11,20
96:23 97:2,5,8,13,25 98:2,7
98:11,14,17 99:5,7,10,15
99:17,21,24 100:2,5,8,12
100:15 101:1,5,9,11,14,18
101:21 102:1,6,8,11,14,18
102:21,24 103:2,12,16,18
105:1,4,7,10,14,17,20,22
106:2,4,7,10,15,17,24
107:2,5,8,11,20,24 108:3,6
108:9,12,15,18,21,24 109:2
109:6,10,14,18 110:1,4,10
110:13,15,18 111:9,15,18
111:21,25 112:3,10,13,16
113:4,7,10,13,16,19,22
114:1,5,9,12,15 115:2,8,16
115:18,24 116:1,5,9,16
117:4,7,9,12,15,18,22,24
118:4,6,9,14,19,22 119:3,6
119:8,12,14,17,22,24 120:3
120:5,9,11,14,16,20,22,24
121:2,4,7,12,14,18,21
122:2,7,10,14,17,20,23
123:1,8,11,16,18,21,24
124:2,7,9,14,17,20 125:9
125:12,15,19,23 126:3,5,7
126:10,13,16 127:7,10,14
127:16,18,21,24 128:2,8,11
128:18,20,25 129:3,5,8,10
129:12,16,19,24 130:2,5,8
130:17,19,23 131:3,9,12,17
131:20,23 132:2,6,10,18,21
132:24 133:2,5,11,13,17,19
133:24 134:4,6,8,11,15,19
134:21,23 135:1,3,6,9,11
135:18,20,23,25 136:3,6,15
136:18,21,24 137:3,9,13,17
137:20,23 138:2,5,9,12,15
138:20,23 139:24 140:2,6,8
140:12,22,25 141:3,7,11,14
141:18,20,23 142:1,14,17
143:9,12,15,17,19,24 144:2
144:5,16,21,24 145:2,5,8
145:11,14,18,21,24 146:2,6
146:9,13,16,21 147:1,7,10
147:14,17,23 148:2 149:1,4
149:6,9,13,16,20,23,25
150:3,6,9,12,15,20,24
151:2,5,8,12,15,18,21
152:1,8,11,13,17,20,23
153:2,6,11,15,19,22,25

[fifth - gold]

**fifth (cont.)**
154:3,7,17,20,23,25 154:4
155:8,12,14,17,25 156:3,5
156:8,11,16,19,22 157:1,6
157:8,12,16,20,25 158:4,9
158:12,16,20,24 159:1,3,7
159:11,14,17,21,24 160:3,5
160:8,12,16,20,23 161:1,3

**figure**
28:4 39:25 40:3

**figures**
95:1 121:13,15

**file**
1:4 55:2 84:20 126:22
127:12,15,17,20,22 128:10
139:7 162:5

**filed**
26:25 36:18 38:15 39:1
54:21 55:5 155:2

**filled**
26:23 36:15 39:4

**final**
26:22

**financial**
45:25 48:1,2 59:22 60:1,4
60:18 95:6

**find**
135:21

**fine**
9:23 13:21 16:11 18:25
22:3 103:25 104:1,1

**finish**
11:1

**finras**
157:14,15

**firms**
160:4

**first**
5:22 9:22 15:22 16:22 41:6
67:25 77:11 78:18 79:4
81:21 99:4 106:21 110:6
123:4 139:5,8 155:1

**five**
19:14 30:4,24 97:19 98:19

**flaherty**
2:5

**flavio**
50:2,3 71:24 153:23

**florida**
43:8 49:12,15 86:13,18
87:16 105:9,15,18,19 106:6
106:9 155:11

**follow**
15:25 29:22 30:17 31:6,23
32:5,25 33:2 35:12 80:21

**followed**
15:25

**following**
12:12,17 13:2 22:7 23:4,12
24:16,18,23,25 25:16 28:13
28:20,22 30:9,11 93:11

**follows**
5:23

**forced**
67:8

**forcing**
66:13

**foregoing**
162:10

**foreign**
14:1

**forex**
93:19 94:4,10 115:10 120:1
120:7 124:4,13

**forged**
157:18

**forget**
89:18

**form**
4:8 7:3 18:13,16,18 20:9,17
20:25 21:1,2 23:22 28:7,12
33:7,21 34:19,20 35:18
36:17 38:13,25 41:1 43:22
65:3 66:10 101:20

**formal**
6:18,19,23,24

**formatting**
10:2

**formed**
43:24 44:3

**former**
53:11

**forms**
40:23 43:5

**forth**
22:9 32:11,12 68:8 163:6

**forward**
21:20 33:2 103:25

**foundation**
140:4,11

**foundational**
83:18

**founded**
65:13

**founder**
117:20,23 118:11

**four**
93:21 94:12 95:9,20 96:13
96:18 97:15 139:5,8

**free**
17:24 22:6 23:3 65:2

**friday**
151:10

**friendly**
119:11

**full**
5:6,11 7:17 104:16 137:12

**fund**
101:8 111:19 155:11,13,16

**funded**
70:3

**funding**
100:10

**funds**
47:6,10 56:2,6,9 58:5,20,24
59:3,8,10,11 70:2,4 75:16
94:21,22 97:4,11 99:18
100:14 101:25 102:3,5,7,9
102:12,16,20,22 103:1
107:7 108:2,23 109:11,13
109:16,17 113:2,2,5,8,11
113:14,18,21,25 114:3,7,11
114:14 137:6 147:12 150:5
153:17,20,24 159:23 160:2

**further**
20:6 21:9 30:18 31:24 67:1
67:18 163:9

**future**
31:20 115:12

**g**

**gain**
110:9

**gaining**
92:8

**gains**
92:13

**gas**
144:17,19,20,22,25 145:3

**general**
16:5 18:11

**generally**
116:3

**generate**
92:13 93:18 121:6,24 122:5
123:14 124:12 150:18

**generates**
92:8 120:2 121:1 123:6
124:5

**generating**
119:21 149:24

**generation**
126:1

**generators**
119:11

**gentleman**
7:22

**getting**
100:7

**gifts**
103:14

**give**
11:22 17:20 18:9 20:2,11
21:17 80:8

**given**
67:3 100:1 103:13 163:8

**gives**
93:17

**giving**
30:6

**globally**
134:3,14

**gm**
138:18

**go**
5:7 8:13 9:11,19 10:15 14:7
15:19,20 21:22 28:24 29:8
35:14 41:22 54:4,5 55:11
67:1 80:25 87:4,7 89:21
90:8,9,10 93:2 95:15 102:5
103:9 104:7 112:20 116:17
124:21 125:24 133:6
135:12,13 138:25 142:19

**goals**
106:22

**goes**
21:6 85:13 139:17

**going**
7:23 8:10 10:7 11:18 13:12
15:7 16:7 20:13,19,19,20
21:20 23:1 26:7 27:2 29:5
33:1,2,5,13 34:23 35:14,21
36:1,2,20 39:6 41:4,8,15,25
42:4 45:22 46:7 47:8 48:6
48:23 49:9 53:3 54:12
55:11 63:25 64:7,13 65:17
67:21 68:2,8 79:1 81:6,11
82:24 83:11,12,12 84:5,9
87:3,5,7,7,8,20,21 89:10,11
89:13 90:9 93:1,2 95:8
96:12,18 97:14,16 98:18,20
100:16 103:3,25 104:3,11
104:14 105:25 107:12
109:19 110:24 112:25
114:16 115:9 116:10,17
118:23 119:18 124:21
125:24 128:12,14 130:9
132:11 133:6 135:13 136:9
137:14 142:2,4,24 143:1
148:3 149:10 155:18
161:21

**gold**
133:9,16,21 135:16

[gonvalves - instruction]

**gonvalves**
50:2,4 51:3 71:25 72:2,5,12
72:15,18 153:23 158:17
**gonzalez**
72:8
**good**
7:22 41:15 63:23 64:15
65:13,20 67:5
**graduate**
48:14
**graduated**
118:1
**granite**
43:7 46:2 53:25 57:15
**granting**
11:25
**great**
9:25 10:14 41:13
**grew**
82:9
**gross**
27:9 34:5,8 37:4 39:19
**ground**
10:16 14:3
**grounds**
12:4
**group**
51:18,23 52:2,4,8 59:8
72:13
**guaranteed**
74:18 95:25
**guess**
30:23 31:10 32:10
**guys**
154:13

**h**

**hand**
5:16,25 67:10 155:21
163:14
**handwriting**
137:18,21
**hang**
11:7
**happen**
131:18
**harley**
108:19,22
**hartman**
2:5 30:2,22 31:8,10 32:17
65:17 66:5
**harvard**
48:17,19,21
**havard**
118:1,7,16,21
**head**
10:24 12:15 50:8 148:13

**head (cont.)**
157:11
**header**
79:9,17 81:15
**hear**
11:2 84:12 85:12,16 86:3
86:10,22 87:12 88:2,6
89:23 91:7,8,16 92:9 93:7
93:15 95:14 96:16 97:21
98:3 99:1,11 103:7 106:11
106:18,23 127:25 128:3,15
129:1,6 130:20 139:17
140:3 141:13
**heard**
20:16
**hearing**
1:14
**hedge**
155:11,13,16
**held**
29:1,6 35:23 42:1 43:4
44:18 45:1,5,25 54:9 60:15
64:10 81:8 82:25 83:2
104:10 112:22 142:22
147:18
**helped**
62:7
**hereunto**
163:13
**hi**
72:25 73:5
**high**
48:9 49:6
**higher**
132:4
**highlighted**
111:10
**highly**
18:10
**hire**
157:7
**hired**
63:8 157:10
**history**
48:8 49:1 66:20 156:24
158:2
**hold**
45:5 58:10 86:25 147:24
159:23 160:1
**holding**
61:5
**home**
113:15
**honor**
99:19 153:18

**honored**
97:4 151:20
**hopefully**
87:4
**hour**
14:11 119:7 148:14
**https**
155:22
**huh**
10:24
**hypertechnical**
19:25
**hyphen**
75:13

**i**

**iceland**
126:2,9
**identified**
4:7 85:15 86:4,11 88:3 91:9
92:6 93:8 95:15 96:17
97:22 98:4 99:2,12 103:8
105:24 106:19
**identifies**
87:13 89:24 93:16
**identify**
8:3 91:17 106:12
**il**
3:9
**illicit**
22:17
**illinois**
1:11 2:9 162:7
**immediately**
56:16 97:23
**immunity**
11:25
**impair**
14:16
**impose**
143:8,11 153:4
**imposed**
153:14,16
**impression**
66:16
**improper**
22:20
**inappropriate**
17:20 18:8,11 19:22 20:1
24:14
**include**
34:14 40:5
**including**
34:20 45:9 59:14 60:25
69:21 70:20 77:16,24 98:9
**income**
26:1,4 27:9 34:5,8,11,14,15

**income (cont.)**
37:4 39:24 40:5,5 49:22
52:7 59:20 73:9 102:23,25
**incorrect**
65:23 66:17
**increase**
62:10,23 109:1
**incriminate**
12:5,25
**incrimination**
12:11 17:11 19:5 24:20
25:14 28:11 29:15 35:10
66:3
**incur**
12:24
**indicated**
27:11 28:3
**indication**
150:18
**individually**
44:18 45:2,6
**individuals**
7:25 8:4 15:16
**influence**
14:21
**information**
22:17 53:20 66:6,17 67:12
71:7,14 77:16,24 157:23
**informed**
152:25 153:8
**infrastructure**
83:15
**initial**
16:24
**injecting**
30:24
**insert**
12:10 19:12
**inside**
105:12
**install**
43:7 46:2 53:25 57:15
**institute**
77:10
**institutions**
46:1
**instruct**
14:7 19:2 20:9 22:5 30:10
31:4,16
**instructed**
131:10
**instructing**
21:24 31:2,13
**instruction**
20:15 22:19 32:19

[instructions - leaders]

**instructions**
20:23

**insurance**
75:18

**intelligence**
115:22 116:7

**intelligently**
115:11

**intend**
12:9 104:19

**intension**
23:6 24:8 25:12

**intention**
11:23 28:10 29:13 35:8
109:12

**interest**
8:18,19,24

**interested**
21:8 163:11

**interject**
17:24

**international**
46:17 47:1,3,11,16,20
111:1,7,23

**internet**
142:12

**interpreter**
14:1

**introduce**
105:5

**invest**
68:19,20 103:17 115:11
122:5 146:18,23 147:3,6

**invested**
153:1,10 158:3

**investigation**
6:11,15,19,24 8:1,22 15:17
16:18 17:2,14 23:10 53:13
53:22 66:21 67:7 77:11
78:18 79:25 80:1,4,11,12
80:16,23 82:1,6 115:1

**investigative**
162:13

**investing**
115:17

**investment**
59:19 97:1 101:8 119:11
146:15 150:18

**investments**
75:19 111:14 150:21 151:1

**investor**
47:10 56:2,5,6,9 59:11
146:1 150:22 152:16
153:24 158:11 159:23
160:1

**investors**
44:4 121:23 122:4 123:13
124:11,19 146:5,11 147:2,5
147:11,16 148:1 149:22
151:23 152:24 153:7,21
154:2 158:2,7,11,14 159:4
159:9

**invited**
73:17

**invoke**
11:11,16 61:16

**invoked**
15:24

**invokes**
13:16,18

**invoking**
18:24 65:1

**involved**
66:19 100:6 122:8 123:19

**involvement**
8:21

**irfan**
112:5,11

**irs**
26:23 36:15 39:4

**issue**
19:19

**issued**
26:10

**italicized**
10:4,5

**item**
37:20

**items**
56:22 103:9 112:15 114:4

**j**

**jackson**
1:10 2:8 111:13,20

**january**
1:12 5:4 26:5 45:19 46:6,12
47:24 48:4 58:10 60:22
94:18,23 158:19 159:5
161:22 162:6 163:14

**jeon**
2:4 5:2,11,15,25 6:1 7:16
7:22 9:17,21,25 11:18
12:14 13:4,11,15 15:4,18
16:7,21,23 17:17,23 18:17
18:20,25 20:13 22:4 27:6
28:19 29:8,24 32:24 35:14
35:25 41:15,24 42:3 46:21
50:13 51:22 52:19 54:5,11
57:5,22 58:4 63:6,25 64:6
64:12,18 65:16 68:13 73:5
74:1 78:7 80:6 81:3,10
82:23 83:4 85:10,23,25

**jeon (cont.)**
86:21 87:2 89:10 90:8 91:2
93:1 95:8 96:12 97:14
98:18 100:16 103:3,19
104:3,11 110:23 112:17,20
112:24 125:1,5 126:17
128:12 130:9 136:9 139:2
139:11,14 140:13 142:2,18
144:9,14,20 147:22 148:8
148:20 154:11,14 161:4,12
161:14,20

**job**
27:11 151:25

**john**
18:12 22:12

**jointly**
44:19 45:2,6

**jonathan**
2:6 6:4 17:24 22:11 23:1
32:6 161:6

**josh**
156:20

**joshua**
50:8 160:21

**jp**
46:16,25 47:3,12,15 57:15
110:25 111:7

**jr**
69:10

**judge**
12:24

**jump**
116:10

**jumping**
30:3

**junior**
16:25 69:12,15,17,20,24
70:6,9,12,16,19 118:12,16
118:20 138:6

**jury**
12:24

**k**

**kaywood**
163:3

**keep**
68:8 97:16

**khalid**
112:5

**kilowatt**
119:7

**kind**
84:16 134:24 147:21

**knew**
69:12 77:2,6

**know**
10:5 11:20 14:5,6,11 17:21

**know (cont.)**
20:17 21:3,11 26:12,13
27:3 33:10 36:8 38:19
41:12 42:8 53:6 54:17
64:24 66:25 67:21 68:25
70:12 72:18 77:14,22 78:12
81:24 82:8 84:22,25 85:3
85:11,12 87:6 89:22 90:14
94:17,21 96:21,24 97:3,6
99:8 103:13 107:15 108:4
109:15,23 110:5,11 111:3
113:17,20 114:2,10,13,21
114:22 116:2,6,25 118:7,20
119:4 122:24 124:25 125:2
125:10,20 128:9 130:15
131:10,18 132:14,22
133:20 134:9,12 136:2,4
138:3,13 143:14 148:23
154:18 160:9,21

**knowing**
17:21

**known**
71:24 115:23 116:7

**kwh**
119:1,7

**ky**
143:13,16,18

**kyc**
143:22 144:4,6

**kycts**
144:10

**l**

**laborers**
37:17

**language**
14:1

**languages**
11:4,6

**larin**
163:3

**larry**
2:7 6:5 161:6

**late**
152:22

**latest**
126:1

**launch**
62:17,20

**law**
63:4

**laws**
6:13,16

**leader**
106:22

**leaders**
146:7

[leading - mean]

**leading**
63:21 64:16

**lease**
108:16

**leave**
29:24

**left**
138:16 148:11 157:18

**legal**
161:11

**legible**
81:15

**leigh**
35:1,2,5

**letter**
4:11 9:5 72:20

**letters**
157:14

**levels**
103:11

**license**
154:6,11,19,21,24 155:6,11
155:13 156:14

**lift**
132:9

**lightcoin**
90:1

**likecoin**
141:9

**limited**
22:14

**line**
37:20 39:18 54:24 79:17
161:10

**lines**
79:14,18,21,22 93:17
106:21 128:4

**link**
53:24 54:3

**list**
27:18 37:10,20 47:19 49:18
55:13 58:16 80:15 81:18,20
81:25 82:3,4,5,11,16,20

**listed**
27:18 52:12 82:6

**listen**
21:8

**listing**
44:17

**lists**
34:25

**little**
85:6 89:11,13 91:3 96:13
97:15

**live**
49:12,15 106:1,5

**lived**
70:16

**living**
25:24 113:9 114:14

**llc**
8:11 43:7,8 46:2 50:20,23
51:1,4,7,9,12,18,23 52:2,8
52:15,20,22,25 53:25 59:8
72:9,13 145:12,15 146:11

**located**
23:15 105:9,16,19 122:22
126:2 135:5,16 158:14

**location**
24:11 162:7

**log**
77:3,7

**login**
76:25

**logistics**
73:1,6

**logo**
108:10

**long**
66:20 71:24 83:16 103:25
104:19 114:20 116:19
126:19,20 139:4 142:11
148:14

**longer**
96:13 101:23

**look**
66:18

**looking**
67:12

**looks**
41:19 138:16,18 140:23
152:14

**loophole**
78:17

**lost**
97:7

**lot**
22:8

**lou**
16:13

**louis**
16:23 69:10

**lucie**
105:19

**luxury**
75:5 113:6 114:7

**lynch**
157:18

## m

**machine**
92:18 120:19,23 121:1,6
135:2 141:21

**machines**
92:20 119:2,16 122:16,19
122:21,25 126:1,8,11,15
134:18,22,24 135:4 141:9
141:16,19,24

**magnify**
27:3

**mainoe**
3:5

**maione**
7:20,20 50:11,15 63:2
148:6

**majoring**
118:15

**making**
63:21 99:22 110:12

**mall**
129:2,4

**manage**
89:1

**management**
8:11 50:19,20,23 51:1,4,7,9
51:12 59:4 72:9 145:12,15
146:10

**manager**
43:3

**manages**
92:18

**managing**
88:22 95:5

**mark**
85:19 92:6

**marked**
7:5 26:16 33:17 38:23
53:14 54:19 58:17 79:5
80:3,14,22 84:1 125:11,13
125:17 126:22 127:5
132:16,20,23,25 134:10

**market**
83:16 90:12,16,19,22,25
93:19 94:4,10 115:10,12
120:7 131:2 146:8

**marketing**
61:11 62:1 69:18,21

**markets**
130:1 146:4

**marriage**
163:11

**materials**
62:1 69:18,21

**matter**
1:3,14 6:10,20,25 16:5
46:16 162:3 163:12

**matters**
162:12

**mcc**
4:9,14,17,22 38:16 46:16
47:1,2,8,11,11,15,16,19
49:10,13,16 53:8 56:5 58:6
58:25 61:12,15,17,20,24
62:2,5,7,10,15 63:9,12,15
65:8 67:14,16 68:16,19,22
68:25 69:3,7,9,18,20,22,25
70:3,6,9,13,17 71:1,4,7,18
72:3,16 73:7,9,11,14,19
74:5,11 75:2,7,9,16,18,21
75:21,25 76:11,18,21,24
77:2,6,10,14,21 78:12,17
78:20,21,23,24 79:3,21
81:5 82:1,4,5,13,21 85:4,15
86:12,17 88:10,13,16,19,23
89:1,1,3,7,25 90:16,18,21
90:25 91:10,13,18,25 92:3
92:13 93:17,25 94:3,6,11
94:14,18,21,22 95:2,3,6,17
96:2,6,8,9,10,24 97:3,6,9
97:10 98:8,16 99:19,22
100:1,3,7,10,14 101:19
102:2,9,12,16,20,22,23,23
103:1,10,13,17 105:8,11,15
105:18,18 106:5,6,8,8
107:6 108:1,14,17,20,23,25
109:1,4,8,11,15,17,21,25
110:8,12,14,16 111:1,7,23
112:12 113:1,5,8,11,14,17
113:20,24 114:3,6,10,13,18
115:17 117:2,14,14,23
118:11 119:1,9,15 120:6,19
121:23 122:19,21,24 123:7
123:13 124:6,11,18 125:21
126:8,11,14 127:22 129:7
129:11,14,17,22 130:3,6
131:4,5,13,13,21,24,25
133:1 136:17,25 137:5,7,11
137:11 138:11 140:3,10
141:24 143:8,11,13,20,23
144:1,3,6,7,10,11,22 145:1
145:4,4,7,10,13,16,23
146:8,8,12

**mccemerson**
4:20,21 33:8 36:5

**mccemerson48-54**
41:11

**mccloun**
35:1,2,5

**mcc's**
76:14 82:8

**mcctradingbot.com**
108:11

**mean**
110:8 127:20 130:18

[meaning - observe]

**meaning**
158:8
**means**
12:23 78:10
**media**
159:19
**medication**
14:21
**meet**
148:12
**meetings**
147:19,21,24
**member**
43:4 44:12 73:13,16,17,20
74:6 75:2 77:15,16,22
79:21,22 100:10,23 101:2,3
101:6,7 102:3 113:24
131:14
**members**
62:7 63:15 68:19,22,25
69:3,7 70:10,13 74:5,8,11
74:14,17,20,24 75:4 76:18
78:12,17,20,23 82:15,19
85:4,4 94:11,15,22,22 95:3
96:2,6,9,24 97:3,6,10 98:8
98:16 99:19,23 100:1,3,7
101:16,20 103:10 109:4,8,9
109:16 117:14,14 125:21
125:22 127:23 129:15,18
129:22 130:4,6 131:4,5,6
131:15,21 133:1 136:25
137:5,11 143:8,11,23 144:7
144:11,22 145:1,4,23 146:8
146:12
**membership**
62:11 70:3,7 74:2 79:24
81:25 82:1,4,5,8,11,16,20
93:25 94:3,6,9,17 96:10
100:14 101:15,25 102:3,9
102:12,16,20,22 103:1
107:7 108:1,23 109:1,11,17
111:19 113:2,5,8,11,17,21
113:25 114:3,6,11,14
145:20 157:3
**mendes**
50:2,4 71:25
**mercedes**
114:8
**merely**
12:3 68:4
**merrill**
157:18
**mgm**
129:2,4
**miami**
86:12,18

**michael**
3:5 7:20
**microphone**
84:8 85:21
**microphones**
81:1 84:7 85:22
**middle**
8:14 16:23 50:3
**mike**
64:5
**million**
56:25 57:5 121:25 122:5,9
123:20 124:15
**mine**
141:9
**mined**
76:11
**mineminingcapital.com**
76:22
**miners**
133:10 134:18 135:8
**mines**
91:10,13 119:1
**mining**
1:5 6:10 34:15 40:6 47:7
49:8 61:8 74:6 83:19 86:12
86:17 87:15 92:13,16,18,20
93:20 94:7,11 95:17 106:13
115:20 119:2,16 120:17
121:5,25 122:8,16,19,21,24
123:15,19 124:23 126:6,8
126:11,15 133:16,21 134:2
134:14,18,22,24 135:2,16
162:3
**minute**
54:6 87:8,11,21 88:1 92:5
103:24 104:18 127:2
128:13 130:21 139:21,22
140:1,14
**minutes**
64:3 83:16 89:20 93:2,6
95:9,13,21 96:13 97:15,19
98:19,21,25 100:17,22
103:4 126:18,20 130:10
139:3,5,8 140:15 142:3,5
142:11
**misleading**
157:23
**misunderstanding**
65:24 66:15
**model**
145:7,13
**modified**
32:14
**monday**
93:11 151:11,14 152:6,10

**money**
49:21 50:25 74:9,11,14,17
74:20,24 75:13 93:18,25
94:3,6,9,18 95:2 96:10 97:7
109:5 112:1 151:24 158:6
158:11
**month**
71:18 99:4 121:1,6 123:7
124:5
**monthly**
74:18 95:16,19,21,24 96:3
96:5,8 98:9
**months**
66:25 96:18
**morgan**
46:16,25 47:3,12,15 57:15
110:25 111:8
**morning**
7:22
**motorcycles**
61:3
**move**
9:3 10:7 27:2 33:13 36:20
39:6 41:4,16 45:22 48:6,23
51:24 107:12 110:24
118:23 119:18 126:17
149:10
**moving**
33:5 35:17 38:12 44:15
136:1 151:3
**multiple**
8:17
**muratore**
18:12 22:12
**mute**
81:1 84:7,8 85:21 87:8
89:14,19 126:23 128:14
139:17 142:7
**muted**
85:22 86:6,22 103:22

**n**

**name**
5:6,9,12 6:1 7:17 16:19,23
16:24 26:20 33:7,22 35:1
38:14 39:9 41:18 44:18
45:2,6,25 46:6,12 47:1 50:3
50:4,12 51:21 52:22,25
54:23 55:16,19 57:20 60:19
63:5 69:14 84:13 133:20
137:24 138:18,21 162:17
**named**
44:9 111:20
**names**
156:17
**national**
156:24 157:4,23

**natively**
104:12
**nature**
18:14
**necessary**
13:8 67:5
**need**
10:15,20 13:25 14:6 27:3
35:19 41:12,20 63:25 65:19
68:7 76:25 85:20 101:12
**needs**
28:20 66:8 84:7
**new**
81:16 146:8 153:4 158:11
163:4
**nicholas**
50:8,13 156:20,23 157:2,7
157:10,13,17,21 158:1,18
160:22,24 161:2
**nine**
100:21 139:3 142:5,11
**north**
133:10
**notary**
163:3
**note**
20:24 81:13 112:7 161:8
**notice**
1:15
**number**
8:7 33:8 36:4,5 38:15 41:11
43:2 44:15 45:23 53:7
72:20 73:25 79:3 81:4
82:12 114:17,18 148:7
162:5
**numbered**
82:20
**numbers**
35:5

**o**

**obey**
9:14,18,24
**obeyed**
9:10
**object**
18:7,13,17 20:9 21:1 23:22
**objected**
20:25 21:2
**objection**
18:4,6,14,16 20:16 21:4
23:3
**obligations**
64:21
**observe**
114:2

[obtain - picture]

**obtain**
138:1
**obtained**
107:6 108:1,22
**obviously**
20:19 22:18
**occurred**
131:19
**october**
41:17 45:15
**offer**
68:19 145:19
**offered**
75:18 95:17 145:10,17
**offers**
75:7 146:15
**office**
72:16,16 76:15,17,21,24
77:4,8,15,23 78:13 97:24
98:6,10,12,15 105:8,11,15
105:19,21 106:6 109:21
110:12 137:7
**officer**
14:9
**officered**
75:21
**officers**
6:7 67:18
**offices**
6:8
**offline**
110:23
**oh**
50:15 86:6
**oil**
133:9,16,21
**okay**
9:23,25 10:14 11:9 12:14
18:12 22:4 23:1 29:8 30:18
30:21 31:18,24 32:23 33:4
33:5 35:16 38:22 53:3 64:5
65:16 80:19 82:23 83:25
85:10 87:1,25 89:10 91:2,6
96:12 98:18,24 103:3,7,19
103:23 104:11,23 110:19
130:9,20 132:15 135:12
138:24 139:7,20 144:13
148:17
**old**
158:10
**omitted**
82:15,19
**once**
113:1
**online**
76:19

**open**
68:5 137:1
**opened**
45:11 47:2 75:1 77:11
78:18
**opening**
6:17 7:2 74:11 137:4
**operate**
115:21
**operates**
120:6
**opinion**
17:25
**opportunity**
6:23 7:7 65:22,25 66:7,14
67:4 68:19
**opposed**
9:7 68:4
**option**
78:1,4
**order**
6:18,19,23,24 53:21 74:6
76:24 109:1 130:25 136:25
**original**
10:4 96:25
**oscar**
78:7
**ot**
78:5,7,8,10,14,16
**outcome**
163:12
**outside**
105:12
**owned**
133:9,15,21
**owner**
49:18
**owners**
148:12
**owns**
108:5 136:4

**p**

**p.m**
142:18
**p.m.**
81:6 82:23 83:4 112:21,24
142:19 161:20,23
**package**
74:8 121:20 123:6 124:4
**packages**
74:6 95:17 101:15 111:14
121:24 122:5 123:14
124:12
**pad**
161:11

**page**
9:20 27:2,5,6,8,17 33:13,20
34:23,24 36:20,21 39:6,8
41:8 42:24,25 45:23 48:24
53:5 79:4 110:6 115:9,19
116:3,10 117:16,19,25
118:10,23 119:18,19
120:17 121:17 122:11
123:2,23 124:3 125:24,25
133:6,22,25 135:12,13
137:15 148:9 149:11,14,18
150:8,10,16,22,25 151:3,4
152:2 159:12 161:11
**pages**
1:8 42:7 107:13 109:22
110:2 111:2,4 114:20
116:19,23 124:23 132:13
148:22 150:23 159:19
**paid**
94:23 96:6,9 97:24 98:5
101:13,16,17 131:5,6,21
134:22 145:3 152:6
**paper**
132:12
**paragraph**
28:2 37:20 133:25
**park**
126:6
**part**
14:25 27:17 28:2 32:18
37:3,9 39:18 40:17,20
75:15 104:16 139:7 148:9
148:11
**participating**
74:21
**particular**
111:16 114:19
**parties**
163:10
**partner**
50:5 51:4
**partnered**
119:10
**partners**
49:24
**partnership**
135:16 140:4,10
**party**
113:3 141:17,22,25
**password**
76:25
**pause**
63:25 161:6
**pay**
70:2 96:2 101:2,6 109:15
129:7,11 136:19 137:11

**pay (cont.)**
144:3 147:8 152:9 158:7,10
**paying**
93:20 94:11,14 100:24
109:12 122:18
**payment**
99:13,19,22 100:10 101:20
128:1,6
**payments**
74:18 100:1,3,7,11 151:10
151:13 152:5,7,10
**payouts**
129:17,21 130:3,6
**paypal**
56:19 57:7,10
**pdf**
35:20 41:20
**pending**
29:12
**people**
63:8 136:19 140:24 141:2,5
158:22
**percent**
110:7,9 120:2,2 121:20
123:6,9 124:5 146:19,25
147:6 150:19 152:15
**percentage**
74:25
**perform**
61:23
**performed**
143:18
**period**
45:19 49:2
**person**
9:8 77:3,7 90:14 95:14
96:16 97:21,23 98:3 99:1
105:23 106:11,19 111:20
127:8 139:22
**personal**
56:21 57:19 112:1,14
113:14 114:4 153:24
**personally**
31:11
**persons**
8:21
**perspective**
125:21
**phonetic**
35:1
**photos**
107:13,15
**phrase**
136:7
**picture**
117:17

[pictures - prospective]

pictures
 149:11
piers
 1:7 4:4 5:9,10,11,13,14,15
 5:19,21 6:22 7:6,12,19,21
 7:23 8:5,6,8,13 10:9,10
 11:4,21 13:16,22 15:9
 17:10 23:6,14 24:8,13,16
 25:21,23 28:10 29:11 33:7
 33:9 35:8 36:3,7,11 38:14
 38:18 39:9 41:19 42:5,11
 47:2 53:4 54:14,24 65:7
 67:13 68:15 81:12 83:6
 84:13 85:15 86:3,11 87:12
 87:14 88:3 89:25 90:6,11
 91:10,18 92:7 93:8,16
 95:15 96:18 97:21,22 98:5
 99:1,2,12 100:21 103:7,9
 104:23 105:6,24 106:13,20
 107:16 108:8 111:6 113:1
 114:19,23 117:2,20 125:7
 128:15 130:15 136:13
 139:20 140:19 142:10
 143:7 144:17 146:14
 148:21 149:17 150:7
 154:15 155:24 162:4
pires
 70:22,23 71:6,10,17
place
 1:9 87:16 106:6 157:13
plan
 14:10 25:6,9 148:15
planned
 161:12
plans
 106:23
platform
 63:5 109:25 110:8,14,16
 128:1,6
platinum
 111:13
play
 83:13 87:7,9,21 89:11,22
 90:8 93:1 96:12 126:19,21
 126:23 130:10 139:6,10,16
 142:2,4
played
 85:10 87:11,25 89:20 91:6
 93:6 95:13 97:19 98:24
 104:25 107:23 127:2,5
 130:22 139:20 140:21
 142:9
playing
 66:21 84:4 85:6,9,24 87:10
 87:20,24 89:14,16 91:3,5
 93:5 95:9,12 96:15,16

playing (cont.)
 97:15,16,18 98:19,20,23
 100:17,20 103:4,6 104:19
 104:22 127:1 128:13
 130:13 139:8,19 140:13,18
 148:15
plays
 85:20
please
 5:5,15 7:16 9:20 10:22,23
 10:24 11:3 14:4 26:11 33:9
 38:18 41:7 53:4 54:16
 63:19 80:13 85:22 107:14
 114:20 116:24 121:5,19
 124:24 126:23,24 148:21
point
 22:13 65:19 66:11 78:1
 87:1 101:19,23 119:20
 120:1 121:23 123:5 129:18
 131:5,13 145:20 151:17
 152:18 153:3 154:4 158:5
points
 121:11,17 123:4
policy
 77:10 101:22 151:16
polish
 2:6 11:17 30:13 32:8,23
 68:7
porsche
 114:8
port
 105:19
portfolio
 116:19
position
 21:19 32:9,14 44:6 68:9
positions
 32:12
possible
 8:24 10:21
posts
 110:12
potential
 8:18 117:14
poulos
 3:4,6 5:7 7:18,18 8:9 9:19
 9:23 11:7,15 12:12 13:2,6
 13:14,21 15:2,7,21 16:2,15
 16:19,22 17:15,19 18:7,16
 18:19,22 19:6 20:25 22:3,5
 22:12 23:16,22,24 24:13
 25:2,20 26:17 27:5 28:17
 28:24 30:1 31:3,9,16 32:13
 32:21 33:4,18 41:5,13,23
 46:19 51:20 52:17 57:3,20
 58:2 63:18 64:2,17,22 66:4

poulos (cont.)
 66:18 73:3,24 78:6 80:8,19
 80:25 83:17,25 84:5 85:18
 86:24 89:18 103:23 104:2
 110:20 112:19 125:3 136:7
 138:25 139:9,13 142:23
 144:8,13,19 147:21 148:19
 154:10,13 161:8,16
poulous
 9:6
power
 119:11
powerpoint
 84:16 148:9
prefer
 139:9
preparers
 35:1
present
 26:5 45:20 46:8,13 47:24
 48:4 49:4 58:11 60:9,22
 94:19,24 106:21 107:10
 149:7 158:19 159:6
presentation
 4:10 84:17 115:4,7 116:18
 117:5,8,11,13 124:22
 127:12 141:5 148:9
presentations
 62:5 63:12 69:22
presently
 23:25
president
 54:24 61:15 69:9
previously
 24:15
price
 131:8
principle
 33:23 36:22 39:10
prior
 6:17 7:2 93:18
private
 150:17,21 151:1
privately
 43:4 133:15,21
privilege
 11:23 12:3,10,22 15:8,10
 19:9 23:7 24:9 25:13 29:14
 30:15 31:21 35:9 66:2
privileged
 22:17
prizes
 75:4 103:10
probably
 142:12

problematic
 22:23
problems
 19:20
procedure
 143:18
procedures
 9:7,9,12,15,18 143:22
 144:4
proceed
 11:19 21:18 68:6,14
proceeding
 6:9 20:6
proceedings
 162:12
produce
 38:7 40:22 79:24,25 83:24
 114:25
produced
 26:9 53:11 80:3,10,12,15
 80:22 81:25
profession
 33:23
profit
 73:11 74:15 118:25 120:17
 121:1,6,25 122:6,9 123:3,7
 123:9,15,20 124:5,13 151:7
profits
 147:16 151:9,10,20
program
 74:22 75:12,13,15,21
programs
 75:7 88:16
promised
 109:13 121:20 150:13
promises
 109:4,7
promote
 62:5 69:25 159:15,19
promoted
 62:21 108:25
promotions
 145:22
proofreader's
 162:1,17
proper
 18:5
properties
 60:24,25
property
 61:5
prosecution
 12:1
prospective
 109:9

[provide - represent]

**provide**
35:4 43:6 53:20 59:20 60:1
60:4 65:2 77:23 113:2
147:12 154:1

**provided**
59:19,22 82:12,16 85:4
95:3 102:3 117:13 125:21
127:22 153:20

**provides**
53:24 77:16 128:22

**providing**
71:14 112:11 157:22

**public**
62:18 63:6 130:1 131:2
163:3

**publically**
148:17

**purchase**
62:24 108:13

**purchased**
107:3 134:25

**purchases**
120:19

**purchasing**
74:8

**purpose**
6:10 84:25 128:9

**purposes**
104:12

**pursuant**
1:15 10:11

**push**
66:24

**put**
5:25 41:6 78:2 139:15
142:6

**q**

**question**
7:24 10:25 11:2,2,11 12:1,8
12:15,21,25 13:12,20 14:4
15:3,22,25 17:1,12,19 18:2
18:3,5,9,9,11,23 19:7,11,12
20:1,4,8,8,10,12 21:2,3,6
21:14,25 22:6,15,16 23:2,8
24:10,14 25:14,19 28:11,15
28:18 29:12,15,21 30:14,16
30:19,20 31:1,5,6,19 32:2,2
32:3,16,16 33:1,2 35:10
43:2 44:20 45:22,24 46:20
46:24 48:6,8,18,23,25 49:2
49:3,7,14 64:16 65:2 66:1
67:13,15,15,20 68:5 73:25
77:20 79:8 80:20,21 83:18
83:22 144:9,15 161:9

**questioning**
65:21 68:12

**questionnaire**
4:13 41:17 42:7,12,15,21
44:16 45:14 47:20 52:12

**questions**
7:9 8:10 10:23 11:20 12:7
14:17 15:15,18 17:15,21
18:8 19:10,14,16,21 21:9
21:10,10,12,13,16 26:13
30:18 31:20,22,24 63:21
64:19 65:3,23,25 67:2,6
80:13 139:5,12 161:5,7,13
161:14,16

**quibble**
64:25

**quibbling**
67:24

**quickly**
85:13

**quite**
141:13

**quote**
22:10,10 156:13,15

**r**

**raise**
5:16 67:23

**range**
65:2 114:8

**ration**
23:8

**reach**
103:10 106:22

**read**
7:7 8:15 9:1 10:16 11:18
12:16,19 13:13 14:14 22:1
38:15 39:25 40:3 49:3
114:17 149:8

**reads**
138:14

**ready**
26:13,14 33:11,11,12 36:9
36:10 38:20,21 42:9,10
53:6,9 54:17,18 107:15,17
109:23,24 111:3,5 114:22
114:22,24 116:25 117:1
124:25 125:6 132:14,15
148:23,24

**real**
60:25 75:22

**really**
150:4

**reason**
14:6 21:11

**reasons**
11:17 24:15

**recall**
144:14

**receipt**
122:4

**receipts**
39:19

**receive**
38:4 56:2,5,9 58:5 59:3,7
109:4 124:18 146:24 147:6
151:22,24

**received**
40:6 47:6,10,14 48:2 52:7
56:24 58:20 94:18 99:13,20
111:23 113:1 144:7,10

**receives**
123:13 124:11

**receiving**
74:17,25 93:10 97:11

**recess**
29:6 42:1 54:9 64:10 81:8
82:25

**recircle**
41:6

**recognize**
127:4 137:18 139:21

**recommended**
101:24

**record**
5:2,6,12 6:17 7:3,17 10:22
13:11 14:8 19:8 20:24
21:24 22:22,25 28:21,25
29:2,5,9,10 30:12,14 31:12
32:12 35:22,24 36:1 38:16
41:10,22,25 42:4 53:7 54:5
54:12 64:7,13,23 65:11
68:5,10 79:5 81:1,7,11,13
82:24 83:1,3,5,6 104:7,17
112:20,23,25 136:10
142:20,22 143:1,2 161:21
161:22 163:7

**recorded**
10:19 27:8 162:12

**recording**
142:25

**recruit**
62:7 68:22 70:25 147:9

**recruited**
63:15

**reddcoin**
91:10,13,19

**refer**
138:6,21

**referring**
11:16 141:19

**reflect**
110:21

**reflective**
22:22

**refuse**
12:4,20 21:3

**refusing**
29:20

**regard**
22:16

**regarding**
135:7

**regards**
15:15 16:5 17:12

**regional**
2:5

**related**
47:6,11,14 58:21,24 59:3,8
68:16 100:10 163:9

**relating**
58:5

**relation**
53:25

**relatively**
66:19

**released**
99:3

**releasing**
99:8

**relevant**
49:1

**remaining**
121:8,10

**reminding**
66:13

**remote**
9:7

**renew**
100:24

**renewal**
101:12

**repeat**
11:3 46:19,21 48:18 49:14
51:20 52:17 58:2 63:2 68:2
79:8 144:8

**repercussions**
20:21

**rephrase**
14:5 77:20 129:21

**replay**
85:18

**reported**
34:12

**reporter**
5:12 10:19,21 14:7 46:23

**reporting**
1:24

**represent**
26:8 53:10 79:21,22 146:14
146:22 147:2,5 155:9,15

[representation - september]

representation
8:17 39:14,22 65:20
representations
109:8 124:1 137:11
represented
7:12 8:16,20 146:17
representing
7:24 8:6,6
represents
8:17,21
republic
135:17
request
14:8 69:17 97:4 153:18
154:6,11,19,22,24 155:10
158:8
requested
97:11 151:25 152:5,12
158:7
requests
99:18 151:19 152:9
requires
67:19
requiring
66:12
research
157:9
reserve
20:14
residents
78:17
resolve
8:24
respect
30:17 31:24
respectfully
64:23
respective
32:11 85:4
respond
13:5,19 15:6 17:11 21:5
53:21
responding
25:1
response
10:23 11:1 15:14 18:21
19:6 24:10 25:14,15 26:10
28:11 29:15 30:16,20,25
31:5,19,22 35:10 36:6 46:1
53:12
responsible
88:22 94:14 95:5 102:15,19
110:11 113:3 122:18 156:6
rest
142:2

restriction
153:4,8,12,14,16
resume
68:12
return
4:19 26:9,20,22 35:18 36:6
96:19 121:20
returning
25:6,9
returns
109:4 149:22,24 150:11,13
150:25
review
6:23 36:8 38:19 54:16
reviewing
26:11,12 33:10 42:8 53:5
107:14 109:22 114:21
116:24 124:24 132:13
148:22
rewind
84:6 89:12
right
5:16 11:15 21:19 26:20
31:11,15,17 34:6 58:14
62:5,8,15 63:9,13,19 64:16
66:4 69:10 71:19 74:6,9
75:5,16,22,25 76:3,9,25
77:8 79:18 80:16,24 81:22
105:13,25 106:14 108:20
111:8,17 130:1 131:8 137:2
137:8,25 142:23 146:8
152:16 155:21
rights
11:12,14 13:9 19:4 20:14
66:3
ripple
91:19
risk
8:19
road
67:25
robot
75:15 88:5
robotic
120:13
robots
88:10,13,16,19,23 89:1,4,7
92:21 100:6
rock
90:11,15,18,22,25
role
50:22 52:1 61:8 70:19 72:2
72:5,8,11 125:16 132:19
136:13,14 142:15 143:10
149:2

roles
61:24
room
141:1,5
rosenberg
11:13
route
67:9
rover
114:8
row
79:9 81:14
rules
10:16 14:3 20:18 64:19
run
89:3 156:1
runs
105:21 110:14

s

salary
48:3 71:17,21,22
sales
39:19
sample
10:3
saw
12:14 150:23
saying
30:23 98:5
says
30:7,11 54:24 90:5,18
110:6 112:7 115:20 116:11
116:19 117:19,20,25
118:12 119:1,9,20,25
120:19,25 121:23 123:5,13
124:11 126:1 133:7,14
135:14 138:1,17,18 150:17
151:10 152:3,4,4
schedule
33:21 34:4,12,20 36:21
37:3,9 39:8,10,17 40:17,20
40:23 41:1
school
48:9 49:6
science
118:3,16
screen
7:4 27:4 41:7,9 42:6,24
54:14 81:12 83:14 104:4,13
109:20 126:21 137:15
148:4,11 151:4 155:21
screw
23:11
script
11:19 127:19

season
160:18
sec
9:9 12:22 14:25 15:11,24
16:5 26:9 40:22 53:12
77:11 78:18 80:4,15,23
81:21 82:12,17 83:8 143:3
154:5,10,11,13,19,24 155:2
155:5,6 156:14
second
9:20 41:21 80:8,20 87:3
92:6 104:7 119:20 130:21
138:7 139:1
seconds
41:22 85:11 86:1,2 87:8,12
87:22 88:1 89:21 93:3,7
95:10,14,21 96:14 97:16,20
98:20,25 100:18,22 103:4
103:25 104:18 127:3
128:14 130:11 139:4,21,23
140:1,14,16 142:4,5,11
sec's
4:8 7:3 26:10 53:21
secure
119:10
securities
1:1,9 2:3 44:25 45:8,11,18
59:14 146:15
security
6:3,7 11:17 33:22
seeing
83:18
seek
22:17 137:6
seen
26:15 33:16 36:11 38:22
53:14 54:19 82:3,5 107:18
110:2 117:5 125:7 132:16
137:15 148:25 155:23
self
12:11 17:11 19:5 23:7
24:20 25:14 28:11 29:15
35:10 66:3
semi
120:7,13,15
send
141:16,22,25
senior
6:4
sent
9:5 53:12
sentence
134:16 152:4
september
10:9 54:21 55:9

[services - substantive]

**services**
1:24 75:9 145:10,16
**session**
19:14
**set**
32:12 163:5,13
**seven**
99:13,20
**shake**
10:24
**shaking**
12:14
**shares**
74:15
**sheet**
80:10
**short**
21:11 29:6 42:1 47:7 49:9
54:9 64:10 81:8 82:25
104:9 142:21
**shot**
83:14 104:4,13 109:20
126:21 137:15
**shots**
148:4
**show**
12:9 26:7 33:6 36:2 53:3
79:1,6,13 83:11 90:25 95:1
104:3,11,14 109:19 114:16
132:11 137:14 138:10
148:3 150:25 155:18
**showed**
105:3,8
**showing**
7:4 42:5,24 54:13 91:13
99:25 110:5 118:10 140:9
140:10,14
**shown**
6:18 7:3 84:17 95:20
103:14 105:12 106:25
107:22 127:13 139:22,25
156:10,13
**shows**
89:7 95:21 149:19,21 150:8
150:10
**side**
22:10 137:25 138:16
**signature**
10:3,4 54:23
**signed**
77:15 97:24 135:10,14,21
135:24
**signer**
46:15,25 111:7
**signs**
77:22

**similar**
145:7,13 146:7
**simply**
16:16 65:2 67:13
**single**
26:25 36:18 38:15 39:1
87:5
**sir**
11:7
**sit**
22:21
**six**
126:20
**sixth**
134:2,13
**slide**
90:3,5 95:20 118:24 121:11
123:3 149:18,21 150:16
**slides**
148:25 149:3,5,7
**social**
33:22 59:10 159:19
**software**
36:23 37:23 38:1,5 39:12
40:10,13
**sold**
75:9
**solely**
133:9
**sorry**
18:17 19:25 29:18,19 39:17
41:5 46:20 50:11 82:4
86:21,24 90:2,9 121:9
125:5 127:20 129:20
138:25 146:24 152:3
**source**
26:1,4 34:11 39:24 96:5,8
102:23 109:16
**sources**
102:25
**souza**
5:9,13 41:19
**space**
50:20 76:14 136:11
**speak**
11:5
**speaker**
84:12 85:14 86:4,10 87:13
88:2 89:23 91:8,16 92:6
93:7,15 99:11 103:8 127:25
128:3,15 129:1,6,13
**speaking**
15:16 127:9 140:24 141:1
**specific**
20:7 30:25

**specifically**
20:2 30:10
**speed**
66:22
**spell**
5:6,11 7:17 16:19 50:3,12
136:9
**spelled**
50:19 72:16,19 73:5 116:12
116:20 136:10
**spend**
56:21 113:5,8,11,14 114:6
144:6,10 153:23
**spending**
114:3
**spent**
28:3 102:7,20 112:1,14
114:10,13 145:4 153:21
**spoke**
16:13
**spoken**
16:4,17 17:1,4
**spreadsheet**
79:7,14
**st**
105:19
**staff**
66:18
**stamps**
125:3
**stand**
29:4 78:8 119:7
**standard**
1:16 5:3 29:9 35:25 42:4
54:7,11 64:13 81:11 104:8
112:21,25 142:19 161:21
161:24
**start**
10:25 84:9 93:9,10 116:12
**started**
85:16 86:5
**starting**
100:17 128:13 142:3
**state**
5:5 6:16 7:17 12:3 23:3
86:11 87:14 88:4 91:18
93:9 97:23 99:3,12 105:24
106:13,20 128:4,16 141:8
154:5 155:1,5,9,10 163:4
**stated**
48:13 68:9 92:7 141:13,15
**statement**
37:1,7 86:8,15 87:6,18 88:8
91:22 92:11 93:13,23 96:21
98:1 99:6,16 106:16 115:15
115:25 118:5 119:4,13,23

**statement (cont.)**
120:4,6,10,21 121:3 123:17
124:8 126:4 128:19 129:9
133:12,18 134:5,7,20
135:19 140:7 141:17 154:8
154:16,16
**statements**
106:3 123:23 154:2 156:10
156:13 161:18
**states**
1:1 25:7,10 33:22 34:5
36:22 37:3 39:10,18 43:20
43:25 44:4 49:3 60:25 61:3
63:12,16 68:23 69:1,4,7
70:10,14,16 78:2,24 85:16
86:6 115:11 118:15 124:4
134:1 138:13 140:5 158:15
**stating**
33:11
**status**
39:2
**steel**
135:8
**step**
21:7 22:9
**sticker**
108:11 139:15
**sting**
7:25
**stock**
45:9 115:12,17
**stocks**
59:14
**stop**
64:4 86:1 87:3 139:11
**stopped**
86:2 100:21 140:15
**stored**
135:4
**streicker**
3:6
**stuffy**
137:25
**submit**
154:21
**submitted**
154:5,18 155:10
**subpoena**
4:12 10:8,10 26:10 36:6
53:12,22
**substance**
10:15
**substances**
14:22
**substantive**
83:8 143:3

[suggesting - try]

**suggesting**
66:12

**suite**
3:8

**suncoast**
57:19,22

**supplemental**
6:24

**supplies**
28:4

**support**
63:22,23 65:4,10,14 67:19
71:7,15 113:12 134:7

**supporting**
40:3

**supposedly**
75:16

**sure**
11:18 15:5 29:3 41:23
46:21 81:3,4 90:2 104:2
148:19

**sustain**
20:16

**swap**
130:15,18

**swear**
5:17

**sworn**
5:23 163:6

                    t

**t.me**
155:22

**taken**
20:23 109:20

**talk**
70:6,9 110:23 113:23

**talking**
140:20

**talks**
8:15

**tango**
78:7

**task**
61:23

**tax**
4:19 26:9,13,22 28:3,7,12
35:18 36:6,18 38:13,25
39:8,11,16,18 40:23

**td**
160:14

**teacher**
118:17

**teachers**
156:25 157:4,23

**tech**
72:25 73:5

**technicality**
20:10

**technology**
71:7,15 72:19,23

**ted**
15:4,20 17:23 20:14 21:20
21:20 23:2 28:19 29:24
30:2 32:8,18 41:10 64:14
80:6,18 83:23 86:20,21
103:21 112:17

**telegram**
155:20,23 156:1,7

**tell**
5:17 8:9 83:23 138:14
150:7

**telling**
62:24

**terms**
87:4 145:10,16

**testified**
5:23

**testifying**
14:25 15:11,23

**testimony**
6:21 10:12 11:22 17:5,8
22:24 23:10 66:10 81:21
83:9 143:4 162:13 163:5,7

**textbook**
20:18

**thank**
23:1 29:3 41:13 50:15 64:9
68:6 83:25 148:20

**thefifth**
115:5

**theodore**
3:4 7:18

**theorem**
90:1 128:7 131:14 146:19

**thing**
63:3 66:10

**things**
10:15 12:19 65:18 155:7

**think**
13:6,8 17:17,19 18:4,8,10
18:11,20 19:1,21 20:1,14
30:2 31:11 32:11 35:19
46:24 51:24 63:4 65:18
66:16 67:5,17,24 68:3,8
80:9 83:21,22 84:6 85:25
161:4

**third**
113:3 133:25

**thirty**
96:13

**thousand**
27:19

**three**
11:6 43:6 55:18 95:13
121:10,16 140:15 142:3
153:4,9,13

**thursday**
93:9,10 110:7

**tighe**
3:6

**tiles**
43:8

**time**
1:16 5:3 12:5 16:12,20 21:7
26:11 29:4,7,10 30:7 33:9
36:1,7 38:18 41:12 42:2,4,8
45:19 49:1 53:4 54:8,10,12
54:16 64:6,8,11,12,13 81:9
81:11 82:17 85:22 86:1
93:18 104:8,10,12 107:14
109:22 111:2 112:21,25
114:21 116:24 124:24
132:13 142:19 143:1
145:20 148:22 151:17
152:5,19 154:4 155:2 158:6
161:16,21,24

**title**
61:11 115:10 117:19
118:11,24 123:2 148:10
149:8

**titled**
47:16

**today**
6:4 7:13 10:18 12:1 14:1,18
14:25 15:12 17:8,25 19:11
42:22 47:8 161:18

**today's**
6:9,21 9:7 19:14

**told**
14:24 15:10,23 118:17

**top**
135:14 138:8

**topic**
136:1

**tops**
43:8

**total**
60:17

**trade**
45:8 56:16 88:5 89:4 123:3
123:5 124:4

**traded**
75:16,25 125:11 131:2

**trader**
50:9 157:11 160:25

**traders**
115:21 116:2 148:13
156:14,18,21

**trades**
88:11,14,17 89:8 90:18,25
105:25 106:1 150:5

**trading**
59:13,16 75:9 88:19 90:15
90:21 92:14,23 106:5,9
109:25 110:8,14,16 112:8
113:3 115:23 116:8 119:20
120:1,8,13,13,15 124:13
147:15 148:12 161:2

**training**
38:4 59:25 60:3

**transaction**
111:11,16

**transactions**
76:19

**transcribed**
10:20

**transcript**
10:20 22:1 162:11 163:7

**transcription**
162:11

**transfer**
56:18 57:6,13,18,24 137:6

**transferred**
102:17

**travel**
70:3

**traveled**
69:24

**trial**
6:4 145:19

**troubled**
65:12

**truck**
27:19,21,24 37:14

**true**
37:1,7 39:14,22 41:1 42:17
44:23 46:3 49:10 56:15,24
65:4 86:8,15 87:18 88:8
91:22 92:11 93:13,23 96:22
98:1 99:6,16 100:23 106:3
106:16 115:15,25 118:5
119:5,13,23 120:4,10,21
121:3 123:17 124:8 126:4
128:19 129:9,17,20,21
131:4 132:3,7 133:12,18
134:5,20 135:19 140:7
141:17 162:11 163:7

**truth**
5:17,18,18

**truthful**
12:8

**try**
46:21 66:22 79:6 86:1
89:12

[trying - youtube]

**trying**
32:19 129:13
**tuesday**
1:12 5:4 162:6
**type**
42:14 53:17 67:7
**typed**
41:18 55:12

**u**

**uh**
10:24
**undersigned**
162:10
**understand**
9:1 12:11 13:1,13,23 14:4
14:13,15,17 16:11 18:14
21:19 31:1 32:9,9,21 66:6
67:11 104:16
**understanding**
12:2 79:20
**understands**
12:16 13:9
**union**
57:19
**unique**
52:14,19,22,25
**united**
1:1 25:7,10 43:20,25 44:4
60:25 61:3 63:12,16 68:23
69:1,4,7 70:10,13,16 78:2
78:23 85:16 86:5 140:5
158:14
**university**
118:1,8,16.21
**updating**
98:12
**upper**
148:11 155:21
**urban**
140:24
**use**
20:6 27:4 61:11 112:2
143:20 153:24 158:25
159:2 160:4
**usually**
56:15

**v**

**value**
20:4 60:7 94:22 129:23
131:1,7 132:1 137:12
**variation**
128:24 132:4
**various**
61:24 74:9 75:24 95:16

**vehicle**
108:13,16
**vehicles**
61:2 113:6
**verbal**
10:23
**vermont**
126:12
**verse**
16:8
**verses**
146:1
**version**
39:16,17 79:6
**versions**
75:24
**versus**
31:13
**vice**
61:14
**video**
4:15,16 64:4 81:2 83:12,15
83:16,19 84:1,4,15,20,21
84:22 85:1,3,8,11,14,24
86:2,4 87:10,14,23 88:3
89:15,21,24 91:4,9 93:4,8
95:11,14 96:15,17 97:17,23
98:4,22 100:19 103:5,14,24
104:5,6,14,16,24 105:2,6,8
105:11,23 106:12,18 107:1
107:4,22 110:22 126:18
127:5,8 128:16 130:12,21
139:3,7,16,19,23 140:15,17
140:20 141:8 142:3,6,8,10
142:16 148:5,10,14 149:8
**videos**
62:4
**view**
76:18
**violations**
6:12
**voice**
127:4
**volume**
62:24
**vp**
49:8
**vpn**
77:8,10

**w**

**wallet**
137:12
**wallets**
100:9,14
**want**
8:13 9:21 10:5 11:13 13:22

**want (cont.)**
15:4,19 16:9 20:24 22:13
29:24 32:13 33:16 63:19
64:1,22 66:11 79:13 81:3
81:13 87:6 103:21 112:17
116:23 135:12 139:6
**wanted**
22:21,25 32:24 67:23 155:7
**wants**
13:16 85:12 125:2
**ways**
74:9 158:21
**web**
7:14 10:2
**webex**
1:15 84:2 147:25
**website**
76:17,21 83:18
**websites**
159:15,19
**wechat**
159:2
**weekly**
74:18 98:9
**weeks**
100:23
**went**
67:25 69:14 85:25 118:20
**we've**
32:10
**whatsapp**
158:25 159:10
**whereof**
163:13
**white**
132:12
**wilfully**
157:22
**win**
75:4
**wire**
111:12 112:5,7
**wise**
16:13
**wish**
12:2,10
**withdraw**
96:25 97:4 99:18 137:1,6
151:19
**withdrawal**
152:15,22 153:18 158:8
**withdrawals**
99:3,9 153:5,9,13

**witness**
1:7 3:3 4:3 5:5,22 13:11
18:21 65:1 66:9 67:21
104:1 162:4 163:5,8,13
**won**
103:9
**woodfield**
48:9
**words**
12:6
**work**
27:14 34:1 48:3 52:11,14
61:17 62:10,17,20 63:3,8
65:7 67:14,16 68:15 70:17
71:1,3,7 72:22,25 131:25
136:20 138:10 158:22
**worked**
49:13,16 51:6 52:11 61:20
62:23 73:19,22 77:2,6,21
78:21,24 89:1 97:9 102:2
102:23 108:14,17,20
126:14 131:24 158:18
**working**
24:3 49:4 117:2
**works**
71:10,13 92:9 122:3 136:22
160:13,17
**world**
119:10
**worldwide**
115:21 116:3 138:18
**write**
46:1 121:15,16 123:22,25
156:9,12
**written**
10:20 115:14 128:21 156:7
**wrong**
64:24 130:24 138:17
**www**
108:11

**y**

**yacht**
114:11
**year**
28:4 36:18 38:14 39:1,8,11
39:17,18 40:24 121:25
123:15 124:13
**yesterday**
9:6
**york**
163:4
**youtube**
148:4,10 149:8

[zoom - zoom]

**z**

**zoom**
   147:19,22