**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 2:22-cv-14129-KMM

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION

      Plaintiff,

v.

MCC INTERNATIONAL CORP., *et al.*,

      Defendants.

_____/

## OMNIBUS ORDER

THIS CAUSE came before the Court upon Plaintiff United States Securities and Exchange

Commission's ("SEC" or "Plaintiff") Amended Motion to Temporarily Seal Case in Its Entirety

Until May 5, 2022 (ECF No. 13) and Amended Emergency *Ex Parte* Motion for a Temporary

Restraining Order and Order for Ancillary Relief.[1] ("Mot.") (ECF No. 14). Therein, pursuant to

the federal securities laws and Federal Rule of Civil Procedure 65, and on an emergency and *ex*

*parte* basis, the SEC seeks a temporary restraining order ("TRO") and, upon the expiration of the

TRO, a preliminary injunction against Defendants MCC International Corp. d/b/a "Mining Capital

Coin Corp." ("MCC"), CPTLCoin Corp. ("CPTLCoin"), Bitchain Exchanges ("Bitchain"), Luiz

Carlos Capuci, Jr. a/k/a "Junior Caputti" ("Capuci"), and Emerson Sousa Pires ("Pires")

(collectively, "Defendants"). *See generally* Mot. The SEC seeks an injunction restraining and

enjoining Defendants from violating the federal securities laws. *Id.* ¶ 3. The SEC also requests

---

[1] The SEC also filed an *ex parte* motion for leave to file a brief in excess of the page limit. (ECF
No. 6). The SEC's motion is GRANTED.

orders (1) freezing assets, (2) requiring accountings, (3) granting expedited discovery, (4) prohibiting the destruction of documents, and (5) granting additional emergency relief.[2]  *Id.*

## I.    BACKGROUND

On April 7, 2022, the SEC filed a Complaint alleging that MCC International Corp. and its founders, Luiz Carlos Capuci, Jr. and Emerson Sousa Pires,[3] violated the federal securities laws in a scheme to defraud cryptocurrency investors.  *See generally* ("Compl.") (ECF No. 1).  This case arises out of a multiyear SEC investigation of MCC, Capuci, and Pires.[4]  The SEC alleges that Capuci and Pires convinced potential investors that MCC made money through cryptocurrency mining and by trading stocks, foreign exchange, and cryptocurrency on digital platforms.  *Id.* ¶¶ 18–25.  MCC allegedly generated steady returns through "arbitrage trading" in cryptocurrency, "semi-automatic robotic trading" in the foreign exchange market, and cryptocurrency mining operations in Florida, Vermont, and Iceland.  *Id.* ¶¶ 18–19.  Investors could tap into MCC's success by purchasing "mining packages," which provided investors guaranteed weekly payouts that escalated in value based on the package price.[5]  *Id.* ¶ 26.  MCC and Capuci

---

[2]  Specifically, the SEC requests the following additional emergency relief: (1) repatriation of ill-gotten gains back to the United States, (2) an order requiring Capuci and Pires to surrender their passports to the Clerk of Court, and (3) an order prohibiting Capuci and Pires from leaving the United States until they have fully complied with the Court's Orders.  Mot. ¶ 3.

[3]  The SEC believes Capuci and Pires are both Brazilian citizens currently residing in Brazil.  *See* Compl. ¶¶ 16–17.  Capuci also holds United States citizenship.  *Id.* ¶ 16.

[4]  The Complaint and accompanying declarations indicate that the underlying SEC investigation dates to at least early 2020.  *See, e.g.*, *id.* ¶¶ 50–51; Declaration of Larry Brannon ("Brannon Decl.") (ECF No. 9) ¶ 11.

[5]  MCC allegedly offered mining packages with prices ranging from about $125.00 for a $10.00 weekly payout, to $1.2 million for an $84,000.00 weekly payout.  Compl. ¶ 26.

maintained an investor list showing 65,535 investor accounts.[6]  *Id.* ¶ 55.

MCC, Capuci, and Pires relied on a multilevel marketing scheme to bring in new investors. *Id.* ¶¶ 26–30.  MCC encouraged investors to act as "sponsors," who would receive commissions amounting to 10 percent of sales of mining packages made by the sponsor to her downline team. *Id.* ¶ 27.  MCC promised gifts, including luxury watches and sports cars, to sponsors who proved adept at recruiting new investors.  *Id.* ¶ 28.  Capuci and Pires promoted the multilevel marketing scheme online and at in-person events across the United States.  *Id.* ¶ 29.

According to the SEC, Defendants repeatedly lied to investors and prospective investors about MCC.  *See id.* ¶¶ 48–54.  The SEC alleges that no Defendant was registered with the SEC in any capacity.  *Id.* ¶¶ 13–17.  Contrary to what investors were told, MCC never engaged in any trading or cryptocurrency mining at all.[7]  *Id.* ¶¶ 51–52.  Defendants allegedly lied to investors about their backgrounds and MCC's supposed partnerships with organizations like the Clinton Foundation and the World Bank.  *Id.* ¶ 49.  While MCC told early investors that they could easily liquidate their MCC investments by transferring their assets to a third-party cryptocurrency trading platform, MCC eventually required all investors to withdraw their investments in "CPTL," an MCC-created crypto asset.  *Id.* ¶¶ 31–38.  Investors seeking to withdraw their MCC assets were required to convert those assets to CPTL, which would be hosted in wallets on a purportedly

---

[6]  The SEC claims that more than 1,000 MCC investors live in the United States, including within the Southern District of Florida.  *Id.* ¶ 55.

[7]  According to the Complaint, Capuci and Pires testified in 2020 that MCC "never used" its cryptocurrency mining machines because one machine "uses more electricity than the whole building."  *Id.* ¶ 50.  In testimony on the same topic in 2021 and 2022, they invoked their Fifth Amendment privilege against self-incrimination.  *Id.*  The SEC alleges that MCC admitted "that it never had any trading robots and never engaged in any trading."  *Id.* ¶ 51.  Capuci and Pires invoked their Fifth Amendment right against self-incrimination when questioned about MCC's trading platform.  *Id.*

independent cryptocurrency trading platform called Bitchain.  *Id.* ¶ 35.  Unbeknownst to investors, Bitchain was created and controlled by Capuci and MCC.  *Id.* ¶¶ 15, 39–47.  Defendants provided investors false valuations for CPTL and claimed that CPTL holders would soon be able to use the virtual currency at a casino, mall, store, or via a payment app.  *Id.* ¶¶ 37–38.  The SEC ultimately claims that no one "has ever successfully withdrawn, sold, traded, or otherwise used CPTL."  *Id.* ¶ 54.  According to the SEC, Defendants instead misappropriated much of the funds provided by investors.  *See id.* ¶¶ 55–57.

The SEC alleges that Defendants "netted at least $8.1 million from the sale of mining packages and $3.2 million in initiation fees."  *Id.* ¶ 55.  The Complaint and accompanying declarations describe a web of entities and bank accounts controlled by Defendants and used to siphon investors' funds.  *See e.g.*, Brannon Decl. ¶ 13; Declaration of Steven Tremaglio ("Tremaglio Decl.") (ECF No. 8) ¶¶ 5–6, 22, 27, 30, 34–43.  Defendants allegedly spent millions of dollars on travel, luxury cars, a yacht, and real estate, among other things.  *See* Compl. ¶¶ 56–57.  The SEC also alleges that Capuci received about $18.5 million in cryptocurrency assets.  Tremaglio Decl. ¶¶ 14, 20.  After the SEC issued subpoenas in its investigation, Capuci began to close bank accounts and liquidate a number of assets.[8]  Brannon Decl. ¶¶ 93, 96–105, 136.  The SEC believes Capuci, who holds both United States and Brazilian citizenship, fled to Brazil with

---

[8]  According to the SEC, three of Capuci's Florida properties are currently under contracts for sale that could close before the end of April 2022.  Mot. ¶ 7; Brannon Decl. ¶¶ 113, 123.  The SEC emphasized the importance of halting of at least one of these sales in an *ex parte* letter and subsequent phone call to Chambers on April 11, 2022.  The Court reminds the SEC that, "[u]nless invited or directed by the presiding Judge, attorneys and any party represented by an attorney shall not: (a) address or present to the Court in the form of a letter or the like any application requesting relief in any form, citing authorities, or presenting arguments."  S.D. Fla. L.R. 7.7.

his family on March 25, 2022.[9]  Compl. ¶¶ 16–17; Brannon Decl. ¶¶ 11, 135.  The SEC believes Pires ended his involvement with MCC sometime in 2020 and currently resides in Brazil.  Compl. ¶¶ 16–17; Brannon Decl. ¶ 11.

Now, the SEC seeks a TRO and other injunctive relief on an emergency and *ex parte* basis. *See generally* Mot.

## II.    LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 65(b), the Court may enter a temporary restraining order.  Fed. R. Civ. P. 65(b).  To obtain a TRO, a party must generally demonstrate: "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that entry of the relief would serve the public interest." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225–26 (11th Cir. 2005) (citation omitted).  Moreover, a Court may only issue a TRO without notice to the adverse party if the movant shows: (1) "specific facts in an affidavit or a verified complaint [that] clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition;" and (2) "the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required."  Fed. R. Civ. P. 65(b)(1).

The SEC is entitled to injunctive relief if it establishes (1) a prima facie case showing a defendant has violated the federal securities laws and (2) a reasonable likelihood defendant will reoffend if not enjoined.  *SEC v. Shiner*, 268 F. Supp. 2d 1333, 1340 (S.D. Fla. 2003); *see SEC v.*

---

[9]  The Brannon Declaration states that "Capuci left his residence in Florida and moved to Brazil in July 2021, after the SEC issued subpoenas in the Investigation on June 29, 2021."  Brannon Decl. ¶ 11.  According to the SEC, Capuci returned briefly to Florida in March 2022 before leaving again for Brazil.  *Id.* ¶ 135.

*Unique Fin. Concepts, Inc.*, 196 F.3d 1195, 1199 n.2 (11th Cir. 1999).  Because the SEC appears before this Court "not as an ordinary litigant, but as a statutory guardian charged with safeguarding the public interest in enforcing the securities laws," *SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 808 (2d Cir. 1975); *see SEC v. Lauer*, No. 03-80612-CIV, 2008 WL 4372896, at *24 (S.D. Fla. Sept. 24, 2008), *aff'd*, 478 F. App'x 550 (11th Cir. 2012), it "faces a lower burden than a private litigant when seeking an injunction, and need not meet the requirements for an injunction imposed by traditional equity jurisprudence." *SEC v. LottoNet Operating Corp.*, No. 17-21033-CIV, 2017 WL 6949289, at *9 (S.D. Fla. Mar 31, 2017), *report and recommendation adopted*, No. 17-21033-CIV, 2017 WL 6989148 (S.D. Fla. Apr. 6, 2017).  Unlike private litigants, the SEC need not demonstrate irreparable injury or a balance of equities in its favor.  *See SEC v. U.S. Pension Tr. Corp.*, No. 07-22570-CIV, 2010 WL 3894082, at *22 (S.D. Fla. Sept. 30, 2010), *aff'd*, 444 F. App'x 435 (11th Cir. 2011).

## III.  DISCUSSION

### A.  Temporary Restraining Order

The Court finds that the SEC has made a sufficient showing to warrant the entry of a temporary restraining order on an emergency[10] and *ex parte* basis.  The declarations and exhibits attached to the SEC's Motion demonstrate that Defendants likely violated the federal securities laws and will likely continue to do so if the Court does not grant the SEC's request for injunctive relief.

First, the SEC has established a prima facie case that Defendants violated the federal securities laws.  The SEC has put forth evidence in the form of declarations and voluminous

---

[10]  The SEC's Amended Emergency *Ex Parte* Motion for a Temporary Restraining Order and Order for Ancillary Relief (ECF No. 14) complies with Local Rule 7.1(d)'s requirements for emergency motions.  *See* S.D. Fla. L.R. 7.1(d).

exhibits.  *See generally* Brannon Decl.; Tremaglio Decl.  The evidence supports the SEC's claims

that Defendants solicited investments by promising investors guaranteed returns based on MCC's

purported investment strategy, which included trading and cryptocurrency mining.  Despite these

representations to investors, MCC never engaged in trading or cryptocurrency mining at all, and

investors were not allowed to withdraw their funds from MCC, Bitchain, or any other Defendant.

To establish a prima facie case of violation of Section 5 of the Securities Act of 1933

("Securities Act"), the SEC need only allege (1) the sale or offer to sell securities, (2) the absence

of a registration statement covering the securities, and (3) the use of facilities of interstate

commerce in connection with the sale or offer of securities.  *See Shiner*, 268 F. Supp. 2d at 1342.

"Neither negligence nor scienter is an element of a prima facie case under Section 5 of the

Securities Act."  *SEC v. Friendly Power Co.*, 49 F. Supp. 2d 1363, 1367 (S.D. Fla. 1999).  Here,

as noted above, the SEC has shown that Defendants offered investors a security for which there

was no registration statement and did so using the facilities of interstate commerce.  *See* Brannon

Decl. ¶¶ 10, 23–42.

The SEC has also established a prima facie case that Defendants violated Sections 17(a)(1)

through 17(a)(3) of the Securities Act,[11] and Section 10(b) of the Securities Exchange Act of 1934

("Exchange Act") and Rule 10b-5 promulgated thereunder.  "To establish prima facie claim under

Sections 17(a)(1) and (3) of the Securities Act and subsections (a) and (c) of Rule 10b-5, the SEC

must show that (1) the defendant committed a deceptive or manipulative act (2) in furtherance of

the alleged scheme to defraud (3) with scienter."  *SEC v. Quiros*, No. 16-CV-21301, 2016 WL

11578637, at *12 (S.D. Fla. Nov. 21, 2016).  Section 10(b) and Rule 10b-5 require a showing of

---

[11]  The SEC alleges that all Defendants violated Sections 17(a)(1) and 17(1)(3) of the Securities
Act and that MCC, Capuci, and Pires further violated Section 17(a)(2).  Compl. ¶¶ 62–67.

either an "intent to deceive, manipulate, or defraud" or "severe recklessness." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1238 (11th Cir. 2008). The SEC has shown that Defendants repeatedly lied to investors to promote and maintain their allegedly fraudulent scheme. The SEC's Complaint and accompanying declarations recount a multitude of false statements and omissions that provide a basis for scheme liability under Sections 17(a)(1) and 17(a)(3) and Section 10(b). *See, e.g.*, Brannon Decl. ¶¶ 25–28.

Section 17(a)(2) of the Securities Act makes it illegal for "any person in the offer or sale of any securities . . . to obtain money or property by means of any untrue statement of material fact." 15 U.S.C. § 77q(a)(2). The Court finds that the SEC has established a prima facie case that Capuci and Pires, through personal gain by means of their misrepresentations and omissions, violated Section 17(a)(2). *See Quiros*, 2016 WL 11578637, at *15; *SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 797–98 (11th Cir. 2015).

The SEC has also shown that Capuci and Pires are liable for MCC's violations under Section 20(e) of the Exchange Act. "Section 20(e) of the Exchange Act provides for liability if the defendant 'had the power to control the general affairs of the entity primarily liable at the time the entity violated the securities laws . . . [and] had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the primary liability." *Quiros*, 2016 WL 11578637, at *16 (quoting *SEC v. Huff*, 758 F. Supp. 2d 1288, 1343 (S.D. Fla. 2010)). The evidence before the Court shows the SEC has established a prima facie case that Capuci and Pires controlled MCC while the company allegedly violated the federal securities laws. Capuci and Pires are therefore liable for MCC's violations of those laws.

In deciding whether to grant injunctive relief, "a court should consider the 'egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter

involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of the conduct, and the likelihood that the defendant's occupation will present opportunities for future violations.'" *Huff*, 758 F. Supp 2d at 1355 (quoting *SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1322 (11th Cir. 1982)).  The SEC has shown that Defendants engaged in a multilayered scheme to defraud cryptocurrency investors using a series of digital platforms.  Defendants evidently recognize the wrongful nature of their conduct.  Indeed, at least one Defendant, Capuci, allegedly liquidated a number of assets and left the United States for Brazil after the SEC issued subpoenas in its investigation. *See, e.g.*, Brannon Decl. ¶¶ 93, 96–105, 136.

According to the SEC, Capuci and Pires are currently in Brazil, and it is not clear from the SEC's submissions to this Court what occupations, if any, Capuci and Pires pursue or whether they continue to violate U.S. securities laws in that country.  Still, the apparent lack of remorse shown by Defendants, their continued possession of investors' funds, and the ease with which they may revive a similar scheme via the internet gives this Court reason to believe that injunctive relief is necessary to prevent Defendants from engaging in future violations of the securities laws.

Accordingly, the SEC has made a sufficient showing in support of a TRO.

**B.  Ancillary Relief**

The SEC also seeks (1) an asset freeze, (2) an accounting, (3) expedited discovery, (4) a document preservation order, and (5) repatriation of assets and the surrender of passports pending Capuci's and Pires's compliance with the Court's Orders.  The Court will take each request in turn.

Pursuant to their general equity powers, federal courts may order ancillary relief to preserve a defendant's assets and ensure that wrongdoers do not profit from their unlawful

conduct. *See, e.g., Levi Strauss & Co. v. Sunrise Int'l Trading Co.*, 51 F.3d 982, 987 (11th Cir. 1995); *SEC v. Solow*, 682 F. Supp. 2d 1312, 1325 (S.D. Fla. 2010). Requesting equitable relief "invokes the district court's inherent equitable powers to order preliminary relief, including an asset freeze, in order to assure the availability of permanent relief." *Levi Strauss & Co.*, 51 F.3d at 987. A federal court may also bar defendants from filing for bankruptcy protection as a means to defeat an asset freeze. *See, e.g., SEC v. Complete Bus. Sols. Grp., Inc.*, No. 20-CIV-81205, 2020 WL 9209280, at *2 (S.D. Fla. July 31, 2020); *SEC v. Onix Cap., LLC*, No. 16-24678-CIV, 2017 WL 6728814, at *3 (S.D. Fla. July 24, 2017), *report and recommendation adopted*, No. 16-24678-CIV, 2017 WL 6728773 (S.D. Fla. Oct. 23, 2017). An asset freeze is appropriate "as a means of preserving funds for the equitable remedy of disgorgement." *SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 734 (11th Cir. 2005).

The Court need only find some basis for inferring a violation of the federal securities laws to impose an asset freeze. *SEC v. Unifund SAL*, 910 F.2d 1028, 1037 (2nd Cir. 1990); *SEC v. Comcoa, Ltd.*, 887 F. Supp. 1521, 1524 (S.D. Fla. 1995). The SEC's "burden for showing the amount of assets subject to disgorgement (and, therefore available for freeze) is light: a reasonable approximation of a defendant's ill-gotten gains" is all that is required." *ETS Payphones*, 408 F.3d at 735 (citation and quotation omitted)). "There does not need to be evidence that assets will likely be dissipated in order to impose an asset freeze." *FTC v. IAB Marketing Assocs., LP*, 972 F. Supp. 2d 1307, 1313 n.3 (S.D. Fla. 2013); *SEC v. Gonzalez de Castilla*, 145 F. Supp. 2d 402, 415 (S.D.N.Y. 2001) (noting that "the SEC must demonstrate only . . . a concern that defendants will dissipate their assets").

As set forth in the Brannon Declaration, MCC raised at least $8.1 from investors.[12] Brannon Decl. ¶ 58. According to the SEC, no investor has been able to withdraw their funds. *See* Compl. ¶¶ 17–18. Defendants Capuci and Pires testified in 2020 that their salaries ranged from $5,000 to $20,000 in Bitcoin per month, and that they sold the Bitcoin for fiat currency through digital asset trading platforms like Coinbase. Brannon Decl. ¶ 60.[13] The SEC's analysis of Capuci's and Pires's Coinbase accounts reflects that Capuci received about $18.5 million in cryptocurrency assets and Pires received about $3.3 million in cryptocurrency assets between January 2018 and March 2022. Tremaglio Decl. ¶¶ 14, 20–33. As of March 18, 2022, only $6,449.84 remained in Capuci's and Pires's combined Coinbase accounts. *Id.* ¶ 44. The SEC estimates that Capuci currently has approximately $3 million in assets and Pires has approximately $1 million in assets. Brannon Decl. ¶¶ 106–33. No investor money has been returned to MCC investors, and only a portion of the at least $8.1 million raised remains under Defendants' control. Thus, the disgorgement amounts against Defendants exceed their known assets. The SEC informs the Court that Defendants began disposing of their assets as soon as they received SEC subpoenas. *See, e.g.*, Brannon Decl. ¶¶ 93, 96–105, 136. The SEC claims Capuci and Pires are in Brazil and at least one Defendant, Capuci, is actively winding down his assets in the United States. Compl. ¶¶ 16–17; Brannon Decl. ¶¶ 11, 135. Accordingly, the Court finds that there is good reason to believe Defendants will hide, transfer, or otherwise dissipate their ill-gotten assets unless those assets are restrained. A freeze of all Defendants' assets is

---

[12]  The SEC further states that MCC likely received an additional $9.7 million from investors in the form of fees. Brannon Decl. ¶ 58. According to the SEC, MCC has not provided any financial statements or tother books and records reflecting sources of revenue for any legitimate business operations. *Id.* ¶¶ 54–56.

[13]  Capuci testified that MCC was his only source of income during this time. *Id.* ¶ 60.

therefore appropriate at this time.

The Court also finds that a repatriation order is appropriate to enable the retrieval of investor funds that Defendants sent overseas. *LottoNet*, 2017 WL 6949289, at *21 ("Under these circumstances where investor funds are overseas, a repatriation order will enable the retrieval of investor funds diverted overseas."). The Court further considers it appropriate to (1) direct Capuci and Pires to surrender their passports to the Clerk of Court if and when they return to the United States and (2) prohibit Capuci and Pires from traveling outside the United States pending the resolution of this case—if and when they return to this country. *See, e.g.*, *SEC v. Creative Cap. Consortium, LLC*, No. 08-81565-CIV, 2009 WL 10664454, at *4 (S.D. Fla. Jan. 8, 2009) (ordering similar relief).

The Court also considers an accounting appropriate to accurately determine the scope of Defendants' alleged fraud and Defendants' ability to disgorge illicit proceeds. *See, e.g.*, *SEC v. Int'l Swiss Invs. Corp.*, 895 F. 2d 1272, 1276 (9th Cir. 1990). As the SEC has shown, Defendants maintained significant assets during the period relevant to this case, including bank accounts, digital cryptocurrency wallets, luxury cars, and real estate. *See* Brannon Decl. ¶¶ 106–33; Tremaglio Decl. ¶¶ 14, 20–33.

The Court also considers expedited discovery appropriate in anticipation of a preliminary injunction hearing in this matter. *See* Fed. R. Civ. P. 26(d), 30(a), 33(b), and 34(b) (authorizing expedited discovery). The Eleventh Circuit has not adopted a standard regarding expedited discovery. "However, many district courts within the Eleventh Circuit have expressly used a general good cause standard when confronted with expedited discovery requests." *FTC v. On Point Glob. LLC*, No. 19-25046-Civ, 2020 WL 32996, at *1 (S.D. Fla. Jan. 2, 2020) (collecting cases). "Good cause may be found where there is 'some impelling urgency,' or 'hazard of loss,'

requiring action to be 'taken forthwith.'" *Id.* (quoting *GE Seaco Servs., Ltd. v. Interline Connection, N.V.*, No. 09–23864–CIV, 2010 WL 1027408, at *1 (S.D. Fla. Mar. 18, 2010)). As noted above, the SEC has shown that Defendants Capuci and Pires reside overseas and at least Capuci has recently been winding down his assets in the United States. The Court therefore finds good cause to permit expedited discovery prior to a preliminary injunction hearing. Furthermore, the Court finds that an order prohibiting Defendants from destroying records is necessary to ensure that appropriate equitable belief will ultimately be available. *See Shiner*, 268 F. Supp 2d at 1345–46.

### C.  Motion to Temporarily Seal Case Until May 5, 2022

The Court now turns to the SEC's Amended Motion to Temporarily Seal Case in Its Entirety Until May 5, 2022. (ECF No. 13). Therein, the SEC requests that the Court "temporarily seal this case in its entirety, including sealing the Complaint, the docket, all motion, exhibits, declarations, or other filings or Orders entered in this matter, until May 5, 2022." *Id.* at 1. The SEC states that Defendant Capuci, who currently resides in Brazil, "is scheduled to return to Florida on May 2, 2022," and the SEC "seeks to serve Capuci with the complaint and the TRO-related filings upon his return to the United States." *Id.* at 1–2. The SEC argues that Defendant Capuci may "take evasive measures to thwart the SEC's efforts to serve him" or decide to remain in Brazil if Capuci is made aware of this matter before his planned flight to Florida. *Id.* at 2.

The SEC argues that temporarily sealing the matter will afford the SEC "sufficient time to effectuate the purpose of the asset freeze and the other emergency relief, by providing notice of Court Orders to financial institutions, the United States Marshals and other law enforcement, and to third parties who are in possession of defendants' assets." *Id.* at 2. A temporary seal would

also give the SEC "sufficient time to provide such notice before defendants are made aware of this matter will reduce the likelihood that defendants will be able to further dissipate or hide assets before such assets can be effectively safeguarded." *Id.* The Court agrees. *See Dell Inc. v. BelgiumDomains, LLC*, No. Civ. 07-22674, 2007 WL 6862341, at *7 (S.D. Fla. Nov. 21, 2007) (granting motion to temporarily seal a case file to ensure the court's seizure order would be effectively implemented where the court found that the defendants, who operated counterfeiting businesses electronically, would likely destroy evidence or move it out of the jurisdiction). Accordingly, the Court finds good cause to temporarily seal this matter. The SEC's Amended Motion to Temporarily Seal Case in Its Entirety Until May 5, 2022 (ECF No. 13) is GRANTED.

## IV.    CONCLUSION

UPON CONSIDERATION of the *Ex Parte* Motion, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that the SEC's Amended Motion to Temporarily Seal Case in Its Entirety Until May 5, 2022 (ECF No. 13) and Amended Emergency *Ex Parte* Motion for a Temporary Restraining Order and Order for Ancillary Relief (ECF No. 14) are GRANTED. The SEC's Motion to Temporarily Seal Case in Its Entirety (ECF No. 3) and Emergency *Ex Parte* Motion for a Temporary Restraining Order and Order for Ancillary Relief (ECF No. 4) are DENIED AS MOOT. The hearing scheduled for April 22, 2022 is CANCELLED. It is further ORDERED AND ADJUDGED that:

1. Defendants, their agents, servants, employees, attorneys, entities under their control, and those persons or entities in active concert or participation with them who receive actual notice of this Order, by personal service or otherwise, and each of them, are hereby restrained and enjoined from violating Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and (c), by, directly or indirectly, in the absence of any

applicable exemption (1) unless a registration statement is in effect as to a security, making use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; (2) unless a registration statement is in effect as to a security, carrying or causing to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale; or (3) making use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed with the SEC as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding of examination under Section 8 of the Securities Act, 15 U.S.C. § 77h, by, directly or indirectly, offering to buy or sell securities without a registration statement being in effect.

2.  Defendants, their agents, servants, employees, attorneys, and those persons in active concert or participation with them who receive actual notice of this Order, by personal service or otherwise, and each of them, be and hereby are temporarily restrained and enjoined from directly or indirectly, by use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any securities, knowingly or recklessly: (1) employing devices, schemes, or artifices to defraud, (2) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not

misleading; or (3) engaging in acts, practices, and courses of business which have operated, are now operating, or will operate as a fraud upon the purchasers of such securities in violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder.

3. Defendants, their agents, servants, employees, attorneys, and those persons in active concert or participation with them who receive actual notice of this Order, by personal service or otherwise are temporarily restrained and enjoined from, directly or indirectly, violating Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly (1) to employ any device, scheme, or artifice to defraud; (2) to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser, by, directly or indirectly (i) creating a false appearance or otherwise deceiving any person, or (ii) disseminating false or misleading documents, materials, or information or (iii) making, either orally or in writing, any false or misleading statement in any communication with any investor or prospective investor.

4. Defendants, their agents, servants, employees, attorneys, and those persons in active concert or participation with them who receive actual notice of this Order, by personal service or otherwise are temporarily restrained and enjoined from, directly or indirectly,

soliciting any new investors; accepting additional funds from existing investors; or issuing, purchasing, offering, or selling any security.

5.   Defendants, their agents, servants, employees, attorneys, and those persons in active concert or participation with them who receive actual notice of this Order, by personal service or otherwise are temporarily restrained and enjoined from, directly or indirectly, encumbering any of the assets under their possession, custody, or control, or from filing a voluntary or involuntary petition of bankruptcy without leave of this Court.

6.   Defendants, within SEVEN (7) DAYS of receipt of the entry of this Order, shall repatriate, and take such steps as are necessary to repatriate, to the territory of the United States of America, any and all assets and funds derived from investors as detailed in the Complaint, held by or in the name of any Defendant, or in which any Defendant, directly or indirectly, has or had any beneficial interest, or over which any Defendant maintained or maintains or exercised or exercises control, including, any and all assets and funds (1) held in a foreign bank, brokerage, or other financial account or (2) transferred out of the United States from any account within the territory of the United States at any point from January 1, 2019 to the present.

7.   Defendants shall provide to this Court and to the SEC, within TEN (10) DAYS of the entry of this Order, a written description of all funds and assets required to be repatriated and the status and location of such funds, assets, and repatriation efforts.

8.   Upon entry of this Order and service thereof, Defendants Luiz Carlos Capuci, Jr. and Emerson Sousa Pires shall surrender to the Clerk of Court all passports in their possession, custody, and control once they return to the United States.  The Clerk of Court shall maintain custody of such passports until otherwise ordered by this Court.

If Defendants Capuci and/or Pires are currently in the United States, the Defendants Capuci and Pires shall immediately upon entry of this Order and service thereof surrender to the Clerk of Court all passports in their possession, custody, and control until such time as this Court orders otherwise.

9. Defendants Luiz Carlos Capuci, Jr. and Emerson Sousa Pires are prohibited from traveling outside the United States unless and until this Court finds that they have fully complied with this Order.  If Defendants Capuci and Pires are currently located outside the United States, this paragraph shall apply upon their return to the United States.

10. The SEC may file notices of *lis pendens*, or any similar document that has the effect of clouding title, on all pieces of real property in which a Defendant has an interest, including but not limited to the properties located at the following addresses, which upon information and belief are currently owned, in whole or in part, directly or indirectly, by Defendant Luiz Carlos Capuci, Jr.: (1) 381 Southfield St., Kissimmee, Florida 34747; (2) 129 SE Via San Marino, Port St. Lucie, Florida 34984.

11. The SEC may provide notice to third parties that certain assets belonging to Defendants should be safeguarded or locked down or otherwise prevented from being moved, retrieved, or altered.

12. Defendants are hereby prohibited from further encumbering their interests in any real or personal property by means of pledging it for collateral for any purpose or by allowing it to secure any obligation.

13. Notice of this Order, any other Orders of the Court, or notices required to be issued by the SEC, may be accomplished by delivery of a copy of the Order or notice by first class mail, overnight delivery, international express mail, facsimile, electronic mail, or

personally, by agents or employees of the SEC: (i) upon any Defendant, or on their counsel, including but not limited to attorneys who have represented any Defendant in the underlying SEC investigation, by email; and (ii) upon any bank, saving and loan institution, credit union, financial institution, transfer agent, broker-dealer, investment company, title company, commodity trading company, storage company, law enforcement, or any other person, partnership, corporation, or legal entity that may be subject to any provision of an Order.  For purposes of notice to anyone in possession of documents, records, assets, funds, property, or property rights, actual notice of an Order shall be deemed complete upon notification by any means, including, but not limited to, notice by facsimile transmission or email of this Order.

14. Defendants, and all of their agents, servants, employees, attorneys, depositories, banks, and those persons in active concert or participation with any of them, are restrained and enjoined from, directly or indirectly, destroying, mutilating, concealing, altering, disposing of, or otherwise rendering illegible in any manner, any of the books, records, documents, correspondence, ledgers, accounts, financial transactions, statements, electronic files, computers, or any other property or data of any kind, and wherever located or stored: (1) pertaining in any way to any matter described in the Complaint, or any amendment thereto, filed by the SEC in this action; (2) pertaining in any way to MCC, the digital asset referred to as "CPTL" or "CPTLCoin," Bitchain, or any investors or principals thereof; or (3) that were created, modified or accessed by Defendants Luiz Carlos Capuci, Jr. and Emerson Sousa Pires.  (These documents and data are collectively referred to here as "Evidence.").

    a.   Such Evidence include both "hard copy" versions and electronically stored information in Defendants' possession, custody, or control, including text files, data compilations, word processing documents, spreadsheets, email, voicemail, data bases, calendars and scheduling information, log, file fragments and backup files, letters, instant messages, memoranda, notes, drawings, designs, correspondence, or communication of any kind. Evidence that is stored electronically may be maintained on shared network files, computer hard drives, servers, DVDs, CD-ROMs, flash drives, thumb drives, laptops, digital recorders, netbooks, PDA, or other handheld or smartphone devices.

15. The obligations set forth above include an obligation to provide notice to all Defendants' employees, custodians, agents, or contractors who may be in possession of Evidence.  This duty also extends to the preservation and retention of Evidence in the possession or custody of third parties, such as an internet service provider or a cloud computing provider if such Evidence is within Defendants' control.

16. Defendants are ordered to act affirmatively to prevent the destruction of Evidence.  This duty may necessitate: (1) quarantining certain Evidence to avoid its destruction or alteration; or (2) discontinuing the recycling of backup tapes or other storage media, and the deletion of emails, "trash," "recycling," "drafts," "sent," or "archived" folders.

17. Defendants are directed not to run or install any drive cleaning, wiping, encrypting, or defragmenting software on hard disks of computers that may contain Evidence.

18. Immediately upon entry of this Order, parties may take depositions upon oral examination of parties and nonparties subject to THREE (3) DAYS' notice.  All parties

shall comply with the provisions of Rule 45 of the Federal Rules of Civil Procedure regarding issuance and service of subpoenas with respect to nonparties, and such nonparties shall be subject to at least THREE (3) DAYS' notice.  Should Defendants fail to appear for a properly noticed deposition as defined herein, they shall be prohibited from introducing evidence at a hearing on the SEC's request for a preliminary injunction.

19. For the purposes of conducting expedited discovery prior to a hearing on the SEC's request for a preliminary injunction, service of discovery requests shall be sufficient if made upon counsel of record or, if there is no counsel of record, upon the party itself, by email or overnight courier delivery.  Notice to the SEC shall be delivered to Jonathan Polish by email at the following email address: PolishJ@SEC.gov.

20. Depositions taken pursuant to this Order shall not impact the number of depositions parties may take in regular, non-expedited discovery.

21. Within FIVE (5) DAYS of the issuance of this Order, each Defendant shall each make a sworn accounting to this Court in the manner set forth below.  The sworn accounting shall cover the period from January 1, 2019 to the present, and shall consist of the following:

    a. An identification and description of (1) all assets, funds and property received, directly or indirectly, from any client or investor; (2) the amount of such funds or value of such assets; and (3) the location of such funds and for each location provide the name and address of the bank or other financial institution, the account name, the account number, and the approximate date on which the funds were placed at the location.

b.  An identification and description of each Defendant's assets and liabilities, wherever such assets and liabilities are located, including: (1) a description of the asset or liability; (2) the amount or value or the asset or liability; (3) the location of the asset or liability, including when appropriate the name and address of the bank or other financial institution in which the asset or property is located, the account name, and the account number; (4) the date the asset was acquired or the date the liability was incurred; and (5) whether the asset is encumbered and, if so, the nature of the encumbrance, including the identity of the creditor or lien holder.

22. This Court shall retain jurisdiction over this matter and Defendants to implement and carry out the terms of all Orders that may be entered and/or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court and will order other relief that this Court deems appropriate under the circumstances.

23. All funds and other assets held, managed, or controlled, whether directly or indirectly, by Defendants MCC International Corp. d/b/a "Mining Capital Coin Corp.", CPTLCoin Corp., Bitchain Exchanges, Luiz Carlos Capuci, Jr. a/k/a "Junior Caputti", and Emerson Sousa Pires (collectively, "Defendants") are hereby frozen pending determination of the SEC's request for a preliminary injunction (ECF No. 14).

24. Defendants, and any of their agents, servants, employees, attorneys, depositories, banks, and those persons in active concert or participation with any one or more of them, and each of them, who receive actual notice of this Order or of the terms of the asset freeze provisions contained herein, by personal service, mail, facsimile transmission, email, or otherwise, are hereby restrained from, directly or indirectly,

transferring, selling, encumbering, receiving, concealing, changing, pledging, hypothecating, assigning, liquidating, incurring debt upon, or otherwise disposing of, or withdrawing, any funds, assets or other property (including money, real estate, personal property, securities, chose in action, or any other form of asset or property of any kind whatsoever).

25. The asset freeze articulated herein extends to accounts at any financial institution: (1) in the name of any Defendants; (2) that any Defendant has signatory authority or a beneficial interest; (3) that any Defendant directly or indirectly controls, owns, or manages; (4) held for the benefit of any Defendant, including through corporations, trusts, partnerships, agents, nominees, friends, or relatives; or (5) which are traceable to funds and assets, wherever located, belonging to the victims of the securities law violations alleged in the SEC's Complaint.

26. Any Defendant, and their agents, servants, employees, attorneys, depositories, banks, and those persons in active concert or participation with any one or more of them, and each of them, who receive actual notice of this Order or of the terms of the asset freeze provisions contained herein, by personal service, mail, facsimile transmission, email, or otherwise, is hereby restrained from, directly or indirectly, transferring, selling, encumbering, receiving, concealing, changing, pledging, hypothecating, assigning, liquidating, incurring debt upon, or otherwise disposing of, or withdrawing, any funds or assets, that constitute investor funds or any accounts or property into which investor funds were deposited or invested.

27. Any Defendant, and their agents, servants, employees, attorneys, depositories, banks, and those persons in active concert or participation with any one or more of them, and

each of them, who receive actual notice of this Order or of the terms of the asset freeze provisions contained herein, by personal service, mail, facsimile transmission, email, or otherwise, are hereby restrained from opening or causing to be opened any safe deposit boxes, commercial mail boxes, or storage facilities titled in the name of any Defendant, or subject to access by them, without providing the SEC prior notice and an opportunity to inspect the contents in order to determine whether they contain assets subject to this Order.

28. Any bank, financial or brokerage institution or other person or entity holding any such funds or anything else of value, in the name of, for the benefit of, or under the control of any Defendant, or any account holding investor funds wherever located, and that receives actual notice of this Order or of the terms of the asset freeze provisions contained herein, by personal service, mail, email, facsimile transmission or otherwise, shall hold and retain within its control and prohibit the withdrawal, removal, transfer, disposition, pledge, encumbrance, assignment, set off, sale, liquidation, dissipation, concealment, or other disposal of any such funds, assets or property belonging to any Defendant, or in which any Defendant has a beneficial interest, wherever located and held in whatever name.

29. Assets covered by this Order include, but are not limited to, any holdings in the following accounts:

| INSTITUTION | ACCOUNT NUMBER | ACCOUNT HOLDER |
|---|---|---|
| Bank of America | Account ending in 7903 | Emerson Souza Pires |
| Bank of America | Account ending in 1933 | Emerson Souza Pires |
| Bank of America | Account ending in 1962 | Emerson Souza Pires |
| Coinbase | Account ending in 90f4542 | Luiz Capuci |

| Coinbase | Account ending in 475e646 | Luiz Capuci |
|---|---|---|
| Coinbase | Account ending in da7e345 | Emerson Souza Pires |
| Coinbase | Account ending in 099b031 | Empires X (Emerson Pires is an authorized signer) |
| Paypal | Account ending in 3301866 | Luiz Capuci |
| Paypal | Account ending in 1193048 | Luiz Capuci |
| Paypal | Account ending in 9326858 | Luiz Capuci |
| Paypal | Account ending in 6567812 | Mining Capital Coin Corp. |
| Paypal | Account ending in 3149048 | Mining Capital Coin Corp. |
| Paypal | Account ending in 2699299 | Hitech Commerce & Logistic Corp. (Luiz Capuci is an authorized person on the account) |
| Paypal | Account ending in 0639577 | United General Construction LLC (Luiz Capuci is an authorized person on the account) |
| Paypal | Account ending in 5668719 | JK Gas Station Service Corp. (Luiz Capuci is an authorized person on the account) |
| Paypal | Account ending in 7695965 | Emerson Pires |
| Paypal | Account ending in 9674442 | Emerson Pires |
| Paypal | Account ending in 7085920 | Emerson Pires |
| Paypal | Account ending in 7805838 | Emerson Pires |

| | | |
|---|---|---|
| Paypal | Account ending in 4694 | Emerson Pires |
| Paypal | Account ending in 5639 | Emerson Pires |
| Paypal | Account ending in 4343 | Emerson Pires |
| Paypal | Account ending in 5779 | Emerson Pires |
| Paypal | Account ending in 6579535 | Empires X Corp. (Emerson Pires is an authorized person on the account) |
| Paypal | Account ending in 1133750 | E&J Granite (Emerson Pires is an authorized person on the account) |
| PNC Bank | Account ending in 9325 | Luiz Capuci |
| PNC Bank | Account ending in 1434 | Emerson Pires |
| PNC Bank | Account ending in 7144 | Empires X Corp. (Emerson Pires is an authorized person on the account) |
| Stride Bank | Account ending in 71518 | Emerson Pires |
| Suncoast Credit Union | Account ending in 0000 | Emerson Pires |
| Suncoast Credit Union | Account ending in 0050 | Emerson Pires |
| Varo Bank | Account ending in 2747 | Luiz Capuci |
| Varo Bank | Account ending in 6631 | Luiz Capuci |
| Wells Fargo | Account ending in 3528 | Empire X Corp. (Emerson Pires is an authorized person on the account) |

30. The United States Marshal is directed to assist in the recovery and safeguarding of vehicles and watercraft in Defendants' possession, custody, and control.  Such vehicles and watercraft may include, but are not limited to, the following:

| VEHICLE MAKE AND MODEL | POSSIBLE OWNER | VEHICLE IDENTIFICATION NUMBER |
|---|---|---|
| Jeep Cherokee (2020) | Luiz Capuci | Number ending in D614808 |
| Pillard Hardtop 4DR (2017) | Luiz Capuci | Number ending in C596135 |
| Mercedes-Benz G63 AMG (2015) | Luiz Capuci | Number ending in 231187 |
| Harley Davidson VRSCDX Night Rod Special Edition (2014) | SL Trustee Corp. (Luiz Capuci) | Number ending in C802655 |
| Cadillac Escalade ESV Premium Luxury (2021) | SL Trustee Corp. (Luiz Capuci) | Number ending in R233l51 |
| Ferrari 488 Pista (2019) | SL Trustee Corp. (Luiz Capuci) | Number ending in 0242271 |
| Land Rover Range Rover Autobiography (2020) | SL Trustee Corp. (Luiz Capuci) | Number ending in A590933 |
| Lamborghini Urus (2019) | SL Trustee Corp. (Luiz Capuci) | Number ending in LA01775 |
| Ferrari F8 Tributo (2020) | SL Trustee Corp. (Luiz Capuci) | Number ending in 0255380 |
| Hummer (2008) | SL Trustee Corp. (Luiz Capuci) | Number ending in H104244 |
| Sea Ray Boats (2000) | SL Trustee Corp. (Luiz Capuci) | Hull number ending in 77J900 |

| Lamborghini Urus (2019) | Emerson Pires | Number ending in LA01316 |
|---|---|---|
| Land Rover Range Rover Autobiography (2020) | Emerson Pires | Number ending in A403l33 |
| Harley Davidson Road King Tilt Tandem (2007) | Emerson Pires | Number ending in F009208 |
| Mercedes-Benz S63 AMG | Emerson Pires | Number ending in A005053 |

31. To facilitate this asset freeze, no later than 24 hours after Defendants' counsel receives this Order, each Defendant shall identify with specificity to the SEC all accounts, including bank accounts, brokerage accounts, retirement accounts, and/or trust accounts, in which that Defendant has an ownership or beneficial interest.

32. This Order shall expire within FOURTEEN (14) DAYS from the date of issuance, unless extended for a like term for good cause shown upon motion duly filed or served on all Parties.

33. Pursuant to 28 U.S.C. § 636 and the Magistrate Judge Rules of the Local Rules of the Southern District of Florida, the above-captioned Cause is hereby REFERRED to United States Magistrate Judge Ryon M. McCabe to take all necessary and proper action as required by law with respect to the SEC's request for a preliminary injunction (ECF No. 14).  The SEC shall be permitted, but is not required, to file a supplemental brief and supporting exhibits in advance of any preliminary injunction hearing.

34. The SEC is INSTRUCTED to schedule a hearing before United States Magistrate Judge Ryon M. McCabe, at which time Defendants and/or any other affected persons may challenge this Order and move to dissolve the same, and at which time the Court will hear argument on the SEC's request for a preliminary injunction.

35. Any response or opposition to the SEC's Motion for Preliminary Injunction must be filed and served on the SEC's counsel by FORTY-EIGHT (48) HOURS prior to the hearing and filed with the Court, along with proof of service.  The above dates may be revised upon stipulation by all Parties and approval of this Court.  Defendants are hereby notified that failure to appear at the hearing may result in the imposition of a preliminary injunction against them under the federal securities laws, Fed. R. Civ. P. 65, and this Court's inherent authority.

DONE AND ORDERED in Chambers at Miami, Florida, this *21st* day of April, 2022.

K. MICHAEL MOORE
UNITED STATES DISTRICT JUDGE

c: All counsel of record