UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 2:22-cv-14129-MOORE/MCCABE

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION

      Plaintiff,

v.

MCC INTERNATIONAL CORP., *et al*.,

      Defendants.

_____/

### REPORT & RECOMMENDATION

      THIS CAUSE comes before the Court upon Plaintiff United States Securities and Exchange Commission's ("SEC") Amended Emergency *Ex Parte* Motion for a Temporary Restraining Order ("TRO") and Order for Ancillary Relief ("Motion"). [DE 14]. The SEC's request for a preliminary injunction was referred to the undersigned United States Magistrate Judge by United States District Judge K. Michael Moore. [DE 15].

      Having thoroughly considered the testimony and credibility of the witnesses, the evidence admitted at the preliminary injunction hearing, the arguments of counsel, and having reviewed the relevant legal authorities, the Court makes the following findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52[1] and finds that the SEC has demonstrated a proper showing for a preliminary injunction against all Defendants and for the continuation of certain

---

[1] To the extent that any findings of fact may constitute conclusions of law, they are adopted as such and vice versa.

ancillary relief.  As such, the undersigned respectfully **RECOMMENDS** that the Motion's request for a preliminary injunction [DE 14] be **GRANTED** as detailed below.

I.     <u>**BACKGROUND & PROCEDURAL HISTORY**</u>

On April 7, 2022, the SEC filed a Complaint against Defendants MCC International Corp. d/b/a "Mining Capital Coin Corp." ("MCC"), CPTLCoin Corp. ("CPTL"), Bitchain Exchanges ("Bitchain"), Luiz Carlos Capuci, Jr. a/k/a "Junior Caputti" ("Capuci"), and Emerson Sousa Pires ("Pires") (collectively, "Defendants").  [DE 1 ("Compl.")].

A.     <u>**Summary of the Complaint**</u>

The Complaint alleges that the SEC conducted a multiyear investigation of MCC, Capuci, and Pires, dating back to at least early 2020.  *Id.* ¶¶ 50-51; DE 9 - Declaration of Larry Brannon ("Brannon Decl.") ¶ 11.  The Complaint further alleges that MCC and its founders, Capuci and Pires, violated the federal securities laws in a scheme to defraud cryptocurrency investors.  *See generally* Compl.

Capuci and Pires convinced potential investors that MCC made money through cryptocurrency mining and by trading stocks, foreign exchange, and cryptocurrency on digital platforms.  *Id.* ¶¶ 18-25.  MCC allegedly generated steady returns through "arbitrage trading" in cryptocurrency, "semi-automatic robotic trading" in the foreign exchange market, and cryptocurrency mining operations in Florida, Vermont, and Iceland.  *Id.* ¶¶ 18-19.  Investors could tap into MCC's success by purchasing "mining packages," which provided investors guaranteed weekly payouts that escalated in value based on the package price.  *Id.* ¶ 26.  MCC allegedly offered mining packages with prices ranging from about $125.00 for a $10.00 weekly payout, to $1.2 million for an $84,000.00 weekly payout.  *Id.* ¶ 26.  MCC and  Capuci maintained an investor list showing 65,535 investor accounts.  *Id.* ¶ 55.

MCC, Capuci, and Pires relied on a multilevel marketing scheme to bring in new investors. *Id.* ¶¶ 26-30.  MCC encouraged investors to act as "sponsors," who would receive commissions amounting to ten percent of sales of mining packages made by the sponsor to her downline team. *Id.* ¶ 27.  MCC promised gifts, including luxury watches and sports cars, to sponsors who proved adept at recruiting new investors.  *Id.* ¶ 28.  Capuci and Pires promoted the multilevel marketing scheme online and at in-person events across the United States.  *Id.* ¶ 29.  Defendants made repeated misrepresentations to investors and prospective investors about MCC.  *Id.* ¶¶ 48-54.  No Defendant was registered with the SEC in any capacity, nor has any Defendant ever registered or tried to register any offering of securities under the Securities Act of 1933 ("Securities Act") or any class of securities under the Securities Exchange Act of 1934 ("Exchange Act").  *Id.* ¶¶ 13-17.

Contrary to what investors were told, MCC never engaged in any trading or cryptocurrency mining at all.  *Id.* ¶¶ 51-52.  Capuci and Pires testified in 2020 that MCC "never used" its cryptocurrency mining machines because one machine "uses more electricity than the whole building."  *Id.* ¶ 50.  In testimony on the same topic in 2021 and 2022, they invoked their Fifth Amendment privilege against self-incrimination.  *Id.*  MCC admitted "that it never had any trading robots and never engaged in any trading."  *Id.* ¶ 51.  Capuci and Pires invoked their Fifth Amendment right against self-incrimination when questioned about MCC's trading platform.   *Id.*

Defendants made misrepresentations to investors about their backgrounds and MCC's supposed partnerships with organizations like the Clinton Foundation and the World Bank.  *Id.* ¶ 49.  While MCC told early investors that they could easily liquidate their MCC investments by transferring their assets to a third-party cryptocurrency trading platform, MCC eventually required all investors to withdraw their investments in "CPTL," an MCC-created crypto asset.  *Id.* ¶¶ 31-38.  Investors seeking to withdraw their MCC assets were required to convert those assets to CPTL,

which would be hosted in wallets on a purportedly independent cryptocurrency trading platform called Bitchain. *Id.* ¶ 35. Unbeknownst to investors, Bitchain was created and controlled by Capuci and MCC. *Id.* ¶¶ 15, 39-47. Defendants provided investors false valuations for CPTL and claimed that CPTL holders would soon be able to use the virtual currency at a casino, mall, store, or via a payment app. *Id.* ¶¶ 37-38. The SEC ultimately claims that no one "has ever successfully withdrawn, sold, traded, or otherwise used CPTL." *Id.* ¶ 54. Defendants instead misappropriated much of the funds provided by investors. *Id.* ¶¶ 55-57.

As a result, Defendants "netted at least $8.1 million from the sale of mining packages and $3.2 million in initiation fees." *Id.* ¶ 55. The Complaint and accompanying declarations describe a web of entities and bank accounts controlled by Defendants and used to siphon investors' funds. *See, e.g.*, Brannon Decl. ¶ 13; DE 8 - Declaration of Steven Tremaglio ("Tremaglio Decl.") ¶¶ 5-6, 22, 27, 30, 34-43. Defendants spent millions of dollars on travel, luxury cars, a yacht, and real estate, among other things. Compl. ¶¶ 56-57. Capuci received about $18.5 million in cryptocurrency assets. Tremaglio Decl. ¶¶ 14, 20.

After the SEC issued subpoenas in its investigation, Capuci began to close bank accounts and liquidate a number of assets. Brannon Decl. ¶¶ 93, 96-105, 136. The SEC believes Capuci, who holds both United States and Brazilian citizenship, fled to Brazil with his family on March 25, 2022. Compl. ¶¶ 16–17; Brannon Decl. ¶¶ 11, 135. The SEC believes Pires ended his involvement with MCC sometime in 2020 and currently resides in Brazil. Compl. ¶¶ 16-17; Brannon Decl. ¶ 11.

**B.** **The Instant Motion and TRO**

On April 20, 2022, the SEC filed the instant Motion. [DE 14]. In the Motion, the SEC seeks a TRO and other injunctive relief and, upon the expiration of the TRO, a preliminary

injunction against Defendants restraining and enjoining them from violating the federal securities law, as well as other relief. *Id.*

On April 26, 2022, District Judge Moore entered an Omnibus Order authorizing an emergency *ex parte* TRO. [DE 15]. That Order also granted certain ancillary relief, including an asset freeze, an accounting, expedited discovery, document preservation, repatriation of assets, and the surrender of passports. *Id.* Thereafter, upon the SEC's motion, the Court granted an extension of the TRO to May 19, 2022. [DE 24].

### C.   Preliminary Injunction Hearing

On May 12, 2022, the Court held an evidentiary hearing on the SEC's request for a preliminary injunction. [DE 42]. Counsel for the SEC attended, as did counsel for Defendant Capuci. *Id.* Over the course of approximately four-and-a-half hours, the Court heard testimony from SEC accountants Larry Brannon and Steven Tremaglio, admitted relevant affidavits and other documents and videos into evidence, and heard argument from counsel. [DE 42-43]. Having considered the evidence and arguments presented, the Court makes the following findings of fact and conclusions of law.

## II.   FINDINGS OF FACT & CONCLUSIONS OF LAW

The Court finds that the SEC has met its burden for imposing preliminary injunctive relief. The Court found SEC accountants Larry Brannon and Steven Tremaglio to be credible witnesses who offered testimony consistent with other evidence admitted during the hearing.[2] The undersigned respectfully recommends that a preliminary injunction be entered and that certain ancillary relief authorized by the TRO be continued, as set forth below.

---

[2] The testimony has not been formally transcribed and made part of the record. To the extent the Court cites to the declaration of either Larry Brannon or Steven Tremaglio, their testimony during the preliminary injunction hearing was materially consistent with their declarations.

A.      **Threshold Issues**

Before turning to the merits of the preliminary injunction, the Court addresses two threshold issues raised by Capuci: notice and lack subject matter jurisdiction.

1.      **Notice**

Capuci first argues that he received inadequate notice of the preliminary injunction hearing. He argues the SEC was obligated to secure service of process over him in accordance with Federal Rule of Civil Procedure 4 and the Hague Convention prior to the Court's hearing on the preliminary injunction.  As set forth below, the Court disagrees.

Federal Rule of Civil Procedure 65 provides that a court may issue a preliminary injunction "only on notice to the adverse party."  Rule 65 does not define "notice," nor does it specify how notice must be provided.  *VMR Products, LLC v. Elec. Cigarettes Outlet, LLC*, 12-23092, 2012 WL 12867830, at *2 (S.D. Fla. Sept. 28, 2012), *report and recommendation adopted sub nom.*, *VMR Products, LLC v. Elec. Cigarettes Outlet*, 12-23092-CIV, 2012 WL 12868168 (S.D. Fla. Oct. 15, 2012) (citation omitted).   "Rule 65, however, does not require service of process on the adverse party." *Id.* (quotation and citation omitted).  "Rather, as the Eleventh Circuit has made clear, '[t]he sufficiency of notice prior to the issuance of a preliminary injunction is a matter left within the discretion of the trial court.'" *Id.* (quoting *United States v. State of Alabama*, 791 F.2d 1450, 1458 (11th Cir. 1986)).

In this case, the SEC submitted a certificate of service stating that, on May 5, 2022, it emailed a copy of, among other things, the Complaint, the TRO, and the order setting the preliminary injunction hearing, to Chris Wellman, who represented Defendants Capuci, MCC, CPTL, and Bitchain in the underlying SEC investigation.  [DE 45-2].   On May 5, 2022, the SEC also emailed the same items to Ted Poulos, who represented Defendant Pires in the underlying SEC

investigation.  *Id.*

The Court finds this sufficient to satisfy the requirements of Rule 65 notice for all Defendants.  *See VMR Products, LLC*, 12-23092, 2012 WL 12867830, at *2 (providing notice to counsel sufficient to satisfy Rule 65).  The Court also notes that District Judge Moore's TRO expressly permitted the SEC to provide notice to Defendants by email to their counsel, including "attorneys who have represented any Defendant in the underlying SEC investigation."  [DE 15 ¶ 13].

The Court rejects Capuci's argument that the SEC had to obtain full blown service in accordance with Rule 4 and the Hague Convention prior to the preliminary injunction hearing.  By its very terms, Rule 65 requires "notice," not "service."  Other courts have considered, and rejected, the argument Capuci now advances.  *See Almetals, Inc. v. Wickeder Westfalenstahl, GMBH*, No. 08-10109, 2008 WL 624067, at *4 (E.D. Mich. Mar. 6, 2008) ("If Defendant's position were correct, Rule 65 would be inoperable against foreign Defendants."); *Samsung Elec. Co. v. Early Bird Sav.*, No. 13-CV-3105-BEN DHB, 2014 WL 324558, at *2 (S.D. Cal. Jan. 27, 2014) ("Given the length of time that it can take to serve a foreign defendant, placing a 28–day maximum on the TRO in these circumstances would effectively defeat injunctive relief because Defendants could simply wait for the TRO to dissolve."); *Fellowes, Inc. v. Changzhou Xinrui Fellowes Off. Equip. Co.*, No. 11 C 6289, 2012 WL 3544841, at *3 (N.D. Ill. Aug. 16, 2012), *vacated on other grounds*, 759 F.3d 787 (7th Cir. 2014) ("But Rule 65 expressly requires only notice, not service of process. Therefore, this Court finds that service of process under the Hague Convention is not required for sufficient notice.").

2.      <u>**Subject Matter Jurisdiction**</u>

Capuci next argues the Court lacks subject matter jurisdiction because the securities scheme described in the Complaint centered on foreign investors and involved, at most, an incidental number of United States investors. Indeed, out of approximately 65,000 MCC investors, less than 1,000 are known to have resided in the United States. At the hearing, Capuci's counsel adduced evidence that MCC built certain safeguards into its website and its Terms and Conditions that prohibited United States residents from investing in MCC products. [Ex. F; Ex. I]. Given that the scheme involved mostly foreign investors, Capuci argues this Court lacks subject matter jurisdiction and the SEC failed to present sufficient evidence to the contrary to carry its burden.

The Court disagrees. Under the so-called "Dodd-Frank fix," federal courts can assert extraterritorial jurisdiction over securities cases in certain circumstances:

EXTRATERRITORIAL JURISDICTION

The district courts of the United States and the United States courts of any Territory shall have jurisdiction of an action or proceeding brought or instituted by the Commission or the United States alleging a violation of section 77q(a) of this title involving—

(1) conduct within the United States that constitutes significant steps in furtherance of the violation, even if the securities transaction occurs outside the United States and involves only foreign investors; or

(2) conduct occurring outside the United States that has a foreseeable substantial effect within the United States.

15 U.S.C. § 77v(c)(1). Subsection (1) is referred to as the "Conduct Test," and subsection (2) is referred to as the "Effects Test."

The Court finds that the SEC has met its burden to show subject matter jurisdiction under the Conduct Test. In particular, the SEC introduced evidence that Defendants engaged in significant Florida-based conduct as part of the scheme. MCC maintained an office in Port St. Lucie, Florida, and investors visited the office. [Ex. 2; Ex. 18 ¶¶ 17-22]. The SEC introduced a

YouTube promotional video that featured MCC's Port St. Lucie office as well as landmarks in Port St. Lucie; this video was available on the internet between October 31, 2019 and August 2021.  [Ex. 21].  In addition, the SEC introduced evidence that both Capuci and Pires maintained residences in Florida, utilized United States bank accounts to receive investor funds, and that the corporate Defendants were registered as United States companies.  [Ex. 18 ¶¶ 6, 7, 9, 79-84, 88, 89, 91, 92, 106, 112, 122, 125].

In addition, the SEC introduced evidence that Defendants used MCC's presence in the United States to promote the scheme.  The SEC presented a video of Capuci dramatically and demonstrably appearing outside MCC's Florida offices saying, "You think I would do an illegal company [in the] United States in a place like this? This is the huge, the biggest street in Port Saint Lucie!"  [Ex. 4 at 3 min., 40 sec.].  In that same video, Capuci displays and describes what he calls "almost 400 machines" in MCC's Florida offices that are "mining" and "making money for you guys!"  [Ex. 4 at 51 sec.].  Pires made a similar video while standing outside MCC's Florida office. [Ex. 3].

Moreover, the evidence established that more than 900 MCC investors had United States addresses.  [Ex. 1].  Based on all of this evidence, the Court finds that the SEC has met its burden to demonstrate subject matter jurisdiction under the Conduct Test of the "Dodd-Frank fix" statute.

**B.**     **Preliminary Injunction**

The Court now turns to the merits of the SEC's request for a preliminary injunction against all Defendants.  Pursuant to Federal Rule of Civil Procedure 65(b), the Court may enter a preliminary injunction "to maintain the status quo until a final decision on a matter can be reached." *United States v. DBB, Inc*., 180 F.3d 1277, 1282 (11th Cir. 1999).  "[T]he SEC is entitled to a preliminary injunction when it establishes the following:  (1) a prima facie case of previous

violations of federal securities laws, and (2) a reasonable likelihood that the wrong will be repeated." *SEC v. Unique Fin. Concepts, Inc*., 196 F.3d 1195, 1199 n.2 (11th Cir. 1999) (citation omitted). "The SEC appears not as an ordinary litigant, but as a statutory guardian charged with safeguarding the public interest in enforcing the securities laws. The SEC therefore faces a lower burden than a private litigant when seeking an injunction, and need not meet the requirements for an injunction imposed by traditional equity jurisprudence." *SEC v. Lottonet Operating Corp*., No. 17-21033-CIV, 2017 WL 6949289, at *9 (S.D. Fla. Mar. 31, 2017), *report and recommendation adopted,* No. 17-21033-CIV, 2017 WL 6989148 (S.D. Fla. Apr. 6, 2017) (citations omitted). "The SEC therefore faces a lower burden than a private litigant when seeking an injunction, and need not meet the requirements for an injunction imposed by traditional equity jurisprudence." *Id.* (citations omitted). "Unlike private litigants, the SEC need not demonstrate irreparable harm or the unavailability of an adequate remedy at law." *Id.*

As set forth below, the Court finds the SEC has made a sufficient showing under both prongs of the test.

### 1. Prima Facie Violations of Securities Laws

The SEC has made a prima facie showing of violations of the following securities laws: Section 5 of the Securities Act; Sections 17(a)(1) through 17(a)(3) of the Securities Act and Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder; and Section 20(e) of the Exchange Act. The Court will address each violation in turn.

### (a) Section 5 of the Securities Act

Section 5 of the Securities Act prohibits the use of any means of interstate commerce or the mails to offer to sell or offer to buy any security without having first filed a registration statement with the SEC as to such security. *SEC v. Levin*, 849 F.3d 995, 1001 (11th Cir. 2017) (citing 15

U.S.C. § 77e(a), (c)).  "To establish a prima facie case for a Section 5 violation, the SEC must prove three elements: (1) no registration statement was in effect as to the securities, (2) the defendant sold or offered to sell these securities, and (3) interstate transportation or communication and the mails were used in connection with the sale or offer of sale."  *Id.* (internal quotation and citation omitted). "Neither negligence nor scienter is an element of a prima facie case under Section 5 of the Securities Act."  *SEC v. Friendly Power Co*., 49 F. Supp. 2d 1363, 1367 (S.D. Fla. 1999).

Here, the evidence shows that Defendants solicited investments by promising investors guaranteed returns based on an investment strategy that included cryptocurrency mining and trading stocks, foreign exchange, and cryptocurrency on digital platforms.  [Ex. 2-17; Ex. 18 ¶¶ 23-42; Ex. 19; Ex. 21].  Defendants solicited these investments by using instrumentalities of interstate commerce, primarily via the internet.  [Ex. 2-8; Ex. 10-12; Ex. 16-17; Ex. 18 ¶¶ 23-42; Ex. 19; Ex. 21].  Moreover, no Defendant was registered with the SEC in any capacity, nor has any Defendant ever registered or tried to register any offering of securities.  [Ex. 18 ¶ 10].  Accordingly, the SEC has established a prima facie case that Defendants violated Section 5 of the Securities Act.

**(b)** **Section 17(a) of the Securities Act &
Section 10(b) of the Exchange Act**

Section 17(a) of the Securities Act makes it unlawful to engage in certain conduct "directly or indirectly" in "the offer or sale of securities."  15 U.S.C. § 77q(a).  Section 17(a)(1) prohibits "employ[ing] any device, scheme, or artifice to defraud"; Section 17(a)(2) prohibits "obtain[ing] money or property by means of any untrue statement of a material fact or any [material] omission"; and Section 17(a)(3) prohibits "engag[ing] in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."  15 U.S.C. § 77q(a)(1)-(3).  "A showing of scienter is required under Section 17(a)(1), but Sections 17(a)(2) and (a)(3) only require a showing of negligence."  *Lottonet Operating Corp*., 17-21033-CIV, 2017 WL 6949289, at *10

11

(citing *Aaron v. SEC*, 446 U.S. 680, 697 (1980)).  To establish a prima facie case based on conduct violating these provisions, "the SEC must establish: (1) the defendant committed a deceptive or manipulative act; (2) in furtherance of the alleged scheme to defraud; (3) with scienter (or negligently, with respect to Section 17(a)(3))." *Id.* (citation omitted). [3]

Similarly, Section 10(b) of the Exchange Act and Rule 10b-5 render it unlawful, in connection with the purchase or sale or securities, to: (a) employ any device, scheme, or artifice to defraud; (b) make any untrue statement or omission of material fact; or (c) engage in any act, practice, or course of business which operates or would operate as a fraud or deceit on any person, in connection with the purchase or sale of any security.  15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.  "The SEC must also establish scienter and that the violations were made while using any means or instrumentality of interstate commerce." *Lottonet Operating Corp.*, 17-21033-CIV, 2017 WL 6949289, at *10 (citing *SEC v. Corp. Relations Grp.*, No. 6:99-cv-1222, 2003 WL 25570113 at *7 (M.D. Fla. Mar. 28, 2003)).

Here, the evidence shows the Defendants made material misrepresentations and omissions to investors as part of a scheme to defraud. For instance: (a) contrary to Defendants' representations, MCC never engaged in any trading or cryptocurrency mining [Ex. 16-17]; (b) contrary to Defendants' representations, Bitchain was created and controlled by Capuci and MCC [Ex. 9]; (c) Defendants provided investors false valuations for CPTL [Ex. 11-12]; and (d) Defendants claimed that CPTL holders would soon be able to use the virtual currency but no one has ever successfully withdrawn, sold, traded, or otherwise used CPTL [Ex. 18 ¶ 64].

---

[3] The SEC alleges that all Defendants violated Sections 17(a)(1) and 17(1)(3) of the Securities Act and that MCC, Capuci, and Pires further violated Section 17(a)(2).  Compl. ¶¶ 62-67.

The SEC has met its burden to show these misrepresentations and omissions were made with the requisite scienter in order to further Defendants' multilayered scheme to defraud investors. Instead of using the investors' funds as promised, Defendants instead misappropriated investors' funds through a web of entities and bank accounts controlled by Defendants to siphon investors' funds.  [Ex. 18; Ex. 20].  Accordingly, the SEC has established a prima facie case that Defendants violated Sections 17(a)(1) through 17(a)(3) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

### (c)      Section 20(e) of the Exchange Act

Section 20(e) of the Exchange Act provides for liability if the defendant "had the power to control the general affairs of the entity primarily liable at the time the entity violated the securities laws . . . [and] had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the primary liability."  *SEC v. Quiros*, 16-CV-21301, 2016 WL 11578637, at *16 (S.D. Fla. Nov. 21, 2016) (citation omitted).  "The Eleventh Circuit has held that the control person is not required to have participated in the wrongful transactions to establish liability." *Id.* (citing *Brown v. Enstar Group, Inc.*, 84 F.3d 393, 397 n.5. (11th Cir. 1996)), *aff'd,* 455 F. App'x 882 (11th Cir. 2012) (per curiam).

Here, the evidence shows that Capuci was the Registered Agent, President, and Director of MCC and Pires was the Vice-President, Secretary, Treasurer, and Marketing Director of MCC.  [Ex. 18 ¶ 6].  A handwritten organizational chart also named Capuci as the CEO of MCC and Bitchain.  [Ex. 9].  Capuci created CPTL's website, and MCC required all investors to withdraw their investments in CPTL, which was hosted in wallets on Bitchain which, as stated, was controlled by Capuci and Pires.  [Ex. 8-9; Ex. 18 ¶¶ 7, 33-42, 64].  Based on all of this, the Court finds that Capuci and Pires controlled the corporate Defendants while those entities were engaging in securities

violations, and that the SEC has established a prima facie case that Capuci and Pires violated Section 20(e) of the Exchange Act.

**2.**   **Risk of Repeated Violations**

"In assessing whether there is a 'reasonable likelihood' of future violations, courts look to the following factors: (1) the egregiousness of defendant's actions; (2) the isolated or recurrent nature of the infraction; (3) the degree of scienter involved; (4) the sincerity of a defendant's assurances against future violations; (5) the defendant's recognition of the wrongful nature of the conduct: and (6) likelihood of opportunities for future violations." *Lottonet Operating Corp.*, 17-21033-CIV, 2017 WL 6949289, at *18 (citing *SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1322 (11th Cir. 1982)).

Here, as stated, the SEC has shown that Defendants engaged in a multilayered scheme to defraud cryptocurrency investors using a series of digital platforms.  Defendants evidently recognize the wrongful nature of their conduct and at least one Defendant, Capuci, allegedly liquidated a number of assets and left the United States for Brazil after the SEC issued subpoenas in its investigation.  [Ex. 18. ¶¶ 93, 96-105, 136].  The Court also notes that both Capuci and Pires were subpoenaed during the SEC's investigation of this case and both asserted their Fifth Amendment privilege.  Moreover, according to the SEC, both Capuci and Pires are believed to be presently in Brazil.  The Court therefore finds that a preliminary injunction is necessary to prevent Defendants from engaging in future violations of the securities laws due to the apparent lack of remorse shown by Defendants and the ease with which they may revive a similar scheme via the internet.

### C.   Ancillary Relief

The SEC also requests ancillary relief as part of this preliminary injunction.  The original TRO imposed an asset freeze and required an accounting, expedited discovery, document preservation, repatriation of assets, and the surrender of passports.  The SEC requests continued ancillary relief here, with some modifications.[4]  [DE 45].  Pursuant to their general equity powers, federal courts may order ancillary relief to preserve a defendant's assets and ensure that wrongdoers do not profit from their unlawful conduct.  *See, e.g., Levi Strauss & Co. v. Sunrise Int'l Trading Co.*, 51 F.3d 982, 987 (11th Cir. 1995); *SEC v. Solow*, 682 F. Supp. 2d 1312, 1325 (S.D. Fla. 2010). The undersigned respectfully recommends the continuation of certain ancillary relief as described below.

### 1.   Asset Freeze

An asset freeze is appropriate "as a means of preserving funds for the equitable remedy of disgorgement."  *SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 734 (11th Cir. 2005).  "The Court need only find some basis for inferring a violation of the federal securities laws to impose an asset freeze."  *Lottonet Operating Corp.*, 17-21033-CIV, 2017 WL 6949289, at *20 (citations omitted). The SEC's "burden for showing the amount of assets subject to disgorgement (and, therefore available for freeze is light: a reasonable approximation of a defendant's ill-gotten gains is all that is required.  Exactitude is not a requirement[.]"  *Id.* (citing *ETS Payphones*, 408 F.3d at 735). "SEC's burden to demonstrate the potential for dissipation of funds is even lighter. *Id.* (citing *FTC v. IAB Marketing Assocs., LP*, 972 F. Supp. 2d 1307, 1313 n.3 (S.D. Fla. 2013) ("There does not need to be evidence that assets will likely be dissipated in order to impose an asset freeze")).

---

[4] Specifically, the SEC no longer requests expedited discovery and agrees to remove references to Defendants' attorneys in the asset freeze and the requested injunction.  [DE 45].  The SEC also removed the accounting paragraphs from its proposed injunctive relief.  [DE 45-1].

Here, the evidence supports the continuation of an asset freeze. Defendants raised at least $8.1 from investors and received an additional $9.7 million from investors in the form of fees. [Ex. 1; Ex. 18 ¶¶ 54-56, 58]. Capuci and Pires testified in 2020 that their salaries ranged from $5,000 to $20,000 in Bitcoin per month, and that they sold the Bitcoin for fiat currency through digital asset trading platforms like Coinbase. [Ex. 18 ¶ 60]. The SEC's analysis of Capuci's and Pires's Coinbase accounts reflects that Capuci received about $18.5 million in cryptocurrency assets and Pires received about $3.3 million in cryptocurrency assets between January 2018 and March 2022. [Ex. 20 ¶¶ 14, 20-33]. MCC has not provided any financial statements or other books and records reflecting sources of revenue for any legitimate business operations. [Ex. 18 ¶¶ 54-58]. As of March 18, 2022, only $6,449.84 remained in Capuci's and Pires's combined Coinbase accounts. [Ex. 18 ¶ 44]. The SEC estimates that Capuci currently has approximately $3 million in assets and Pires has approximately $1 million in assets. [Ex. 18 ¶¶ 106–33].

As discussed above, at least one Defendant has been actively winding down his assets in the United States since he received the SEC subpoena, and both Capuci and Pires are believed to be located in Brazil. [Ex. 18 ¶¶ 11, 93, 96–105, 136]. Accordingly, the Court finds good cause exists to believe Defendants may hide, transfer, or otherwise dissipate their ill-gotten assets unless those assets are restrained. As such, the undersigned recommends a continued freeze of all Defendants' assets until this matter is resolved on the merits.

Capuci argues that the current asset freeze is unreasonable and disproportionate given that the vast majority of MCC investors resided outside of the United States. He argues the Court should limit the asset freeze to Florida-only assets, which would be more than enough to satisfy potential claims of United States investors.

16

The Court cannot agree.  To begin, SEC witnesses testified it is not yet possible to calculate the exact losses suffered by United States investors because Defendants have not supplied the records that would make those calculations possible.  Exact losses remain unknown.  "Any risk of uncertainty about exact amount received falls on the wrongdoer whose illegal conduct created the uncertainty."  *SEC v. Lauer*, 445 F. Supp. 2d 1362, 1370 (S.D. Fla. 2006).

Moreover, the SEC is not limited to freezing only those funds that are connected to a defendant's wrongdoing.  *Id.* ("Many district courts faced with this argument agree that '[t]here is no requirement that frozen assets be traceable to the fraudulent activity underlying a lawsuit.'").  The undersigned therefore recommends that a full asset freeze be continued to preserve funds for potential disgorgement and other allowable remedies.

### 2.    Records Preservation

The current TRO includes a record preservation order.  The undersigned recommends that the preliminary injunction continue to order the preservation of records to ensure that files and records are preserved while the SEC continues to identify additional assets.

### 3.    Repatriation of Assets

The undersigned also recommends that the preliminary injunction continue to order repatriation of assets.  The SEC presented evidence that, after the SEC subpoenas issued, several bank accounts were closed, assets were sold, and assets were transferred to third parties.  [Ex. 18 ¶¶ 93-105].  As stated, both Capuci and Pires are believed to be in Brazil.  [Ex. 18 ¶ 11].  Under these circumstances, a repatriation order will enable the retrieval of investor funds diverted overseas.  *Lottonet Operating Corp.*, 17-21033-CIV, 2017 WL 6949289, at *21.  The undersigned also recommends that the TRO's direction regarding the surrender of passports be extended until the preliminary injunction concludes.

III.        **RECOMMENDATION**

For the reasons set forth above, the undersigned respectfully **RECOMMENDS** the following injunction be entered:

1.        Defendants, their agents, servants, employees, entities under their control, and those persons or entities in active concert or participation with them who receive actual notice of this Order, by personal service or otherwise, and each of them, until the conclusion of this action, are restrained and enjoined from violating Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and (c), by, directly or indirectly, in the absence of any applicable exemption (1) unless a registration statement is in effect as to a security, making use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; (2) unless a registration statement is in effect as to a security, carrying or causing to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale; or (3) making use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed with the SEC as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding of examination under Section 8 of the Securities Act, 15 U.S.C. § 77h, by, directly or indirectly, offering to buy or sell securities without a registration statement being in effect.

2.        Defendants, their agents, servants, employees, and those persons in active concert or participation with them who receive actual notice of this Order, by personal service or otherwise, and each of them, until the conclusion of this action, are restrained and enjoined from directly or

indirectly, by use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any securities, knowingly or recklessly: (1) employing devices, schemes, or artifices to defraud, (2) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (3) engaging in acts, practices, and courses of business which have operated, are now operating, or will operate as a fraud upon the purchasers of such securities in violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder.

3.     Defendants, their agents, servants, employees, and those persons in active concert or participation with them who receive actual notice of this Order, by personal service or otherwise, until the conclusion of this action, are restrained and enjoined from violating Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly (1) to employ any device, scheme, or artifice to defraud; (2) to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser by, directly or indirectly: (i) creating a false appearance or otherwise deceiving any person, or (ii) disseminating false or misleading documents, materials, or information or (iii) making, either orally or in writing, any false or misleading statement in any communication with any investor or prospective investor.

4.     Defendants, their agents, servants, employees, and those persons in active concert or participation with them who receive actual notice of this Order, by personal service or otherwise,

until the conclusion of this action, are restrained and enjoined from, directly or indirectly, soliciting any new investors; accepting additional funds from existing investors and prohibiting their direct or indirect issuance, purchase, offer or sale of any security.

5. Defendants, their agents, servants, employees, and those persons in active concert or participation with them who receive actual notice of this Order, by personal service or otherwise, until the conclusion of this action, are restrained and enjoined from, directly or indirectly, encumbering any of the assets under their possession, custody, or control, or from filing a voluntary or involuntary petition of bankruptcy without leave of this Court.

6. Defendants shall immediately repatriate, and take such steps as are necessary to repatriate, to the territory of the United States of America, any and all assets and funds derived from investors as detailed in the Complaint, held by or in the name of any Defendant, or in which any Defendant, directly or indirectly, has or had any beneficial interest, or over which any Defendant maintained or maintains or exercised or exercises control, including, any and all assets and funds (1) held in a foreign bank, brokerage, or other financial account or (2) transferred out of the United States from any account within the territory of the United States at any point from January 1, 2019 to the present.

7. Defendants shall immediately provide to this Court and to the SEC a written description of all funds and assets required to be repatriated and the status and location of such funds, assets, and repatriation efforts.

8. Upon entry of this Order and service thereof, Defendants Luiz Carlos Capuci, Jr. and Emerson Sousa Pires shall surrender to the Clerk of Court all passports in their possession, custody, and control once they return to the United States. The Clerk of Court shall maintain custody of such passports until otherwise ordered by this Court. If Defendants Capuci and/or Pires are currently in

the United States, the Defendants Capuci and Pires shall immediately upon entry of this Order and service thereof surrender to the Clerk of Court all passports in their possession, custody, and control until such time as this Court orders otherwise.

9.      Defendants Luiz Carlos Capuci, Jr. and Emerson Sousa Pires are prohibited from traveling outside the United States unless and until this Court finds that they have fully complied with this Order. If Defendants Capuci and Pires are currently located outside the United States, this paragraph shall apply upon their return to the United States.

10.     The SEC may file notices of *lis pendens*, or any similar document that has the effect of clouding title, on all pieces of real property in which a Defendant has an interest, including but not limited to the properties located at the following addresses, which upon information and belief are currently owned, in whole or in part, directly or indirectly, by Defendant Luiz Carlos Capuci, Jr.: (1) 381 Southfield St., Kissimmee, Florida 34747; (2) 129 SE Via San Marino, Port St. Lucie, Florida 34984; (3) 126 SE Via San Marino, Port St. Lucie, Florida 34984; and (4) 9056 SW Pepoli Way, Port St. Lucie, Florida 34987.

11.      The SEC may provide notice to third parties that certain assets belonging to Defendants should be safeguarded or locked down or otherwise prevented from being moved, retrieved, or altered.

12.     Defendants are hereby prohibited from further encumbering their interests in any real or personal property by means of pledging it for collateral for any purpose or by allowing it to secure any obligation.

13.     Notice of this Order, any other Orders of the Court, or notices required to be issued by the SEC, may be accomplished by delivery of a copy of the Order or notice by first class mail, overnight

delivery, international express mail, facsimile, electronic mail, or personally, by agents or employees of the SEC: (i) upon any Defendant, or on their counsel, including but not limited to attorneys who have represented any Defendant in the underlying SEC investigation, by email; and (ii) upon any bank, saving and loan institution, credit union, financial institution, transfer agent, broker-dealer, investment company, title company, commodity trading company, storage company, law enforcement, or any other person, partnership, corporation, or legal entity that may be subject to any provision of an Order. For purposes of notice to anyone in possession of documents, records, assets, funds, property, or property rights, actual notice of an Order shall be deemed complete upon notification by any means, including, but not limited to, notice by facsimile transmission or email of this Order.

14.     Defendants, and all of their agents, servants, employees, depositories, banks, and those persons in active concert or participation with any of them, until the conclusion of this action, are restrained and enjoined from, directly or indirectly, destroying, mutilating, concealing, altering, disposing of, or otherwise rendering illegible in any manner, any of the books, records, documents, correspondence, ledgers, accounts, financial transactions, statements, electronic files, computers, or any other property or data of any kind, and wherever located or stored: (1) pertaining in any way to any matter described in the Complaint, or any amendment thereto, filed by the SEC in this action; (2) pertaining in any way to MCC, the digital asset referred to as "CPTL" or "CPTLCoin," Bitchain, or any investors or principals thereof; or (3) that were created, modified or accessed by Defendants Luiz Carlos Capuci, Jr. and Emerson Sousa Pires. (These documents and data are collectively referred to here as "Evidence.").

15.     Such Evidence include both "hard copy" versions and electronically stored information in Defendants' possession, custody, or control, including text files, data compilations, word

processing documents, spreadsheets, email, voicemail, data bases, calendars and scheduling information, log, file fragments and backup files, letters, instant messages, memoranda, notes, drawings, designs, correspondence, or communication of any kind. Evidence that is stored electronically may be maintained on shared network files, computer hard drives, servers, DVDs, CD-ROMs, flash drives, thumb drives, laptops, digital recorders, netbooks, PDA, or other handheld or smartphone devices.

16.     The obligations set forth above include an obligation to provide notice to all Defendants' employees, custodians, agents, or contractors who may be in possession of Evidence. This duty also extends to the preservation and retention of Evidence in the possession or custody of third parties, such as an internet service provider or a cloud computing provider if such Evidence is within Defendants' control.

17.     Defendants are ordered to act affirmatively to prevent the destruction of Evidence. This duty may necessitate: (1) quarantining certain Evidence to avoid its destruction or alteration; or (2) discontinuing the recycling of backup tapes or other storage media, and the deletion of emails, "trash," "recycling," "drafts," "sent," or "archived" folders.

18.     Defendants are directed not to run or install any drive cleaning, wiping, encrypting, or defragmenting software on hard disks of computers that may contain Evidence.

19.     This Court shall retain jurisdiction over this matter and Defendants to implement and carry out the terms of all Orders that may be entered and/or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court and will order other relief that this Court deems appropriate under the circumstances.

20.    All funds and other assets held, managed, or controlled, whether directly or indirectly, by Defendants MCC International Corp. d/b/a "Mining Capital Coin Corp.", CPTLCoin Corp., Bitchain Exchanges, Luiz Carlos Capuci, Jr. a/k/a "Junior Caputti", and Emerson Sousa Pires (collectively, "Defendants") are hereby frozen until the conclusion of this litigation.

21.    Defendants, and any of their agents, servants, employees, depositories, banks, and those persons in active concert or participation with any one or more of them, and each of them, who receive actual notice of this Order or of the terms of the asset freeze provisions contained herein, by personal service, mail, facsimile transmission, email, or otherwise, until the conclusion of this action, are restrained and enjoined from, directly or indirectly, transferring, selling, encumbering, receiving, concealing, changing, pledging, hypothecating, assigning, liquidating, incurring debt upon, or otherwise disposing of, or withdrawing, any funds, assets or other property (including money, real estate, personal property, securities, chose in action, or any other form of asset or property of any kind whatsoever).

22.    The asset freeze articulated herein extends to accounts at any financial institution: (1) in the name of any Defendants; (2) that any Defendant has signatory authority or a beneficial interest; (3) that any Defendant directly or indirectly controls, owns, or manages; (4) held for the benefit of any Defendant, including through corporations, trusts, partnerships, agents, nominees, friends, or relatives; or (5) which are traceable to funds and assets, wherever located, belonging to the victims of the securities law violations alleged in the SEC's Complaint.

23.    Any Defendant, and their agents, servants, employees, depositories, banks, and those persons in active concert or participation with any one or more of them, and each of them, who receive actual notice of this Order or of the terms of the asset freeze provisions contained herein,

by personal service, mail, facsimile transmission, email, or otherwise, is hereby restrained from, directly or indirectly, transferring, selling, encumbering, receiving, concealing, changing, pledging, hypothecating, assigning, liquidating, incurring debt upon, or otherwise disposing of, or withdrawing, any funds or assets, that constitute investor funds or any accounts or property into which investor funds were deposited or invested.

24.     Any Defendant, and their agents, servants, employees, depositories, banks, and those persons in active concert or participation with any one or more of them, and each of them, who receive actual notice of this Order or of the terms of the asset freeze provisions contained herein, by personal service, mail, facsimile transmission, email, or otherwise, are hereby restrained from opening or causing to be opened any safe deposit boxes, commercial mail boxes, or storage facilities titled in the name of any Defendant, or subject to access by them, without providing the SEC prior notice and an opportunity to inspect the contents in order to determine whether they contain assets subject to this Order.

25.     Any bank, financial or brokerage institution, or other person or entity holding any such funds or anything else of value, in the name of, for the benefit of, or under the control of any Defendant, or any account holding investor funds wherever located, and that receives actual notice of this Order or of the terms of the asset freeze provisions contained herein, by personal service, mail, email, facsimile transmission or otherwise, shall hold and retain within its control and prohibit the withdrawal, removal, transfer, disposition, pledge, encumbrance, assignment, set off, sale, liquidation, dissipation, concealment, or other disposal of any such funds, assets or property belonging to any Defendant, or in which any Defendant has a beneficial interest, wherever located and held in whatever name.

26.     Assets covered by this Order include, but are not limited to, any holdings in the following

accounts:

| INSTITUTION | ACCOUNT NUMBER | ACCOUNT HOLDER |
|---|---|---|
| Bank of America | Account ending in 7903 | Emerson Souza Pires |
| Bank of America | Account ending in 1933 | Emerson Souza Pires |
| Bank of America | Account ending in 1962 | Emerson Souza Pires |
| Coinbase | Account ending in 90f4542 | Luiz Capuci |
| Coinbase | Account ending in 475e646 | Luiz Capuci |
| Coinbase | Account ending in da7e345 | Emerson Souza Pires |
| Coinbase | Account ending in 099b031 | Empires X (Emerson Pires is<br><br>an authorized signer) |
| Paypal | Account ending in 3301866 | Luiz Capuci |
| Paypal | Account ending in 1193048 | Luiz Capuci |
| Paypal | Account ending in 9326858 | Luiz Capuci |
| Paypal | Account ending in 6567812 | Mining Capital Coin<br><br>Corp. |
| Paypal | Account ending in 3149048 | Mining Capital Coin<br><br>Corp. |
| Paypal | Account ending in 2699299 | Hitech Commerce & Logistic Corp. (Luiz Capuci is an authorized person on the account) |
| Paypal | Account ending in 0639577 | United General Construction LLC (Luiz Capuci is an authorized person on the account) |
| Paypal | Account ending in | JK Gas Station Service Corp. (Luiz Capuci is an authorized person on the |

| | 5668719 | account) |
|---|---|---|
| Paypal | Account ending in 7695965 | Emerson Pires |
| Paypal | Account ending in 9674442 | Emerson Pires |
| Paypal | Account ending in 7085920 | Emerson Pires |
| Paypal | Account ending in 7805838 | Emerson Pires |
| Paypal | Account ending in 4694 | Emerson Pires |
| Paypal | Account ending in 5639 | Emerson Pires |
| Paypal | Account ending in 4343 | Emerson Pires |
| Paypal | Account ending in 5779 | Emerson Pires |
| Paypal | Account ending in 6579535 | Empires X Corp. (Emerson Pires is an authorized person on the account) |
| Paypal | Account ending in 1133750 | E&J Granite (Emerson Pires is an authorized person on the account) |
| PNC Bank | Account ending in 9325 | Luiz Capuci |
| PNC Bank | Account ending in 1434 | Emerson Pires |
| PNC Bank | Account ending in 7144 | Empires X Corp. (Emerson Pires is an authorized person on the account) |
| Stride Bank | Account ending in 71518 | Emerson Pires |
| Suncoast Credit Union | Account ending in 0000 | Emerson Pires |
| Suncoast Credit Union | Account ending in 0050 | Emerson Pires |
| Varo Bank | Account ending in 2747 | Luiz Capuci |
| Varo Bank | Account ending in 6631 | Luiz Capuci |
| Wells Fargo | Account ending in 3528 | Empire X Corp. (Emerson Pires is an authorized person on the account) |

27.     The United States Marshal is directed to assist in the recovery and safeguarding of vehicles and watercraft in Defendants' possession, custody, and control. Such vehicles and watercraft may include, but are not limited to, the following:

| VEHICLE MAKE AND MODEL | POSSIBLE OWNER | VEHICLE IDENTIFICATION NUMBER |
|---|---|---|
| Jeep Cherokee (2020) | Luiz Capuci | Number ending in D614808 |
| Pillard Hardtop 4DR (2017) | Luiz Capuci | Number ending in C596135 |
| Mercedes-Benz G63 AMG (2015) | Luiz Capuci | Number ending in 231187 |
| Harley Davidson VRSCDX Night Rod Special Edition (2014) | SL Trustee Corp. (Luiz Capuci) | Number ending in C802655 |
| Cadillac Escalade ESV Premium Luxury (2021) | SL Trustee Corp. (Luiz Capuci) | Number ending in R233l5 |
| Ferrari 488 Pista (2019) | SL Trustee Corp. (Luiz Capuci) | Number ending in 024227 |
| Land Rover Range Rover Autobiography (2020) | SL Trustee Corp. (Luiz Capuci) | Number ending in A590933 |
| Lamborghini Urus (2019) | SL Trustee Corp. (Luiz Capuci) | Number ending in LA01775 |
| Ferrari F8 Tributo (2020) | SL Trustee Corp. (Luiz Capuci) | Number ending in 025538 |
| Hummer (2008) | SL Trustee Corp. (Luiz Capuci) | Number ending in H104244 |

| | SL Trustee Corp. (Luiz Capuci) | |
|---|---|---|
| Sea Ray Boats (2000) | SL Trustee Corp. (Luiz Capuci) | Hull number ending in 77J900 |
| Lamborghini Urus (2019 | Emerson Pires | Number ending in LA01316 |
| Land Rover Range Rover Autobiography (2020) | Emerson Pires | Number ending in A403l3 |
| Harley Davidson Road King Tilt Tandem (2007) | Emerson Pires | Number ending in F00920 |
| Mercedes-Benz S63 AMG | Emerson Pires | Number ending in A005053 |

## IV.     **NOTICE OF RIGHT TO OBJECT**

The parties shall have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with United States District Judge K. Michael Moore.  Failure to file objections timely shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and Recommendation and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report and Recommendation.  *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1.

**RESPECTFULLY SUBMITTED** in Chambers at West Palm Beach in the Southern District of Florida, this 18th day of May 2022.

RYON M. MCCABE
U.S. MAGISTRATE JUDGE